# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

A. MATHEW, J. AFFHOLTER,
**PLAINTIFFS**

**-AGAINST-**

CITIGROUP GLOBAL MARKETS,
CITADEL SECURITIES LLC, FTX,
ALAMEDA CAPITAL, ANTARA CAPITAL,
NEW YORK STOCK EXCHANGE,
SUSQUEHANNA INTERNATIONAL GROUP,
MUDRICK CAPITAL, VIRTU FINANCIAL,
FOX BUSINESS, NASDAQ,
GOLDMAN SACHS GROUP,
UNKNOWN DEFENDANTS
**DEFENDANTS**

AMC ENTERTAINMENT, HYCROFT MINING
HOLDING CORPORATION, DTCC, FINRA
**NOMINAL DEFENDANTS**

Civil Action

No. 1-23-CV-12302-FDS

**JURY TRIAL DEMANDED**

**FIRST AMENDED CIVIL ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.      SUMMARY OF CLAIMS……………………………………………………..

II.     JURISDICTION AND VENUE…………………………………………….

III.    THE PARTIES………………………………………………………..

    A.  Plaintiff………………………………………………………..

    B.  Defendant……………………………………………………..

IV.     AMC ENTERTAINMENT HOLDINGS HISTORY……………………..

V.      DEFENDANT'S SCHEME………………………………………………

    A.  AMC BIG PICTURE…………………………………………….

    B.  BRAZILIAN DEPOSITORY RECEIPTS…………………………..

    C.  DEFENDANTS STOPS RELEASING DATA………………………

    D.  CITIGROUP'S "PROJECT POPCORN" SCAM……………………

    E.  "ALLEGED" SALE OF UNREGISTERED SECURITIES BY AMC AND CITIGROUP……………………………………………………

    F.  CITIGROUP IS FIREMAN AND ARSONIST………………………

    G.  CITADEL BACKGROUND AND MARKET FUNCTION…………

    H.  CITADEL TAUNTS AMC INVESTORS ………………………….

    I.   CITADEL'S ALARMING FINANCIALS…………………………..

    J.   CITADEL HIDING RISK OVERSEAS …………………………….

    K.  FTX JANUARY 27TH, 2021……………………………………..

    L.  DEFENDANT'S MARKET MANIPULATION SCHEME …………

    M.  SPOOFING……………………………………………………..

    N.  DEFENDANTS CAUSED INNUMERABLE FAILURE TO DELIVER (FTDS)………………………………………… …………………

    O.  REGSHO VIOLATIONS…………………………………………

    P.  LIMIT UP, LIMIT DOWN (LULD) ABUSE ………………………

    Q.  DEFENDANT'S DARK POOL NEGATES NATIONAL MARKET SYSTEM'S SUPPLY AND DEMAND MODEL ………………………………..

    R.  CITADEL CANCELLING RETAIL ORDERS……………………..

    S.  TRADING IRREGULARITIES…………………………………….

    T.  MEDIA SHORT AND DISTORT CAMPAIGNS…………………..

VI.     LOSS CAUSATION AND STANDING……………………………………

    A.  AMC BDR………………………………………………………

    B.  APE……………………………………………………………

    C.  DARK POOLS, PARKING, AND OUT OF SEQUENCE…………

    D.  CANCELLATION OF ORDERS…………………………………

    E.  SPOOFING……………………………………………………..

    F.  CRYPTONIZED TOKENS……………………………………….

    G.  LULD…………………………………………………………

    H.  MUDRICK CAPITAL……………………………………………

VII.    THE MARKET WAS EFFICIENT DURING THE RELEVANT PERIOD.

VIII.   CAUSE OF ACTION………………………………………………

IX.     PRAYER FOR RELIEF……………………………………………….

X.    DEMAND FOR JURY TRIAL.…………………………………………..

## Glossary of Terms

**AMC**: Refers to AMC Entertainment Holdings, Inc. class "A" Common Stock

**APE**: Refers to AMC Entertainment Holdings, Inc. preferred stock equity units

**"Apes"**: This term extends the "APE" concept and refers to the collective community of retail investors are partaking in the buy-and-hold strategy for specific stocks.

**ATS (Dark Pools)**: Alternative Trading Systems, or Dark Pools, are private exchanges for trading securities not accessible by the investing public, often used by large institutional investors.

**BDR**: A Brazilian Depositary Receipt (BDR) is a financial instrument that represents a share in a foreign company traded on the Brazilian stock exchange. BDRs allow Brazilian investors to invest in foreign companies without leaving the Brazilian market, while the underlying shares are held by a depositary institution in the company's home country.

**DMM** Stands for Designated Market Maker, previously known as a Specialist. DMMs have roles in maintaining fair and orderly markets, often by buying or selling for their account to minimize price volatility.

**Dodd-Frank Wall Street Reform and Consumer Protection Act**: This act provides the SEC with additional authority to regulate and enforce rules related to market manipulation and abusive practices, potentially including naked short selling.

**DTCC**: The Depository Trust & Clearing Corporation (DTCC) is essential in the clearing and settlement process. Any abuse of the Continuous Net Settlement (CNS) system and the creation of excessive FTDs could significantly impact the integrity of the entire trading system, adding a layer of complexity to the legal analysis.

**Ethereum Wrapped Tokens**: Wrapped tokens are a type of cryptocurrency that represents the value of another cryptocurrency. They are created to allow one cryptocurrency to be used on a different blockchain. For example, a wrapped Bitcoin token on the Ethereum blockchain will enable Bitcoin to be used in Ethereum's DeFi applications.

**FINRA**: FINRA, as a self-regulatory organization, also imposes rules and regulations that govern the conduct of broker-dealers, such as Citadel Securities. These rules may include those that ensure fair and transparent market practices.

**FTD** Stands for Failure to Deliver. This occurs when one party in a trading contract doesn't deliver on their obligation, either the shares, the cash, or both, within the standard settlement period.

**IDQS** Stands for Internalized Displayed Quotation System. It is a trading system where quotes are publicly displayed, but the trades are executed internally within a firm.

**"Infinity Squeeze"**: An "infinity squeeze" is a situation where the price of a stock could rise indefinitely due to extreme demand from short sellers needing to cover their positions. At the same time, very few shares are available to buy.

**Limit Order Book**: A record of unexecuted limit orders maintained by the security specialist who works at the exchange. It shows the buying and selling interest at different price levels.

**LULD** Stands for Limit Up-Limit Down. It's a set of rules major U.S. stock exchanges use to prevent trades in stock at prices outside specified levels.

**National Best Bid and Offer (NBBO)**: The NBBO represents the highest bid and lowest offer prices available for security across all exchanges and market makers.

**National Market System (NMS)**: A system in the U.S. that integrates various market data to present a unified and transparent view of current stock prices and ensures that all investors have equal access to the same trading opportunities.

**PFOF** Stands for Payment for Order Flow. It refers to the compensation that a broker receives, not from the client, but from a third party that executes the trade for directing the order to them.

**"Project Popcorn"**: Citigroup Global Markets scheme to defraud AMC Shareholders through issuing the APE shares.

**RegSHO (Threshold list)**: Regulation SHO is an SEC regulation defining short-selling stocks' rules. The Threshold List includes securities with a significant number of failure-to-deliver positions (FTDs).

**Wash Trades**: Wash trades, where an investor simultaneously buys and sells the same financial instruments to create misleading, artificial market activity, can be a sign of market manipulation.

## AMENDED CIVIL ACTION COMPLAINT

Plaintiffs A.P. Mathew and J. Affholter, pro se (attorney to be named later), for his

complaints against the Defendants Citigroup Global Markets, Citadel Securities LLC, FTX,

Alameda Capital, Antara Capital, New York Stock Exchange, Susquehanna International Group,

Mudrick Capital, Virtu Financial, Fox Business, NASDAQ and Goldman Sachs allege upon

personal knowledge, information and belief and an investigation by as follows:

## I.    SUMMARY OF CLAIMS

1. This case presents serious allegations of widespread market manipulation and antitrust

violations involving AMC Entertainment Holdings, Inc. (AMC) stock. Throughout the Relevant

Period of 2016-2023, the defendants—including key financial institutions, market makers, hedge

funds, and exchanges—are accused of overtly engaging in a deliberate and sophisticated

conspiracy to monopolize the trade of AMC stock (See Exhibit "AH", which illustrates the grand

scheme, attached hereto and incorporated herein by reference). All defendants had a stake in the

joint venture. The two exchanges and the two regulatory bodies mentioned furthered the

purported acts by providing aide through regulatory neglect and collusion.  Utilizing dark pools

for opaque trading, the defendants allegedly coordinated their efforts to suppress the natural

market forces of supply and demand, to deflate AMC's share price, and to erode shareholder

confidence through a myriad of illegal activities. These activities purportedly include repeated

spoofing, naked short selling, and complex financial engineering strategies such as the dilution

of stock, all aimed at undermining the integrity of the marketplace and establishing dominion

over AMC's trade in a manner that violates federal antitrust laws.

2. AMC Entertainment Holdings, Inc. is a company that owns and operates movie

theaters. AMC is one of the largest movie theater chains globally and is based in the United

States. AMC (which stands for American Multi-Cinema) offers a variety of experiences including traditional film screenings, IMAX screenings, and dine-in theaters. The company also provides its customers with the ability to rent out theaters for private showings and special events. In addition to its physical theaters, AMC ventured into the streaming industry with AMC Theatres On Demand, a digital movie rental and purchase service. During the COVID-19 pandemic, AMC faced significant financial difficulties due to mandated shutdowns and the general reluctance of consumers to gather in enclosed spaces. However, it received attention in the news in 2021 as it became a target of the Reddit forum r/WallStreetBets, leading to volatile swings in its stock price due to a short squeeze.

3. Citigroup Global Markets and other defendants has a long-standing business history with AMC CEO Adam M. Aron. With insider knowledge, Citigroup has taken confidential banking information and opened short positions and swaps against their client. As AMC's lender during its acquisition spree between 2015 and 2022, Citigroup had detailed knowledge of AMC's financial situation and is accused of using this to trade against AMC. Citigroup and defendants suffered significant losses during the AMC short squeeze. Citigroup resorted to shorting AMC heavily on a daily basis, using financial instruments such as swaps, exotic options, and BDRs to suppress the price.

4. During the 2021 r/WallStreetBets run up, retail shareholders purchased the float of the AMC and refused to sell their shares. Citigroup reportedly suffered significant losses during the Reddit-driven short squeeze of AMC's stock, leading to significant losses as well as a predicament in which they would be squeezed into bankruptcy and would cause a systemic market risk. This predicament prompted Citigroup, which was heavily short before the first short squeeze, to devise a scheme called "Project Popcorn" to circumvent the wishes of the AMC

shareholders and to increase the float through the release of the APE shares, then a later planned

reverse stock split, and conversion, in order for Citigroup and potentially other Defendants to

close their short positions and/or limit their exposure to risk. Citigroup worked with Antara

Capital to procure the vote regarding the AMC reverse split and conversion. Citigroup's Derek

Van Zandt approached AMC's CEO, Adam Aron, in 2021 to discuss the situation, which suggests

that Citigroup has been working against AMC with or without the CEO's knowledge. Citigroup

is alleged to have devised a scheme, with the aim of defrauding AMC investors.

5. During the relevant period, AMC NYSE ticker (AMC) was heavily manipulated by

Citigroup. When positive news was presented to shareholders, the stock would plummet

unnaturally, even while the vast majority of the stock was being held by the retail shareholders.

Citigroup has allegedly used various financial instruments, including swaps, exotic options, and

BDRs to short AMC on the NYSE, NASDAQ, and other markets. Citigroup reportedly holds

millions of AMC common shares and convertible notes, potentially to close out their swap and

short positions. The decision for Citigroup to close these positions could affect AMC's share

price significantly. Noticing the irregularities in trading and blatant market manipulations, AMC

investors became concerned and reached out the company (AMC) CEO Aron, SEC and Federal

Law Enforcement entities, but no action was taken.

6. Citigroup allegedly used unsponsored Brazilian Depositary Receipts (BDRs), issued

without the explicit consent and cooperation of AMC and its Shareholders, to influence AMC's

share price. As the depositary bank for these BDRs, Citigroup held the corresponding foreign

shares and facilitated their issuance in Brazil. Citigroup is also accused of partnering with

financial publications to generate negative press about AMC, using dark pools for covert trading

of AMC shares, and colluding with FTX and other crypto exchanges to short AMC's stock using cryptonized tokens.

7. Citadel is the market maker for AMC and APE securities. AMC securities order flow was routed to various ATS (dark pools) (See Exhibit "AI", regarding the dark pool, attached hereto and incorporated herein by reference) that were used to suppress price action.

8. Citadel worked with FTX to create illegal tokenized crypto shares of AMC stock in order to naked short AMC and destroy shareholder value.

9. Citadel used derivative products sourced from Alameda Research (a hedge fund associated with FTX) to manipulate AMC's stock price artificially.

10. Citadel, Citigroup and Goldman Sachs, through intermediaries, illegally manipulate the Limit Up Limit Down (LULD) halts in order to halt trading in AMC stock on the New York Stock Exchange. The action taken by Citadel, Citigroup, and the New York Stock Exchange prevented AMC stock from gaining value during volatile periods.

11. Citadel and Fox Business have manipulated the market sentiment around AMC stock by including the publication of articles and social media bots and influencers (including network anchors) that use techniques such as fear-mongering and spreading misinformation about AMC as part of a campaign to illegally short and distort the AMC stock.

12. As a result of Citigroup, Citadel, Virtu, Susquehanna, the NASDAQ, and other institutional market participants taking actions such as naked shorting and other market manipulation techniques, AMC has experienced a record number of failure to delivers (FTDs) as part of their campaign to destroy AMC shareholder value, as well as being on the threshold list for over 50 days.  AMC is continually listed on the New York Stock Exchange's (NYSE)

Threshold List, which displays an ongoing pattern of naked short selling and an ongoing failure to properly close out the failure to delivers (FTDs) on AMC stock by the defendants (including the NYSE).

13. Mudrick Capital (a hedge fund and short seller of AMC) is accused of conspiring with Adam Aron and trading on insider information in order to manipulate market prices of stocks (such as AMC and Hycroft) to their mutual advantage.

14. The NASDAQ is accused of market manipulation of AMC stock by interfering with the timing of organic buying and selling, abusing out of sequence trades, and price manipulation by utilizing algorithms that slow down and interfere with the ability to buy or sell the stock.

II.    **JURISDICTION AND VENUE**

15. Subject Matter Jurisdiction: This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. This action also arises under the Securities Exchange Act of 1933 and the Securities Exchange Act of 1934, as amended, which confer federal question jurisdiction pursuant to 28 U.S.C. § 1331. The Securities Exchange Act of 1933, specifically Section 17(a), and the Securities Exchange Act of 1934, particularly Section 10(b) and Rule 10b-5 promulgated thereunder, prohibit fraudulent practices in the conduct of securities trading and offerings. This action also arises under federal antitrust laws, specifically the Anti-Trust Violations Clayton Act § 4, 15 U.S.C. § 15, The Sherman Antitrust Act, 15 U.S.C. § 1 & 2, which prohibits business activities that anti-competitively restrict trade and monopolize markets. Plaintiffs allege conduct by the defendants that amounts to a conspiracy in restraint of trade, in violation of Section 1 of the Sherman Antitrust Act, and monopolistic behavior contrary to Section 2 of the same act. These allegations introduce substantial federal questions as they directly involve the

interpretation and application of federal antitrust laws which are designed to ensure free and

unfettered competition as the rule of trade. By invoking the Sherman Act, the plaintiffs assert

claims that necessarily depend on the resolution of a substantial question of federal law, thus

establishing federal question jurisdiction under 28 U.S.C. § 1331. The conduct alleged in this

complaint, if proven, represents a scheme by financial institutions and market actors to

manipulate markets and restrict competition, precisely the type of activities that the Sherman Act

was enacted to prevent. The application of the Sherman Act's provisions is essential to the

plaintiffs' case and central to the litigation, hence jurisdiction is proper in this Court on the basis

of a federal question. The plaintiffs allege violations that include fraudulent misrepresentations

and omissions of material facts relevant to the trading of securities, manipulative and deceptive

practices, and breaches of fiduciary duty—all of which are quintessential federal issues, thus

conferring subject matter jurisdiction upon this Court. Furthermore, this Court may exercise

supplemental jurisdiction over related state law claims under 28 U.S.C. § 1367, because they

form part of the same case or controversy under Article III of the United States Constitution.

These claims are so intertwined with the federal claims that they cannot be properly adjudicated

without considering the federal questions.

16. Personal Jurisdiction: In addition, this Court possesses diversity jurisdiction under 28

U.S.C. § 1332(a), as the matter in controversy exceeds the sum or value of $75,000, exclusive of

interest and costs, and is between citizens of different states. Plaintiffs A. Mathew and J.

Affholter are individuals with citizenship in states diverse from that of the various defendants,

including Citigroup Global Markets, Citadel Securities, and others, who are incorporated and

have principal places of business in states other than where the plaintiffs are domiciled. This

Court has personal jurisdiction over the defendants because they have minimum contacts with

the Commonwealth of Massachusetts and the exercise of jurisdiction over them does not offend traditional notions of fair play and substantial justice. More specifically, all defendants have ties to Massachusetts.

17. Fox Business maintains substantial connections with Massachusetts, making it an appropriate venue for litigation. The channel boasts a significant viewership in the state, facilitated through local cable (Fox 25) and satellite providers, underlining its widespread influence and reach. Moreover, its digital presence is prominent among Massachusetts residents, many of whom access the network's news, streaming services, and mobile applications. In regard to targeted advertising, Fox Business News further shows its intent to engage with the Massachusetts audience by running online advertisements tailored for them. On the operational front, Fox Business News has fortified its on-ground presence by establishing bureaus, retaining correspondents, and involving regular contributors from within Massachusetts. Additionally, their commercial ties to the state are evident through contracts with Massachusetts-based advertisers and collaborations with local media outlets. Complying with state-specific broadcasting or digital content delivery regulations signifies their adherence to Massachusetts' legal frameworks. Notably, their commitment to the state's audience is further exemplified by the regular production of content and live broadcasts conducted within Massachusetts, reinforcing their strong ties to the Commonwealth.

18. This Court has personal jurisdiction over AMC Entertainment Holdings ("AMC" or "AMC Theatres") because the company has purposefully availed itself of the privilege of conducting business activities within Massachusetts. AMC Theatres operates or has operated multiple cinema locations within the state, deriving substantial revenue from Massachusetts residents. By operating these establishments, AMC Theatres has established continuous and

systematic contacts with Massachusetts, making the exercise of jurisdiction by this Court

consistent with traditional notions of fair play and substantial justice.

19. Citigroup Global Markets, commonly known as Citi, is an integral Wall Street

banking entity with a notable operational footprint in Massachusetts. The bank's tangible

presence is evidenced by its branches, ATMs, and other facilities peppered across the state,

marking a direct and active business engagement. Serving the financial needs of the local

populace, Citi undertakes a range of transactions; from the simplicity of opening and managing

bank accounts for residents and businesses to the complexities of providing loans, mortgages,

and other bespoke financial solutions to individuals, businesses, and even the state government.

Their commitment to offering financial advisory services to the Massachusetts clientele further

underscores their in-depth business involvement. Digitally, Citi has tailored its online presence,

operating a website that not only targets but also caters to the unique requirements of

Massachusetts residents and businesses, fostering systematic and enduring contact. Reinforcing

their commitment, they are not just licensed to operate within the state but also consistently liaise

with local regulatory bodies, thus weaving an enduring relationship with Massachusetts'

institutional framework. This relationship is further solidified by their propensity to ink contracts

with local residents and businesses, particularly those that anticipate sustained and multifaceted

interactions.

20. FTX and Alameda Research hold significant connections with the investor

community in Massachusetts. As a former leading cryptocurrency exchange and trading firm,

their platforms served a substantial number of Massachusetts residents, who partook in digital

asset trading and investment services offered by FTX. Alameda Research's trading activities

likely impact the value of digital assets held by Massachusetts-based investors, underlining a

direct economic linkage. FTX has carried out targeted marketing campaigns, educational webinars, or customer service initiatives in Massachusetts. Moreover, a history of collaboration with Massachusetts-based tech or financial service providers to support their trading infrastructure or customer interface demonstrates a committed and sustained interaction with the state's economic environment.

21. Both the New York Stock Exchange (NYSE) and the NASDAQ demonstrate a pronounced interconnectedness with Massachusetts, evident in their multifaceted operations. Foremost among these is the listing of Massachusetts-based companies on both the NYSE and the NASDAQ, linking these exchanges to the state via regulatory compliance, periodic reporting, and routine checks. While their primary operations can be anchored elsewhere, the significance of both exchanges in Massachusetts is undeniable. Numerous individual and institutional investors from the state actively trade on both platforms. To serve this audience, both the NYSE and the NASDAQ have introduced trading tools, platforms, and outreach initiatives tailored specifically for Massachusetts entities, underlining their commitment. This connection is further emphasized by the exchanges' ongoing dialogues with Massachusetts regulatory authorities, especially on securities law matters and issues concerning state-based entities. In the digital realm, both the NYSE and the NASDAQ have online trading platforms and informative websites that aren't just generic portals. They are carefully crafted to target and cater to a significant segment of Massachusetts users. Furthermore, the broker-dealer ecosystem in Massachusetts, acting as a conduit between the state's investors and these exchanges, benefits from tools, platforms, and resources provided by both, reinforcing the symbiotic relationship they share with the state.

22. Hedge funds (Citadel, Goldman Sachs, Antara, Susquehanna, Mudrick) and Market Makers (e.g., Citadel, Virtu, Susquehanna) maintain deep ties to Massachusetts. Many invest in companies anchored in the state, further embedding their business interests. Several have offices or representatives in financial hubs like Boston, demonstrating tangible commitment. Regular interactions with Massachusetts regulatory bodies underscore their established presence. Firms like Virtu facilitate trades for Massachusetts-based entities, emphasizing their integration. Additionally, they engage local service providers, host events in the state, and offer digital platforms tailored for local users. Long-term contracts with Massachusetts stakeholders confirm their ongoing, systematic engagement.

23. Hycroft Mining Holding Corporation ("HYMC" or "Hycroft") has a notable engagement with investors based in Massachusetts. Their stock, traded by individual and institutional investors from the state, highlights a financial interconnectedness. HYMC's periodic communications, shareholder meetings, or investor relations events that cater to or include Massachusetts-based shareholders emphasize their commitment to this investor base. If they've conducted investment outreach or have investor relations representatives dedicated to Massachusetts, it solidifies their targeted engagement. Furthermore, any Massachusetts-specific investor platforms or resources offered by HYMC, or partnerships with local investment firms or advisors, indicate a direct and systematic relationship with the state's investment community.

24. Venue: Venue is appropriate in this District in Massachusetts under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this district, and many defendants are subject to personal jurisdiction here. The defendants have engaged in significant business activities within Massachusetts, making it a focal point for the alleged infractions. Key witnesses and documentary evidence are likely located within Massachusetts, providing greater

accessibility and convenience for evidence presentation. Massachusetts courts have familiarity with the local investors and business practices in question, which can contribute to a more efficient adjudication of the case. Defendants have established systematic and continuous contact with Massachusetts, justifying the state's interest in adjudicating the matter. The issues at hand have a substantial connection to Massachusetts, thus there is a local interest in resolving the dispute within the state. Some defendants are subject to regulation by Massachusetts financial authorities, aligning enforcement and interpretive jurisdiction with the venue. Massachusetts is a convenient forum for the parties and witnesses under 28 U.S.C. § 1404(a), which allows for the transfer of venue to a district where the case could have been brought initially, considering the convenience of parties and witnesses and the interests of justice. Consolidating the proceedings in Massachusetts where the majority of the defendants have contacts would promote judicial economy and avoid the potential for inconsistent rulings if cases were to proceed in different jurisdictions.

25. Venue is also proper in this District for the Depository Trust & Clearing Corporation (DTCC) and the Financial Industry Regulatory Authority (FINRA), as both entities have significant connections to the claims at issue. DTCC's clearing and settlement activities within Massachusetts are directly related to the transactions underlying this litigation. FINRA's regulatory role over the parties and conduct in question further anchors the venue here, given its pervasive activities in the District. Both DTCC and FINRA's continuous and systematic contacts in this jurisdiction underscore Massachusetts as a fitting venue. The centralization of these proceedings in a District knowledgeable about the financial and regulatory context in which DTCC and FINRA operate will yield judicial efficiency and avert inconsistent outcomes. The inclusion of DTCC and FINRA in this venue, under the considerations of 28 U.S.C. § 1404(a), is

in the interest of justice, consolidating the dispute in a forum experienced with the local financial landscape and avoiding fragmented litigation. Therefore, Massachusetts presents a convenient and logical venue for addressing all matters related to DTCC and FINRA in connection with this case.

26. Similarly, venue is appropriate in this District for AMC Entertainment Holdings. AMC's business dealings and the impact of the events that are central to this litigation have a substantial connection to Massachusetts with its twelve locations in just the greater Boston area. Their conduct has contributed significantly to the legal issues at hand, with evidence and witnesses likely found within this District. Centralizing the case here, where AMC's actions are under scrutiny, serves the interests of justice and judicial economy, providing a forum with direct oversight of related events and the relevant legal environment. The District's familiarity with the commercial context of AMC's operations and the potential regulatory scrutiny they may face here further supports Massachusetts as the proper venue for this dispute. In alignment with 28 U.S.C. § 1404(a), this venue will facilitate access to evidence, increase convenience for witnesses, and ensure a consistent adjudication of the case.

III.    **THE PARTIES**

A. **Plaintiff**

27. Plaintiff A.P. Mathew is domiciled in Massachusetts. He actively monitors and publishes the company's performance on the NYSE, financial documents, and changes in internal governance. Mr. Mathew has been a verified shareholder of AMC since spring of 2021. His shares were verified by the Court as part of the Consolidated C.A. 2023-0215-MTZ (Del. Ch.) case.

28. Plaintiff J. Affholter resides in Michigan. Mr. Affholter has been a verified AMC Shareholder since February 2021. His shares were verified by the Court as part of the Consolidated C.A. 2023-0215-MTZ (Del. Ch.) case.

**B. Defendants**

29. Citigroup Global Markets is a subsidiary of Citigroup Inc. ("Citigroup"), a multinational investment bank and financial services corporation based in the United States. Citigroup Global Markets operates as a broker-dealer and provides a wide array of financial services to corporations, governments, institutions, and individuals worldwide. Its services include but are not limited to, securities brokerage, foreign exchange, wealth management, market making, investment banking, trading and principal investments, fixed income and equity sales and trading, and structured and derivative products. This unit of Citigroup is also involved in underwriting and distributing new issues of government and corporate bonds, money market securities, and public and private equity securities. Citigroup has had over 570 Regulatory Events, and 639 arbitration events for unethical, illegal matters and practices dating back decades.[1]  Citigroup is incorporated in Delaware. Citigroup Global Markets is incorporated in New York.

30. Citadel Securities LLC ("Citadel") is a global hedge fund founded in 1990 by Ken Griffin. It is one of the largest hedge funds in the world, with over $400 billion in assets under management. Citadel's main business is trading securities, but it also invests in other asset

---

[1] Citigroup Global Markets Summary. Broker Check By FINRA. Link: https://brokercheck.finra.org/firm/summary/7059. Date Accessed: September 22, 2023.

classes, such as real estate and private equity. Citadel is a major player in the financial markets, and its activities have a significant impact on the global economy. Citadel has been criticized for its size and power, and for its use of complex financial instruments. It currently has over 70 major FINRA regulatory infractions and arbitrations.[2] They are currently in litigation in the New York Southern District for another stock manipulation case.  Citadel's headquarters are located in Chicago, Illinois. It has offices in over 20 cities around the world. Citadel employs over 4,000 people. Citadel's clients include pension funds, sovereign wealth funds, and wealthy individuals. Citadel's trading desk is one of the most active in the world. Citadel has been involved in a number of high-profile legal cases, including the 2008 financial crisis. Citadel Securities LLC is incorporated in Delaware.

31. Susquehanna International Group (referred to as "Susquehanna" or "SIG") is a global trading and technology firm founded in 1987 by Jeff Yass, Arthur Dantchik, and Joel Greenberg. Headquartered in Bala Cynwyd, Pennsylvania, SIG operates offices around the globe, including locations in New York, Dublin, Sydney, and Hong Kong. Though not strictly a hedge fund, the firm engages in a range of financial services including market making, options trading, equities, commodities, fixed income, and private equity. Susquehanna is known for its expertise in complex, quantitative trading strategies and is one of the largest traders of options in the United States. Susquehanna has built a reputation for using sophisticated quantitative models and cutting-edge technology to identify trading opportunities.  Susquehanna International Group is incorporated in Delaware.

---

[2] Citadel Securities LLC. Summary. Broker Check By FINRA. Link: https://brokercheck.finra.org/firm/summary/116797. Date Accessed: September 22, 2023.

32. Antara Capital ("Antara") is an event-driven hedge fund founded in 2018 by Himanshu Gulati, a veteran of the financial industry with over 20 years of experience. The firm is headquartered in New York City and invests in event-driven opportunities across the capital structure, such as distressed debt, special situation equities, and catalyst credit. Antara Capital seeks to deliver equity-like returns with credit-like downside protection. Antara Capital is incorporated in Delaware.

33. Mudrick Capital ("Mudrick") is a distressed investment firm founded in 2009 by Jason Mudrick, who is a long time associate with the CEO of AMC Adam Aron. Mudrick Capital is well-known for investing in companies facing bankruptcy or other financial hardships. Mudrick Capital is also linked to one of the other defendants, Citadel, which has ownership in Mudrick Capital. Mudrick Capital is incorporated in Delaware.

34. New York Stock Exchange (NYSE) is a stock exchange based in New York City, New York, United States of America. The NYSE was founded in 1792 and lists approximately 2,400 stocks are trading including AMC (Ticker:AMC) and previously listed AMC Preferred Equity Units (Ticker:APE). The NYSE is owned by Intercontinental Exchange (Ticker: ICE) which was founded in 2000. New York Stock Exchange (NYSE) is incorporated in Delaware.

35. FTX is a cryptocurrency derivatives exchange principally engaged in the transaction of cryptocurrencies and ancillary financial products. FTX was founded in 2019 by Sam Bankman-Fried and Zixiao "Gary" Wang. FTX filed for bankruptcy in November 2022. Several FTX executives were criminally charged for their roles in FTX's collapse. FTX played a nefarious role utilizing tokenized securities to illegally manipulate the stock price of AMC. FTX is incorporated in Antigua and Barbuda.

36. Alameda Research (referred to as "Alameda", "Alameda Research", or "Alameda Capital"), founded in 2022, a Hedge Fund affiliated with FTX and presided over by Caroline Ellison, has been implicated in these questionable undertakings within the derivatives market. Alameda Capital is an entity known for quantitative trading and the utilization of diverse trading strategies, including the shorting of stocks, has been identified as engaging in illicit and unregulated methods to manipulate stock prices. Ellison plead to guilty to fraud (regarding her role in the 2022 FTX collapse) in December 2022. Alameda Capital is incorporated in California.

37.  Fox Business News ("Fox Business"), known formally as Fox Business Network (FBN), is an American pay television business news channel that is part of the Fox News Media division of Fox Corporation (a publicly traded company on the NASDAQ under tickers: FOXA and FOX). Fox Business Network was launched in October 2007. It competes with CNBC and Bloomberg Television, offering financial and business news and has a lineup of business analysis and financial programming. This includes shows that cover the financial markets and discuss economic, corporate, and consumer issues. It's available in nearly 75 million homes in the United States and has expanded its reach through online and mobile platforms. Fox Business is known for providing a conservative perspective on economic and business issues, and its programming often features business leaders, investors, and experts discussing various topics, including market trends, investment strategies, and economic policy. Fox Corporation, Fox Business's parent company, is incorporated in Delaware.

38. Virtu Financial Inc. ("Virtu") is a financial entity headquartered in New York City, New York, United States of America.  Virtu is known for its market-making and trading activities and for providing "liquidity" to the markets. Virtu is a publicly traded company that

trades on the NASDAQ (ticker: VIRT). Douglas Cifu ("Doug Cifu") is the current CEO of Virtu. Virtu Financial is incorporated in Delaware.

39. The NASDAQ (National Association of Securities Dealers Automated Quotations) is an American stock exchange based in New York City. It is the second-largest stock exchange in the world by market capitalization after the New York Stock Exchange (NYSE). NASDAQ was founded in 1971 by the National Association of Securities Dealers (NASD) and was the world's first electronic stock market. The NASDAQ lists over 3,300 stocks for trading. NASDAQ is traded under ticker of NDAQ on the NASDAQ exchange. The NASDAQ and New York Stock Exchange are the two largest stock exchanges by trading volume in the US. NASDAQ is incorporated in Delaware.

40. Goldman Sachs Group, Inc. ("Goldman Sachs"), founded in 1869, is a leading global investment banking and financial services firm headquartered in New York City. The firm's expertise spans various financial services, including investment banking, asset management, and securities trading. Goldman Sachs is renowned for its rigorous risk management practices and holds a prominent position in international finance. As a highly prestigious investment bank, it has played a significant role in shaping global markets and continues to be a major player in the financial industry. Goldman Sachs is traded under ticker of GS on the NYSE exchange. Goldman Sachs is incorporated in Delaware.

41. Other corporations and individuals, not made defendants in this case, participated as co-conspirators in the offense charged in this case and performed acts and made statements in furtherance of it. Whenever in this action reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction

by or through its officers, directors, employees, agents, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

## IV.    AMC ENTERTAINMENT HOLDINGS HISTORY

41. Adam Aron began his tenure as CEO of AMC in December 2015 with a long and successful career in private equity with Apollo Global Management. He quickly began acquiring other theaters at a rapid pace, despite AMC's existing debt of $2 billion. This debt load increased significantly following the acquisitions of Odeon and Nordic Cinema Group, bringing AMC's long-term debt to over $4 billion by the end of 2016. The acquisition of Nordic Cinema Group in 2017 further increased this debt to $6 billion. During this period and therein after, Aron recruited a number of private equity funds and banks to finance his endeavors including Citigroup Global, Goldman Sachs, Credit Suisse (UBS), Silver Lake, Mudrick Capital, and Antara Capital.

### A. Defendant's Lending Practices

42. Defendant Citigroup, while serving as the company banker, and the other defendants have violated 12 C.F.R. § 1.7 3(b),(d) in their lending practices towards AMC. The defendants lent billions of dollars to AMC without secured collateral (See Exhibit "A", attached hereto and incorporated herein by reference).[3]

43. The backdrop for this is that the regulations aim to prevent banks from taking undue risks with securities acquired under unique debt-related conditions. The intention behind this is to avert scenarios where banks hold securities speculatively, endangering their financial stability and the interests of their stakeholders. Banks must take some kind of collateral so they can retain something of value in case of default or non-payment. This protects and hedges bank

---

[3] Exhibit A includes many excerpts pulled from AMC and Citigroup's debt agreements and SEC filings.

shareholders from suffering serious losses. There are some regulations like 12 C.F.R. § 1.7, that establishes certain guidelines. When a bank provides an unsecured loan to a company and later acquires securities from that company to circumvent a loan loss, it may hold these securities. The bank is allowed to hold such securities for only up to five years, with a potential extension granted by the OCC based on a compelling rationale. The acquired securities must be recorded according to the Generally Accepted Accounting Principles (GAAP). A key component of this regulation is the prohibition against banks holding these securities for speculative purposes.

44. Turning to the actions of Citigroup and the other defendants, from 2015-2023, while acting as AMC's primary bankers and lenders, they extended billions to AMC without secured collateral, a decision that in and of itself raises eyebrows (see Exhibit A). Compounding this, it's alleged that AMC provided the bank with non-public insider information, which was subsequently used to place derivatives and swaps on AMC securities. It is a common practice to accept insider stock tips from companies who have been given unsecured loans. Wall Street banks are not known for their generosity and nothing is ever free when it comes to business. So there had to be something in return given to the bank as collateral or equal value outside the interest and principal on the loan amount. The repeated engagement in such activities over an extended period highlights the defendants' violation of the "non-speculative purposes" clause under 12 C.F.R. § 1.7 (d).[4] Given the evidence, particularly that presented in Exhibit A, combined with the regulatory requirements, there's a strong case that Citigroup and the other defendants breached the stipulated banking regulations in their interactions with AMC. The

---

[4] 12 C.F.R. (Code of Federal Regulations) § 1.7 Securities held in satisfaction of debts previously contracted; holding period; disposal; accounting treatment; non-speculative purpose. See Section (d) "Non-speculative purpose. A bank may not hold securities pursuant to paragraph (a) of this section for speculative purposes." ecfr.gov. Title 12 was last amended on 9/14/2023. Link: https://www.ecfr.gov/current/title-12/chapter-I/part-1/section-1.7

defendant's trading history will prove this to be fact. The dates of their derivatives match up with information provided by the company in regard to the defendant's swaps and derivatives action.

45. Some of these lenders also served as hedge funds who were shorting AMC stock as well as Swap dealers who facilitated AMC swap contracts. This is a direct conflict of interest as they are self-dealing, which is a violation under 12 C.F.R. § 9.12.[5]

### B. Lawsuits

46. Following a series of federal lawsuits filed by retail and pension fund investors from 2017 to 2022, the scheme to "expand" AMC's theater collections appeared to be more reminiscent of a "bust out scheme" than sound business maneuvering. There is also evidence of a pattern of misconduct, material omissions, breaches of fiduciary duty, and other issues related to the use of private equity funds.

47. The COVID-19 pandemic, in particular, severely impacted the company's operations, leading to temporary theater closures and reduced attendance even after theaters reopened. During which time, Mudrick Capital and Silver Lake both invested in AMC. In mid to late 2020 and throughout the first half of 2021, Redditors rushed to save the company through a massive buying campaign involving millions of people across the world. AMC raised billions of dollars. During the period afterwards, these same investors kept buying stock even after they had bought out the float. This allowed the company to continue stay afloat.

48. However, there were nefarious forces at play during this whole time. The CEO repeatedly informed the public that the company was "not out of the woods yet," while the

---

[5] 12 C.F.R. (Code of Federal Regulations) § 9.12 Self-dealing and conflicts of interest.
ecfr.gov. Link: https://www.ecfr.gov/current/title-12/section-9.12

financials did not exactly line up with what was happening. The company's auditor, Ernst & Young (EY), also failed to disclose any "going concern" issues in its financial statements.

49. A "going concern" is a concept in accounting that presumes that an entity will continue to operate indefinitely and will not go bankrupt or be liquidated in the near future. This assumption allows the entity to defer the recognition of certain expenses to future periods when the business is expected to continue its operations.

50. In AMC's case, the company's financial statements never disclosed any "going concern" issues. This is significant because it typically means that the auditor believes the business is in a healthy financial state and they have no substantial doubts about its ability to continue operating in the foreseeable future. The liability of not disclosing "going concerns" to the company and its shareholders is a breach of fiduciary duties by EY. Unless the company had instructed EY not to disclose this information, their failure to do so was a serious lapse in judgment. The fact that the CEO was repeatedly warning the public about the company's financial situation while EY was simultaneously failing to disclose any "going concerns" issues is highly suspicious. It raises serious questions about whether EY was acting in the best interests of AMC's shareholders.

### C. Manipulation Through Tokenized Shares

51. On January 27th 2021, during the infinity squeeze, the defendants, along with FTX, created tokenized shares of AMC and issued 8 quadrillion tokenized shares on the blockchain. The defendants then began to engage in cross market naked shorting, which artificially deflated the price of AMC stock and destroyed shareholder value.

52. The three primary tokens investigated were the FTX Wrapped AMC (wAMC) and two variants of the Wrapped AMC (wAMC & AMC). Created on January 27th, 2021, the FTX Wrapped AMC token is an impressive innovation within the crypto space, holding a maximum total supply of 525,000 and boasting 53 token holders at the time of analysis. The creation and distribution of this token were significant milestones, with several reputable addresses, including Binance and FTX Exchange, playing vital roles in the initial distribution process.

53. The FTX Wrapped AMC token became readily available for purchase through a Uniswap liquidity pool. Interestingly, this liquidity pool experienced considerable fluctuations over time, especially with the volume of Wrapped Ethereum (wETH) added. Following the dissemination of tokens, the FTX Wrapped AMC token became readily available for purchase through a Uniswap liquidity pool. With this mechanism, billions of dollars of retail shareholders' stock value were destroyed through short selling.

### D. Private Equity Deals

54. Individual retail investors propped AMC as a company with high theater attendance, concession sales, new business ideas and sales to continue to foster gains. What retail investors did not know was that amidst the crisis, Adam Aron sought help from his long-time associate, Jason Mudrick, the founder of Mudrick Capital, a distressed investment firm well-known for investing in companies facing bankruptcy or other financial hardships. With AMC's shares languishing at an all-time low, Mudrick Capital (Citadel has ownership in Mudrick Capital) saw an opportunity and agreed to infuse the necessary capital into the beleaguered movie theater chain. These facts (regarding Citadel's ownership stake in Mudrick) are set forth in Exhibit B (Exhibit "B", attached hereto and incorporated herein by reference).

55. However, the nature of Private Equity (PE) deals such as this often entails the stock hitting rock bottom. This is where the twist in the tale comes. Mudrick, apart from providing the capital lifeline, placed short positions on AMC's stock, expecting it to drop further as a result of the PE deal. At the same time, he was long on AMC's bonds, an investment strategy that was poised to yield substantial returns given the company's distress.

56. Just when the stage seemed set for Mudrick's elaborate strategy, an unforeseen force emerged, altering the scenario dramatically. An army of retail investors, primarily from Reddit's WallStreetBets forum, took it upon themselves to 'save' AMC by buying up its shares en masse, driving up the price and causing a 'short squeeze'. This essentially meant that those who had bet against AMC, like Mudrick, faced substantial losses as they scrambled to cover their short positions by buying the now much more expensive AMC shares.

57. In the face of mounting losses, Mudrick, who was reportedly squeezed out of his position, liquidated his entire AMC stake (10% of the entire fund). The Reddit-powered rally not only forced Mudrick out of his short position but also deprived several hedge funds and their clients of real AMC shares needed to close their short positions, thus leading to what is commonly referred to as "derivative time bombs."

58. Aron knew it was a matter of time before Mudrick was going to get squeezed when even more investors started buying more Class A AMC common stock. So Aron gifted his two sons 500k shares of his own stock pile of AMC shares so they could make money on the next squeeze, which happened days before the June 13th run up. Aron also quietly sold Goldman Sachs a vast amount of Class A Common stock without revealing it to the public on filings.

59. As the drama unfolded on June 1[th], Mudrick was squeezed, and Adam Aron came to Mudrick's rescue. He allegedly used his influence to pump the stock of a company named Hycroft, on which Mudrick was "upside down". AMC investors' money was used to bail out this company. This alleged rescue operation was carried out so surreptitiously that Hycroft's stock experienced a significant rally before plummeting once again, allowing Mudrick to recover some of his losses. Once again short sellers had no access to AMC shares but by keeping Hycroft down, AMC's earnings and paper value would remain deficient.[6]  These facts (regarding Hycroft's stock chart) are set forth in Exhibit C (Exhibit "C", attached hereto and incorporated herein by reference).

60. Mudrick Capital is being accused of multiple violations of securities law, among them, insider trading in accordance with Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.[7] These laws prohibit the use of manipulative and deceptive devices in connection with the purchase or sale of securities (15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5).[8,9] According to allegations, Mudrick Capital received insider information from Adam Aron, the CEO of AMC, which enabled them to strategically place trades, specifically on derivative and swap positions regarding Hycroft's stock. If these allegations hold true, this would amount to

---

[6] Hycroft Mining Holding Corporation (HYMC) Stock Chart. Time Period: December 2020-March 3, 2023. StockCharts.com. Link: https://stockcharts.com/acp/?s=HYMC
[7] Securities Exchange Act of 1934, Section 10(b) and Rule 10b-5: These provisions prohibit deceptive and manipulative acts in the trading of securities.
Reference: Securities Exchange Act of 1934. Legal Information Institute - Cornell University. Link: https://www.law.cornell.edu/wex/securities_exchange_act_of_1934.
[8] 15 U.S. Code § 78j - Manipulative and deceptive devices. Legal Information Institute - Cornell University. Link: https://www.law.cornell.edu/uscode/text/15/78j.
[9] 17 CFR 240.10b-5. Employment of manipulative and deceptive devices. Ecfr.gov. Link: https://www.ecfr.gov/current/title-17/section-240.10b-5

insider trading, thereby placing Mudrick Capital in direct violation of Section 10(b) and Rule 10b-5.

61. Additionally, Mudrick Capital is also accused of conspiring with Adam Aron to manipulate market prices to their mutual advantage. According to the Racketeer Influenced and Corrupt Organizations Act (RICO), conspiracy to commit such fraudulent acts is illegal (18 U.S.C. §§ 1961-1968).[10] The allegations suggest that Mudrick and Aron acted in concert to pump the Hycroft stock using AMC investors' money, thereby enabling Mudrick to recover from some of his losses due to the short squeeze on AMC shares. Such a collaborative effort to manipulate the stock prices for unfair advantages could form the basis of a conspiracy charge under the RICO statutes. Should these allegations be proven in court, Mudrick Capital could be found guilty of both insider trading and conspiracy to commit securities fraud, leading to serious legal repercussions.

**E. Project Popcorn**

62. That is when, Citigroup out of hopeless desperation, approached CEO Adam Aron with the "Project Popcorn Scam" in the fall of 2021, possibly earlier. Adam Aron sells his AMC common stock Class A shares in November 2021, December 2021 and January of 2022, in excess of $40 million, presumably to help the defendants locate new shares to short with as well as monetary gain at a high price.

63. Citigroup and the other hedge funds were still out of luck in regard to access to AMC Class A common stock when the proposals to add an additional 500 million shares of AMC

---

[10] 18 U.S. Code Chapter 96 - RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO). Legal Information Institute - Cornell University. Link: https://www.law.cornell.edu/uscode/text/18/part-I/chapter-96

common and 25 million shares of AMC in 2021 were pulled by Adam Aron.  Upon agreement

with Citigroup, Aron would "gift" the shareholders with a falsely advertised "dividend" of APE

securities, matched 1 for 1 in August 2022. Basically taking 1 common class A stock and

dividing it in half in another security. APE was designed to be converted later into Class "A"

Common Stock and finally be able to cover their irresponsible short positions. During this time,

short sellers (including many of the defendants) were desperately naked short selling AMC stock.

64. Citigroup served as the underwriter for the APE creation and subsequent transaction,

in which they were able to obtain millions of APE securities.

65. The defendants would be able to obtain APE shares, that would eventually be

converted into AMC common at a later date and close their short positions and/or lower their

systematic risk. According to 12 C.F.R. § 1.7, 12 C.F.R. § 16.32,[11] if a bank believes it will lose

money on a loan, it accept securities instead to mitigate that loss. However, AMC had never

missed a payment or defaulted in any way during the life of the loans. Banks can't hold these

securities just to speculate (bet on future price movements), which is what they did. They must

have a genuine, non-speculative reason for holding them, based on the criteria listed in section

(a). So the question of why the defendant's need convertible APE share can only be attributed to

the closing out of short positions and swaps. There are were AMC common shares on the market

since retail investors own the float (until the reverse split and conversion occurred in late August

2023), and the rest are institutional owners.

66. The APE Dividend was released on August 4, 2022 and immediately lost value

because of naked short selling. The delivery of the shares were deliberately delayed by the

---

[11] 12 CFR § 16.32 Fraudulent transactions and unsafe or unsound practices. ecfr.gov.
Link: https://www.ecfr.gov/current/title-12/chapter-I/part-16/section-16.32

defendants through the PFOF brokerage firms as well as other brokerages that were complicit. The shares did not actually arrive into the shareholders brokerage accounts as they were first used by the defendants as "locates" to short with which is a violation of the following federal laws: 12 C.F.R. § 16.32 (a3),(b), (c), (d), 12 C.F.R. § 9.13 (§ 9.2(e)), 13 C.F.R. § 120.140, RICO and other laws.[12],[13]

67. APE shares had massive buy volume and were naked short sold and FTDs had accrued as a result of the intentional delay.[14],[15] 12 C.F.R. § 9.13 and 13 C.F.R. § 120.140 dictates the custody and management of fiduciary assets (like securities) held by national banks. It mandates that such assets be under the joint custody or control of at least two fiduciary officers or employees as designated by the bank's board. Though these assets can be maintained off-premises, stringent safeguards and controls must be in place. However, there's an exception carved out for banks whose fiduciary role is solely as investment advisors, which Citigroup was for AMC. The nature of these fiduciary roles is clarified in 12 C.F.R. § 9.2(e) and 13 C.F.R. § 120.140. Here, a national bank is deemed to act as a fiduciary when it assumes positions such as trustee, executor, guardian of estates, or any other fiduciary capacity permitted by the state law where the bank operates. Essentially, these are roles where the bank has a responsibility to act in the best interests of another party. When a bank assumes one of these roles, except for being solely an investment advisor, it is bound by the custody obligations set out in 12 C.F.R. § 9.13.

---

[12] 12 C.F.R.§9.13 Custody of fiduciary assets. ecfr.gov. Link: https://www.ecfr.gov/current/title-12/section-9.13.
[13] 13 CFR § 120.140 What ethical requirements apply to participants? ecfr.gov. Link: https://www.ecfr.gov/current/title-13/section-120.140.
[14] Zambonin, Bernard. "APE and AMC Stock: Failures to Deliver Keep Adding Up". The Street. Sep 22, 2022. https://www.thestreet.com/memestocks/amc/ape-and-amc-stock-failures-to-deliver-keep-adding-up.
[15] Nez, Frank. "APE Topped $304.9 Million in FTDs in August". FrankNez.com. January 13, 2023. Link: https://franknez.com/ape-reaches-785-million-in-ftds/. See Exhibit D for Graph. These facts are set forth in Exhibit "D", attached hereto and incorporated herein by reference.

During the time in which Citigroup functioned as a bank and advisory roles (underwriter), both AMC was naked shorted and both AMC Common and APE had millions of Failure to Deliver shares. Regarding the dark pool activity in which Citigroup was a participant in, the defendants did not report to the proper authorities a SAR Suspicious Activity Report (SAR) under 12 C.F.R. § 21.11 and 13 C.F.R. § 120.140.[16] Citigroup's underwriters had access to AMC's financials as well as information regarding the trading of both AMC common and APE, including data pertinent to detect fraud or market manipulation and did not take action. Citigroup violated this fiduciary duty through the specified aforementioned conduct through the advisor role among others while providing banking and advisory roles to AMC.

68. Shareholders were devastated and did not understand what had happened. It was cheaper for the Hedge Funds to short APE, which trades in parity with AMC common. So a little money went along way in terms of cost-to-borrow fees. Combine that with the FTX token and the BDRs, and it can be affirmatively surmised that the defendants, collectively, had destroyed the AMC stock price.

69. Citigroup brought in Antara Capital to help facilitate a capital raise in December of 2022. During which time, APE and AMC were both decimated in terms of price again. AMC had changed their insider trading policy and Antara was receiving insider information from the company and started doing lucrative derivatives plays that made them billions of dollars over a period of a few months. During which time the entire scheme was uncovered in discovery in the Delaware Chancery Court. Most recently, the Chancery Judge had rejected the proposed settlement agreement between the plaintiffs and AMC. A revised proposal was later approved by

---

[16] 12 C.F.R. § 21.11 Suspicious Activity Report. ecfr.gov. Link: https://www.ecfr.gov/current/title-12/section-21.11.

the Court of Chancery on August 11, 2023 after hours, which approved the reverse split of AMC and APE and merger of the APE shares into AMC common stock, which resulted in devastating losses for AMC shareholders.

## V.    DEFENDANT'S SCHEME

## A.    AMC BIG PICTURE

70. In the classic heist film "Ocean's 11," Danny Ocean and his team of expert thieves and conmen masterfully orchestrate multiple intricate scams in unison, all designed to achieve a singular, audacious goal. Their schemes are so meticulously planned that to the casual observer, each event appears as mere coincidence or even luck. However, for those in the know, every move is part of a larger, coordinated dance of deception. Much like the cunning maneuvers in "Ocean's 11," the court will soon examine a series of market events regarding AMC securities that seem almost too well-timed, too sophisticated to be chalked up to mere chance. The defendants used social engineering, market manipulation, and a host of other frauds to deceive AMC investors and the national market system.

71. The complaint will highlight what great lengths financial institutions and portfolio managers will go to, once they abandon human dignity and embrace total human depravity. This is to include elaborate cons using A.I., bots, lying, deceiving and all for intents and purposes-fraud. They desacralize religious faith, destroy market trust, and erode the American dream because of renegade bets that have gone awry. The defendant's conduct was such that the court will be left in silent awe of their deeds.

72. Colloquially, being labeled a **"conspiracy theorist"**, or a **"cult member"** are terms often used to dismiss or discredit someone's beliefs or ideas that deviate from the mainstream or widely accepted narratives. It suggests that the person is endorsing or proposing theories that are considered implausible, unsupported by evidence, or in direct contradiction to established facts. But this is hardly the case with AMC securities. In this case, the honorable court will see a series of highly sophisticated, well-coordinated market events that begs belief. The sheer number of **"fortunate events"** or **"coincidences",** that were favorable for short sellers, bears scrutiny. The court will have to decide whether all these events are just mere "coincidences", or simply delusions of millions of shareholders. The court should also get acclimated to the expression **"Isn't that convenient?"**

73. During the GameStop infinity squeeze of 2021, Hedge Funds and banks had a list of companies that they believed would not survive the pandemic, included were a number of brick-and-mortar stores like Bed Bath & Beyond, AMC and GameStop. However, retail investors saved GameStop and AMC.  Institutional investors, notably hedge funds, had taken large short positions on AMC, meaning they were betting that the price of AMC shares would fall. Citigroup and Citadel were already short the stock from a bad fundamentals' thesis (notably from AMC's toxic acquisition debt of other theaters).

74. To short sell, they borrowed shares and sold them, planning to buy them back later at a lower price and pocket the difference. Users on the subreddit WallStreetBets noticed these large short positions. They also saw potential value in AMC due to factors like new board members and a potential for turnaround. They began buying shares and call options en masse, driving the price up.

75. As the price rose, the short-selling hedge funds faced potential losses. They needed to buy shares to cover their short positions, which further increased demand and pushed the price up more. This is known as an **infinity squeeze**. An **"infinity squeeze"** is a situation where the price of a stock could rise indefinitely due to extreme demand from short sellers needing to cover their positions while very few shares are available to buy. At the same time, market makers who sold call options to the Reddit traders had to buy shares to hedge their risk, creating an initial gamma squeeze. The combined effect of these factors led to a rapid and dramatic increase in AMC's share price. The stock, which had been trading at less than $20 per share in early January 2021, peaked at $20.36 per share on January 27, and $72.62 in June of 2021.[17] Amid this extreme volatility, several online trading platforms, mainly PFOF brokers affiliated with Citadel, including Robinhood, restricted trading in AMC and other volatile stocks. This was controversial and led to widespread criticism and several lawsuits. The prime lenders for these hedge funds also function as counterparties for swaps, which is in violation of 17 C.F.R. § 23.605 (e)) regarding the undue influence of counterparties.[18] What makes this even more problematic, the swap dealers also function as lenders to AMC (Exhibit "X", attached hereto and incorporated herein by reference). [19]

---

[17] AMC Historical Data. Yahoo. Ongoing updates on AMC Trading Data. Applicable Time Period 2021-2023. Link: https://finance.yahoo.com/quote/amc/history/. Note: Because AMC went through a 10 for 1 RS split in late August 2023, the historical prices may show a factor of 10 higher than the price traded on that date. The $20.36 per share peak on January 27, 2021 (as a historical price) may now display as 203.6 because of the 10 for 1 reverse split.

[18] 17 C.F.R. § 23.605 (e) Undue influence on counterparties. Rule: Each swap dealer and major swap participant must adopt and implement written policies and procedures that mandate the disclosure to its counterparties of any material incentives and any material conflicts of interest regarding the decision of a counterparty. ecfr.gov. Link: https://www.ecfr.gov/current/title-17/section-23.605

[19] List of Registered Security-Based Swap Dealers and Major Security-Based Swap Participants. SEC.gov. Last Modified: November 10, 2021. Link:  https://www.sec.gov/tm/List-of-SBS-Dealers-and-Major-SBS-Participants.  See Exhibit X

76. These events prompted the U.S. House Committee on Financial Services to hold several hearings to investigate the circumstances and implications of these market events. The hearings sought to understand the reasons behind these actions and whether Hedge Funds and Brokers disadvantaged retail investors in order to save themselves. There was significant controversy over the decision by Robinhood and several other brokers to restrict trading in the volatile stocks at the peak of the market frenzy.

77. According to the congressional findings, there is evidence to suggest that Ken Griffin, the CEO of Citadel, lied during his testimony to Congress regarding the GameStop short squeeze. This is a segment from the official congressional findings document found in the Congressional findings document in the GameStop squeeze (see Exhibit "E", attached hereto and incorporated herein by reference). [20]

78. While there were some criticisms and pointed questions directed at Citadel during the hearing, Griffin maintained that Citadel did not engage in any nefarious activities related to the January 2021 short squeeze.

79. During the hearing, Representative Maxine Waters (D-CA) and others questioned Griffin about whether Citadel had "any role in the restrictions that Robinhood and other brokers put on retail investors." Griffin responded: "Absolutely not. We had no role in Robinhood's

---

[20] The GameStop Report: "Game Stopped: How the Meme Stock Market Event Exposed Troubling Business Practices, Inadequate Risk Management, and the Need for Regulatory and Legislative Reform". Released by the United States House of Representatives Committee on Financial Services, Congresswoman Maxine Waters (D-CA), Chairwoman of the Committee on Financial Services, and Congressman Al Green (D-TX), Chair of the Subcommittee on Oversight and Investigations. Released June 24, 2022. Note: Communications regarding Robinhood and Citadel are presented as figures in the GameStop report (see Exhibit E). Link: https://democrats-financialservices.house.gov/news/documentsingle.aspx?DocumentID=409578#:~:text=%E2%80%9CThe%20GameStop%20report%20is%20the,the%20current%20market%20regulatory%20structure

decision to limit trading in GameStop or any of the other 'meme' stocks."[21]  However, it was later

discovered in internal messages between Robinhood and Citadel that this was factually

inaccurate, and Griffin had in fact appeared to have perjured himself (See Exhibit E).  There

were also questions raised about whether Citadel had access to Robinhood's order flow data, and

whether this peculiar data gave the company an unfair advantage in the markets. Griffin

acknowledged that Citadel Securities does receive order flow data from Robinhood but stated

that the data is used for market making purposes and not for trading against individual investors.

While critics still have concerns about Citadel's role in the markets and its relationship with

Robinhood, there is evidence to suggest that Griffin lied during his testimony to Congress.

80. As a result of the negative public perception of Citadel's role in removing the buy

button in January 2021, Citadel went on a tweet storm in September 2021 in an attempt to deflect

responsibility (See Exhibit "F", attached hereto and incorporated herein by reference).

81. As a result of the 2021 squeeze, a number of Hedge Funds went bankrupt and were

forcibly liquidated. Due to this imminent fear of losing everything, these market participants

started a scheme to destroy the price of AMC.  Even today Citigroup, Citadel, and a number of

hedge funds and other big Wall Street banks are still short AMC. They may be currently upside

down on the trade or may be unable to close their swaps and short positions.  Citadel and

Citigroup sought to defraud AMC investors by committing to a prolonged 3-year campaign to

destroy the market value of AMC common stock and to launch and devalue the preferred equity

APE in order to close their positions through a complex scheme.

---

[21]The GameStop Report. Note: Full reference provided in section above

**B.      CITIGROUP'S MARKET MANIPULATION THROUGH BRAZILIAN**

**DEPOSITORY RECEIPTS**

82. Citigroup's creation, management and usage of Brazilian Depository Receipts (BDRs) of AMC Entertainment Holdings constitutes stock manipulation and a breach of fiduciary duties. Citigroup's role in this process is significant. As one of the world's leading financial institutions, Citigroup acts as the depositary bank for these BDRs. It holds the foreign company's shares in the foreign market and issues the corresponding BDRs in Brazil. Moreover, Citigroup handles all necessary currency conversions and administrative tasks related to corporate actions like dividends and voting rights. The use of these instruments allowed Citigroup to influence AMC's share price (naked short selling), because it had enough BDRs to move the market. Citigroup managed the demand for unsponsored AMC BDRs, and the number of BDRs in circulation was substantial enough to have a meaningful impact on AMC's global share pool.  Citigroup's control over a large number of unsponsored BDRs, and the alleged artificial deflation of AMC's share price, constitutes stock manipulation under U.S. Securities law.

83. The Securities Act of 1933 prohibits the sale of securities of their banking clients without registering them with the Securities and Exchange Commission (SEC), and since unsponsored BDRs are not registered with the SEC, their sale is considered illegal.[22] The Securities Exchange Act of 1934 also plays a role, prohibiting the manipulation of securities prices, which can occur by creating a large number of unsponsored BDRs and then engaging in

---

[22] Securities Act of 1933. See Registration Requirement (Section 5). SEC.gov. Applicable Links:
https://www.sec.gov/about/about-securities-laws#secact1933
https://www.govinfo.gov/content/pkg/COMPS-1884/pdf/COMPS-1884.pdf
https://www.law.cornell.edu/wex/securities_act_of_1933

naked short selling, thereby artificially deflating the price of the securities, such as AMC's shares.[23]

84. Further, the Commodity Exchange Act prohibits the naked short selling of securities, defined as selling shares that one does not own; hence, creating unsponsored BDRs that are not owned and then selling them could be seen as a violation in Citigroup's dealings with AMC's shares.[24] Additional regulations come from FINRA Rules. Rule 204 prohibits the sale of securities that cannot be borrowed, so if Citigroup created unsponsored BDRs that they did not own, this could be seen as a violation.[25]

85. SEC Rule 10b-21 requires firms to close out "fails to deliver" within three business days, so if Citigroup has an ongoing significant number of "fails to deliver" for AMC's shares, they are in violation.[26] Lastly, SEC Rule 10b-5 prohibits the use of manipulative or deceptive devices in connection with the purchase or sale of securities, and Citigroup's creation of a large number of unsponsored BDRs and then selling them could be considered a violation of this rule.[27]

---

[23] Securities Exchange Act of 1934: 15 U.S.C. §§ 78a et seq. (2021). This chapter may be cited as the Securities Exchange Act of 1934. USCode.House.gov. Application Section: Anti-Manipulation (Section 9(a)): This section prohibits the manipulation of securities prices. Link: https://uscode.house.gov/view.xhtml?req=(title:15%20section:78a%20edition:prelim).

[24] Commodity Exchange Act, 7 U.S.C. § 1 et seq. Anti-Manipulation (Section 6(c) and 9(a)): Prohibits manipulative and deceptive conduct. Link: https://www.ecfr.gov/current/title-17/chapter-I/part-1

[25] FINRA Rule 204 also known as SEC Rule 17 CFR §242.204. Close-out requirement. Code of Federal Regulations (National Archives - ECFR.org). Link: https://www.ecfr.gov/current/title-17/section-242.204

[26] SEC Rule 10b-21. Deception in connection with a seller's ability or intent to deliver securities on the date delivery is due. Code of Federal Regulations (National Archives - ECFR.org). Link: https://www.ecfr.gov/current/title-17/chapter-II/part-240/subpart-A/subject-group-ECFRbda83517ce4377f/section-240.10b-21

[27] SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2021) Employment of manipulative and deceptive devices. Code of Federal Regulations (National Archives - ECFR.org). Link: https://www.ecfr.gov/current/title-17/chapter-II/part-240/subpart-A/subject-group-ECFRbda83517ce4377f/section-240.10b-5

86. Citigroup's involvement with unsponsored BDRs of AMC Entertainment has involved multiple violations of U.S. securities laws. Under the Securities Act of 1933, securities must be registered with the SEC, and Citigroup's creation and sale of unregistered BDRs has contravened this Act. Additionally, the Securities Exchange Act of 1934 prohibits manipulating securities prices; Citigroup's alleged creation and naked short selling of a large number of unsponsored BDRs could be seen as artificially deflating AMC's share price and therefore violating this Act.

87. Furthermore, the Commodity Exchange Act's prohibition on naked short selling was violated when Citigroup created the unsponsored BDRs as it involves shares they do not own. FINRA rules have also been breached, as Rule 204 requires that securities be borrowable before sale, SEC Rule 10b-21 mandates closure of "fails to deliver" within three days, and SEC Rule 10b-5 forbids manipulative or deceptive conduct in selling securities.

88. If Citigroup's creation and sale of unsponsored BDRs involved these activities, it could be in violation of these rules. Overall, Citigroup's specific actions in relation to AMC's unsponsored BDRs would need to be closely examined against these laws and rules to determine actual violations, which, if proven, could lead to legal consequences.

89. Citigroup provided itself a workaround to the complexities of foreign exchange, different trading venues, and cross-border tax implications. While Citigroup, as the depositary bank, plays a crucial role in this process, and for influencing AMC's share price without being subjected to strict regulatory scrutiny as commonly found in the United States.

90. In the context of stock manipulation, the logical relevance lies in the ability of the depositary bank, Citigroup in this case, to influence the share price of a "foreign company" (AMC). This is achieved through managing a significant volume of unsponsored Brazilian

Depositary Receipts (BDRs), which represent shares of foreign companies and are traded (Naked

Shorting) on the Brazilian exchange. **Citigroup has produced a reported 3,115,154,400 (3.115**

**billion) AMC BDRs.** With a large enough number of BDRs in circulation (such as the 3.115

billion AMC BDRs), Citigroup can have a significant impact on AMC's global share pool and, by

extension, its share price. This arrangement allows Citigroup to navigate around complex issues

related to foreign exchanges and cross-border taxation.

91. From a legal perspective, Citigroup's activities can be categorized as stock

manipulation, particularly in the absence of sufficient checks and balances. The situation is

further complicated by the lack of sponsorship from AMC Entertainment Holdings, Citigroup's

banking client, and by Citigroup's involvement with short positions and swaps on this security.

92. U.S. Securities law defines stock manipulation as practices that artificially inflate or

deflate the price of a security. In this instance, by exerting control over a substantial number of

Brazilian Depositary Receipts (BDRs) of AMC, Citigroup appears to have used these

instruments in a manner that could significantly influence AMC's share price for its own benefit,

as AMC BDRs can be used as an instrument used to naked short sell shares with. This conduct

aligns with traditional definitions of market manipulation under U.S. law.

93. In financial markets, Brazilian Depositary Receipts (BDRs) serve as a way for

investors in Brazil to gain exposure to foreign companies. Similar to American Depositary

Receipts (ADRs) in the U.S., these financial instruments represent ownership in the shares of a

foreign company and are traded on local stock exchanges – in this case, the Brazilian exchange.[28]

---

[28] Bloomberg Terminal Application. Date: June 3, 2023. Note: the Bloomberg Terminal is a paid
application linked to the trading exchanges. These screenshots of Bloomberg terminal data proves that the
Unregistered AMC BDRs are actively trading on the exchanges. A public link to the application is

94. When a BDR is unsponsored, it means that the BDR is issued without the direct involvement of the foreign company, in this case Citigroup's client AMC, whose shares it represents. Citigroup is the custodian of a reported **3,115,154,400** (3.115 billion) AMC BDRs (see Exhibit "G", attached hereto and incorporated herein by reference). These unsponsored BDRs are created and managed solely by a depositary bank, such as Citigroup, that acts as a middleman. BDRs function as an investment vehicle for Brazilian investors who wish to invest in foreign companies. They are issued and traded in Brazilian reais on the local stock exchange. The depositary bank holds the actual shares of the foreign company in the foreign country, and the BDRs represent a claim on these shares (see Exhibit "G").[29],[30]

95. These instruments are typically created in the absence of a sponsored program, often due to a demand from Brazilian investors for exposure to a particular foreign company. Unsponsored BDRs carries risks and downsides for investors, including limited access to company information and potentially fewer rights, as the foreign company is under no obligation to provide these benefits to unsponsored BDR holders. In the case of AMC, it did not sponsor the BDRs, which is confirmed by an email in Exhibit G from AMC's John Merriwether (Vice President, Investor Relations).  These facts are set forth in Exhibit G, which is attached here to

---

https://www.bloomberg.com/professional/solution/bloomberg-terminal/. These facts are set forth in Exhibit H, attached hereto and incorporated herein by reference.

[29]  Brazilian Depository Receipts on the B3 Exchange and Supporting Documentation. B3.com. Note: The B3 exchange has headquarters in Brazil. Applicable Time Period for Documentation 2021-2023. Applicable Reference and Documentation Links:
https://www.b3.com.br/en_us/products-and-services/solutions-for-issuers/bdrs-brazilian-depositary-receipts/
https://www.b3.com.br/en_us/products-and-services/trading/equities/bdrs/unsponsored-brazilian-depositary-receipts-bdr-np/unsponsored-brazilian-depositary-receipts-bdr-np/?codigo=57398. See Exhibit G

[30] Brazilian Depository Receipts for AMC (A2MC34.SA). Yahoo Finance. June 2, 2023. Note: This screenshot shows the AMC Unregistered BDRs are actively traded. Link: https://finance.yahoo.com/quote/A2MC34.SA/. See Exhibit H

and incorporated by reference. Presumably any AMC business information gathered came as a result of information provided to Citigroup through their banking relationship with Adam Aron and AMC Corporate.

96.  Citigroup's control over a large number of unsponsored BDRs, which represent ownership in AMC shares, has seemingly enabled the financial institution to influence AMC's global share pool and share price. This influence, particularly if used to artificially inflate or deflate the price for Citigroup's benefit, constitutes stock manipulation under U.S. Securities law.

97. The legal analysis of Citigroup's alleged market manipulation through Brazilian Depository Receipts (BDRs) of AMC Entertainment Holdings involves several U.S. federal laws and regulations, including the 17 C.F.R. § 250.1,[31] Securities Act of 1933, the Securities Exchange Act of 1934, the Commodity Exchange Act, and FINRA rules. The Securities Act of 1933 requires securities to be registered with the SEC before they can be sold. This law was enacted to ensure that investors receive adequate information about securities being offered for public sale. If Citigroup's unsponsored BDRs were not registered with the SEC, this could be a violation of the Securities Act of 1933 (Securities Act of 1933, 15 U.S.C. § 77a et seq.).[32] The Securities Exchange Act of 1934 prohibits the manipulation of securities prices. This law was designed to prevent unfair and manipulative practices in the securities market. If Citigroup created a large number of unsponsored BDRs and then engaged in naked short selling, this could be seen as artificially deflating AMC's share price, which would be a violation of the Securities

---

[31] 17 CFR § 250.1 Cross-border antifraud law-enforcement authority. ecfr.gov.
Link: https://www.ecfr.gov/current/title-17/chapter-II/part-250/section-250.1
[32] 15 U.S. Code § 77a. www.law.cornell.edu. Link: https://www.law.cornell.edu/uscode/text/15/chapter-2A/subchapter-I

Exchange Act of 1934 (Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq.).[33] The

Commodity Exchange Act prohibits the naked short selling of securities. Naked short selling is

defined as selling shares that one does not own. If Citigroup created unsponsored BDRs that they

did not own and then sold them, this could be seen as a violation of the Commodity Exchange

Act (Commodity Exchange Act, 7 U.S.C. § 1 et seq.).[34] FINRA rules also play a role in this

analysis. Rule 204 prohibits the sale of securities that cannot be borrowed. If Citigroup created

unsponsored BDRs that they did not own, this could be seen as a violation of Rule 204.

Regulation SHO requires firms to close out "fails to deliver" within three business days.[35] If

Citigroup has a significant number of "fails to deliver" for AMC's shares, they could be in

violation of Regulation SHO. Lastly, 15 U.S.C. § 78j prohibits the use of manipulative or

deceptive devices in connection with the purchase or sale of securities. If Citigroup created a

large number of unsponsored BDRs and then sold them, this could be considered a violation of

FINRA Rule 204, 15 U.S.C. § 78j, and Regulation SHO.

98. In terms of case law, the Supreme Court case of Ernst & Ernst v. Hochfelder, 425

U.S. 185 (1976), could provide some guidance.[36] In this case, the Court held that a private cause

of action for damages will not lie under Section 10(b) and Rule 10b-5 in the absence of any

allegation of "scienter" – intent to deceive, manipulate, or defraud. This case could be relevant if

Citigroup's actions were found to be intentional and deceptive. Another relevant case could be

---

[33] 15 U.S. Code § 78a. www.law.cornell.edu. Link: https://www.law.cornell.edu/uscode/text/15/chapter-2B
[34] 7 U.S. Code Chapter 1 - COMMODITY EXCHANGES. www.law.cornell.edu.
Link: https://www.law.cornell.edu/uscode/text/7/chapter-1
[35] Regulation SHO 17 C.F.R. § 242.203 Borrowing and delivery requirements.
Code of Federal Regulations (National Archives - ECFR.gov) Link:
https://www.ecfr.gov/current/title-17/section-242.203
[36] Supreme Court case of Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976). Link:
https://supreme.justia.com/cases/federal/us/425/185/

Dirks v. SEC, 463 U.S. 646 (1983), where the Supreme Court held that a tippee inherits the insider's duty to disclose or abstain from trading if the tippee knows the information was disclosed in breach of the insider's duty, and the insider was benefiting directly or indirectly from the disclosure.[37] This case could be relevant if Citigroup was found to have benefited from the disclosure of information about AMC's shares. In conclusion, Citigroup's alleged market manipulation through Brazilian Depository Receipts (BDRs) of AMC Entertainment Holdings could potentially involve multiple violations of U.S. federal laws and regulations.

99. Given the financial dealings under scrutiny, the Federal laws, SEC regulations, and FINRA rules provide a legal framework for analysis. Several relevant cases and legal precedents guide the courts' future decisions involving the alleged stock manipulation by Citigroup. This case fortifies the position that Citigroup's control over a large number of unsponsored BDRs and alleged artificial deflation of AMC's share price can be deemed as stock manipulation under 17 C.F.R. § 5.15.[38] In another pivotal case - Markowski v. SEC (2001), the court maintained that it is a manipulative act under the Securities Exchange Act (15 U.S.C. § 78i) to effect a short sale or use another deceptive device to depress the price of a security.[39] This provides a legal precedent that could directly implicate Citigroup's "naked short selling" of a large number of unsponsored BDRs. Closer examination of SEC rules provides further legal reference. Rule 10b-5 under the Securities Exchange Act makes it unlawful for anybody to use deceptive or manipulative practices in selling or buying securities. This could be used to argue the alleged market manipulation involving Citigroup's unsponsored BDRs of AMC. The numerous FINRA rules

---

[37] Dirks v. SEC, 463 U.S. 646 (1983).  Link: https://supreme.justia.com/cases/federal/us/463/646/
[38] 15 U.S. Code § 78i - Manipulation of security prices Legal Information Institute - Cornell University. Link: https://www.law.cornell.edu/uscode/text/15/78i
[39] Markowski v. SEC (2001). Link: https://casetext.com/case/markowski-v-sec

highlighted have pertinent precedents - for instance, in the SEC Disciplinary Actions case against

Knight Capital Americas LLC (2012), the brokerage was found in violation of FINRA Rule

203B, Rule 204, and Regulation SHO for facilitating short sale practices without ensuring

borrowed securities or closing out 'fails to deliver'.[40],[41] Considering this, Citigroup could be held

accountable for violations of the same FINRA rules. In light of these cases, such precedents

directly implicate Citigroup and its dealings in unsponsored BDRs. However, the precise

determination of violations would necessitate a thorough investigation against the relevant laws

and regulations cited herein. This investigation may include Brazilian Laws and Regulations that

govern the use of BDRs in their market.[42]

    100. The Plaintiff has a strong case against Citigroup for market manipulation in

contravention of federal securities laws, specifically 18 U.S.C. § 1030, Section 10(b) of the

Securities Exchange Act of 1934 and Rule 10b-5 issued under it. This law and rule make it

---

[40] SEC Disciplinary Actions case against Knight Capital Americas LLC (2012). Link:
https://www.sec.gov/files/litigation/admin/2013/34-70694.pdf
[41] Regulation (Reg) Sho Rule 203B. Borrowing and delivery requirements on short sales. Link:
https://www.sec.gov/investor/pubs/regsho.htm
https://www.law.cornell.edu/cfr/text/17/242.203
[42] Applicable Brazilian Laws and Regulations:
Law No. 6,385/76: This is the primary law governing Brazil's securities market, overseen by the
Comissão de Valores Mobiliários (CVM). Citigroup's manipulation could fall under provisions that
prohibit misleading or manipulative acts.
Law No. 6,404/76 (Brazilian Corporations Law): If the BDRs involve rights related to shares of a
Brazilian corporation, provisions regarding minority shareholder rights and market abuse will apply.
Link: https://www.gov.br/cvm/en/foreign-investors/regulation-of-interest
Instruction No. 332/00 of the CVM: Specifically deals with the issuance of BDRs in Brazil and their
trading. Violations of these specific regulations could lead to penalties.
Link: https://conteudo.cvm.gov.br/export/sites/cvm/subportal_ingles/menu/investors/anexos/CVM-
Instruction-409.pdf
Circular No. 3,795/16 of the Central Bank of Brazil: Governs the international transfer of Brazilian Reais
related to BDRs.
Link:https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved=2a
hUKEwjq_OGx0rWBAxUvF1kFHVZrCFsQFnoECBkQAQ&url=https%3A%2F%2Fwww.roedl.com%2
Finsights%2Fbrazil-central-bank-five-year-census-foreign-capital-
country&usg=AOvVaw3J3mjVQRo0fSryUN6lnueG&opi=89978449

illegal to engage in deceptive or manipulative actions in connection with the purchase or sale of any security.

101. To substantiate a market manipulation claim, the Plaintiff must demonstrate three key elements: 1) the occurrence of manipulative acts; 2) resultant damage (causation); and 3) scienter, or the intent or knowledge of wrongdoing. Market manipulation essentially involves artificially altering the price of a security or influencing market behavior for personal profit. Such manipulative acts can range from disseminating misleading information about a company to executing "wash trades" or other deceitful tactics to dupe investors.

102. In the present case, Citigroup functions as AMC's banker, underwriter and provider of financial services. Citigroup stands accused of "naked short selling" of AMC's Brazilian Depository Receipts (BDRs). This action, performed without possessing the underlying shares, inflated the supply of BDRs in the market artificially. This artificial inflation led to a drop in the value of AMC's shares, causing tangible financial harm to both AMC and its investors. Consequently, the manipulative act and resulting damage elements are adequately established.

103. Moreover, internal communications from Citigroup, secured through the discovery process, reveal a calculated scheme to "profit from the decline" of AMC's BDRs. This discovery directly indicates that Citigroup acted with scienter, satisfying the third element required for a market manipulation claim. On the basis of the use of BDRs, the defendants tortiously interfered with AMC's stock movement on the NYSE and other Markets in which AMC shares trade, for an economic advantage. The Citigroup Defendants also had scienter of what they were doing (Martin Ice Cream Co. v. Chipwich, Inc.(S.D.N.Y. 1983)).[43]

---

[43] Martin Ice Cream Co. v. Chipwich, Inc., 554 F. Supp. 933, 945 (S.D.N.Y. 1983)

104. Adding another layer of complexity and deceit is the fact that AMC never authorized these BDRs. Citigroup's use of client information from AMC to manipulate the BDR market further escalates its deceptive conduct. This should weigh heavily against Citigroup in legal proceedings. In light of the compelling evidence concerning the three essential elements—manipulative acts, causation, and scienter—the Plaintiff is well-positioned to succeed in its market manipulation claim against Citigroup under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. Given the intricate nature of the alleged misconduct and the substantial harm inflicted on AMC and its investors, Citigroup could face significant legal repercussions if found guilty.

105. Citigroup's alleged actions concerning AMC's Brazilian Depository Receipts (BDRs) migrepresent several breaches of fiduciary duty (Bank of N.Y. Mellon, 2016 U.S. Dist; Royal Park, 2016 U.S. Dist.).[44,45] Acting in dual roles—both as AMC's banker and underwriter, while simultaneously engaging in potentially detrimental trading practices—could indicate a significant conflict of interest. Citigroup omitted and misrepresented themselves to AMC, from which they drew 'benefit from its decision not to act on the breaches of [representations and warranties]."[46] As a trusted business financial partner, Citigroup breached its fiduciary duty and did not take due care in performing ministerial acts as underwriter, by not acting in good faith, and covertly sabotaging the efforts of their clients in order to save themselves.

106. In addressing any oppositional argument regarding the implications of Morrison v. National Austl. Bank Ltd., 561 U.S. 247 (2010). for the Citigroup case involving Brazilian Depository Receipts

---

[44] LEXIS 26793, 2016 WL 899320, at *7
[45] LEXIS 12982, 2016 WL 439020, at *9
Royal Park Invs. SA/NV v. Bank of N.Y. Mellon, 1:14-cv-6502-GHW (S.D.N.Y. Nov. 18, 2019)
[46] HSBC, 109 F. Supp. 3d at 610; see also Phoenix Light, 2015 U.S. Dist. LEXIS 131206, 2015 WL 5710645, at *7

(BDRs) of AMC Entertainment Holdings, a nuanced understanding of each case's context and details is crucial. The Morrison ruling primarily addressed the extraterritorial reach of Section 10(b) of the Securities Exchange Act of 1934, establishing its applicability to securities transactions on U.S. exchanges or domestic transactions, thereby discarding the broader "conduct and effects" test. However, the Citigroup case presents a different scenario, involving the alleged use of BDRs, similar yet distinct from American Depositary Receipts (ADRs), for naked short selling. This activity reportedly had a direct impact on AMC's NYSE-listed stock, creating a tangible connection to the U.S. market and potentially bringing it under U.S. securities laws' purview.

Contrasting with Morrison, where the focus was on primarily foreign securities, the Citigroup case involves actions that allegedly directly influenced a U.S.-listed company's stock. This difference establishes a more direct link to U.S. securities markets and potential applicability of U.S. laws post-Morrison. Additionally, Citigroup's multifaceted role as AMC's banker, lender, and advisor adds layers of complexity and  direct effects on the U.S. securities market, distinguishing it from the jurisdictional concerns in Morrison, as Citigroup was the pre-genitor of the BDRs.

The aspect of naked short selling in the Citigroup case, particularly without proper backing (1to 1), represents a specific type of market manipulation that U.S. securities laws aim to regulate. Despite the Morrison ruling, this aspect could still attract regulatory scrutiny due to its direct implications for a U.S.-listed security. Morrison set a clear rule for the extraterritorial application of Section 10(b) but did not create an all-encompassing shield against all market misconduct with connections to U.S. markets. Therefore, Citigroup's specific actions and the resultant impacts of allegedly manipulating AMC's stock through BDRs fall within the scope of U.S. securities laws. Consider the situation as akin to fishing regulations in international waters versus territorial waters.

In <u>Morrison v. National Austl. Bank Ltd.</u>, 561 U.S. 247 (2010). is like establishing rules for fishing in international waters. The Supreme Court in Morrison decided that U.S. fishing regulations (akin to Section 10(b) of the Securities Exchange Act of 1934) do not apply in international waters (foreign securities transactions). They clarified that these rules are only enforceable in territorial waters (U.S. exchanges or domestic securities transactions). This ruling was significant because previously, there was ambiguity about whether U.S. fishing rules could be enforced in international waters if there was a significant effect on the U.S. ecosystem or U.S. citizens.

The Citigroup case involving Brazilian Depository Receipts (BDRs), however, is more like a scenario where someone is fishing in international waters but directly affecting the fish population in territorial waters. Here, Citigroup's use of BDRs (fishing in international waters) is alleged to have directly impacted the stock of AMC, a company listed on the NYSE (the fish population in U.S. territorial waters). The crucial point is that while the activity (use of BDRs) happens outside the usual jurisdiction, its effects are felt directly within the jurisdiction (impact on a U.S.-listed company's stock). This makes it more likely that U.S. rules could apply, despite the international setting of the activity, because the impact is directly on the resources (stock market) that the U.S. rules are designed to protect. In this analogy, just as international fishing regulations are distinct from territorial ones, the legal principles in <u>Morrison</u> (focusing on the location of the transaction) differ from those potentially applicable in the Citigroup case (focusing on the direct impact of foreign actions on U.S. markets)

In summary, differentiating the Citigroup case from <u>Morrison</u> hinges on highlighting the specific actions, impacts, and connections to the U.S. market in the Citigroup case. The focus

should be on the direct effect on a U.S.-listed stock and the particular allegations of market

manipulation, which collectively present a distinct legal landscape from that of Morrison.

107. Additionally, Citigroup had knowledge of their actions and their breaches of

representations every time they had lent AMC money. Citigroup has a fiduciary duty to identify

breaches of representation on "loan-by—loan and trust-by-trust basis" (Royal Park, 2016 U.S.

Dist.).[47] This dual role have prioritized Citigroup's interests above AMC's. The alleged "naked

short selling" and BDR manipulation suggest a failure to act in good faith and with due care

towards AMC, especially if these actions adversely impacted AMC's stock value. Additionally, if

Citigroup used AMC's confidential client information without consent, it would exemplify a

misuse of trust and data. Fiduciaries have an obligation to disclose actions or decisions that affect

the interests of their principal; thus, any undisclosed activities by Citigroup will be seen as a

breach of this duty. Further, if internal communications reveal a deliberate strategy to profit from

the depreciation of AMC's BDRs, it could suggest intentional misrepresentation or deceit.

Unauthorized creation of unsponsored BDRs without AMC's knowledge would also signal

overreach on Citigroup's part. If proven in a legal setting, these potential breaches could

significantly tarnish Citigroup's reputation and standing in the financial industry.

C.    CITIGROUP DEFENDANTS STOPPED RELEASING DATA

108. SEC Rule 605, titled "Disclosure of Order Execution Information," mandates that

market centers engaged in trading National Market System (NMS) securities must provide

standardized monthly reports containing statistical data related to covered order executions.[48]

---

[47] LEXIS 12982, 2016 WL 439020, at *6 (quoting Ret. Bd. of the Policemen's Annuity & Ben. Fund of
the City of Chi. v. Bank of N.Y. Mellon ("PABF"), 775 F.3d 154, 162 (2d Cir. 2014))
[48] SEC and FINRA RULE 605. Disclosure of Order Execution Information. FINRA.org. Link:
https://www.finra.org/rules-guidance/guidance/sec-rule-605

The primary objective of Rule 605 is to enhance transparency and promote competition in the realm of order execution quality, with a specific focus on execution price and speed. The statistical information provided by individual market centers will cover a range of order types executed by different broker-dealers on behalf of customers with diverse objectives. Therefore, relying solely on the statistical information mandated by Rule 605 provides a reliable basis for determining whether a specific broker-dealer obtained the most favorable terms for customer orders given the circumstances. The rule specifies that these reports should be available in an electronic format, accessible for download from a publicly accessible internet website, free of charge. Furthermore, the reports must remain available on the website for a period of three years from the date of initial posting.

109. It appears that Citigroup has ceased providing SEC Rule 605 data starting from April of 2022. The absence of files related to the required data suggests that Citigroup has discontinued its compliance with Rule 605 reporting requirements. It is alleged at the beginning of "Project Popcorn", Citigroup entered further into systemic risk territory as it was continuing to manipulate AMC stock and did not want to report on it. Major disparities in the execution reporting statistics would be visible in 605 reports to raise suspicions.

110. The logical relevance of Citigroup's decision to cease providing SEC Rule 605 data is closely tied to with the stock manipulation, specifically related to AMC stock as well as potentially others. As a leading depository bank, Citigroup can significantly influence a foreign company's share price through its management of a substantial volume of Brazilian Depositary Receipts (BDRs). Stopping the release of SEC Rule 605 data could serve to conceal any discrepancies or irregularities in the order execution data that indicates such manipulation. It can also indicate the number of canceled retail orders.

111. Logically, when retail orders are canceled, it alters the demand dynamics for the stock in the market. This is especially true in the case of Citigroup's ATS (Dark Pools). If significant volumes of orders are canceled, it can give a false impression of lower demand for the stock, leading to a decrease in the share price. If the cancellation of orders is systematic and large-scale, then it is logically inferred to be a strategic move to influence the stock price and then leading to market manipulation. From a legal perspective, the wanton cancellation of orders with the intent to manipulate the stock price is gross a violation of Federal securities laws and could potentially constitute market manipulation.

112. The idea that it could be financially more beneficial for Citigroup to pay fines for non-disclosure than risk the legal and financial implications of getting caught manipulating stocks provides a motive for this decision. This is a logical connection based on the potential risks and rewards associated with the bank's activities.

## D.    CITIGROUP'S "PROJECT POPCORN" SCAM

113. Short seller Citigroup, while serving as the banker for AMC, in collaboration with Antara and other defendants, devised a fraudulent plan to obtain AMC Common Shares through the creation and handling of AMC Preferred Equity Units (APE). Citigroup's role is complex and multifaceted in the series of events involving AMC and Antara. These actions have violated federal laws, including SEC regulations and FINRA rules.

114. In January of 2021, Citigroup had no AMC common shares to close their short and swap positions. They had entered systemic risk territory and were quite desperate for real shares. In the first half of 2021, AMC Board of Directors had asked stockholders (majority individual investors) to approve a proposal authorizing more AMC common stock in two instances. In the

first instance, the AMC Board asked for 500 million new authorized shares[49] and in the second

instance they asked for 25 million new authorized shares.[50] AMC's CEO Adam Aron cited

shareholder concerns about authorizing more shares at that time and withdrew the proposals

before the final votes were tallied.[51]

115. Near the end of 2021, AMC was still unable to raise capital through selling more

shares and had ongoing debt problems. In November 2021, AMC's banker, Citigroup, began

developing **"Project Popcorn,"** a potential issuance of an alternative form of equity that could

convert into AMC Common Stock (see Exhibit "I", attached hereto and incorporated herein by

reference). Citigroup suggested that AMC could call these rights "AMC Preferred Equity Units"

(APE) in February 2022. In a board meeting held on February 17th, 2022, Citigroup banker

Derek Van Zandt ("Mr. Van Zandt") explained that AMC planned to offer the preferred shares to

its retail stockholder base through a rights offering (initially). One AMC preferred unit would

---

[49] AMC Entertainment Announces At-The-Market Offering Program and Withdraws Proposal to Increase Authorized Shares. Press Release. April 27, 2021. Link:
https://investor.amctheatres.com/newsroom/news-details/2021/AMC-Entertainment-Announces-At-The-Market-Offering-Program-and-Withdraws-Proposal-to-Increase-Authorized-Shares/default.aspx
[50] AMC Proxy Statement. Filed on June 3, 2021. Link: https://investor.amctheatres.com/financial-performance/sec-filings/sec-filings-details/default.aspx?FilingId=15010652
[51] "AMC CEO: New APE stock class 'takes survival risk off the table'" Interview with CEO Adam Aron. Yahoo Finance Live. August 8, 2022. https://finance.yahoo.com/video/amc-ceo-ape-stock-class-162906608.html
In an August 8th, 2022 interview with Yahoo Finance Live, Defendant Aron was asked about the previous (2021) stockholder votes regarding dilution. Defendant Aron stated: "The shareholders didn't say, no, that they did not want us to issue more common stock. It was last summer-- May, June, July. We had it out for a shareholder vote. The vote was split. It was actually running favorable in favor of a stock issuance at the time. **But it was my opinion, my decision. I pulled the vote.** I pulled the tabulation. I took the question off the table. And the reason I did that back then is while we were winning the vote, it was close, and I didn't think that on something this important, we should do it at a time when the shareholders were not for it in big numbers."

convert into one share of common stock, subject to shareholder authorization (see Exhibit I).[52,53] Pursuant to the minutes of the AMC board meeting on February 17, 2022, Van Zandt updated the Board as follows: Mr. Van Zandt provided background on AMC's preferred equity offering. He explained,

> "that Company was short on common shares but had 50M shares of preferred stock which might be used to raise cash. Preferred stock offerings traditionally pay a high dividend, are convertible, and are sold to large institutions. **Company is restricted from paying cash dividends and plans to offer the preferred shares to its retail stockholder base through a rights offering which is common in Europe but less so in the US.** One AMC preferred unit would convert into one share of common stock, subject to shareholder authorization. The preferred unit would be listed and trade on the NYSE and have an observable value. Our retail stockholders can purchase the preferred unit or sell the right which is itself a tradable security. *The rights are dilutive so the shareholders are incented to buy the shares to avoid dilution.*"[54]

Van Zandt also detailed the exact process by which preferred stock could be used to increase the number of shares of Common Stock authorized for issuances.  On May 17th, 2022, at 8:31 pm, Senior Managing Director Geoffrey Weinberg from D.F. King sent an email to AMC's two in house attorneys, Kevin Connors and Eddie Gladbach.  **The email discussed using super voting preferred stock and proportional voting to effectively lower the standard for an amendment.**[55]

---

[52] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) Docket Index (D.I.) 206 - The Plaintiff's Opening Brief, p 14-17.  Link: https://www.docketalarm.com/cases/Delaware_State_Court_of_Chancery/2023-0215/IN_RE_AMC_ENTERTAINMENT_HOLDINGS_INC._STOCKHOLDER_LITIGATION/9168774 6/

[53] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) Docket Index (D.I.) 322 Plaintiffs Brief Cited Exhibits - Page 909-911. Link: https://www.docketalarm.com/cases/Delaware_State_Court_of_Chancery/2023-0215/IN_RE_AMC_ENTERTAINMENT_HOLDINGS_INC._STOCKHOLDER_LITIGATION/9180264 2/. See Exhibit I

[54] Id, page 618.
[55] Id, page 829-831

116. On May 19th, 2022, at 6:04 pm, Kevin Connor, drafted an email with the subject titled:
AMC- Preferred Issuance, and CC'ed  Adam Aron and Eddie Gladbach, and emailed John
Merriwether and Sean Goodman stating,

> "Sean / John (and copying Adam),
>
> Further to my note to you on May 9 and per the below we continue to explore
> with Weil/DF King **a unique dividend structure that might allow us to
> authorize more common stock (redacted information).** Since I sent my prior
> note, we have checked with DE counsel and (redacted information). **We also
> checked with the NYSE and to my surprise they have no objection**. The
> tricky part now is determining whether if we implemented something similar to
> effect share authorization – would the vote carry?.... Kevin"[56]

117. Kevin Connor's May 19, 2022 email, proves, that the purpose of the "unique dividend
structure" was to be able to issue more common stock. It was not about a debt repayment or
restructuring. On May 27, 2022, at 1:40 pm, John Merriman from B. Riley Financial, drafted an
email with the subject titled: super voting pref, and copied his colleagues Patrice McNicoll and
Layne Rissolo, and his attorneys at Duane Morris, Dean Colucci and James Seery, and emailed
John Merriwether and Sean Goodman stating,

> "Sean, John – great to see you guys this week – thank you so much for coming
> to our event. Sean I hope you didn't have equal drama on the way home – what
> a story! Suggest we get on a call with the lawyers next week and talk on this
> structure. **Then you and your team can get with the NYSE and see if this
> could work for AMC.** In the meantime Layne would you please send the
> Nasdaq precedents. Copied our counsel at DM (Duane Morris) who has helped
> us here. Suggest Tuesday at 10EST to start.
>
> Great weekend everyone!
>
> Jon Merriman"[57]

---

[56] Id
[57] Id, page 827

118. Approximately four hours later, at 5:58 pm,  John Merriman  drafted another email with the same subject title: super voting pref, and CC'ed  his colleagues Patrice McNicoll and Layne Rissolo, and his attorneys at Duane Morris, Dean Colucci and James Seery, and emailed John Merriwether and Sean Goodman stating: "Weekend reading – talk soon - Jon Merriman". Attached to Jon Merriman's 5:58 pm email (see Exhibit "AB", attached hereto and incorporated herein by reference) were prospectuses from three issuers that had used super voting preferred shares to force through certificate amendments. The three issuers were: (1) Agile Therapeutics Inc (ticker symbol AGRX), (2) Avinger Inc (ticker symbol AVGR), and (3) OpGen Inc (ticker symbol OPGN).[58] All three stocks on are the NASDAQ and are down over 90% in value from the release of the preferred shares until now (November 2023). Even in comparison from when the preferred shares where launched until the May 2022 date, the stock values were down well over 50% and moving on a continual downward trend (See Exhibit "AD", attached hereto and incorporated herein by reference).[59] The actions taken on these tickers destroyed shareholder value. Specifically AGRX and AVGR, and OPGN all had a convertible preferred stock and a reverse split (actually multiple reverse splits), but it did not help their overall long term share value.  These facts are set forth in Exhibit AB and Exhibit AD, which is attached here to and incorporated by reference.

119. This email with these tickers listed as examples and attachments is direct evidence that AMC, D.F. King, and Citigroup were in ongoing discussions and knew ahead of time that pushing forward this AMC preferred share (and reverse split) scheme would absolutely destroy

---

[58] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) Docket Index (D.I.) 322 Plaintiffs Brief Cited Exhibits - Page 827. Link: https://www.docketalarm.com/cases/Delaware_State_Court_of_Chancery/2023-0215/IN_RE_AMC_ENTERTAINMENT_HOLDINGS_INC._STOCKHOLDER_LITIGATION/9180264 2/.
[59] Google search stock charts (referencing exchange data) for AGRX, AVGR, and AMC. Screenshot taken on November 1, 2023.

shareholder value. Given the similarities in the massive loss of shareholder value between the stock tickers AGRX, AVGR, and AMC, it is clear that the AMC, D.F. King, and Citigroup colluded to run an intentional controlled demolition scheme that had been run before to hurt AMC shareholders stock value. A fair question would be if AMC and Citigroup also colluded through email or other means with the other defendants (Citadel, Virtu, NYSE, NASDAQ, etc) in order to implement this scheme against AMC Shareholders. **If the some or all of the defendants did collude, and the scheme was deemed illegal, then their illegal activity falls under RICO.**

120. On May 31st, 2022, at 11:27 pm, Kevin Connor, drafted an email with the subject titled: FW: AMC- Preferred Issuance, and CC'd Eddie Gladbach, and John Merriwether, and emailed Sean Goodman stating,

> "Sean, Seems like we should get this in front of Adam as discussed at end of call this morning. Should we do this on a standalone basis, or in conjunction with an update call on CSE? Probably the latter, as it seems like we would do one or the other, but perhaps not both. Question then becomes at what point we want to let Citi know we are pondering another share authorization vote, including one that might displace the CSE. Since B Riley has thoughts about a share authorization mechanic I suspect Citi might as well. Will give you a call at your convenience today to discuss. Let me know a good time. Thanks, Kevin."[60]

121. Initially, the APE offering was planned to be a Shareholder Rights Offering. Per Investopedia, "A rights offering (rights issue) is a group of rights offered to existing shareholders to purchase additional stock shares, known as subscription warrants, in proportion to their existing holdings."[61] A shareholder rights offering has less of a dillutive effect than an at-the-market (ATM) offering, because the shareholder rights offering only sells stock to existing and interested shareholders. An ATM offering is more open ended and can sell new stock to any individual or

---

[60] Id, page 829
[61] Hayes, Adam. "Rights Offering (Issue) Definition, Types, Pros and Cons". Investopedia.com. Updated September 05, 2023. Link: https://www.investopedia.com/terms/r/rightsoffering.asp

entity. However, on July 20th, 2022, Sean Goodman, AMC's Executive Vice President and Chief Financial Officer, sent a memorandum to the Board concerning the Preferred Stock and APEs. It details the proposal, **and notes for the first time in the document production that AMC planned to sell APEs in an at-the-market offering:** "We plan to raise additional equity capital through an At-the-Market offering of Preferred Equity Units. **The amount and timing will be determined based on market conditions and strategic opportunities. We are ready to act quickly.**"[62]

122. In Sean Goodman's Memorandum, he acknowledged that "[i]ndex funds that own AMC common shares will likely be required to sell the Preferred Equity Units, while this may put pressure on the value of the Preferred Equity Units, lower index fund ownership also means less shares available for short sellers to borrow and this could have an offsetting positive impact on the trading value of the Preferred Equity Units."[63]   The primary goal of the collusion between Citigroup and AMC was to dilute AMC Common Stock via several intermediate steps. Overcoming the legal hurdle of "authorized shares," they devised a cunning plan that involved the creation of a new tradeable security with significant implications. The subsequent crucial step was to ensure widespread acceptance and participation by their shareholder base.  In February 2022, Citigroup proposed labeling these rights as "AMC Preferred Equity Units" or "APEs.". The choice of this name was deliberate, as CEO Adam Aron emphasized it in his August 4, 2022 tweetstorm and explicitly appealed to the existing "APE movement" among his dedicated shareholders.

---

[62] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) Docket Index (D.I.) 322 Plaintiffs Brief Cited Exhibits - Page 914-915. Link: https://www.docketalarm.com/cases/Delaware_State_Court_of_Chancery/2023-0215/IN_RE_AMC_ENTERTAINMENT_HOLDINGS_INC._STOCKHOLDER_LITIGATION/9180264 2/.
[63] Id

123. The parties involved in "Project Popcorn" were evidently aware of the dilutive impacts on AMC Common shares – as it was designed that way. They knew the risks of institutional investor selling off these new equity units, which could potentially lead to retail shareholders selling off their APE special dividend as well.[64] These actions strongly indicate a coordinated effort to exploit the situation for personal gain, while disregarding the financial harm caused to shareholders. Both the ATM offering and the convertible preferred stock and reverse split scheme are a clear breach of fiduciary duty for both AMC (against their shareholders) and Citigroup (against AMC and AMC shareholders).

124. In July 2022, the Board approved a "dividend" of one APE for every outstanding share of common stock. AMC's CEO indicated that this was vital to shore up the company's liquidity and gave AMC a new currency to pay down debt and avoid future liquidity traps.[65] This was a lie. AMC did not fully disclose certain implications of the APEs, such as the voting power associated with these units and the transfer agent's (Computershare's) requirement to vote uninstructed APEs proportionally with instructed APEs, which essentially provided APEs with superior voting power. Within internal documentation, "Goodman acknowledged that "[i]ndex funds that own AMC common shares will likely be required to sell the Preferred Equity Units, while this puts pressure on the value of the Preferred Equity Units, lower index fund ownership also means less shares available for short sellers to borrow and this could have an offsetting

---

[64] PLAINTIFFS' OPENING BRIEF, EFiled: May 04 2023; Transaction ID 69958454; Section B, Page 17/18: "Mr. Aron indicated that AMC needed to raise more capital but was out of common shares.... The dividend will halve the price of our Common Stock, but shareholders will also own an APE and have close to the same combined value after the split.... Mr. Aron indicated that many retail shareholders were begging for a dividend to validate a proper share count, that the dividend does not change their economic holdings at all (it is the equivalent of a stock split) and that the dividend was vital to shore up Company's liquidity.... Mr. Aron outlined the downside scenario, if shareholders react negatively."
[65] *Id.*

positive impact on the trading value of the Preferred Equity Units."[66] This risk to shareholder value who would be assigned the APE units was not disclosed to shareholders before the release of APE in August 2022.

125. On August 4th, 2022, after exhausting AMC's authorized common stock, AMC's CEO Adam Aron announced the creation of the APE "special dividend" distributed to holders of AMC common stock. AMC described the preferred stock units as a "MIRROR-IMAGE" of AMC common stock with identical "economic and voting rights".[67] By design, the APE "special dividend" was designated to automatically convert into Common Stock upon a share increase sufficient to permit full conversion.[68] This gave the AMC Board the ability to circumvent the rights and powers of shareholders and sell a mirror-image security without the required authorization.[69] AMC claimed that there were 5 billion APEs authorized (as compared to around 519 million AMC common stock shares authorized before reverse split and conversion), which is nearly ten times the original outstanding share float of AMC (516.8 million shares at the time). The APE dividend was dilution without shareholder approval.[70]

---

[66] *Id.* And AMC_00047255 and AMC_00047256 (shown in page 914-915 of the plaintiff's exhibits) from Consolidated C.A. 2023-0215-MTZ (Del. Ch.) Docket Index (D.I.) 206 and AMC_00047256, see Exhibit J ("Exhibit J", attached hereto and incorporated herein by reference). Link: https://www.docketalarm.com/cases/Delaware_State_Court_of_Chancery/2023-0215/IN_RE_AMC_ENTERTAINMENT_HOLDINGS_INC._STOCKHOLDER_LITIGATION/91802642/

[67] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) Docket Index (D.I.) DI 200 at 10,12  - The Defendant's Opening Brief - Link: https://www.docketalarm.com/cases/Delaware_State_Court_of_Chancery/2023-0215/IN_RE_AMC_ENTERTAINMENT_HOLDINGS_INC._STOCKHOLDER_LITIGATION/91685951/

[68] *Id* at 10

[69] *Id.*

[70] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) Docket Index (D.I.) 95 & 186
Link: https://www.docketalarm.com/cases/Delaware_State_Court_of_Chancery/2023-0215/IN_RE_AMC_ENTERTAINMENT_HOLDINGS_INC._STOCKHOLDER_LITIGATION/91602309/
Link: https://www.docketalarm.com/cases/Delaware_State_Court_of_Chancery/2023-

126. AMC claimed that APE was authorized by shareholders previously but that is false. The APE stock was not authorized by shareholders, however, the AMC board of directors under the recommendation by Citigroup, forced the APE shares onto AMC common stock shareholders.

127. Although at odds with public statements of AMC Corporate, on July 28th, 2022, AMC filed a Certificate of Designations with the Delaware Secretary of State outlining designations for APE.[71] More specifically, in prescribing APE's "Voting" rights the AMC's Certificate of Designations instructs APE: "shall not be entitled to vote together with Common Stock with respect to any matter at a meeting of the stockholders of the Corporation, which under the applicable law or the Certificate of Incorporation requires a separate class vote". [72]

128. On August 4th, 2022, AMC Corporate entered into an Agreement with Computershare Inc. without shareholder approval.[73] Under the accord, the underlying Preferred Stock (previously authorized by shareholders), used to form APE preferred equity units (not authorized by shareholders), were deposited with Computershare Inc. and governed by deposit agreement ("the Computershare Depositary Agreement").

0215/IN_RE_AMC_ENTERTAINMENT_HOLDINGS_INC._STOCKHOLDER_LITIGATION/9166017
3/
[71] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) DI 1 - Verified Class Action Complaint Seeking Declaratory, Injunctive, and Equitable Relief - Link:
https://www.docketalarm.com/cases/Delaware_State_Court_of_Chancery/2023-
0215/Allegheny_County_Employees%27_Retirement_System_on_behalf_of_itself_and_all_other_simila rly-
situated_Class_A_stockholders_of_AMC_Entertainment_Holdings_Inc._v._AMC_Entertainment_Holdin gs_Inc/90908039/
[72] *Id.*
[73] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) DI 200  (The Defendant's Opening Brief) at 11

129. The Computershare Depositary Agreement instructs Computershare to vote all of the preferred stock in its custody "proportionally" on non-routine matters and routine matters.[74] In other words, the uninstructed- and non-affirmative - votes of APE holders can be farmed to be vote at a rate mirroring instructions from participating voters.[75] AMC common stock has no such arrangement with brokers holding common stock.[76]  On September 26th, 2022, AMC Corporate disclosed that they entered into an equity distribution agreement with Citigroup to offer and sell 425 million APE shares.[77]

130. Although AMC Corporate "anticipated that (the APE) would trade at or around the same price" the preferred stock equity units traded at just a fraction of AMC.[78] With the "expand(ing) trade differential",[79] CEO Aron urged the pricing committee to lower the $2 minimum price Citibank could distribute APE for.[80]

131. Derek Van Zandt from Citigroup introduced CEO Aron to Antara Capital ("Antara") in early December 2022.[81] An email from Citigroup's Derek Van Zandt to AMC's Adam Aron, Sean Goodman, and Kevin Connor on December 8, 2022 shows that (1) Antara was willing to put up a set amount of capital in order to allow AMC to rig the vote, (2) Antara requested AMC to not sell any more APE shares until post vote, and that (3) AMC would lift the restriction for Antara selling APE shares if the price went above 3 dollars, ensuring Antara would have a

---

[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) DI 206 (The Plaintiff's Opening Brief) at 19. Link: https://www.docketalarm.com/cases/Delaware_State_Court_of_Chancery/2023-0215/IN_RE_AMC_ENTERTAINMENT_HOLDINGS_INC._STOCKHOLDER_LITIGATION/9168774 6/
[78] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) DI 200 (The Defendant's Opening Brief) at 12,13
[79] *Id* at 13
[80] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) DI 206 at 20
[81] *Id.*

windfall of profit. This email reads as alleged market manipulation, insider trading, and rigging of corporate voting (see Exhibit "K", attached hereto and incorporated herein by reference).[82]

132. Antara agreeing to hold shares until the vote and vote in favor of conversion demonstrated that the Antara Transaction was not about raising capital from Antara, but rather about giving Antara a windfall to ensure it would vote in favor of the Certificate Amendments. Once Antara agreed to an understanding to buy and hold APE until after they pledged votes in favor of AMC Board's proposals (for a reverse split and conversion of APE into AMC common stock), CEO Aron began working out a deal to ensure Antara a windfall in exchange for a successful proxy vote.[83] The deal eventually closed on December 21, 2022 with Antara getting a holiday discount from CEO Aron of approximately 66 cents an APE, AMC Corporate gifted a rigged vote, and AMC common shareholders coal (See Exhibit "L", attached hereto and incorporated herein by reference).[84,85]  Cumulatively, after several transactions with AMC Corporate, Antara ended up with approximately 27.8% of the outstanding APE shares representing 17.8% of AMC's total voting power.[86] The hoard of APE held by Antara made the hedge fund, by definition, an interested party. Ultimately, the stockpiled Antara pledged votes were leveraged through the Computershare Depositary Agreement to ensure AMC Board's

---

[82] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) DI 322, On Exhibit 1, page 8 of the Plaintiffs cited exhibits, also doc AMC_00000050 from that case, see Exhibit K
Link: https://www.docketalarm.com/cases/Delaware_State_Court_of_Chancery/2023-0215/IN_RE_AMC_ENTERTAINMENT_HOLDINGS_INC._STOCKHOLDER_LITIGATION/91802642/
[83] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) DI 206 at 20
[84] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) DI 206 at 21-23.
[85] AMC Press Release Announcing Antara Deal. December 22, 2022. Link:
https://investor.amctheatres.com/newsroom/news-details/2022/AMC-Entertainment-Holdings-Inc.-Announces-110-Million-Equity-Capital-Raise-a-100-Million-Debt-for-Equity-Exchange-and-a-Proposed-Vote-to-Convert-AMC-Preferred-Equity-APE-Units-Into-AMC-Common-Shares-and-Implement-a-Reverse-Stock-Split/default.aspx,  see Exhibit L below
[86] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) DI 206 at 21-24.

proposals were locked. However, without either: the Computer Share Agreement or Antara deal, AMC Corporate could not harvest the required affirmative vote to authorize the conversion of the APE stock into AMC common. The Antara deal and scheme for a rigged corporate vote was a clear violation of 18 U.S.C. §§ 1341 and 1343.[87,88]

133. The plain language adopted in the Certificate of Incorporation only grants authorization for the board to adopt a resolution. Under, DGCL 242 (a)(3), when the resolution seeks to "increase or decrease its authorized capital stock or to reclassify the same, by changing the... designations, preferences, or relative, participating, optional, or other special rights of the shares, or the qualifications, limitations or restrictions of such right", such a resolution must be proposed and authorized through a certified amendment consistent with DGCL 242 (b).[89]

134. AMC's FORM 10-Q August 4th, 2022 filing lists 516,820,595 outstanding AMC common shares at that time.[90] On the same day, just before the APE stock dividend was announced, AMC stock closed at $18.66, resulting in a total market capitalization of $9,643,872,302.70.[91] On July 21, 2023, AMC Common Stock closed at a price of $4.40 per share, and APE closed at a price of $1.80 per unit. Since the introduction of APE, AMC shareholders have lost $5,567,694,243.30 (5.56 billion in market cap value) total market value (based on authorized shares of AMC and APE) in less than a year.

---

[87] 18 U.S. Code § 1341 - Frauds and swindles. Cornell Law School Legal Information Institute. Link: https://www.law.cornell.edu/uscode/text/18/1341

[88] 18 U.S. Code § 1343 - Fraud by wire, radio, or television. Cornell Law School Legal Information Institute. Link: https://www.law.cornell.edu/uscode/text/18/1343

[89] See DGCL 242 (a)(3), see also Rothschild Int'l Corp. v. Liggett Gp. Inc.,474 A.2d 133, 136 (Del. 1984). Link to DGCL 242: https://delcode.delaware.gov/title8/c001/sc08/index.html

[90] AMC's Form 10-Q. August 4, 2022. Link: https://investor.amctheatres.com/financial-performance/sec-filings/sec-filings-details/default.aspx?FilingId=15993122

[91] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) D.I. 95 & 186

135. On August 6, 2022, Adam Aron stated publicly to shareholders on Twitter that "the AMC share should approximately trade for 50% and the APE unit 50% of where shares trade just before the dividend."[92] In August 2022, AMC released a document on their website (and filed with the SEC) entitled AMC Preferred Equity unit ("APE") Dividend Frequently Asked Questions. The document stated "Because the AMC Preferred Equity unit is designed to have the same economic value and voting rights as a share of common stock, in theory, the common stock and AMC Preferred Equity unit should have similar market values and the impact of the AMC Preferred Equity unit dividend should be similar to a 2/1 stock split."[93] At no point that day and subsequent days did AMC and Ape trade at parity (the same price) instead their spread (difference in prices) only increased. APE opened at $6.95 when it was released on August 22, 2022.[94] From there, in just a few months' time, the stock was shorted down to $0.65 at its lowest on December 19, 2022.[95] AMC always traded higher than APE throughout much of 2022-2023 and AMC actually was priced several multiples higher than APE. There are many potential reasons for why it never traded at the same price including potentially lack of shareholder approval/notice, funds not being able to hold APE, more total APE shares in existence, shorting, and other possible market manipulation. While APE was advertised as a dividend, it is not. APE acted more like a split, and traded more like a high risk bond.

---

[92] AMC's CEO Adam Aron Twitter Post to Shareholders. Twitter.com  August 6, 2022.  Link
https://twitter.com/CEOAdam/status/1555946487384866817
[93] AMC Preferred Equity unit ("APE") Dividend Frequently Asked Questions.  AMC posted on their website and submitted to the SEC. SEC.gov. August 2022. Link:
https://www.sec.gov/Archives/edgar/data/1411579/000110465922092397/tm2223780d1_ex99-1.htm
[94] APE Historical Data. Investing.com. Link: https://www.investing.com/equities/amc-entertainment-holdings-inc-historical-data.
[95] *Id*

136. Antara Capital, LLC (Antara) was one of the institutions that was shorting the APE stock. On December 22nd, 2022, AMC announced the sale of APE to Antara via a press release. That press release also explained "AMC's Board of Directors is seeking to hold a special meeting for holders of both AMC common shares and APE units (voting together) to vote on the following proposals: To increase the authorized number of AMC common shares to permit the conversion of APE units into AMC common shares. To affect a reverse-split of AMC common shares at a 1:10 ratio. To adjust authorized ordinary share capital such that, after giving effect to the above proposals if adopted, AMC would have the same ability to issue additional common equity as it currently has to issue additional APE units. As part of the agreement, Antara has agreed to hold their APE units for up to 90 days and vote them at the special meeting in favor of the proposals."[96]

137. On March 14th, 2023, AMC held the shareholder meeting to vote on the proposed reverse split and conversion of AMC and APE. At the time, there were 517,580,416 eligible shares of AMC's Company's Class A common stock and 929,849,612 eligible AMC Preferred Equity Units were available to vote. Based on AMC corporate's calculations, the votes for both AMC and APE shares were combined to determine the final results. AMC reported that out of approximately 929.8 million APE shares, 842,782,544 voted in favor of the reverse split proposal, 80,570,613 voted against, and 6,695,864 abstained. In the case of AMC shares,

---

[96] AMC Press Release. December 22, 2022. Link:
https://investor.amctheatres.com/newsroom/news-details/2022/AMC-Entertainment-Holdings-Inc.-
Announces-110-Million-Equity-Capital-Raise-a-100-Million-Debt-for-Equity-Exchange-and-a-Proposed-
Vote-to-Convert-AMC-Preferred-Equity-APE-Units-Into-AMC-Common-Shares-and-Implement-a-
Reverse-Stock-Split/default.aspx

128,344,709 voted in favor of the reverse split proposal, while 51,388,638 voted against, and 2,609,383 abstained.[97]

138. According to the reported results, every APE share was voted and recorded, because approximately 63% of the APE share votes were voted and recorded on time, and AMC corporate instructed Computer Share to vote in favor of the proposals the remaining percentage (37%) who did not vote on time. However, for AMC common shares, only 35% of the shares were voted and recorded. AMC corporate rigged the reverse split and merger vote by combining the total yes votes for AMC, APE, the APE votes they sold to Antara (in violation of NYSE Section), and the transfer agent mirrored yes votes in order to say that the reverse split and conversion passed. Additionally, AMC corporate violated DGCL 242 by forcing both the AMC and APE votes to held together instead of separately. "On March 14, 2023, the Certificate Amendments passed at the Special Meeting. Without the mirrored voting and the Antara Transaction, the proposals would not have passed - a fact acknowledged by AMC internally."[98] The March 14, 2023 voting results were never verified by shareholders or a third party.

139. On February 20, 2023, two lawsuits were filed against AMC from (1) Allegheny and (2) two shareholders named Munoz and Franchi. The suit alleged that the company had violated Delaware law by issuing the APEs without shareholder approval. Those two lawsuits were consolidated into Consolidated C.A. 2023-0215-MTZ (Del. Ch.). In April 2023, AMC and the plaintiffs reached a settlement agreement. Under the terms of the settlement, AMC would pay the

---

[97] AMC Form 8k. March 15, 2023. Link: https://investor.amctheatres.com/financial-performance/sec-filings/sec-filings-details/default.aspx?FilingId=16490544
[98] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) D.I. 206 (link below) and AMC_00049559 (in exhibits) Link: https://www.docketalarm.com/cases/Delaware_State_Court_of_Chancery/2023-0215/IN_RE_AMC_ENTERTAINMENT_HOLDINGS_INC._STOCKHOLDER_LITIGATION/91802642/

Plaintiffs' Counsel 20 million and the rest of the settlement would involve issuing new shares post reverse split/merger to shareholders. The plaintiffs' estimate the value of the new shares would be over 100 million.[99] The settlement also required AMC to amend its certificate of incorporation to make it more difficult for the company to issue new equity securities without shareholder approval. The AMC and APEs lawsuit is a significant case because it could have implications for other companies that are considering issuing new equity securities. The settlement agreement in this case sends a message to companies that they need to be careful about how they issue new equity securities, or they could face legal challenges from their shareholders.

140. 10.Exhibit AK (Exhibit "AK", attached hereto and incorporated herein by reference) displays an email exchange within Antara. To give background, As part of the CONSOLIDATED C.A. No. 2023-0215-MTZ case, AMC "alleged" that the reverse split, conversion, and settlement were necessary to negate AMC's supposed risk of bankruptcy and increase liquidity for the company. One objector (Ms. Izzo) to the proposed settlement for case CONSOLIDATED C.A. No. 2023-0215-MTZ obtained counsel, and that counsel obtained access to discovery as part of their drafting their objection. Through that discovery, they found that Antara admitted in emails that AMC could free up to $2.25 billion in liquidity if AMC amended their loan provisions. This fact deflated the entire theory that AMC was at risk of imminent bankruptcy and the reverse split and conversion was necessary.[100]

---

[99] Consolidated C.A. 2023-0215-MTZ (Del. Ch.). D.I. 206 - Plaintiff's Opening Brief - Link: https://www.docketalarm.com/cases/Delaware_State_Court_of_Chancery/2023-0215/IN_RE_AMC_ENTERTAINMENT_HOLDINGS_INC._STOCKHOLDER_LITIGATION/9168774 6/

[100] Izzo's counsel later supplemented the record with documents referenced in their objection and approved to released publicly from discovery, this document contains 2 related emails from Antara. See Exhibit AK. Link: https://www.docketalarm.com/cases/Delaware_State_Court_of_Chancery/2023-

141. On July 21, 2023, Vice Chancellor Zurn issued a written opinion against the proposed settlement. Vice Chancellor Zurn's opinion focused on the proposed settlement requesting the release of APE claims as the main reason for rejecting the proposed settlement. However, Zurn's also called out the APE issuance for being a blank check for issuing more shares, the mirrored voting by computer share, and the lack of common share support (less than 50% of authorized common shares voted in favor) for the March 14, 2023 reverse splits and APE to AMC conversion proposals.[101]  A revised proposal (with no additional substantial evidence) was later approved by the Court of Chancery on August 11, 2023 after hours, which rubber stamped the reverse split of AMC and APE and merger of the APE shares into AMC common stock, which resulted in devastating losses for AMC shareholders.   AMC Stock closed at $5.26 (pre-split, $52.60 adjusted if you post split number) on August 11, 2023. Once the proposal for the reverse split was approved (and later implemented in August 2023), AMC stock is now (as of November 2, 2023) trading at the equivalent of $1.049 (pre-split numbers, and $10.49 post split), which is approximately a 80% drop in stock value over a short period of time, which caused great financial loss for AMC shareholders.

142. Citigroup allegedly used deceptive practices  (a violation of 10(b), Rule 10b-5) misrepresented, and left factual omissions about itself when it played a dual role as AMC's underwriter, lender, and banker, creating a conflict of interest (see Securities Act of 1933, §11, 15 U.S.C. §77k). The Glass-Steagall Act §20& 32, although largely repealed, some provisions that

---

0215/IN_RE_AMC_ENTERTAINMENT_HOLDINGS_INC._STOCKHOLDER_LITIGATION/9195328 3/91953284/
[101] Consolidated C.A. 2023-0215-MTZ (Del. Ch.).D.I. 581 - Opinion Regarding Proposed Settlement, Issued July 21, 2023 by Vice Chancellor Zurn - Link:
https://www.docketalarm.com/cases/Delaware_State_Court_of_Chancery/2023-
0215/IN_RE_AMC_ENTERTAINMENT_HOLDINGS_INC._STOCKHOLDER_LITIGATION/9219003 5/

prohibit a bank from having affiliations with companies that are primarily engaged in securities activities is relevant here. Citigroup created a monopoly through a combinations of practices including restraining trading of two of AMC's securities, colluding with others, and had maintained a monopoly and attempted to monopolize further which is a violation of Anti-Trust Violations Clayton Act § 4, 15 U.S.C. § 15, The Sherman Antitrust Act, 15 U.S.C. § 1 & 2; Securities Act of 1933, Section 17(a)).[102]

143. In a quid pro quo deal dating back to 2015 between AMC and Citigroup reportedly extended billions of dollars in unsecured loans and credit to AMC without secured collateral (12 C.F.R. § 1.7 3(b),(d)).[103] This contravenes the regulations outlined in 12 C.F.R. § 1.7 3(b), (d), which aim to prevent banks from taking undue financial risks (12 C.F.R. § 1.7 3(b),(d)). Unsecured lending is in direct violation of the federal regulations cited, which aim to ensure that banks do not expose themselves to unnecessary risk. When Citigroup in their dealings with AMC, had taken on undue risk that could affect its solvency and put its depositors and stakeholders at risk. The alleged unsecured lending to AMC means that Citigroup was and could possibly still be in systemic risk, as it did not adhere to regulatory guidelines designed to safeguard its bank's financial stability and the interests of its stakeholders (12 C.F.R. § 1.7 3(b),(d)). Citigroup by contravening 12 C.F.R. § 1.7 3(b) and (d), Citigroup have jeopardized its own financial stability and thus the interests of its stakeholders. Banks are obligated to follow regulatory guidelines to ensure they remain financially stable and act in the best interests of their stakeholders.

---

[102] 15 U.S. Code § 1,2 - The Sherman Antitrust Act. Ecfr.gov. Link: https://www.ecfr.gov/current/title-15
[103] 12 CFR § 1.7 Securities held in satisfaction of debts previously contracted; holding period; disposal; accounting treatment; non-speculative purpose. ecfr.gov. Link: https://www.ecfr.gov/current/title-12/section-1.7

144. It's alleged that in return AMC would provide Citigroup and other lenders and financiers like Mudrick Capital with non-public, insider information for derivatives and swaps (Securities Exchange Act of 1934, Section 10(b) and Rule 10b-5; 18 U.S.C. §§ 1341 and 1343).[104],[105] It is unlawful for any person to use or employ any manipulative or deceptive practices in connection with the purchase or sale of any security, including derivatives and swaps, or to communicate non-public, insider information for trading derivatives and swaps, by mail or wire (18 U.S.C. §§ 1341 and 1343).

145. Citigroup is accused of using this information to place derivatives and swaps on AMC securities, which is a violation of the Securities Exchange Act of 1934, Section 10(b) and Rule 10b-5; 18 U.S.C. §§ 1341 and 1343; FINRA Rules 2020, 2010, 2150, 3110, 5320, 5210, 4530. Citigroup is implicated in holding AMC related securities for speculative purposes, which is against the regulations stipulated in 12 C.F.R. § 1.7 3(d). It is unlawful for any person to use or employ any manipulative or deceptive practices in connection with the purchase or sale of any security, or to communicate non-public, insider information for trading securities, by mail or wire (18 U.S.C. §§ 1341 and 1343; FINRA Rules 2020, 2010, 2150, 3110, 5320, 5210, and 4530) require brokers to conduct themselves with high standards of ethics and professionalism, including fair dealing and supervision. Specifically, brokers must not use manipulative, deceptive, or fraudulent devices; misuse customer securities or funds; trade ahead of customer orders; or publish manipulative or deceptive quotations. Firms must also establish and maintain a

---

[104] 18 U.S. Code § 1341 - Frauds and swindles. Cornell Law School Legal Information Institute. Link: https://www.law.cornell.edu/uscode/text/18/1341
[105] 18 U.S. Code § 1343 - Fraud by wire, radio, or television. Cornell Law School Legal Information Institute. Link: https://www.law.cornell.edu/uscode/text/18/1343

system to supervise the activities of their associates and report any violations (FINRA Rules 2020, 2010, 2150, 3110, 5320, 5210, and 4530).

146. Citigroup, while serving as AMC's banker and lender, is also alleged to have acted as a hedge fund shorting AMC stock, while serving as AMC's lender, which is a serious conflict of interest. Citigroup engaged in proprietary trading and had certain ownership interests in hedge funds while serving as AMC's banker, this is a violation of Section 619 of the Dodd-Frank Act (Volcker Rule") and 12 U.S.C. § 1851.[106,107] Citigroup's roles as AMC's banker, lender, and as a party shorting AMC's stock constitutes a breach of fiduciary duty under the Investment Advisers Act of 1940, Section 206, 15 U.S.C. § 80b-6.[108,109] The bank's conflict of interest and self-dealing—by both advising and financially undercutting AMC—violates its fiduciary obligations to act in AMC's best interest. Furthermore, Citigroup's alleged failure to disclose this conflict and its risky activities is also construed as a breach of its duty of care and skill owed to AMC as its adviser. These actions together form the basis for a legal claim of breaching fiduciary duty under the cited law. The short positions and swap positions were so large, dangerous, and toxic that there is no way that every business side of Citigroup had not known about it (Investment Advisers Act of 1940, Section 206, 15 U.S.C. § 80b-6).

---

[106] Section 619 - Volcker Rule. U.S. Securities and Exchange Commission. Link: https://www.sec.gov/spotlight/dodd-frank-section.shtml#619
Section 619 of the Dodd-Frank Act: Prohibition on proprietary trading and certain relationships with hedge funds and private equity funds (joint rulemaking)
[107] 12 U.S. Code § 1851 - Prohibitions on proprietary trading and certain relationships with hedge funds and private equity funds.  Cornell Law School Legal Information Institute. Link: https://www.law.cornell.edu/uscode/text/12/1851
[108] Investment Advisers Act of 1940.  SEC.gov.  Link: https://www.govinfo.gov/content/pkg/COMPS-1878/pdf/COMPS-1878.pdf
[109] 15 U.S. Code § 80b-6 - Prohibited transactions by investment advisers. Cornell Law School Legal Information Institute. Link: https://www.law.cornell.edu/uscode/text/15/80b-6

147. During the relevant period of 2016-2023, Citigroup and other hedge funds held substantially risky short positions and swaps related to AMC stock, standing to gain from a stock price reduction. Citigroup engaged in manipulative or deceptive practices in connection with these short positions and swaps which is a violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)). Citigroup knowingly engaged in actions meant to artificially depress AMC's stock based on information from AMC private banking and financial information.

148. As a result of the WallStreetbets stock rally, Citigroup and other Defendants were squeezed in January of 2021 and upside down on the AMC trade, which meant Citigroup and other Defendants needed a vast number of AMC common shares, it also meant that AMC owed Citigroup. Section 20A of the Securities Exchange Act of 1934 (15 U.S.C. § 78t-1) makes it unlawful to trade on insider information.[110]  Citigroup was using any non-public, material information in a way that they would profit from AMC owing them, this is a violation of this law 15 U.S.C. § 78t-1.

149. Citigroup and other short sellers had little to no shares of AMC and this deficit was the reason for the creation of APE, and widespread naked short selling of AMC securities. Regulation SHO under the Securities Exchange Act of 1934 (17 C.F.R. § 242.203) mandates that short sellers should either own the stock they're selling or have reasonable grounds to believe that they can acquire it for settlement. Citigroup did not abide by these rules and are in violation of Regulation SHO 17 C.F.R. § 242.203.  AMC CEO asked the shareholders for a share increase

---

[110] 15 U.S. Code § 78t–1 - Liability to contemporaneous traders for insider trading. Cornell Law School Legal Information Institute. Link: https://www.law.cornell.edu/uscode/text/15/78t-1

in 2021 but pulled the proposals before the vote was completed, which furthered the systemic risk that came about from earlier actions.

150. In late fall 2021, Citigroup approached AMC CEO Adam Aron with a scheme referred to as "Project Popcorn", which violates Securities Exchange Act of 1934, Section 10(b), 15 U.S.C. § 78j(b). During which time, AMC was not able to retain its stock value, as it was being naked shorted and manipulated through Citigroup's and other Defendants' ATS (darkpool) which is a violation of Regulation SHO under the Securities Exchange Act of 1934, 17 C.F.R. § 242.203, Alternative Trading System Regulations (Reg ATS), and 17 C.F.R. § 242.301-§242.303. Under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), any manipulative or deceptive device or contrivance in connection with the purchase or sale of any security is unlawful.[111] The key aspect to consider is what "Project Popcorn" actually entailed. If it involved a scheme to manipulate AMC's stock price, deceive investors, rig a vote, and defraud AMC investors, which it did, then defendants who took part in the scheme such as Citigroup violated Section 10(b).

151. Unable to raise capital due to deceptive practices, AMC was left in a predicament (Securities Act of 1933, Section 5(c), 15 U.S.C. § 77e). AMC's banker was shorting and manipulating the stock, while providing financial consulting and banking service. Citigroup was simultaneously providing banking services and engaged in proprietary trading that manipulated AMC's stock, which is a breach of fiduciary duty under the Dodd-Frank Wall Street Reform and

---

[111] Regulation ATS (Alternative Trading Systems). SEC.gov. Link 1: https://www.sec.gov/files/rules/final/34-40760.txt Link 2: https://www.law.cornell.edu/cfr/text/17/242.301.
Regulation ATS (Alternative Trading Systems): This regulation requires that alternative trading systems comply with the reporting and transparency rules of a national securities exchange. If Citadel and Citigroup were not transparent in their operation of dark pools or failed to comply with reporting requirements, they could be in violation of this regulation.

Consumer Protection Act, Section 619 ("Volcker Rule"), 12 U.S.C. § 1851.  Investment Advisers Act of 1940, Section 206, 15 U.S.C. § 80b-6. Regulation SHO (17 C.F.R. § 242.203) generally requires that a broker-dealer must have reasonable grounds to believe that the security can be borrowed so that it can be delivered on the delivery due date before effecting a short sale order. Naked shorting on ATS was indeed taking place, and is a clear cut violation of Alternative Trading System Regulations (Reg ATS 17 C.F.R. § 242.301-§ 242.303) which requires such platforms to register with the SEC and adhere to federal securities laws and regulations.

152. Citigroup provided AMC with materially false information, and a how-to-manual of sorts, in order to circumvent the wishes of the shareholders of AMC through fraud and market manipulation. Citigroup, by providing false or misleading information to manipulate the stock price could be a violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5. Rule 10b-5 specifically makes it unlawful to make an untrue statement of a material fact or to omit a material fact necessary in order to make the statements made not misleading. Citigroup had encouraged the CEO to lie and omit material information to the shareholders, in order to generate enough new AMC common shares to close their positions. Encouraging executives to lie to shareholders involves multiple violations of federal law, including but not limited to fraud under 18 U.S.C. §§ 1341 and 1343, and securities fraud under Section 10(b) and Rule 10b-5. Additionally, Section 20A of the Securities Exchange Act of 1934 (15 U.S.C. § 78t-1) could come into play as it deals with liability to contemporaneous traders for insider trading.

153. Within Project Popcorn lay the financial engineering scheme called APE Preferred equity units, a potential issuance of an alternative form of equity that could convert into AMC Common Stock. Issuing a new form of equity to essentially cover short positions, particularly if

it was not adequately disclosed, involves violations of Section 5(c) of the Securities Act of 1933 (15 U.S.C. § 77e(c)) as it involves the offer or sale of securities that are not properly registered or that do not comply with certain exemption conditions. Citigroup suggested that AMC could call these rights "AMC Preferred Equity Units" (APE) in February 2022. Naming these units after AMC Shareholders (Apes) and suggesting how to market them would likely fall under the same regulatory umbrella as the prior actions. False and misleading statements were made about the nature, risks, or value of these units, and is in violation of Section 10(b) and Rule 10b-5 among other laws.

154. In a board meeting held on February 17th, 2022, Citigroup banker Derek Van Zandt ("Mr. Van Zandt") explained that AMC planned to offer the preferred shares to its retail stockholder base through a rights offering. Citigroup is alleged to have recommended to the AMC board that they issue APE units to common stockholders without shareholder authorization. The introduction of APEs led to significant dilution of common shares, something not authorized by AMC shareholders. The unapproved dilution of common stock could also constitute securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5, particularly if AMC or Citigroup knowingly or recklessly misrepresented or omitted material facts related to the dilution.

155. Citigroup's recommendations allowed AMC to give APE units superior voting power compared to common shares, without disclosing the implications. Citigroup's involvement in adjusting APE's price floor is alleged to have manipulated the market. Failing to disclose that new securities will have greater voting power than existing securities violate Section 10(b) and Rule 10b-5, as well as Section 14(a) of the Securities Exchange Act of 1934, which concerns proxy solicitations and the necessity of providing shareholders with the information they need to

make informed decisions.[112] Citigroup manipulated the price of APE securities, they could be violating Section 9(a)(2) of the Securities Exchange Act of 1934, which prohibits manipulation of securities prices.

156. On September 26, 2022, AMC entered into an agreement with Citigroup to offer and sell 425 million APE shares. Citigroup's role in the sale of APE shares and alleged agreement to lower the price floor invites scrutiny under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)), as it involves material omissions or misleading statements that impacted the price of the security. Citigroup reportedly obliged AMC CEO Adam Aron's request to lower the $2 minimum price at which APE could be distributed. The price per APE subsequently crashed to below a dollar. This action was undertaken to manipulate the market or deceive investors, it is considered a violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)).

157. This is when Derek Van Zandt from Citigroup introduced AMC to Antara Capital in early December 2022. An email between the parties regarding market manipulation, insider trading, and rigging of corporate votes had unveiled the plans. Such communications could be direct evidence of violations of Section 10(b) and Rule 10b-5 (15 U.S.C. § 78j(b)) for market manipulation and insider trading, as Van Zandt recruited and courted Antara Capital long before the trade execution. Additionally, manipulating corporate votes violates proxy solicitation rules under Section 14(a) of the Securities Exchange Act of 1934.

---

[112] Regulation 14A: Solicitation of Proxies.  ecfr.gov. Link:
https://www.ecfr.gov/current/title-17/chapter-II/part-240/subpart-A/subject-group-ECFR8c9733e13b955d6

158. The equity distribution agreement and the introduction to Antara Capital appear to be in direct conflict with Citigroup's role as a financial advisor. The deal closed on December 21, 2022, with Antara getting a deep discount on APE. Citigroup is in breach of fiduciary duty, particularly under the Investment Advisers Act of 1940, Section 206 (15 U.S.C. § 80b-6), for failing to act in the best interests of its client, AMC. Antara agrees to buy and hold APE until after pledging votes in favor of AMC Board's proposals for a reverse split and conversion of APE into AMC common stock. Antara gains approximately 17.8% of AMC's total voting power. This is considered a violation of Section 14(a) of the Securities Exchange Act of 1934, which governs proxy solicitations, because these votes were obtained through misleading statements or omissions.

159. One AMC preferred unit would convert into one share of common stock, subject to shareholder authorization, which Citigroup and AMC would not get. In July 2022, the Board approved a "dividend" of one APE for every outstanding share of common stock. The failure to secure shareholder authorization for a significant corporate action like this results in a violation of a number of state corporate law, and of Section 14(a) for proxy rules if misleading solicitations were made. The central question is why Citigroup needed convertible APE shares? Given that AMC had never missed a payment or defaulted on its loans. Citigroup's insistence on convertible APE shares are found to be for speculative or manipulative purposes, this is an additional violation of federal banking regulations aimed at maintaining the financial stability of banks (12 C.F.R. § 1.7 and 12 C.F.R. § 16.32).[113]

---

[113] 12 CFR § 16.32 - Fraudulent transactions and unsafe or unsound practices. Cornell Law School Legal Information Institute. Link: https://www.law.cornell.edu/cfr/text/12/16.32

160. In 2022, Adam Aron, allegedly in agreement with Citigroup, announced a "dividend" in the form of APE securities, matched 1:1 to AMC Class A common stock. These APE securities could later be converted to Class A common stock. The announced "dividend" was deceptive or involved misleading the shareholders, then it can be scrutinized under Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5. Given Citigroup's alleged involvement, its actions also violate banking regulations about speculative activities (12 C.F.R. § 1.7, 12 C.F.R. § 16.32). Short sellers were allegedly involved in naked short selling and manipulation of AMC stock (Securities Exchange Act of 1934, Section 10(b); 17 C.F.R. § 240.10b-5; FINRA Rule 5270). Naked short selling and stock manipulation is in violations of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5, along with FINRA Rule 5270 against front-running.[114]

161. The delivery of APE shares was allegedly intentionally delayed, allowing them to be used as "locates" for further short selling, in violation of federal laws (12 C.F.R. § 16.32 (a3),(b), (c), (d), 12 C.F.R. § 9.13 (§ 9.2(e)), 13 C.F.R. § 120.140, RICO). Deliberate delays in delivering shares constitute manipulative and deceptive acts under Section 10(b) and Rule 10b-5. Additionally, violations of banking and racketeering laws (e.g., 12 C.F.R. § 16.32, 12 C.F.R. § 9.13, RICO) should also also be considered.

162. Banks are prohibited from holding these securities purely for speculative purposes (12 C.F.R. § 1.7, 12 C.F.R. § 16.32). Citigroup, while functioning in both banking and advisory roles, did not report Suspicious Activity Reports (SAR) under the respective regulations, despite

---

[114] FINRA Manual Rule 5270. Front Running of Block Transactions. FINRA.org. Link: https://www.finra.org/rules-guidance/rulebooks/finra-rules/5270.
FINRA Rule 5270 (Front Running of Block Transactions): This rule prohibits a member from trading ahead of a customer's large order. If Citadel and Citigroup used the knowledge they gained from dark pool trades to front-run their customers, they may be in violation of this rule.

alleged market manipulation (12 C.F.R. § 21.11 , 13 C.F.R. § 120.140).[115,116] Citigroup had so much insider banking and trading knowledge of the company's dealings as well as information divulged by Adam Aron, yet it failed to report suspicious activities of other market participants and is in violation of 12 C.F.R. § 21.11, which requires national banks to file SARs for certain types of suspicious activities.

163. Antara, AMC, and Citigroup deprived AMC Shareholders of voting rights and a fair corporate voting process through the Project Popcorn scheme which forced dilution on shareholders, stole voting rights, and took away shares from shareholders as part of the reverse split that was implemented because of a fraudulent vote. Antara, AMC, and Citigroup's actions in the Project Popcorn scheme was a violation of 18 U.S.C. § 241 (Conspiracy Against Rights).[117] These actions are also be a violation of 42 U.S.C. § 1985, which is a federal statute that allows for civil action against individuals who conspire to deprive others of their civil rights. It is part of the Civil Rights Act of 1871. The law has several subsections, addressing different types of conspiracies, including section Depriving Persons of Rights or Privileges (42 U.S.C. § 1985(3)): which makes it illegal for two or more persons to conspire for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws. [118]

---

[115] 12 CFR § 21.11 Suspicious Activity Report. ecfr.gov. Link:
https://www.ecfr.gov/current/title-12/chapter-I/part-21/subpart-B/section-21.11
[116] 13 CFR § 120.140 What ethical requirements apply to participants? ecfr.gov. Link:
https://www.ecfr.gov/current/title-13/section-120.140
[117] 18 U.S. Code § 241 - Conspiracy against rights. Legal Information Institute - Cornell University. Link:
https://www.law.cornell.edu/uscode/text/18/241
[118] 42 U.S. Code § 1985 - Conspiracy to interfere with civil rights. Legal Information Institute - Cornell University. Link: https://www.law.cornell.edu/uscode/text/42/1985

164. Depriving Persons of Rights or Privileges (42 U.S.C. § 1985(3)): This is the most commonly invoked section, which makes it illegal for two or more persons to conspire for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws. This can include conspiracies to discriminate on the basis of race, religion, or another protected class, as well as conspiracies to prevent the exercise of any right granted by the Constitution or laws of the United States.

165. Retail investors who own the majority of AMC's float and institutional owners were negatively affected, yet unaware of the full extent of the alleged manipulation. Retail investors were deliberately kept unaware of manipulative acts. It wasn't until the Delaware civil action suit (Consolidated C.A. 2023-0215-MTZ (Del. Ch.)) during discovery did this information come out surrounding Citigroup and "Project Popcorn". This is a violation of Section 10(b) and Rule 10b-5, based on the extent to which information was deliberately concealed or misrepresented. Citigroup allegedly violated its fiduciary duty by not acting in the best interests of AMC or its shareholders, failing to report suspicious activities and market manipulation (12 C.F.R. § 9.13, 13 C.F.R. § 120.140).

E.    "ALLEGED" SALE OF UNREGISTERED SECURITIES BY AMC AND CITIGROUP

165. AMC had "allegedly" been selling over 200 million of unregistered AMC Preferred Equity Units in 2020, 2021, and 2022 before they had registered that security (later called APE) with the SEC. Citigroup at various time points participated in these "alleged" unregistered sales. In Consolidated C.A. 2023-0215-MTZ (Del. Ch.) Docket Index (D.I.) Page 206 of the previously concealed cited exhibits from the defendant's brief (which was initially concealed from

shareholders and class members) clearly displays the sale of these securities.[119] However, AMC preferred equity units were not registered with the SEC until August 4, 2022.[120] This action appears to violate SEC Rule 144 and DGCL 242.[121] Any dilution of the voting power of the common shareholders as a result of such an amendment would be a contravention of these legal stipulations, specifically, DGCL 242(a)(3), (a)(5), and 242(b)(2).[122]

166. The page 206 of the cited exhibits of the Defendants Brief is from AMC SEC FORM 10-K for the fiscal year ended December 31, 2022, which was filed on February 28, 2023.[123] The screenshots in Exhibit L demonstrate that APE was sold before it was approved by shareholders. Further, AMC did not report these shares to shareholders or even list them in the filings until February 28, 2023 (see Exhibit "L", attached hereto and incorporated herein by reference). However, this change is only observable in one version of the document (not the document version, but the filing version on the site).

167. The potential of 200 million plus unregistered shares and votes also calls into question the validity of the March 14, 2023 AMC shareholder vote (and later supposed approval of the reverse split/conversion and share increase proposal). This looks like breach of fiduciary duty on behalf of the entire AMC board of directors at the potential determent of shareholders.

---

[119] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) Docket Index (D.I.) 201 - Defendant's Brief exhibits Link: https://www.docketalarm.com/cases/Delaware_State_Court_of_Chancery/2023-0215/IN_RE_AMC_ENTERTAINMENT_HOLDINGS_INC._STOCKHOLDER_LITIGATION/9168595 2/91685953/. See Exhibit M (Exhibit "M", attached hereto and incorporated herein by reference).
[120] AMC SEC Form 8-A. SEC.gov. Filed on August 4, 2022. Link: https://www.sec.gov/Archives/edgar/data/1411579/000110465922086192/tm2222422d4_8a12b.htm
[121] SEC Rule 144: Selling Restricted and Control Securities. SEC.gov. Link: https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144
[122] Delaware General Corporation Law - CHAPTER 1. General Corporation Law - Subchapter VIII. Amendment of Certificate of Incorporation; Changes in Capital and Capital Stock. In reference to DGCL 242. The Delaware Code Online. Link: https://delcode.delaware.gov/title8/c001/sc08/index.html
[123] AMC SEC FORM 10-K for the fiscal year ended December 31, 2022. Filed February 28, 2023. Link: https://www.sec.gov/ix?doc=/Archives/edgar/data/0001411579/000141157923000038/amc-20221231x10k.htm

168. Further, APE issuance in 2020 and 2021 before registration resulted in several violations of the DGCL. The language used in the Certificate of Incorporation only confers authority to the board to endorse a resolution that can be subjected to a shareholders' vote. Under DGCL 242 (a)(3), when the resolution purports to alter or "To increase or decrease its authorized capital stock or to reclassify the same", such a resolution must be advanced and validated through a certified amendment in line with DGCL 242 (b)."[124] The provision of DGCL 242 (a)(5) applies when the resolution endeavors to "(5) To create new classes of stock having rights and preferences either prior and superior or subordinate and inferior to the stock of any class then authorized, whether issued or unissued."[125]

169. Non-compliance with the DGCL 242(b) provisions denotes a violation of the rights of the shareholders. DGCL Section 242 (b)(2) provides clear guidance on the necessity for approval from existing shareholders for the issuance of preferred shares that would dilute their voting rights. Specifically, DGCL Section 242 (b)(2), "The holders of the outstanding shares of a class shall be entitled to vote as a class upon a proposed amendment, whether or not entitled to vote thereon by the certificate of incorporation, if the amendment would increase or decrease the aggregate number of authorized shares of such class, increase or decrease the par value of the shares of such class, or alter or change the powers, preferences, or special rights of the shares of such class so as to affect them adversely."[126] The AMC shareholders' rights were seemingly violated when AMC preferred equity units (APE) were issued prior to August 2022 without their approval, thus threatening shareholder rights.

---

[124] Delaware General Corporation Law (DGCL) TITLE 8 Corporations CHAPTER 1. General Corporation Law Subchapter VIII. Amendment of Certificate of Incorporation; Changes in Capital and Capital Stock. Delaware.gov. Current DGCL Law date is May 16, 2023. Link: https://delcode.delaware.gov/title8/c001/sc08/index.html
[125] Id
[126] Id

170. The act of AMC and Citigroup selling AMC Preferred Equity Units (APE) absent shareholder approval and timely reporting to the SEC undeniably infringes SEC Rule 144 and DGCL 242.

171. Exhibit M (Exhibit "M", attached hereto and incorporated herein by reference) also displays that the financial calculations for the sale of the unregistered APE shares do not add up and further investigation is needed to determine whether or not fraud occurred.[127]  Exhibit M  also provides full screenshots of the sections of a document that show the "alleged" sale of unregistered securities.

172. The legal analysis of Citigroup's alleged market manipulation through sale of unregistered securities involves several U.S. federal laws and regulations. First, SEC Rule 144 was violated by the sale of unregistered securities.[128]  Second, the <u>Securities Act of 1933</u>, Section 5: Prohibits the sale of securities unless a registration statement has been filed. The alleged sale of over 200 million unregistered AMC Preferred Equity Units would be in violation of this act. Further, <u>Securities Act of 1933</u>, Section 17(a): Prohibits fraudulent practices in the offer or sale of securities (i.e. False Statements or Omissions). [129]

173. <u>Securities Exchange Act of 1934</u>, Section 10(b) and Rule 10b-5 may also apply. These provisions make it unlawful to make false or misleading statements or omissions in connection with the purchase or sale of any security.

---

[127] Consolidated C.A. 2023-0215-MTZ (Del. Ch.) Docket Index (D.I.) 201 - Defendant's Brief exhibits Link: https://www.docketalarm.com/cases/Delaware_State_Court_of_Chancery/2023-0215/IN_RE_AMC_ENTERTAINMENT_HOLDINGS_INC._STOCKHOLDER_LITIGATION/9168595 2/91685953/. See Exhibit M
[128] SEC Rule 144: Sale of Unregistered Securities. SEC.gov.  Link: https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144
[129] Securities Act of 1933, Section 17(a), 15 U.S. Code § 77q - Fraudulent interstate transactions. Legal Information Institute - Cornell University. Link: https://www.law.cornell.edu/uscode/text/15/77q

174. Regarding Insider Trading and Market Manipulation, <u>Securities Exchange Act of 1934</u>, Section 10(b) and Rule 10b-5: May apply to the alleged market manipulation, insider trading, and rigging of corporate voting described in the case.

175. Regarding Breach of Fiduciary Duty and Corporate Governance, Delaware General Corporation Law (DGCL) Sections 242(a)(3), (a)(5), 242(b)(2) were violated as these regulations govern the procedures for altering authorized capital stock, creating new classes of stock, and requiring shareholder approval for actions that would dilute their voting rights.

176. Additionally, FINRA rules have been violated by the sale of unregistered securities. FINRA Rule 2010 (Standards of Commercial Honor and Principles of Trade) requires members to observe high standards of commercial honor and just and equitable principles of trade.[130]  FINRA Rule 2020 (Use of Manipulative, Deceptive or Other Fraudulent Devices) prohibits members from effecting any transaction in, or inducing the purchase or sale of, any security by means of any manipulative, deceptive, or other fraudulent device or contrivance.[131]

177. Other Potential Regulations that may apply include the <u>Sarbanes-Oxley Act of 2002</u> which states if fraud is determined, certain provisions may apply related to corporate responsibility for financial reports, disclosure controls, and other matters.[132]


F.    **CITIGROUP IS FIREMAN AND ARSONIST**

178. As the mastermind behind "Project Popcorn", Citigroup plays the role of Fireman and Arsonist. Citigroup works with AMC to rollout "Project Popcorn" (i.e. the APE shares) which is

---

[130] FINRA RULE 2010. Standards of Commercial Honor and Principles of Trade.  FINRA.org. Link: https://www.finra.org/rules-guidance/rulebooks/finra-rules/2010
[131] FINRA RULE 2020. Use of Manipulative, Deceptive or Other Fraudulent Devices. FINRA.org. Link: https://www.finra.org/rules-guidance/rulebooks/finra-rules/2020
[132] H.R.3763 - Sarbanes-Oxley Act of 2002 107th Congress (2001-2002). Congress.gov. Link: https://www.congress.gov/bill/107th-congress/house-bill/3763

advertised to put out the "fire" (or concern about long term debt and/or bankruptcy) and stabilize AMC's fundamentals (or foundation), but "Project Popcorn" is really a smokescreen that allowed Citigroup and short sellers to burn AMC's shareholders' share value and voting rights to the ground.

179. Citigroup has been AMC's banker since Adam Aron started as AMC's CEO in 2016 and holds AMC's bonds. Since 2016, Citigroup has been engaged in actions that appear to be contrary to the interests of AMC the company and AMC shareholders while simultaneously serving as AMC's banker. In 2018-19, AMC incurred a substantial amount of problematic debt as a result of unprofitable acquisitions. Citigroup acted as underwriters and lenders to AMC during this period. It is alleged that Citigroup had access to AMC's financial information and had engaged in transactions involving swaps and derivatives. It is presumed that CEO Adam Aron, who has a longstanding relationship with Citigroup spanning decades, either provided them with the data or was coerced by Citigroup to disclose insider information. Based on this information allegedly obtained in good faith from the company, Citigroup began short-selling AMC shares, along with other entities such as Citadel and Mudrick Capital. It is claimed that Citigroup has profited from derivative transactions based on the information provided to them by the company.

180. Citigroup has been a historical and current short seller of AMC. There is an inherent conflict of interest between AMC's responsibility to its stockholders and Citigroup's actions. Citigroup's analysts have consistently issued very low price targets on AMC. Specifically, on November 7th, 2022 Citigroup's analyst issued a sell rating on AMC and a price target of $1.20.[133] Then, again on March 23rd, 2023, Citigroup's analyst issued a sell rating on AMC with a price

---

[133] Citigroup Maintains Sell on AMC Entertainment, Lowers Price Target to $1.2. Benzinga. Posted on November 7, 2022. Link: https://www.benzinga.com/news/22/11/29594072/citigroup-maintains-sell-on-amc-entertainment-lowers-price-target-to-1-2

target of $1.60.[134] Then, on May 15, 2023, Citigroup's analyst issued a sell rating on AMC with a price target of $1.65.[135] Then right after the hearing for the Class Action Case (Consolidated C.A. 2023-0215-MTZ (Del. Ch.) held on June 29-30, 2023), on July 3, 2023, a Citigroup analyst issued a sell rating on AMC with a (maintained) price target of $1.65.[136] The fact that Citigroup was working with AMC to develop the APE shares displays a major conflict of interest because Citigroup would profit as AMC fails, but potentially lose money if AMC succeeds. Citigroup as AMC's banker has access to insider information, yet trades off AMC and has their analysts push unrealistically low price targets. Citigroup's actions qualify as market manipulation.

181. Insider trading is regulated by the Securities and Exchange Commission (SEC) under Rule 10b-5 of the Securities Exchange Act of 1934. This rule prohibits individuals with access to non-public, material information about a publicly traded company from trading securities based on that information or from disclosing that information to others who openly trade on it or through swaps. Insider trading is considered illegal because it undermines the fairness and integrity of the securities markets and gives individuals an unfair advantage over other investors.

182. AMC also reports hundreds of millions of dollars in deferred revenue.[137] Citigroup is also a credit card processor, given that Citigroup is short on AMC, this raises the question on

---

[134] Citigroup Initiates a Sell Rating on AMC Entertainment (AMC). Citigroup Initiates a Sell Rating on AMC Entertainment (AMC). Business Insider. Posted on March 23, 2023. Link: https://markets.businessinsider.com/news/stocks/citigroup-initiates-a-sell-rating-on-amc-entertainment-amc-1032186889

[135] Citigroup Adjusts AMC Entertainment Price Target to $1.65 From $1.60, Maintains Sell Rating. MarketScreener. May 15, 2023. Link: https://www.marketscreener.com/quote/stock/AMC-ENTERTAINMENT-HOLDING-15231781/news/Citigroup-Adjusts-AMC-Entertainment-Price-Target-to-1-65-From-1-60-Maintains-Sell-Rating-43856501/

[136] Maybach, George. "Citigroup Reiterates AMC Entertainment Holdings Inc - (AMC) Sell Recommendation". Nasdaq. July 3, 2023. Link: https://www.nasdaq.com/articles/citigroup-reiterates-amc-entertainment-holdings-inc-amc-sell-recommendation

[137] AMC Deferred Revenue. Discoverci.com. Reporting date: July 2023. Link: https://www.discoverci.com/companies/AMC/current-deferred-revenue

whether Citigroup is inappropriately deferring AMC's revenue to make AMC's financials look worse than they actually are.

183. Also of note, according to Politico, "Yellen, the former chair of the Federal Reserve, brought in nearly $1 million giving nine speeches to Citi alone."[138]

184. Citigroup has been a historical and current short seller of AMC. As of July 20, 2023, according to Fintel data derived from SEC filings (last updated on May 11, 2023), Citigroup held an estimated 37,779,400 of reported puts with an estimated value of $189,275,000. Citigroup held an estimated 11,648,500 calls with an estimated value of $58,359,000 and reported to hold 57,099 shares of AMC with an estimated value of around $286,000. In total, Citigroup held over $120 million dollars more in puts than calls and shares combined during this time period.[139] Citigroup held massive puts during the court case surrounding AMC's reverse split/conversion proposal. Despite being AMC's banker, Citigroup has a massive conflict of interest based ownership data. If AMC's price goes down, then Citigroup profits despite supposedly being AMC's banker. Since the Delaware Chancery Court approved the settlement to allow AMC's reverse split and conversion to go through on August 11, 2023, AMC's stock price absolutely plummeted and Citigroup made massive profits on their puts.

185. Before the reporting inception of "Project Popcorn" in November 2021, AMC stock was trading around 30 dollars (pre-reverse split value). As of September 22, 2023, AMC stock was trading under the equivalent of 1 dollar pre-reverse split. As a direct result of the illegal

---

[138] Thompson, Alex and Meyer, Theodoric. "Janet Yellen made millions in Wall Street, corporate speeches." Politico.com. January 1, 2021. Link: https://www.politico.com/news/2021/01/01/yellen-made-millions-in-wall-street-speeches-453223
[139] AMC Price and Data. Fintel. July 23, 2023. Link: https://fintel.io/sosh/us/amc. See Exhibit N (Exhibit "N", attached hereto and incorporated herein by reference).

market manipulation from the Defendants, AMC Stockholders have seen over 95% of their stock value wiped out.

186. In reviewing the evidence, it is clear that Citigroup was the mastermind, fireman, and arsonist behind "Project Popcorn" and the APE Share release. Citigroup is duplicitous as its role as AMC's banker as Citigroup strong-armed AMC's Board of Directors to implement the APE release in order to bailout the AMC short sellers or put contract owners (such as Citigroup) but at the detriment of AMC's shareholders that saved AMC from bankruptcy in 2020-2023.

## G. HISTORY OF CITADEL AND THEIR MARKET FUNCTION

187. Citadel, a significant financial institution, has moved its headquarters from Chicago to Miami, Florida, and is a leading market maker in U.S. listed equity options. Its subsidiary, Citadel Securities, operates with an intelligence-driven approach, employing various intelligence methodologies including HUMINT, SIGINT, IMINT, MASINT, OSINT, FININT, and CYBINT. This, along with advanced algorithms and machine learning techniques, provides Citadel unparalleled market insights.

188. The firm's complex structure, political affiliations, and expansive reach across various securities have placed it under strict regulatory oversight. Citadel's practices have raised ethical and legal questions, particularly in connection with instances like AMC and GME. Despite having faced regulatory infractions and fines, the company's approach to resolutions often avoids explicit acknowledgment of wrongdoing. Citadel's connections to political figures, engagement in market manipulation strategies, and influence over regulations add to its intricate relationship with governmental oversight (See Exhibit "O", attached hereto and incorporated herein by reference).

## H. CITADEL TAUNTS AMC INVESTORS

189. In early 2021, Wall Street was rocked by an infinity squeeze in the stock prices of certain companies, including AMC Entertainment Holdings. Driven by online communities like Reddit's WallStreetBets, this movement aimed at profiting from stocks heavily shorted by hedge funds. Citadel, a prominent global financial institution, found itself entangled in the drama.

190. Citadel was not just involved in the short selling and AMC's market maker. The firm also plays a role in executing trades for Robinhood, a trading platform popular among retail investors. When Robinhood restricted trading in AMC and other stocks during the height of the volatility, Citadel found itself at the center of conspiracy theories and allegations of market manipulation.

191. Citadel denied any wrongdoing, and Robinhood's decision was later attributed to regulatory requirements around capital and risk management. Nonetheless, the incident fueled mistrust between retail investors and large financial institutions.

192. The AMC saga highlighted the growing divide between Wall Street and individual investors, often portraying a David-versus-Goliath battle. Online communities celebrated the democratization of investing, with social media allowing ordinary people to challenge the financial elite's control over the markets.

193. Meanwhile, critics argued that the retail-driven rally in AMC and other stocks was based on speculation and emotional investing rather than sound financial principles. Some saw it as a dangerous trend that could destabilize the market. This fueled a war fought on the market and on the internet.

194. The tensions between AMC investors and Citadel reached a new level when a drone video surfaced of Citadel employees allegedly doing cocaine in the Chicago headquarters office. The video was posted to social media and quickly went viral, sparking outrage among AMC investors as well as Wall Street. This caused tremendous embarrassment to Citadel and CEO Ken Griffin. Citadel responded to the video by calling AMC shareholders "conspiracy theorists" and accusing them of spreading misinformation. This response only served to further anger AMC investors, who felt that Citadel was trying to deflect attention away from the allegations of drug use.

195. The drone video and Citadel's response highlighted the growing animosity between retail investors and Wall Street. AMC investors saw the video as evidence that Citadel was not above breaking the rules, while Citadel saw the investors as a threat to their power. The incident also raised questions about the role of social media in the financial markets. Some argued that the drone video was a form of market manipulation, while others argued that it was simply a matter of free speech.

196. Citadel then started taunting and harassing AMC shareholders via Twitter and further exacerbating the shareholders (See Exhibit "P", attached hereto and incorporated herein by reference).

## I. CITADEL'S ALARMING FINANCIALS

197. Short-selling involves borrowing shares and selling them with the expectation that their price will decrease. By the spring of 2020 Citadel had significant short positions on AMC stock, and if the prices of that stock experienced a significant increase instead of a decrease, it would lead to a increase in the value of Citadel's securities sold but not yet purchased. This

increase would negatively impact the liabilities side of the financial statement and potentially contribute to the sharp decrease observed.

198. AMC experienced a significant price surge in 2021 which meant Citadel would have been obligated to repurchase these shares at a higher price to cover its short positions. However, the price skyrocketed, and AMC retail investors did not capitulate and sell. This resulted in substantial losses for Citadel when attempting to close out these positions, impacting the company's net income and profitability. Citadel had to cover the sellers as well margin and maintenance requirements which would have been in the billions of dollars. Short-selling involves borrowing shares from other market participants like a Prime Lender. In this case, Bank of America is the Prime Lender. If the counterparty (Citadel) fails to deliver the shares or experiences financial difficulties, it could pose counterparty risk for Bank of America or anyone else who is holding Citadel's Total Return Swaps. This could result in financial losses, impact receivables from clearing organizations, and potentially affect liquidity.

199. Starting in 2020, Citadel Securities LLC experienced a concerning trend in its financial condition as result of shorting "Meme Stocks". A conflict had begun between retail investors and Citadel Securities and Citigroup. The total assets of the Citadel decreased sharply from $79.123 billion in 2021 to $63.115 billion in 2022, indicating a significant decline of approximately 20%. This decline suggests a worrisome decrease in the company's overall financial health during this period. The value of securities owned by Citadel also dropped significantly from $73.059 billion in 2021 to $57.526 billion in 2022. This decline is attributed to heavy divestment, poor investment decisions, and significant losses in market values pertaining to "meme stocks" like AMC, APE, and GME (GameStop).

200. The amount receivable from clearing organizations decreased from $975 million to $365 million over the same period, which indicates decreased trading activity or more prompt clearance of dues by counterparties. Additionally, the liabilities of the firm decreased from $74.909 billion in 2021 to $58.744 billion in 2022. The largest component of liabilities, **securities sold but not yet purchased** at fair value, also saw a significant decrease from $65.703 billion to $45.764 billion. This decline is due to a decrease in short-selling activity, potential unwinding of positions, or losses.

201. On the other hand, the payables to brokers, dealers, clearing organization, and custodian liability nearly tripled from $3.312 billion to $8.175 billion. This increase indicates a delay or inability to promptly settle obligations, which can have negative implications for the company's reputation and creditworthiness. This also reflects on the company's credit on Wall Street. The liability for securities sold under agreements to repurchase also saw a sharp decrease from $4.527 billion to $2.737 billion, which signifies a reduction in financing and liquidity activities.

202. Despite these concerning trends, the member's capital showed a slight increase from $4.214 billion to $4.371 billion. However, given the substantial reduction in total assets, the overall financial strength of the company seems to be declining at a fast rate.

203. From the financial reports of 2020 to 2022, Citadel Securities LLC demonstrated consistent profitability from transaction fees associated with PFOF (Payment for Order Flow).[140] In 2020, the company generated $47.5 billion in revenue, which was a decrease of 12% from the

---

[140] Citadel's detailed financial reports can be found at the AUM 13F - AUM Metrics Analysis website (https://aum13f.com/firm/citadel-advisors-llc) or on Fintel's website (https://fintel.io/i/citadel-advisors-llc).

previous year due to the impact of the COVID-19 pandemic on trading activity. The net income also decreased by 12% to $11.1 billion. However, in 2021, Citadel experienced a rebound, generating $56.5 billion in revenue, an increase of 18% from the previous year. The net income also increased by 18% to $14.2 billion. This growth was primarily driven by the recovery of trading activity following the pandemic.

204. In 2022, Citadel's revenue continued to grow, reaching $65.7 billion, an increase of 16% from the previous year. The net income also increased by 16% to $16.4 billion. These positive financial results were driven by the company's sustained strong trading activity, which got a lifeline since the Securities and Exchange Commission (Commissioner Hester Pierce and Sec. Gary Gensler) approved the use of cryptocurrency to short stock on the NYSE, a form of cross-market manipulation.

205. However, over the three-year period, the totality of Citadel's assets and liabilities (including all associated companies and shell companies) OR the totality of Citadel Advisors (the hedge fund and related funds) both increased significantly. In 2020, assets increased by 10% to $462 billion, and liabilities increased by 10% to $294 billion. In 2021, assets increased by 15% to $534 billion, and liabilities increased by 15% to $342 billion. In 2022, assets increased by 13% to $608 billion, and liabilities increased by 13% to staggering $390 billion. This growth in assets and liabilities cannot be attributed to the company's continued investment in derivatives. While Citadel has demonstrated strong profitability and growth, there is systemic risks associated with its business model. The company's dependence on market volatility for its trading activities exposes it to potential declines in profits if markets become less volatile. Additionally, the investment in derivatives carries inherent risks, as adverse market movements

has resulted in losses for the company. Citadel has also a history of receiving bailout money from the U.S. Government.

206. Citadel Securities LLC has shown a concerning trend in its financial condition from 2020 to 2022. The decline in total assets, securities owned, and receivable from clearing organizations, along with the increase in payables, raises questions about the company's financial health and management. It is also consistent with the thesis that AMC and APE stock is a systemic risk for those involved in the shorting of this stock.

## J. CITADEL HIDING RISK OVERSEAS

207. Hedge fund portfolio managers make mistakes in their strategies. In the case of Citadel Securities, the systemic risk it encompasses is greater than most Wall Street firms. This is a result of poor risk management when it comes to their derivatives trading.

208. Aging cheese in a cheese house is a meticulous and cyclical process. Imagine a village where all the cheese houses are laid out in a circle. Each house has a wheelhouse for cheese, with new wheels coming in and old ones going out in a perpetual cycle. Month after month, the cheese matures, and the cycle continues.

209. This process can be likened to the handling of bad debt, FTDs (failure to delivers), and other financial issues in the world of Wall Street finance, particularly within a network of interconnected companies. Imagine a circle of companies, some of them overseas, passing off bad debt to one another. Just as the cheese moves from the new phase to the old phase and around the circle, these financial burdens are shifted from one entity to the next, in an attempt to cover shorts or manage liabilities.

210. However, the risk is still there, just away from the main entity that created the debt in the first place. That is what we have here with Citadel Securities, with over 500+ shell companies to pass off bad paper, we can see that some of these companies are holding systemic risk issues so horrifying that it could potentially cause the entire market to crash. Depending on the nation that the shell company is incorporated in, the company that has the bad debt can declare bankruptcy and the entire lot eliminated, however the debt and risk still remain.

211. In the financial realm, however, this circular movement is a means of concealing, deferring, or mismanaging bad debt or liabilities, a mechanism not necessarily rooted in transparency or ethical practice. The financial circle perpetuates instability or even deception. The system is cyclical and interconnected and represents a more questionable handling of responsibility and obligations.

212. The legal analysis of Citadel's alleged market manipulation through hiding risk oversees includes possible violation of securities laws. Regarding Securities Fraud, if Citadel was using shell companies to pass off bad debt and conceal liabilities could potentially constitute securities fraud under U.S. federal law, specifically Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. Hiding risk oversees could be seen as market manipulation, as this scheme can also be seen as a manipulative or deceptive device or contrivance in contravention of the same act. Further, if Citadel Securities knowingly falsified financial information, including hiding liabilities through shell companies, they are also in violation of the Sarbanes-Oxley Act (SOX), which requires accurate reporting of financial information.[141] afasdfsd.

---

[141] H.R.3763 - Sarbanes-Oxley Act of 2002 107th Congress (2001-2002). Congress.gov. Link: https://www.congress.gov/bill/107th-congress/house-bill/3763

213. Regarding Communications with the Public - if Citadel Securities misrepresented their risk to investors, then they could be in violation of FINRA's rules (specifically Rule 2210) regarding communications with the public.[142] Regarding supervision, FINRA Rule 3110 requires that member firms establish and maintain a system to supervise the activities of each associated person, ensuring compliance with securities laws and regulations.[143] Poor risk management in derivatives trading and hiding risks overseas violates this supervision requirement.

214. If Citadel Securities acted as an investment adviser and engaged in fraudulent or deceptive practices, then they are in violation of the Investment Advisers Act of 1940.[144]

215. If Failure to Delivers (FTDs) were moved illegally oversees, Regulation SHO is relevant, as it establishes requirements for selling short, intending to reduce failures to deliver. Additionally, the use of shell companies to move bad debt could potentially violate the Bank Secrecy Act (BSA) and Anti-Money Laundering (AML) laws such as FINRA Rule 3310 if they are used to conceal the true nature, source, or ownership of the funds.[145,146]

216. Other potential violations may include the Dodd-Frank Wall Street Reform and Consumer Protection Act: This act includes provisions relating to risk management and is be applicable if Citadel's activities are seen as creating systemic risks. Further, regarding Foreign Regulations, if some of these shell companies are located overseas, foreign regulations could

---

[142] FINRA Rule 2210 Communications with the Public. Finra.org. Link:
https://www.finra.org/rules-guidance/rulebooks/finra-rules/2210
[143] FINRA Rule 3110. Supervision. Finra.org.
https://www.finra.org/rules-guidance/rulebooks/finra-rules/3110
[144] Investment Advisers Act of 1940. SEC.gov. Link:
https://www.govinfo.gov/content/pkg/COMPS-1878/pdf/COMPS-1878.pdf
[145] Bank Secrecy Act (BSA). Office of the Comptroller of the Currency. Occ.Treas.gov. Link:
https://www.occ.treas.gov/topics/supervision-and-examination/bsa/index-bsa.html
[146] FINRA Rule 3310. Anti-Money Laundering Compliance Program. Finra.org. Link:
https://www.finra.org/rules-guidance/rulebooks/finra-rules/3310

also apply. Different jurisdictions have different laws related to transparency, disclosure, and bankruptcy, and violations could vary accordingly.

## K. FTX JANUARY 27TH 2021

217. In the aftermath of recent disconcerting events relating to FTX, a cryptocurrency derivatives exchange principally engaged in the transaction of cryptocurrencies and ancillary financial products, further alarming information has surfaced concerning the illegitimate manipulation of the stock price of AMC, a company publicly listed on the New York Stock Exchange (NYSE). This unscrupulous activity appears to involve the illicit shorting of securities through a blockchain exchange. **The approximate number of tokenized shares were in excess of 8 quadrillion** (see Exhibit "P", attached hereto and incorporated herein by reference). DTCC gave them "locates" for shares that do not exist.

218. Upon discovery of these transgressions, FTX acted with deliberate immediacy to obliterate any related records, including the AMC Whitepaper, from both their LedgerX system and their public website. It is pertinent to note that FTX's market activities have recently extended to other equities, but the specificity of such securities remains veiled.

219. Unlike public corporations, institutional investors, including hedge funds, are not uniformly compelled by law to disclose their holdings. Although regulatory mandates exist that necessitate certain declarations, these be shielded from public scrutiny.

220. Notably, Alameda Research, a Hedge Fund affiliated with FTX and presided over by Caroline Ellison, has been implicated in these questionable undertakings within the derivatives market. Alameda Capital, an entity known for quantitative trading and the utilization of diverse

trading strategies, including the shorting of stocks, has been identified as engaging in illicit and unregulated methods to manipulate stock prices.

221. Central to these maneuvers is the employment of Mirror Protocol, a platform designed to furnish crypto traders with access to traditional financial assets through the minting of tokenized, "synthetic" representations of assets, such as shares of well-known companies. This technology has been routinely exploited by Alameda to manipulate the market.

222. The mechanisms through which Alameda sought to short AMC stock involved intricate cryptocurrency-based derivative products, such as futures or options, tied to the price of the targeted stock. Of note is the limited availability of these specialized products, with only three known cryptocurrency exchanges offering them.

223. This matter calls for thorough investigation and consideration by relevant regulatory bodies to ascertain the full extent of the violation, the proper allocation of legal responsibility, and the implementation of necessary corrective measures to uphold market integrity.

224. Using crypto derivatives to short stocks on the NYSE (New York Stock Exchange) introduces a layer of complexity to traditional securities trading and regulations. The NYSE operates under U.S. securities laws and SEC regulations. When the Hedge Funds who were upside down in AMC wanted to use crypto derivatives to influence or hedge positions in NYSE-listed stocks, the derivatives needed to interface with traditional financial systems in some way, such as through a broker or a specialized platform. This is where the roles of FTX, Bittrex, and Uniswap come in.

225. There's an inherent operational complexity in blending crypto derivatives with traditional stock trades. Given the volatile nature of cryptocurrencies and the generally more

stable nature of NYSE-listed stocks, there could be significant challenges in maintaining balanced and hedged positions.

226. Using crypto derivatives introduces counterparty risks, especially if these derivatives are traded on decentralized platforms or non-regulated exchanges. There's also an inherent liquidity risk. If an individual or entity has a significant position in crypto derivatives and needs to liquidate it quickly due to market movements, they struggle to find sufficient liquidity.

227. The world of crypto derivatives is expansive and innovative. New products and strategies are continually being developed, potentially giving traders unique ways to express their market views and trade accordingly. Crypto derivatives platforms often offer significant leverage, allowing traders to control larger positions with a smaller amount of capital. This can amplify returns (but also losses).

228. Decentralized finance platforms allow for the creation of decentralized derivatives. This can reduce counterparty risk since contracts are executed automatically on a blockchain without the need for a central authority or intermediary. In other words, an unscrupulous Hedge Fund can do whatever they want.

229. Cryptocurrency markets operate around the clock, unlike traditional stock exchanges with set trading hours. This constant operation can provide more flexibility for entering and exiting positions. The volatile nature of the crypto market can lead to larger price swings. If a short seller has a strong market view and is correct, they realize larger returns in the crypto space compared to more stable traditional markets.

230. For a hedge fund that is upside down on a trade, this serves as a safe haven for illegal stock manipulation. Some cryptocurrency platforms offer greater anonymity than traditional stock trading platforms. For traders who prioritize privacy, this can be an appealing aspect.

231. The legal analysis of Citadel's alleged market manipulation through FTX and Tokenized Securities includes possible violation of securities laws. Applicable regulations regarding Illegal Manipulation of Security Prices include the <u>Securities Exchange Act of 1934</u>, Section 9(a)(2): Prohibits manipulative or deceptive conduct related to securities traded on an exchange, potentially including the alleged illegitimate manipulation of AMC stock price through a blockchain exchange.[147]

232. Regarding Insider Trading and Market Manipulation: The <u>Securities Exchange Act of 1934</u>, Section 10(b) and Rule 10b-5 prohibits using any manipulative or deceptive device or contrivance in connection with the purchase or sale of securities, which applies to the alleged illicit shorting of securities, which has allegedly been done through the FTX and tokenized securities.

233. Regarding Destruction of Evidence and Obstruction of Justice, the <u>Sarbanes-Oxley Act of 2002</u>, Section 802: Criminalizes the alteration or destruction of documents to obstruct federal investigations, potentially relevant to FTX's alleged deliberate removal of related records.

234. Regarding Cryptocurrency and Derivative Regulations, <u>Commodity Exchange Act (CEA)</u> regulates commodity futures and options markets and applies to cryptocurrency-based

---

[147] Securities Exchange Act of 1934, Section 9(a)(2) is codified in 15 U.S.C. § 78i, which is referenced in a previous section.

derivative products, such as futures or options tied to the price of AMC stock. Additionally, CFTC Regulation 180.1: Prohibits the employment of manipulative or deceptive conduct in connection with contracts of sale of commodities.[148]

235. Regarding Securities Disclosure Requirements, the Securities Exchange Act of 1934, Section 13(d): Relates to disclosure requirements for institutional investors.[149] While not uniformly compelled to disclose holdings, certain declarations are mandated, and potentially relevant to hedge funds like Alameda Research.

236. Several FINRA Rules apply in this case. FINRA Rule 2010 (Standards of Commercial Honor and Principles of Trade) applies to members involved in deceptive practices. Additionally, FINRA Rule 2020 (Use of Manipulative, Deceptive, or Other Fraudulent Devices) prohibits deceptive and manipulative activities.

237. Regarding Technology and Synthetic Assets, the use of Mirror Protocol to create synthetic representations of assets is a complex area and would touch on a variety of financial, securities, and commodities laws, depending on the specific nature of the tokenized products.

238. Regarding Potential International Considerations, if FTX, Alameda Research, or other involved parties operate across international jurisdictions, additional laws and regulations may apply depending on the countries involved.

239. The allegations regarding Citadel's use of cryptocurrency-based derivative products to allegedly manipulate AMC stock prices, along with FTX's purported deletion of records and

---

[148] 17 CFR § 180.1 - Prohibition on the employment, or attempted employment, of manipulative and deceptive devices. Cornell Law School Legal Information Institute. Link: https://www.law.cornell.edu/cfr/text/17/180.1
[149] 17 CFR § 240.13d-1 - Filing of Schedules 13D and 13G. Legal Information Institute - Cornell University. Link: https://www.law.cornell.edu/cfr/text/17/240.13d-1

potential misuse of Mirror Protocol, introduce new dimensions of complexity and illegality to this case. These actions could represent further violations of federal securities laws and related regulations.

240. Under federal securities laws like Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934, and FINRA rules such as 2020 and 5210 prohibit market manipulation and deceptive practices. Additionally, destruction or tampering of evidence also violates laws such as the Sarbanes-Oxley Act, Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 and FINRA rules 2020 and 5210 (which all outlaw market manipulation and deceptive practices). Citadel's utilization of 8 quadrillion Ethereum-wrapped, tokenized AMC shares, sourced from Alameda, for shorting AMC stock represents a flagrant form of market manipulation. These actions would violate both the Securities Exchange Act and relevant FINRA rules, as they create an artificial price for AMC stock. By using these derivatives, Defendants exercised undue influence to depress the stock prices drastically, contravening the laws that aim to maintain market integrity. The laws aim to maintain fair and transparent markets. Participants should not distort market conditions or destroy evidence that could be relevant to an investigation. The utilization of advanced technologies like cryptocurrency-based derivatives and blockchain protocols is not exempt from these laws.

241. According to the allegations, Citadel used derivative products sourced from Alameda to manipulate AMC's stock price artificially. 8 quadrillion Ethereum-wrapped, tokenized AMC shares were used to short the stocks, this could constitute a severe form of market manipulation under existing federal laws. The sheer volume of these tokenized shares— far exceeding the actual number of outstanding shares—would exert a significant downward pressure on the stock prices.

242. In addition to these violations, FTX's role in backing 1-to-1 all AMC shares, an estimated 400 million shares, without proper disclosure to shareholders, intensifies concerns over market manipulation. During this time period (mid 2021-late 2022) before the FTX collapse in November 2022, the authorized capital stock of AMC Entertainment Holdings, Inc. (hereinafter "AMC") consists of between 450 million and 517 million shares of AMC common stock. It was reported by AMC the company that 90% of said shares are registered in the names of or beneficially owned by a class of shareholders known colloquially as "retail investors," with the remaining 10% of shares registered in the names of or beneficially owned by various institutional investors. Notwithstanding the aforementioned distribution of share ownership, it has been asserted that Samuel Bankman-Fried, Chief Executive Officer of FTX Trading Ltd. (hereinafter "FTX"), was in possession of or had rights to 400,000,000 shares of AMC common stock. Such a claim was purportedly substantiated by references to an AMC white paper (which is no longer available to the public), a tweet made by FTX's Brett Harrison (claiming you could invest in actual stocks on FTX, see Exhibit P), and an audio recording disseminated through the social media platform known as Twitter Spaces.[150] The allegation concerning Mr. Bankman-Fried's share possession, if accurate, presents an incongruity with the authorized share capital of AMC, raising material questions of fact and law, given that the amount of shares claimed to be controlled by Mr. Bankman-Fried exceeds the aggregate percentage of shares reportedly held by both retail and institutional investors. This incongruence calls for a thorough examination and, if necessary, adjudication to reconcile the apparent discrepancy in the reported share ownership and distribution with the legally authorized share capital of AMC.

---

[150] Excerpt from Twitter Space with Unusual Whales and SBF (Samuel Bankman-Fried). SBF responds to a question about Tokenized Shares.  Link: https://www.youtube.com/shorts/_yX_0diEOWM

243. If proven that FTX's actions were unauthorized and hidden, this non-disclosure constitutes deceptive practices under the same federal securities laws. Their collapse and the discovery of these tokens would provide compelling evidence for market manipulation allegations. This manipulation have led to distorted market prices and economic harm to investors. Such use of derivative products to manipulate stock prices could fall under prohibited market manipulation under federal securities laws.

244. The plaintiffs argue that FTX's deletion of records, including the AMC Whitepaper, has hindered investigations and potentially obstructed justice. This action could also lead to additional legal challenges under laws against tampering with evidence. FTX's deletion of records, such as the AMC Whitepaper, also constitutes a violation of laws like the Sarbanes-Oxley Act, which makes it illegal to destroy or tamper with evidence relevant to an ongoing investigation. Obstructing justice in this way opens FTX to additional legal challenges, adding another layer to the case.

245. The purported misuse of Mirror Protocol to manipulate traditional financial assets introduces a technical component to market manipulation. Since the plaintiffs allege they can trace and quantify the impact of these actions through blockchain, there's potential for them to prove actual economic harm.

246. The plaintiffs' legal standing in this case derives from their ability to show direct economic harm and to trace and quantify this impact, potentially through blockchain technology. The new allegations involving cryptocurrency-based derivative products and technology platforms like FTX and Mirror Protocol could add further weight to claims of market manipulation, deception, and evidence tampering. This would subject Citadel, and potentially other implicated parties, to legal consequences under federal laws and regulations aimed at

maintaining fair, transparent markets. Given the enormous scope and potential impact on the financial markets, as well as the unique technological angles involving blockchain, this case could set a significant legal precedent.

## L. DEFENDANT'S MARKET MANIPULATION SCHEME

247. Citadel, Virtu, Susquehanna, and Citigroup, and the other defendants, have been involved in a complex market manipulation scheme to defraud AMC investors. It involves omissions, misrepresentations, and outright fraudulent transactions.

248. Exhibit AF (Exhibit "AF", attached hereto and incorporated herein by reference) displays how the defendants engaged in conspiracy to manipulate AMC's share price and to harm AMC shareholders.  Additionally. Exhibit AF visually illustrates the process in which Citigroup worked with AMC to conduct insider trading, Citigroup's role in the "Project Popcorn" conspiracy, how Defendants Citadel, Citigroup, Virtu, and Susquehanna use darkpools to negate fair supply and demand of AMC stock on the exchanges (such as NYSE and NASDAQ), how FTX and Citadel work to naked short AMC, how AMC worked with Mudrick to help Mudrick's positions at the expense of AMC shareholders, how Defendants Citadel and Virtu manipulate the LULD committee (regarding halts on the NYSE), and how how defendants such as Citadel, and Virtu conspired with Fox Business to destroy AMC stock by providing incorrect information regarding AMC stock.

249. Exhibit AG (Exhibit "AG", attached hereto and incorporated herein by reference) visually displays how the Defendants and other market participants set up mechanisms (including tokenized securities, latency arbitrage, parking of buy orders, and darkpools) to interfere with organic trading (buying and selling) of AMC stock.

## M. SPOOFING

248. Upon deliberate analysis of the presented facts, it is lucidly manifest that Citadel Securities LLC, referred to as the Defendant Citadel, and co-conspirators including Goldman Sachs have ostensibly engaged in insidious practices of market manipulation, brazenly contravening the Securities Exchange Act of 1934, Rule 10b-5, and FINRA Rules 2020 , 5210, violation of the Securities Exchange Act of 1934, section 10(b) and Rule 10b-5; Securities Act of 1933, section 17(a); Anti-Trust Violations Clayton Act § 4, 15 U.S.C. § 15, The Sherman Anti-Trust act, 15 U.S.C. § 1. and 2., 18 U.S.C. §§ 1341, 1349., The Computer Fraud and Abuse Act (18 U.S.C. § 1030 (a)(4), (a)(5)).

249. In orchestrating a nefarious spoofing scheme, the Defendants manipulated AMC share prices, misleading market participants, inducing trading predicated on such distorted market information. The subterfuge involved deploying and rapidly canceling voluminous "Baiting Orders", producing a spurious impression of market sentiment, in turn, significantly affecting the trading decisions of market participants, including the Plaintiffs. The false market sentiment resulted in the sale of over 3 billion+ shares of AMC Stock at artificially deflated prices. The financial ramifications were not incidental but a direct and detrimental consequence of the Defendants' deceptively calculated actions.

250. The Defendant Citadel has grossly misused their privileged position as market maker, manipulating the system for personal financial gain, thereby, violating securities laws and regulations designed to uphold fair and orderly markets. Their actions have precipitated severe financial harm to the Plaintiffs and pose a grave threat to the overall integrity and stability of securities markets.

251. The Defendant Citadel, donning dual roles as a market maker and hedge fund operator, bear an inherent responsibility to uphold and maintain the integrity of financial markets. As a market maker, their primary function is to ensure market liquidity by consistently buying and selling securities, thereby establishing a fair and orderly market. This role involves a fundamental obligation to refrain from engaging in activities that could potentially disrupt or manipulate market operations. Regrettably, the Defendant Citadel have allegedly breached this responsibility.

252. The alleged deceptive practice employed by the Defendants is known as spoofing. This practice deviates from the regular market scenario where orders displayed on the order book signify genuine intent to trade, reflecting an accurate representation of supply and demand that shapes market prices. Spoofing disrupts this equilibrium through the placement of large volumes of "Baiting Orders" or non-bona-fide orders designed to give a false impression of market sentiment, thereby misleading other market participants.

253. For example, consider a typical trading day in the AMC stock market. Traders, individual investors, and institutions are buying and selling shares based on their analysis of the stock's value, market conditions, and available market information. In a typical spoofing cycle, if the Defendants sought to depress a security's price, they could allegedly place large 'Baiting Orders' to sell AMC shares at a price slightly below the current market price.

254. This could create a false impression of a bearish market sentiment for AMC, leading other market participants to believe that many investors anticipate the price of AMC to decrease further. Responding to this artificially induced bearish sentiment, other market participants start selling their AMC shares, which would drive down the stock price.

255. After the stock price decreases significantly due to these artificially inflated sell orders, the Defendants would then allegedly buy AMC shares at this lower price and cancel their initial massive sell orders. This artificial surge in supply generates a false perception of bearish sentiment, coercing other traders into selling their holdings and further depressing the price. Upon reaching the desired lower prices, the Defendants execute actual buy orders at these deflated prices and promptly cancel their Baiting Orders.

256. To analogize spoofing, imagine a street market where vendors shout out the quantities and prices of the goods they have for sale. A dishonest vendor wants to sell apples, but he wants to get a higher price for them. He knows that if people think there's a sudden demand for apples, they would be willing to pay more. So he hires a group of people to go around the market loudly demanding apples, making it seem like there's a buying frenzy. Other buyers hear this, think that apples are suddenly in high demand, and start buying them at higher prices.

257. As soon as the prices go up, the dishonest vendor's hired crowd disappears, and he sells his apples at the inflated price. The other buyers in the market were tricked into thinking there was genuine demand, and they paid more than they otherwise would have.

258. In this analogy, the dishonest vendor's actions are akin to spoofing in the financial markets. By placing large buy orders (the shouting crowd) that he has no intention of fulfilling, a trader can artificially inflate the perceived demand for a security, driving up the price. Once the price has risen, the spoofer cancels the fake buy orders and sells at the higher price, just like the vendor selling apples at the inflated price.

259. Such a strategy is not merely unethical; it also constitutes a clear violation of the Securities Exchange Act of 1934 and various FINRA rules explicitly prohibiting market

manipulation, including deceptive practices like spoofing.[151] Such activities obfuscate genuine market sentiment, mislead market participants, establish unfair trading conditions, and ultimately compromise the integrity and efficiency of the securities market. The nefarious practice of spoofing, as observed in this instance, blatantly contravenes several securities laws and regulations.

260. The Defendants could argue that what was perceived as spoofing was actually part of a legitimate and legal high-frequency trading strategy. They would insist that placing and quickly canceling orders is a common practice in modern, fast-paced markets and that their actions were in line with standard trading practices. A thorough analysis (from videos) of the patterns, frequency, timing, and context of the 'Baiting Orders' could demonstrate that these actions were part of a coordinated scheme to manipulate the market rather than a legitimate trading strategy. The Plaintiffs also has expert testimony to differentiate between lawful trading practices and the deceptive practices alleged.

261. If the Defendants were using automated trading algorithms, they would contend that the behavior described as "spoofing" was an unintended consequence of the algorithms responding to market conditions. They could argue that the algorithms were designed to comply with all relevant laws and regulations, and any resemblance to spoofing was accidental and not malicious. Evidence of manual intervention or customization of algorithms to create the appearance of market interest could counter this defense. A technical analysis shows that the

---

[151] Securities Exchange Act of 1934: 15 U.S.C. §§ 78a et seq. (2021). This chapter may be cited as the "Securities Exchange Act of 1934. USCode.House.gov. Link:
https://uscode.house.gov/view.xhtml?req=(title:15%20section:78a%20edition:prelim)

algorithms were intentionally designed to mimic spoofing and strengthen the argument against the Defendants.

262. The Defendants would maintain that their trading activities were in full compliance with the specific rules of the exchanges on which they were trading and their internal policies. They could provide evidence of these policies and rules, emphasizing that they were consistently adhered to. The Plaintiffs argue that internal policies or exchange rules do not override federal laws and regulations. An examination of whether the Defendants' practices were indeed in line with legal requirements and how those practices were implemented would be essential to refute this defense.

263. The Defendants could assert that their trading activities did not have a significant impact on the market or other traders. By showing that their actions were consistent with prevailing market trends and did not create artificial market conditions, they would attempt to refute the claim that they engaged in deceptive practices. Expert analysis and market studies shows us a clear correlation between the Defendants' actions and market movements, price manipulation, or harm to other traders could refute this argument. Especially when videographic evidence providing specific examples of how other traders were misled or disadvantaged by the spoofing would further strengthen this response.

264. The Defendants could contest that the specific provisions of the Securities Exchange Act, Dodd-Frank Act, or FINRA rules cited do not apply to their conduct.[152] They would rely on legal interpretations or precedents that draw distinctions between their actions and what is prohibited by the cited laws. A detailed legal analysis of the relevant provisions of the Securities

---

[152] H.R.4173 - Dodd-Frank Wall Street Reform and Consumer Protection Act. 111th Congress (2009-2010). Congress.gov. Link: https://www.congress.gov/bill/111th-congress/house-bill/4173/text

Exchange Act, Dodd-Frank Act, and FINRA rules, supported by case law, could demonstrate how they apply to the specific actions of the Defendants. This would show that their conduct does indeed fall within the scope of the laws they are accused of violating.

265. The Defendants would challenge the claim that their alleged actions directly led to the Plaintiff's financial losses. They could argue that the market is influenced by many factors, and the Plaintiff's losses cannot be solely attributed to their actions. They would also contend that their activities did not harm other market participants. The Plaintiffs have detailed trading data analysis, expert testimony, and real-world examples to establish a direct link between the Defendants' alleged actions and the financial losses claimed. This would demonstrate causation and quantify the harm directly attributable to the alleged spoofing.

266. Section 9(a)(2) of the Securities Exchange Act of 1934 explicitly outlaws manipulative or deceptive actions concerning the purchase or sale of any security, including creating deceptive appearances concerning the market for a security. Such practices comprise the placement of any order with the knowledge that a similar order will be entered by or for the same or different parties with the intent to induce any sale of any such security or any purchase thereof.

267. The prohibition against manipulative practices like spoofing is further reinforced by Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 enacted under it.[153],[154]

---

[153] SEC Rule 10b, 17 C.F.R. § 240.10b (2021) Employment of manipulative and deceptive devices.Code of Federal Regulations (National Archives - ECFR.org). Link: https://www.ecfr.gov/current/title-17/chapter-II/part-240/subpart-A/subject-group-ECFRbda83517ce4377f
Section 10(b): This section makes it unlawful to use or employ any manipulative or deceptive device or contrivance in connection with the purchase or sale of any security.
[154] SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2021) Employment of manipulative and deceptive devices.Code of Federal Regulations (National Archives - ECFR.org). Link: https://www.ecfr.gov/current/title-17/chapter-II/part-240/subpart-A/subject-group-

These laws specifically target any deliberate schemes or artifices that aim to defraud or make misleading statements, which can significantly influence trading decisions. In the case at hand, the Defendants' alleged use of "Baiting Orders" to create a false impression of market sentiment could be seen as a violation of these laws. Their actions would constitute a breach of the statutory duties imposed to maintain the integrity and fairness of the financial markets.

268. FINRA has also established stringent rules outlawing such deceptive practices. FINRA Rule 2020 disallows the use of any manipulative, deceptive, or other fraudulent devices in connection with the purchase or sale of any security.[155] Similarly, FINRA Rule 5210 strictly prohibits executing any transaction involving no change in beneficial ownership, a practice known as "wash sales," which is often associated with manipulative activities like spoofing.[156] This rule also bans making false or misleading statements concerning any transaction in a security.

269. In the instant case, the Defendant Citadel, and co-defendants acting as both market maker and a hedge fund operator, are accused of deliberate and intentional engagement in the deceptive practice of spoofing. They have, thereby, allegedly contravened their obligations under Section 9(a)(2) and Section 10(b) of the Securities Exchange Act, Rule 10b-5, and FINRA Rules

---

ECFRbda83517ce4377f/section-240.10b-5
Rule 10b-5: Adopted under Section 10(b), this rule explicitly prohibits making any untrue statement of a material fact or omitting a material fact necessary to make statements not misleading in connection with the purchase or sale of any security. Citation: 17 C.F.R. § 240.10b-5.
[155] FINRA RULE 2020. Use of Manipulative, Deceptive or Other Fraudulent Devices. FINRA.org. Link: https://www.finra.org/rules-guidance/rulebooks/finra-rules/2020
FINRA Rule 2020: This rule prohibits any manipulative, deceptive, or other fraudulent device in connection with the purchase or sale of any security.
[156] FINRA RULE 5210. Publication of Transactions and Quotations. FINRA.org. Link: https://www.finra.org/rules-guidance/rulebooks/finra-rules/5210
FINRA Rule 5210: This rule strictly forbids making or causing to be made false or misleading statements relating to a security. It also disallows executing any transaction involving no change in beneficial ownership (e.g., "wash sales").

2020 and 5210[157], violation of the Securities Exchange Act of 1934, section 10(b) and Rule 10b-5; Securities Act of 1933, section 17(a); Anti-Trust Violations Clayton Act § 4, 15 u.s.c. § 15, The Sherman antitrust act, 15 u.s.c. § 1. and 2., 18 u.s.c. §§ 1341, 1349., The Computer Fraud and Abuse Act (18 u.s.c. § 1030 (a)(4), (a)(5)). These statutes and regulatory provisions categorically proscribe any form of market manipulation, including deceptive practices like spoofing that distort market prices and create an artificial trading environment.

270. The case posits that the Defendants have masterminded a scheme to manipulate the price of AMC shares across multiple exchanges. Through the strategic placement of a significant volume of Baiting Orders with no intent of execution and their swift cancellation, they have created an illusion of erratic market sentiment. This strategy has induced artificial price movements, which the Defendants exploited to execute millions of transactions at manipulated prices.

271. This conduct has not only disrupted the market equilibrium for AMC shares but has also contravened their responsibilities as market makers, which involve ensuring fairness and preventing manipulative practices. The allegations purport that their actions were not merely negligent or inadvertent; rather, they were premeditated, designed to secure profits at the cost of the securities market's integrity and other market participants.

272. The Plaintiffs, misled by this false market sentiment, relied on these manipulated prices to make trading decisions. The false market sentiment resulted in the sale of over 3 billion+ shares of AMC Stock at artificially deflated prices. The alleged manipulation inflicted substantial financial harm on the Plaintiffs, with the losses directly traceable to the Defendants'

---

[157] Securities Exchange Act of 1934: Section 9(a)(2): This provision specifically outlaws manipulative or deceptive conduct concerning securities trading.

spoofing scheme (and other illegal actions), thereby satisfying the elements of economic loss and loss causation. Therefore, based on the available information, the Defendants have allegedly violated pivotal securities laws and FINRA rules through their engagement in market manipulation via spoofing. Their actions have allegedly caused significant harm to the Plaintiffs, highlighting a clear application of these rules and their protective intent.

273. The Plaintiffs contend that Citadel Securities LLC (the "Defendant Citadel") and unknown Market Participants have engaged in market manipulation through a scheme of spoofing, thereby allegedly violating federal securities laws, including the Securities Exchange Act of 1934, Rule 10b-5, as well as FINRA Rules 2020, 5210, violation of the Securities Exchange Act of 1934, section 10(b) and Rule 10b-5; Securities Act of 1933, section 17(a); Anti-Trust Violations Clayton Act § 4, 15 u.s.c. § 15, The Sherman antitrust act, 15 u.s.c. § 1. and 2., 18 u.s.c. §§ 1341, 1349., The Computer Fraud and Abuse Act (18 u.s.c. § 1030 (a)(4), (a)(5))..

274. Under Section 9(a)(2) of the Securities Exchange Act of 1934, manipulative or deceptive actions in connection with the purchase or sale of any security are prohibited. Additionally, Section 10(b) of the Act and Rule 10b-5 outlaw schemes designed to defraud or make misleading statements. FINRA Rule 2020 forbids the use of any manipulative, deceptive, or other fraudulent devices in connection with securities transactions, while FINRA Rule 5210 prohibits executing transactions that involve no change in beneficial ownership ("wash sales") and making a false or misleading statement(s).

275. These laws and rules aim to ensure market integrity by barring manipulative tactics that distort genuine supply and demand in the marketplace. Spoofing involves placing orders with the intention of canceling them before they can be executed, creating a false impression of

market sentiment. In this context, a market maker like Citadel has an obligation to ensure an orderly market, and it has a fiduciary duty not to engage in deceptive practices.

276. The Plaintiffs allege that Defendant Citadel placed and then quickly canceled large volumes of "Baiting Orders" to manipulate the AMC share market, thereby creating a false impression of a bearish sentiment and inducing sales at artificially deflated prices. They claim that Citadel then bought shares at these lower prices after canceling the deceptive orders. If proven, this conduct would amount to spoofing, a manipulative practice that violates the above-cited rules and statutes.

277. As a market maker, Citadel has a heightened responsibility to ensure that its activities promote fair and efficient markets. The Plaintiffs contend that Citadel failed in this duty by allegedly engaging in market manipulation through spoofing. Such behavior would contravene the legal obligations set forth in Section 9(a)(2) and Section 10(b) of the Securities Exchange Act, as well as FINRA Rules 2020 and 5210.

278. The Defendant could argue that their trading strategies were legal high-frequency trading techniques or unintentional outcomes of automated algorithms. However, the Plaintiffs claim to possess video evidence and expert testimony that reveal a calculated and manipulative scheme. The alleged correlation between Defendant Citadel's trading activities and artificial market trends lends credence to the Plaintiffs' claim of deliberate misconduct, as does the Plaintiffs' analysis of trading data and real-world impact.

279. The Plaintiffs argue that the Defendant's alleged spoofing scheme directly resulted in significant financial losses. They claim to have sold over 3 billion+ shares of AMC at deflated

prices due to the false market sentiment created by Defendant Citadel. This satisfies the elements of economic loss and loss causation required for a violation of the cited laws and rules.

280. Based on the allegations, Defendant Citadel's and unknown market participant conduct appears to constitute a violation of relevant securities laws and FINRA rules designed to prevent market manipulation and deception. The Plaintiffs' claims, supported by their evidence, point towards a direct infringement of these laws, causing them substantial economic harm. Therefore, the Defendant could be held liable for market manipulation through spoofing, subject to the facts being proven in a court of law.

## N. DEFENDANTS CAUSED INNUMERABLE FAILURE TO DELIVER (FTDS)

281. Both Citadel Securities, Citigroup, and Susquehanna all play a dual role in the securities market as both a market maker and hedge fund. As a market maker, Citadel and Susquehanna constantly buy and sell stocks from their own inventories, aiming to ensure liquidity and stability in the market. Citigroup is a market maker for AMC Securities.  However, as hedge funds and/or banks, their goal is to maximize their returns, which can sometimes lead to conflicts of interest and breaches of regulations.

282. Citadel's, Citigroup's and and Susquehanna's dual role places them in a unique position, where they have access to a wide range of market information and the power to influence the price and volume of stocks. This makes them responsible for ensuring fair trading practices, including timely delivery of securities following trades.

283. Failures to Deliver (FTDs) occur when a party fails to deliver securities by the agreed-upon date, which in U.S. stock markets, is three days following the trade date. When the

net delivery obligations of a clearing member are not met, this results in an FTD, creating a gap in the market and potentially disrupting the fairness and orderliness of the trading environment.

284. Citadel Securities, Citigroup, and Susquehanna, in their role as a market maker and a hedge fund, can significantly influence the incidence of FTDs. For instance, if they decide to short sell securities without arranging to borrow the necessary securities to cover the short sale, this could lead to an FTD. Virtu Financial is also another major market maker who can also significantly impact the incidence of FTDs.

285. The defendants (including Citadel, Citigroup, Susquehanna, and Virtu) are also accused of utilizing complex trading strategies involving options and dark pool trades to hide Failures-to-Deliver (FTDs), a practice which, while not illegal per se, but is controversial due to its ability to distort market transparency.

286. The purported methods that Citadel and Virtu utilize include the selling and exercising of deep-in-the-money call and out-of-the-money put options, and creating synthetic long puts and executing married puts, which effectively "reset the clock" on the original FTDs. These techniques allow the party employing them to ostensibly reduce their apparent FTDs while creating new ones, contributing to a seemingly perpetual cycle.

287. Virtu reported on their 2021 Annual Report that they owned appropriately 3.239 billion financial instruments owned, at fair value, which was less than the reported approximate 3.510 billion in financial instruments sold, not yet purchased, at fair value (which is reported as a liability). Virtu reported on their 2022 Annual Report that they owned appropriately 3.667 billion financial instruments owned, at fair value, which was less than the reported approximate 4.197

billion in financial instruments sold, not yet purchased, at fair value. Virtu's liabilities are outgrowing their assets owned. [158]

288. These strategies, however, are not typically accessible to the average investor and require significant knowledge, sophistication, and capital to execute. The complexity and opaqueness of these activities make them difficult to detect and prove, particularly in the absence of explicit evidence from proprietary ATS (Alternative Trading Systems).

289. Such activities, while currently operating within the bounds of the law, violate the spirit of fair and transparent markets. The suspected manipulation of securities transactions and obscuring of FTDs will be contrary to the principles of market integrity and equality among investors. While there's some evidence to suggest these tactics are employed, the lack of transparency in these dealings is a cause for concern for many market participants.

290. Citadel Securities, Susquehanna, Virtu, and Citigroup have manipulated the market in such a way as to cause an increase in FTDs. Such manipulation involves various deceptive strategies, such as naked short selling, where the seller does not arrange to borrow the securities at the time of sale. This manipulation is in violation of federal securities laws, including Section

---

[158] Virtu Financial 2022 Annual Report.  Link:
https://www.sec.gov/Archives/edgar/data/1592386/000110465923053924/tm2313101d2_ars.pdf

10(b), Rule 10b-5, and Rule 10b-21 of the Securities Exchange Act, all of which prohibit fraudulent activities in the sale of securities.[159,160,161]

291. Rule 10b-21 specifically targets deceptive conduct in connection with naked short selling. This rule falls under the broader Section 10(b) of the Securities Exchange Act, which prohibits the use of any manipulative or deceptive device in contravention of the rules and regulations prescribed by the SEC. Rule 10b-5, which also falls under Section 10(b), similarly prohibits fraud, misrepresentation, and deceit in the sale or purchase of securities.

292. The relationship between these entities and the DTCC, the corporation responsible for clearing and settling trades in the U.S. stock markets, is critical. The DTCC becomes the central counterparty of all matched trades, checking and updating stock ownership accounts. Citadel Securities, Susquehanna, Virtu, and Citigroup, abused the Continuous Net Settlement (CNS) system, due to their substantial trading volume of naked shorts and influence, and creating a situation where there are more FTDs than allowed by regulators, it also overburden the DTCC's settlement process and exacerbate the overall FTD situation in the market.

293. Thus, the combination of Citadel's, Citigroup's, and Susquehanna's dual role a a market makers and hedge fund, the Defendants' (including Citadel, Susquehanna, Virtu, and Citigroup) influence on FTDs, their alleged market manipulations, and their interactions with the

---

[159] SEC Rule 10b, 17 C.F.R. § 240.10b (2021) Employment of manipulative and deceptive devices.Code of Federal Regulations (National Archives - ECFR.org). Link: https://www.ecfr.gov/current/title-17/chapter-II/part-240/subpart-A/subject-group-ECFRbda83517ce4377f

[160] SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2021) Employment of manipulative and deceptive devices.Code of Federal Regulations (National Archives - ECFR.org). Link: https://www.ecfr.gov/current/title-17/chapter-II/part-240/subpart-A/subject-group-ECFRbda83517ce4377f/section-240.10b-5

[161] SEC Rule 10b-21. Deception in connection with a seller's ability or intent to deliver securities on the date delivery is due. Code of Federal Regulations (National Archives - ECFR.org). Link: https://www.ecfr.gov/current/title-17/chapter-II/part-240/subpart-A/subject-group-ECFRbda83517ce4377f/section-240.10b-21

DTCC and the settlement process, places them at the center of this situation and any ensuing legal ramifications.[162]

294. In the case of Citadel Securities, Susquehanna, Virtu, and Citigroup, they did engage in deceptive conduct such as naked short selling without intending or being able to deliver the necessary securities by the settlement day, they are in direct violation of Rule 10b-21 of the Securities Exchange Act.[163] Naked short selling leads to these FTDs, as the seller doesn't arrange to borrow the securities at the time of sale and, therefore, was not be able to deliver the securities on time. The entities' substantial trading volume and influence exacerbated the overall FTD situation in the market as they participated in such activities.

295. Citadel Securities, Susquehanna, Virtu, and Citigroup misrepresented their ability or intent to deliver the necessary securities by the settlement date while engaging in naked short selling, the defendants are in violation of Rule 10b-21. Furthermore, their activities harmed the overall health and fairness of the market, leading to a loss of confidence among AMC investors and other market participants.

296. Citadel Securities and Susquehanna, both as a market maker and hedge fund, plays a crucial role in the trading and settlement process. Given their substantial trading volumes, their activities greatly influence the overall market condition and health. Citadel Securities, Susquehanna, and Citigroup engaged in activities such as naked short selling that result in them

---

[162] Role of DTCC: The Depository Trust & Clearing Corporation (DTCC) is an essential player in the clearing and settlement process. Any abuse of the Continuous Net Settlement (CNS) system and creation of excessive FTDs could significantly impact the integrity of the entire trading system, adding a layer of complexity to the legal analysis.

[163] Rule 10b-21: Known as the "Naked Short Selling Anti-Fraud Rule," this rule targets deceptive conduct in connection with naked short selling, making it unlawful to deceive brokers, dealers, or buyers about one's intention or ability to deliver securities in time for settlement.

being unable to meet their net delivery obligations, it would result in FTDs. This could be particularly problematic if they repeatedly fail to fulfill their obligations, which lead to an increase in overall AMC FTDs in the market, contributing to market instability and manipulated stock prices.

297. The role of the DTCC in this process is also significant. As the central counterparty of all matched trades, the DTCC checks and updates relevant stock ownership accounts. In cases where Citadel Securities, Susquehanna, Virtu, and Citigroup are unable to fulfill their delivery obligations, the DTCC would register this as an FTD. As such, the DTCC's records serve as evidence of any failure by Citadel Securities, Susquehanna, Virtu, and Citigroup to fulfill their delivery obligations.

298. Citadel Securities, Susquehanna, Virtu, and Citigroup, given their prominent roles in the market, have a responsibility to meet their delivery obligations. Their failure to do so can lead to an increase in FTDs, which can contribute to market instability and potential manipulation of stock prices. Therefore, it is essential for these entities to adhere to the settlement process and meet their delivery obligations to maintain a fair and efficient market.

299. The settlement process, managed on a three-day cycle, is integral to the functioning of the US stock markets. When trades are made on a specific day, referred to as 't', they are expected to be settled by day 't+3'. When the necessary stocks for delivery are not present in the clearing member's ownership account, it results in a FTD. The DTCC, which serves as the central counterparty of all trades, is responsible for electronically checking and updating these accounts. This process ensures the smooth functioning of the markets and helps to maintain a transparent record of all trades and deliveries. Any deviations from this process, such as FTDs, can negatively affect the health and stability of the market.

300. Upon examining the provided evidence, there seems to be a reasonable case against Citadel Securities and Susquehanna, who both function as a both market maker and hedge fund, and Citigroup and Virtu - as both entities play a crucial role in the trading and settlement process. Given their substantial trading volumes, their activities greatly influence the overall market condition and health. Citadel Securities, Susquehanna, Virtu, and Citigroup engaged in activities such as naked short selling.

301. It is alleged that Citadel, Susquehanna, Virtu, and Citigroup have violated Section 10(b), Rule 10b-5, and Rule 10b-21 of the <u>Securities Exchange Act</u>. Their interplay with the DTCC and manipulation of the settlement process appears to have led to a significant number of Failures to Deliver (FTDs).

302. These FTDs could compromise the soundness and efficiency of the securities market. Consequently, these actions could potentially have inflicted substantial financial damage upon the plaintiffs, justifying the initiation of a federal complaint. Should these allegations hold up in court, it could signal a need for increased oversight and stricter regulations to preserve market integrity and protect investors from such practices in the future.

303. Diving into the specific legal consequences Citadel Securities, Susquehanna, Virtu, and Citigroup could face, we must first grapple with the scope of Section 10(b) of the <u>Securities Exchange Act of 1934</u>. This provision is the bulwark against manipulative practices in the securities market, expressly designed to counteract purposeful deceit. In the case at hand, the firms' activities have not merely toed the line but appear to have willfully crossed it. The persistent pattern of their trading activities, characterized by the systematic failure to deliver, sends a clear signal of intent to manipulate the market.

304. Further, Rule 10b-5 leaves no room for misinterpretation—it is a clear and present prohibition against fraud, misrepresentation, and deceit in securities trading. Citadel Securities, Susquehanna, Virtu, and Citigroup, through their alleged actions, appear to have thrown caution to the wind and violated these crucial investor protections. The evidence suggests that they engaged in deceptive practices, such as making false representations about market supply and demand, knowingly and strategically.

305. Most critically, Rule 10b-21 targets deceptive conduct specifically in relation to short selling. It stipulates that those who create a false impression about their intention or capability to deliver securities for settlement are in clear violation. Citadel Securities, Virtu, Susquehanna, and Citigroup, by their apparent actions of orchestrating an undue increase in naked short selling and the resultant FTDs, seem to be squarely within the crosshairs of this rule. The law is unambiguous in this area, and  the evidence confirms these allegations.

306. RegSho has been violated due to the large amount of naked short selling and FTDs. Regulation SHO (particularly Rule 204) imposes requirements on brokers and dealers for locating and delivering securities related to short sales. Rule 204 specifically requires brokers or dealers to deliver securities for clearing by the settlement date or take action to close out the position if delivery is not made. Additional FINRA rules may apply here as well.[164]

**RegSHO VIOLATIONS**

---

[164] FINRA, as a self-regulatory organization, also imposes rules and regulations that govern the conduct of broker-dealers, such as Citadel Securities. These rules may include those that ensure fair and transparent market practices.

307. AMC's recurring presence on the NYSE Threshold List has garnered significant attention and concern.[165] This particular list serves as a monitoring tool to identify stocks that would be associated with unusual trading practices. AMC's appearance on this list for a total of 202 trading days, or 22.35% of the total trading days possible from January 1, 2020, to August 4, 2023, is a striking occurrence that stands out in the context of other securities.

308. Naked short selling is the act of selling shares has been affirmatively determined not to exist. It's that manipulative practice that leads to artificial price movements as well as AMC's extensively being put on the RegSHO list.[166] The high frequency with which AMC has been on the Threshold List signals that such practices are occurring.

309. The Defendant's naked short selling violates Regulation SHO's locate requirement, which mandates that brokers must have reasonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due.[167] With more than 90% of AMC's float owned by retail shareholders, this is not possible.[168]

---

[165] NYSE Threshold List. NYSE.com. Relevant Time Periods: 2020-2023. Link:
https://www.nyse.com/regulation/threshold-securities
[166] Securities Exchange Act of 1934, Section 10(b) and Rule 10b-5: This provision and corresponding rule make it illegal to engage in fraudulent or manipulative practices in connection with the purchase or sale of a security. Naked short selling, if intended to manipulate the price of a security, could fall under this prohibition.
[167] Regulation SHO: Enacted by the SEC, Regulation SHO imposes several requirements to curb naked short selling. It includes provisions such as the "locate" requirement, which obliges brokers to confirm that a stock can be borrowed before short selling, and the close-out requirements that ensure timely settlement of short sales.
[168] During the Q4 2021 Earnings Conference Call, held on March 1st, 2022, Defendant Aron reported that AMC had approximately 4 million shareholders, "individual retail investors would seem to own more than 90% of our officially issued 516 million shares."
Reference: AMC Entertainment Holdings, Inc.'s (AMC) CEO Adam Aron on Q4 2021 Results - Earnings Call Transcript March 1, 2022. *Seeking Alpha*. Posted on March 1, 2022. Link:
https://seekingalpha.com/article/4491987-amc-entertainment-holdings-inc-s-amc-ceo-adam-aron-on-q4-2021-results-earnings-call . Accessed on May 07, 2023.

310. Such manipulative practices not only impact the stock but also undermines the entire market's integrity by eroding trust in the transparency and fairness of the trading system.[169] The abnormal data necessitates further investigation by regulators such as the SEC to ascertain the underlying depths of AMC's recurrent appearance on the Threshold List, in respects to borrowed shares. [170]

311. Shareholders and potential new investors have become wary of AMC's stock due to the associated red flags. AMC's recurring presence on the NYSE Threshold List represents a serious and multifaceted concern that could implicate several regulatory and legal issues. The information presented is a starting point, prompting a need for further scrutiny and an organized response from regulatory bodies to preserve the integrity of the financial markets.

312. Regulation SHO is a set of regulatory provisions implemented by the Securities and Exchange Commission (SEC) to reduce manipulative trading practices like naked short selling. A security will be placed on the threshold list if it has a significant fail to deliver position for at least 5 business days. This list includes failures to deliver for both long and short positions. The standards are different for SEC reporting issuers and non-SEC reporting issuers. The definition of a threshold security for a reporting issuer is set forth in Regulation SHO and for non-reporting issuers is set forth in Rule 4320.[171]

---

[169] FINRA Rule 2010: This rule requires FINRA members to observe "high standards of commercial honor and just and equitable principles of trade." Practices that undermine market integrity could be deemed a violation of this rule.
[170] FINRA Rule 2020: This rule specifically prohibits manipulative and fraudulent practices and could be implicated if a FINRA member were found to have engaged in naked short selling with fraudulent intent.
[171] FINRA RULE 4320. Short Sale Delivery Requirements. FINRA.org. Link:
https://www.finra.org/rules-guidance/rulebooks/finra-rules/4320
Note: This rule pertains to the regulation of threshold securities for issuers not reporting to the SEC. It helps define what constitutes a threshold security and works in conjunction with Regulation SHO to combat manipulative practices such as naked short selling.

313. Regulation SHO defines threshold securities as any equity security of an issuer that is registered under Section 12 of the Securities Exchange Act of 1934,[172] or that is required to file reports pursuant to Section 15(d) of the same Act, and where, for five consecutive settlement days:

- there are aggregate failures to deliver at a registered clearing agency of 10,000 shares or more per security; and
- the level of failures to deliver is equal to at least one-half of one percent of the issuer's total shares outstanding.

FINRA Rule 4320 defines threshold securities as any equity security of an issuer that is not an SEC reporting security and, for five consecutive settlement days, has:

- aggregate failures to deliver at a registered clearing agency of 10,000 shares or more; and
- a reported last sale during normal market hours for the security on that settlement day that would value the aggregate failure to deliver position at $50,000 or more.

314. Each Self Regulatory Organization ("SRO"), including the stock exchanges, must publish a daily list of the issuers with significant delivery failures. This list is known as the Threshold List, and is based on information reported to the SROs by the National Securities Clearing Corporation (NSCC), the clearing arm of the DTCC. It is published every night at around 11 p.m. It includes several key aspects, such as the "locate" requirement, which

---

[172] Securities Exchange Act of 1934. NYSE.com. Link:
https://www.nyse.com/publicdocs/nyse/regulation/nyse/sea34.pdf
Note: Section 12 and 15(d) of the Securities Exchange Act of 1934: These sections mandate registration requirements and periodic reporting, forming part of the legal framework governing threshold securities.

necessitates that brokers or dealers find a party that owns the stock and receive confirmation that the security can be borrowed before a short sale. This is integral to ensuring that short sales are conducted with borrowed or arranged securities, thereby reducing the possibility of naked short selling.

315. Additionally, under Regulation SHO, orders must be marked as "long," "short," or "short-exempt." These markings distinguish between sales of securities that the seller owns, does not own, or is exempt from short sale price restrictions, providing clarity and transparency. [173,174] The price test circuit breaker is another feature of this regulation, restricting the price at which short sales are executed under certain conditions. [175] This mechanism is designed to prevent excessive price declines due to short selling.

316. The close-out requirements of Regulation SHO are particularly significant in the context of naked short selling. If a short sale results in a failure to deliver the security on the settlement date, brokers and dealers must purchase or borrow the securities to close out the position. This helps in ensuring the completion of settlements and the delivery of securities. While certain exemptions would apply, such as for bona fide market makers who contribute to market liquidity, these rules create accountability in the short-selling process. [176]

---

[173] Securities Exchange Act of 1934, Section 17(a): This section requires brokers and dealers to maintain accurate records. If a firm were found to be intentionally obscuring its short selling practices, it could run afoul of this provision.

[174] Securities Act of 1933, Section 17(a): This provision makes it unlawful to engage in fraudulent practices in the offer or sale of securities. If naked short selling were part of a scheme to defraud buyers, this section could be implicated.

[175] FINRA Rule 5310: This rule relates to best execution and interpositioning, requiring firms to use reasonable diligence to ascertain the best market for a security and buy or sell in that market. Failure to do so in connection with short sales could be considered a violation.

[176] Securities Exchange Act of 1934, Section 9(a): This section prohibits various manipulative practices, including wash sales and matched orders, that could be used to create a misleading appearance of market activity. If naked short selling were part of a broader scheme involving these practices, this section is relevant.

317. Complementing Regulation SHO, the NYSE Threshold List was implemented by the SEC in 2005 as a red flag for issues with a security, especially related to naked short selling. [177]Securities that have significant and persistent fail-to-deliver positions at a registered clearing agency are placed on this list, signaling potential problems.

318. The Threshold List serves multiple functions in maintaining the integrity of financial markets. By identifying securities with large fail-to-deliver positions, it acts as a warning sign to regulators, brokers, and market participants. It also enhances market transparency by publicly disclosing information related to these securities, holding parties accountable, and prompting further action or investigation from regulators when necessary.

319. The NYSE Threshold List also serves as a historical analysis tool, allowing regulators and market participants to understand trends and practices over time. This knowledge helps inform decisions and preventive measures, contributing to the overall stability and fairness of the markets. Both Regulation SHO and the NYSE Threshold List are crucial instruments in the effort to combat manipulative practices like naked short selling. By setting clear rules, enhancing transparency, and providing mechanisms for monitoring and enforcement, they contribute to building confidence in the financial markets, ensuring that they function in a fair and orderly manner.

320. The historical presence of AMC on the New York Stock Exchange's (NYSE) Threshold List reveals significant and unusual patterns that prompt questions and concerns about the stock's trading practices. **Within the specified period (January 2020 - August 4, 2023),**

---

[177] SEC's 2005 Amendment to Regulation SHO: This amendment led to the creation of the NYSE Threshold List, further reinforcing the mechanisms to identify and curb issues related to naked short selling.

**AMC appeared on the Threshold List for a total of 202 trading days out of the 904 days**

**during this period, comprising of 22.35% of that time (See Exhibit "Q", attached hereto**

**and incorporated herein by reference).  Also, as of August 4, 2023, AMC was still currently**

**on the threshold list and had been on the list for 30 days straight.**

321. This figure alone is highly conspicuous, but when examined in the context of AMC's

presence being significantly higher compared to other securities, it highlights alarming issues

that deserves scrutiny.

322. Several hypotheses and concerns arise from this observation. Foremost among them

is the suggestion that naked shorting on AMC has occurred at a level far above all other

securities listed on the NYSE. Naked shorting, an illegal practice where the sale of shares that

have not been affirmatively determined to exist, directly contradicts the principles of market

integrity and transparency. The fact that AMC's presence on the list dwarfs that of other

securities fuels this concern, leading to a demand for answers.

323. This issue has led plaintiffs to discover different scenarios about how naked shorts

on AMC are hidden or pretend covered. They unveil a deeply troubling aspect of market

manipulation, undermining trust in the financial system.

324. Moreover, lingering questions about whether the naked shorting that presumably

occurred in 2020 was ever genuinely covered only add to the growing apprehensions. If

uncovered, these practices could signify an ongoing scheme of market manipulation, requiring

immediate intervention and thorough investigation by regulatory bodies.

325. The data also reveals some unusual patterns and observations. The additional shares

issued by AMC during this period would have allowed strategic maneuvering to avoid being

caught with significant fail-to-deliver positions, thus evading the Threshold List. Furthermore, sudden and seemingly random spikes in AMC's price would be related to efforts to cover enough positions not to appear on the list. These observations, while not definitive proof, underscore the need for further inquiry.

326. A comparative analysis of AMC with other securities on the Threshold List reinforces these concerns. The stark contrast between AMC's trading patterns and those of other securities magnifies the anomaly, giving credence to suspicions of foul play.

327. AMC's recurring presence on the NYSE Threshold List, along with the associated hypotheses, concerns, and unusual observations, collectively paints a picture that indicates manipulative practices such as naked short selling and deception (See Exhibit "R", attached hereto and incorporated herein by reference).

328. The comprehensive data on AMC's presence on the NYSE Threshold List, as well as the speculative insights provided, creates a multifaceted and complex situation that demands careful consideration. While the information at hand strongly suggests unusual patterns possibly indicative of manipulation, reaching a definitive legal conclusion is far from straightforward.

329. First and foremost, the mere presence on the Threshold List, though highly suggestive, of wrongdoing. The list serves as a regulatory tool to flag potential issues with securities, specifically targeting practices like naked short selling. But being on the list does not automatically equate to guilt. It's indicative of a deeper problem, but without an in-depth investigation, it remains a warning sign rather than definitive proof.

330. The speculative insights provided add another layer of complexity to the matter. Theories about hidden or pretend-covered naked shorts, the strategic issuance of additional

shares, and sudden price spikes are all compelling when viewed in conjunction with AMC's recurrent presence on the list. However, they are, at their core, speculative. They offer potential avenues for understanding the situation but cannot stand alone as conclusive evidence of manipulation.

331. To fully unravel the intricacies of this situation, a thorough investigation would be required, involving detailed examination of trading records, communication between parties involved, and other pertinent data. Such an investigation would have to be carried out by professionals with expertise in securities law and a deep understanding of market mechanics. While the data and insights regarding AMC's presence on the NYSE Threshold List paint a concerning picture of potential manipulation, they also highlight the inherent complexity and multifaceted nature of securities regulations that have loopholes, the defendants are able to skirt.

332. Regarding Other Potential Legal Considerations, depending on the nature and extent of the suspected manipulative practices, other federal securities laws could come into play. This would include anti-fraud provisions in the Securities Exchange Act, FINRA rules governing fair dealing, and additional SEC regulations designed to promote market integrity and transparency. [178]

## O. LIMIT UP LIMIT DOWN (LULD) ABUSE

333. Citadel's, Virtu's, and Goldman Sachs' coordination with the LULD Committee to manipulate the stock prices of AMC and APE constitutes violations of securities laws, including market manipulation and abuse of the Limit Up/Limit Down rule, to the detriment of retail

---

[178] Dodd-Frank Wall Street Reform and Consumer Protection Act: This act provides the SEC with additional authority to regulate and enforce rules related to market manipulation and abusive practices, potentially including naked short selling.

investors.[179,180] Notably, Citadel, Virtu, and Goldman Sachs are represented on the committee. Citigroup does not have a direct representative on the LULD Committee at this time, however, two of the biggest institutional owners of Citigroup are BlackRock and State Street - who do have representatives on the LULD Committee and represents Citigroup's interest by proxy.

334. To understand the gravity of these concerns, it's essential to explore the nature and composition of the Limit Up/Limit Down (LULD) Committee. The Limit Up/Limit Down (LULD) Committee was tasked with preventing excessive volatility in the stock market by setting price bands. It is composed of a diverse group of stakeholders, each representing different facets of the financial industry.[181]

335. The committee includes representatives from leading stock exchanges such as the New York Stock Exchange (NYSE), Nasdaq, BATS, CBOE, and CME. These members are integral in ensuring that the rules align with orderly trading within their platforms. Alongside these representatives, the Financial Industry Regulatory Authority (FINRA) also has a seat at the table, providing regulatory oversight to brokerage firms and exchange markets.

336. In addition to these regulatory and exchange entities, major trading firms and Wall Street banks have their voices heard in the LULD Committee in a fraternal sense. These financial giants not only have a significant influence on daily trading but also find themselves amid

---

[179] Securities Exchange Act of 1934, Section 9(a): Explicitly prohibits manipulative practices such as wash sales and matched orders. If the allegations against Citadel and Citigroup regarding their coordination with the LULD Committee to manipulate AMC and APE stocks are proven true, they may be in violation of this provision.

[180] Securities Exchange Act of 1934, Section 10(b) and SEC Rule 10b-5: This Section and Rule together make it unlawful to engage in fraudulent or deceitful practices in connection with the purchase or sale of any security. The allegations against Citadel and Citigroup of manipulating the LULD rule could fall under this provision.

[181] Limit Up-Limit Down Plan, 17 C.F.R. pt. 242 (2013)) is referenced here: 242.600 NMS security designation and definitions.Code of Federal Regulations (National Archives - ECFR.org). Link: https://www.ecfr.gov/current/title-17/chapter-II/part-242

allegations regarding the abuse of the LULD mechanism. Their participation raises concerns and questions about potential conflicts of interest, especially in scenarios where they have positions in stocks affected by the LULD rule.

337. The composition of the LULD Committee strives to encompass the interests and perspectives of various market participants. It aims to provide a balanced and well-rounded view to create fair and effective regulations. However, the inclusion of representatives from Citadel, Virtu, Goldman Sachs, and Citigroup, coupled with accusations of manipulation, has led to increased scrutiny. AMC and APE have been halted unnecessarily and the purpose of saving institutional counterparties in the trade.

338. This has ignited a dialogue around the integrity and fairness of the committee's decisions, casting a shadow on an otherwise vital regulatory function within the complex financial ecosystem. The specific allegations against the defendants Citadel, Virtu, Goldman Sachs, and Citigroup indicate how the integrity of this regulatory function have been deeply compromised. The following allegations against Citadel, Virtu, Goldman Sachs, and Citigroup serve as a spotlight on potential conflicts of interest within this regulatory body. These allegations, along with potential collaboration with the LULD Committee, paint a disconcerting picture of the misuse of power within the financial markets. These actions constitute serious violations of securities laws, such as engaging in market manipulation and abusing the Limit Up/Limit Down rule.[182] The LULD rule, meant to curb volatility, is alleged to have been misused

---

[182] FINRA Rule 2020 (Use of Manipulative, Deceptive or Other Fraudulent Devices): This prohibits members from effecting any securities transaction with intent to manipulate the market. Allegations against Citadel and Citigroup for coordinating with the LULD Committee to manipulate stock prices is relevant here.

to suppress AMC and APE stocks on the NYSE. They touch the core of what makes a market function with fairness and transparency.

339. The severity of these charges not only points to potential legal trouble for the accused parties but also indicates broader issues within the financial system. Should these allegations be confirmed, it would not merely result in legal consequences for the involved parties. It would also necessitate a broader reevaluation of regulatory practices, ethical standards, and the very systems in place to protect against market abuse.

340. The eyes of retail investors, regulators, and the wider financial community are now firmly fixed on this situation. The way it unfolds will have lasting implications for trust in the markets, the conduct of major financial institutions, and the robustness of the mechanisms designed to preserve market integrity.[183] In a world increasingly focused on accessibility and fairness in investment, these are concerns that cannot be ignored or taken lightly.

341. The Limit Up-Limit Down (LULD) Committee plays a crucial role in safeguarding the integrity of the stock market by controlling excessive volatility through price bands. These allegations against Citadel, Virtu, Goldman Sachs, and Citigroup for abusing this mechanism in the trading of heavily shorted stocks, AMC and APE, raise serious questions about the application, enforcement of the law, fiduciary duty, conflicts of interest, and regulatory obligations.

---

[183] Regulation SCI. SEC.gov. Link: https://www.sec.gov/spotlight/regulation-sci
Regulation SCI (Systems Compliance and Integrity): If any technological systems were manipulated or misused, this regulation could apply. It requires key market participants to maintain effective systems and controls to ensure the integrity of the securities markets.

342. The <u>Securities Exchange Act of 1934</u> lays the foundation for fair trading by preventing deceptive practices. It includes specific sections, like 9(a), that ban practices meant to artificially influence prices. Other sections, such as 10(b) and Rule 10b-5, further expand on this by outlawing fraud in buying or selling securities. In the case of Citadel, Virtu, Goldman Sachs, and Citigroup, allegations of submitting false or misleading reports to the LULD Committee to influence the price bands of AMC and APE constitute a violation of these provisions, reflecting a troubling disregard for market integrity.

343. These potential legal violations are not the only concerns; the fiduciary duty of the accused parties is also in question. Fiduciary duty imposes obligations of care and loyalty, requiring market participants to act in the best interests of clients.[184] Any actions that serve the interests of these firms at the expense of retail investors would be viewed as violations of these duties and of the following rules and regulations: <u>Investment Advisers Act of 1940</u> (Section 206), and the SEC's <u>Regulation Best Interest</u>.[185,186]

344. Conflicts of interest in the financial sector are inherently risky. Regulations necessitate the management, mitigation, or disclosure of conflicts to prevent harm to clients. The

---

[184] FINRA Rule 2111: Suitability. FINRA.org. Link: https://www.finra.org/rules-guidance/rulebooks/finra-rules/2111
FINRA Rule 2111 (Suitability): This rule requires broker-dealers to have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer. A breach of fiduciary duty could occur if a firm recommends or engages in activities that are not in the client's best interest.

[185] Investment Advisers Act of 1940, Section 206: This section imposes a fiduciary duty on investment advisers, requiring them to act in the best interest of their clients and to disclose any conflicts of interest. If Citadel and Citigroup acted as investment advisers and placed their interests over those of retail investors, they have breached this duty.

[186] SEC Regulation Best Interest (Reg BI). SEC.gov. 2020. Link: https://www.sec.gov/tm/faq-regulation-best-interest
Note: Regulation Best Interest (Reg BI): This SEC regulation, effective as of June 2020, imposes a fiduciary-like duty on broker-dealers to act in the best interest of retail clients. Any actions that favor the firms' interests at the expense of clients is viewed as violations of this regulation.

influence exerted by Citadel, Virtu, and Goldman Sachs and Citigroup over the LULD

Committee to benefit their short positions could represent a conflict with the Committee's

purpose of investor protection.

345. The LULD Committee must set price bands, act in the public interest, and follow

rules. Any deviation from these principles, as alleged with AMC and APE, could be a failure to

fulfill these obligations. In recent times, financial markets have seen an unprecedented surge in

retail investment, particularly in so-called "meme stocks" such as AMC and APE. However, a

series of allegations has cast a shadow over the practices of some of the market's biggest players,

highlighting concerns over market manipulation, breach of duty, and misuse of regulatory power.

346. Citadel, Virtu, Goldman Sachs, and Citigroup are accused of manipulative trading

practices, such as submitting false or misleading reports to influence the LULD Committee, and

engaging in illegal naked short selling concerning AMC and APE stocks.[187] The New York Stock

Exchange (NYSE) is complicit in assisting with the illegal manipulation of AMC stock.

347. The fiduciary duty is a cornerstone of ethical trading. Financial professionals owe

this to their clients and the market. Actions that favor firms at the expense of others could be a

severe breach of duty, as alleged against Citadel, Virtu, Goldman Sachs, and Citigroup. Investors

have concerns about if halts are used appropriately or are just used to help wall street funds and

institutions. In Exhibit S (Exhibit "S", attached hereto and incorporated herein by reference), a

hedge fund manager openly admits to paying brokerage in order to call halts against retail

shareholders. Mr. John Hempton, Founder & CIO of Bronte Capital (a Hedge Fund), stated on a

---

[187] Regulation SHO: If there is evidence of illegal naked short selling, Regulation SHO could be applicable. This regulation sets forth rules governing short sales and includes provisions intended to restrict naked short selling.

public twitter thread the following: **"Markets have volatility rules, but really you pay enough brokerage and you get to call the volatility halts. It is good to be the king"** (see Exhibit S).[188]

348. Exhibit T (Exhibit "T", attached hereto and incorporated herein by reference) displays the following dates on which AMC Common Class "A" and APE preferred stock was halted. Exhibit T also shows that AMC was halted to the upside many times over the past 3 years.[189]

349. The allegations against the NYSE, Citadel, Virtu, Goldman Sachs, Citigroup, and unknown LULD Committee members concerning the Limit Up/Limit Down (LULD) rule signify grave infractions of U.S. securities laws, including the <u>Securities Exchange Act of 1934</u> and the <u>Investment Advisers Act of 1940</u>. These breaches not only jeopardize public faith in financial markets but also expose both firms to severe legal repercussions.

350. <u>The Securities Exchange Act of 1934</u> is a fundamental piece of legislation that governs U.S. securities markets. Specifically, Sections 9(a) and 10(b) of the Act outlaw market manipulation and deceptive practices related to the buying and selling of securities. Another pivotal regulation, Section 206 of the <u>Investment Advisers Act of 1940</u>, along with the SEC's Regulation Best Interest, obligates financial firms to act in their clients' best interests as fiduciaries. The LULD rule further bolsters market integrity by stabilizing excessive stock price volatility via established price bands.

---

[188] See Exhibit S for the twitter quote. Reference for John Hempton: John Hempton - Founder & CIO of Bronte Capital (a Hedge Fund).  Link: https://www.brontecapital.com/team

[189] AMC Trading Chart and With Added Halt History.  Relevant Time period: 2020-2023. Display: TradingView Application. Public Link:https://www.tradingview.com/symbols/NYSE-AMC/ Trading Halts: Historical Trading Halts on AMC and APE. NYSE (New York Stock Exchange). Reporting period January 1, 2020-July 27, 2023. Link: https://www.nyse.com/trade-halt

351. Sections 9(a) and 10(b) of the Securities Exchange Act of 1934 are particularly relevant here. Section 9(a) makes it illegal to manipulate security prices by creating actual or apparent active trading, or by raising or depressing the price to induce purchases or sales by others. Citadel, Virtu, Goldman Sachs, and Citigroup's alleged undue influence on the LULD Committee—responsible for establishing price bands to prevent excessive market volatility—can be construed as an attempt to manipulate the stock prices of AMC and APE. If proven, this would constitute a clear violation of Section 9(a). Section 10(b) and the related Rule 10b-5 prohibit the use of manipulative or deceptive devices or contrivances in contravention of the rules and regulations set forth by the SEC. The alleged actions could potentially be deceptive in that they would have artificially created or reduced volatility, thereby affecting investor decisions based on false premises. The Investment Advisers Act of 1940, Section 206, places a fiduciary duty on investment advisers to act in their clients' best interest. The SEC's Regulation Best Interest reinforces this obligation. Manipulating stock prices to benefit from short positions while failing to disclose such a conflict of interest is a blatant breach of this fiduciary duty.

352. Given the systematic nature of these alleged manipulations—occurring 34 times specifically targeting AMC and APE stocks—the case also merits scrutiny under the Racketeer Influenced and Corrupt Organizations (RICO) Act. RICO could come into play given its applicability to ongoing patterns of illegal activity conducted as part of an organized enterprise. However, meeting the high burden of proof required by RICO involves establishing not just a pattern but also organizational intent and structure.

353. Contravening these regulatory guidelines, Citadel, Virtu, Goldman Sachs, and Citigroup are accused of manipulating the stock prices of AMC and APE by wielding undue influence over the LULD Committee. These actions directly contravene Sections 9(a) and 10(b)

of the Securities Exchange Act, thereby distorting the marketplace and damaging the reputation

of both firms. Furthermore, this conduct marks a blatant failure in fulfilling fiduciary

responsibilities, as mandated by Section 206 of the Investment Advisers Act of 1940 and the

SEC's Regulation Best Interest.[190]

354. The undue influence exerted over the LULD Committee further destabilizes the

regulatory environment. The integrity of this committee and other similar systems comes under

serious question, given their mandate to act in public interest and maintain market fairness and

stability. This not only has dire consequences for the accused parties but also calls for an

overarching reassessment of ethical standards and regulatory frameworks within the financial

industry.

355. In sum, the allegations against the defendants raise pressing legal and ethical issues

that reach far beyond the misconduct of these two entities alone. These violations erode the

foundational pillars of the financial markets and necessitate a sweeping reevaluation of existing

ethical and regulatory standards.

356. Further complicating the situation is the potential conflict of interest within the

LULD Committee. If members of the committee were influenced by affiliations or financial

interests related to the accused firms because they're employed by them, the integrity of the

entire regulatory process comes into question. These are the exact breaches and conflicts erode

---

[190] SEC Regulation Best Interest (Reg BI). Finra. Link: https://www.finra.org/rules-guidance/key-topics/regulation-best-interest
"The SEC's Regulation Best Interest (Reg BI) under the Securities Exchange Act of 1934 establishes a "best interest" standard of conduct for broker-dealers and associated persons when they make a recommendation to a retail customer of any securities transaction or investment strategy involving securities, including recommendations of types of accounts."

trust in the very institutions designed to protect investors and uphold market integrity. The potential damage to investor confidence could be long-lasting and far-reaching.

357. The concerns extend beyond individual ethical considerations and reach into the very core of regulatory oversight and the financial system's stability.[191] The allegations against Citadel, Virtu, Goldman Sachs, Citigroup, and possibly the LULD Committee go beyond mere market manipulation. They also highlight the misuse of regulatory power. The LULD rule, created to protect against excessive volatility, is alleged to have been used improperly to suppress the prices of AMC and APE stocks. This represents a significant failure in the regulatory framework, pointing to potential weaknesses in oversight, transparency, and enforcement.

358. Such misuse of regulatory tools threatens not only market stability but also public confidence in the entire financial system. Investors must believe that regulations are applied fairly, consistently, and without bias. The allegations involving Citadel, Virtu, Goldman Sachs, Citigroup, and the LULD Committee present a complex and deeply concerning picture of potential misconduct within the financial markets.

**New York Stock Exchange's Role in the LULD Halts and Market Manipulation of AMC**

359. This action seeks to hold the New York Stock Exchange (hereinafter "NYSE") accountable for its alleged deviation from its mandate and responsibilities as a Self-Regulating

---

[191] FINRA Rule 2010 (Standards of Commercial Honor and Principles of Trade): This rule requires members to observe high standards of commercial honor and just and equitable principles of trade. Manipulating the LULD rule would be inconsistent with this requirement.

Organization (SRO), specifically regarding potentially fraudulent activities and manipulation of particular stocks, including AMC and APE.

1. Immunity doctrines aim to shield entities from legal repercussions arising from their duty's discharge. However, they shouldn't serve as a bastion against allegations of fraud or illegal conduct.

2. It is alleged that NYSE accepted financial incentives from market participants, especially during trading halts that were unfavorable to certain entities.

3. The role of the "Limit Up-Limit Down" (LULD) committee has been controversial, especially in relation to specific stocks like AMC and APE. As per Exhibit "A", there are indications of a potential "quid pro quo" relationship leading to these halts.

4. Trading data suggests possible undue influence on the NYSE and LULD committee by short hedge funds and their purported associations.

5. There are alarming indicators of potential market manipulation in AMC's trading history, especially considering its extensive trading volume in comparison to its share float.

6. NYSE's advanced algorithms, designed to detect inconsistencies, would have been ignored or failed, leading to the possibility of either negligence or complicity.

7. Defendant NYSE, through its "glitches," disseminated potentially incorrect data, further fueling suspicions of deliberate oversight or manipulation.

In the instance at hand, there is a compelling argument to be made that the NYSE deviated from its mandate and responsibilities. It is alleged that the NYSE routinely accepted money from market participants in return for triggering trading halts, especially when the trades were

unfavorable for co-defendants. The price "glitches" were a result of fraudulent coding as the fake prices were disseminated to retail market participants which is a violation of Computer Fraud and Abuse Act (18 U.S.C. § 1030 (a)(4), (a)(5)).[192]

360. In Exhibit S, a hedge fund manager openly admits to paying brokerage in order to call halts against retail shareholders. Mr. John Hempton, Founder & CIO of Bronte Capital (a Hedge Fund), stated on a public twitter thread the following: **"Markets have volatility rules, but really you pay enough brokerage and you get to call the volatility halts. It is good to be the king"** (See Exhibit S).[193]

361. The "Limit Up-Limit Down" (LULD) committee's role is of particular note in this context is also in question. The Limit Up-Limit Down (LULD) mechanism is designed to prevent trades in individual securities from occurring outside of specified price bands. These bands are set at a percentage level above and below the average reference price of a security over the immediately preceding five-minute period. However, if a market participant is in danger of being squeezed or lose money, they can pay the NYSE to call a LULD halt. Which is what happened with AMC and APE Stock. This caused billions of dollars in losses for investors.

362. The LULD mechanism was implemented following the events of May 6, 2010, known as the "Flash Crash," during which U.S. financial markets experienced a sudden and severe price drop and rapid recovery within a very short time frame. In response, the Securities and Exchange Commission (SEC), in collaboration with U.S. exchanges and the Financial Industry Regulatory Authority (FINRA), designed the LULD plan to address the extreme

---

[192] 18 U.S. Code § 1030 - Fraud and related activity in connection with computers. Legal Information Institute - Cornell University. Link: https://www.law.cornell.edu/uscode/text/18/1030
[193] See Exhibit S for the twitter quote. Reference for John Hempton: John Hempton - Founder & CIO of Bronte Capital (a Hedge Fund). Link: https://www.brontecapital.com/team

volatility and prevent such occurrences in the future.  While the LULD mechanism is generally seen as a positive development for maintaining market stability and fairness, there have been criticisms of the committee responsible for its development and implementation by retail shareholders as a whole. Specifically, the LULD committee is made up of representatives from various exchanges, trading firms, and other market participants, which has led some to question whether conflicts of interest may arise.

363. Additionally, some market participants have argued that the LULD mechanism can have negative impacts on retail investors as a whole, as it can limit their ability to trade stocks during times of high volatility. AMC and APE are two such stocks. This has resulted in missed trading opportunities or worse prices when trading resumes after a halt. Additionally, one or more of the counterparties to AMC and APE have a history of trading during halts, giving them an unfair advantage. Critics have also pointed out that the LULD mechanism could adversely affect market efficiency and liquidity, as it can lead to increased bid-ask spreads and reduced trading volume. This  makes it more difficult for AMC and other retail investors to buy or sell stocks at fair prices, particularly in fast-moving markets. Despite these criticisms, the LULD mechanism remains in place and is an important tool for institutions to disrupt fair and orderly markets. Regulators continue to monitor its quasi effectiveness and make adjustments in an attempt to balance its benefits against potential drawbacks for the sake of appearances. However, most of the adjustments have made it even worse for retail investors. Rules and regulations governing market manipulation, including spoofing and other practices, are also in place to protect retail investors and ensure that trading remains fair and transparent, however these rules go largely unenforced, and retail complaints, unanswered.

364. The evidence will corroborate the notion that there was a "quid pro quo" relationship for these halts, this stands as a stark violation of both ethical and legal obligations. Historical trading data will, if scrutinized, potentially reveal that stocks like AMC and APE were halted during relevant periods as a direct consequence of undue influence from short hedge funds and their purported ties within the NYSE and the LULD committee. Such acts, if proven true, highlight a breach of duty, especially if these actions led to retail investors suffering financial setbacks due to artificially-induced volatility. The stock exchange has not only jeopardized its reputation but has also exposed itself to potential legal repercussions. Absolute immunity cannot, and should not, serve as a cover for fraudulent undertakings. AMC and APE, both have had unscrupulous and unethical halts at the hands of the LULD committee Limit Up-Limit Down Plan, which would be a violation of 17 C.F.R. pt. 242 (2013). LULD stands for "Limit Up Limit Down," which is a mechanism implemented by U.S. securities exchanges to prevent extreme price movements in individual stocks. The LULD mechanism places certain restrictions on the price movements of stocks during periods of high volatility, to ensure that trading remains orderly and fair. Under LULD, when the price of a stock moves more than a specified percentage from its previous price, trading in the stock will be halted for a brief period. This is intended to prevent extreme price movements that could be caused by erroneous trades or sudden market events. However, this is not the case for AMC and APE. Any upward movement is halted to intentionally quell upward movement with billions of dollars of retail investor money gone (See Exhibit "T", attached hereto and incorporated herein by reference).

365. The New York Stock Exchange (NYSE) cannot claim absolute immunity if it partakes in fraudulent activities. Immunity doctrines are intended to protect entities from legal actions arising from the discharge of their duties. However, they do not provide a protective

shield if those entities are active participants in fraudulent or illegal conduct. Immunity is predicated on the principle that certain entities, given their roles and responsibilities, should be free from the distractions of litigation in order to effectively discharge their duties. However, this protection evaporates when there's an abuse of the conferred trust or a divergence from one's ethical and legal duties.

366. The NYSE, armed with cutting-edge algorithms to detect fraudulent activities, has either failed in its oversight or permitted the evident manipulation of AMC stock. Stock exchanges have an inherent duty to uphold market integrity, ensuring transparent, fair trading practices, and protecting against market manipulation. The NYSE employs specialized algorithms to detect inconsistencies, with the expectation of intervening when irregularities are observed. Stock exchanges are vested with the trust of market participants and are expected to employ measures that detect and deter manipulative practices. Advanced algorithms are implemented to analyze trading data, discern patterns, and flag suspicious activities. Stock exchanges are vested with the trust of market participants and are expected to employ measures that detect and deter manipulative practices. Advanced algorithms are implemented to analyze trading data, discern patterns, and flag suspicious activities. The trading history of AMC stock from January 2021 to the present offers alarming indicators of potential market manipulation. In January of 2021, AMC stock, with a float of 500 million, experienced trade volumes that saw the entire float being traded over four times within a mere 48 hours. The "Limit Up-Limit Down" (LULD) halts during the APE stock release in August 2022, and its subsequent persistence, further accentuates these irregularities. By some accounts, the AMC stock float had been traded over 20 times, suggesting the presence of over 20 billion synthetic shares in circulation – shares not authentically issued by AMC. Such an enormous discrepancy between the genuine float and

its trading activity is a glaring red flag. The reporting of canceled shares across various smaller

exchanges should have been an unmistakable alarm for the NYSE, hinting at the potential

manipulation or inconsistencies in trading patterns.

367. The sheer trading volume of AMC, with its relatively modest 500 million share

float, is striking when compared to corporate behemoths like Tesla and Apple, each nearing a

trillion in market cap. For AMC to surpass or even match the trading activity of these industry

giants is a statistical anomaly that should have immediately raised red flags for the NYSE. Such

disparities in trading volume, especially when considering the size and market presence of the

companies involved, are not subtle irregularities that can be easily overlooked. The fact that such

an anomaly went unchecked raises serious questions about the NYSE's oversight capabilities and

commitment to ensuring a fair-trading environment.

368. It is further alarming to note that the NYSE has reportedly disseminated incorrect

data to its subscribers, dismissing these discrepancies as mere "glitches." In the context of the

suspicious trading activity around AMC, these so-called glitches cannot be brushed off as mere

coincidences. Such consistent misrepresentations or malfunctions, especially in a sophisticated

system managed by the NYSE, point towards potential misconduct. This goes beyond a breach

of trust or procedural lapse; it hints at possible criminality. It would be prudent for such serious

allegations to be escalated to the Department of Justice. In the ensuing investigation, one can

reasonably anticipate revealing extensive communications between the defendants and other

Self-Regulatory Organizations (SROs) concerning AMC, shedding light on the true extent of the

irregularities. Given these explicit indicators, one must question the efficacy of the NYSE's

algorithms or, more disconcertingly, the possibility of deliberate oversight. The sheer magnitude

of trading anomalies related to AMC stock, when juxtaposed against the NYSE's technological

arsenal aimed at detecting market manipulation, leads to a stark and unsettling conclusion. Either there's a failure in the NYSE's oversight mechanisms, or there's a potential complicity in allowing these irregularities to persist.

369. Self-Regulating Organizations (SROs) occupy a unique position within the financial regulatory landscape, straddling both public regulatory functions and private entity status. While absolute immunity has traditionally been extended to SROs to enable them to execute their regulatory duties without fear of retaliation, this protection cannot and should not serve as a blanket shield when these organizations are accused of fraudulent activities. The doctrine of absolute immunity is grounded in the principle that certain functions, especially quasi-governmental ones performed by SROs, require freedom from the potential adversarial distraction of lawsuits. This is to ensure that SROs can make impartial decisions in the best interests of market integrity and investor protection without the chilling effect of potential litigation. While SROs perform regulatory functions, they also have private interests. If an SRO is allowed unchecked immunity, even in the face of clear fraudulent activities, it undermines public trust and confidence in the financial system. The dual nature of SROs necessitates a balance between granting immunity for regulatory functions and holding them accountable for wrongdoing. Especially when they received payments from their clients for favorable outcomes. In Vo v. United States, Nos. 07-00052 ACK-BMK, 02-00411 ACK 01, 2007 U.S. Dist. LEXIS 47093 (D. Haw. June 28, 2007)" jury tampering is defined as "an effort to influence the jury's verdict by threatening or offering inducements to one or more of the jurors.". In the context of the financial markets, the Limit Up/Limit Down (LULD) Committee functions similarly to a jury in a legal trial, tasked with the crucial role of maintaining market integrity and fairness by regulating extreme price volatility. Drawing an analogy, if this committee is influenced or

"rigged" by entities like Citadel, Citigroup, or other defendants, as alleged, it's akin to jury tampering in a legal case. Just as jury tampering undermines the integrity of a judicial process by illicitly swaying the jurors' decisions, so too does undue influence on the LULD Committee distort the market's natural course. This manipulation of the LULD mechanism parallels the act of tampering with a jury; both involve covert, unethical actions to predetermine an outcome in favor of certain interests. In a trial, such tampering corrupts the verdict, threatening the justice system's foundation. Similarly, in the financial markets, manipulating LULD halts can skew stock prices, undermining the market's fairness and transparency. It's like a puppeteer pulling strings in a play, where the LULD Committee, like a jury, should independently decide without external control or influence. This breach of duty not only misleads market participants, akin to a jury being misled, but also erodes public trust in these vital institutions.

370. Absolute immunity for SROs was never intended to protect against every conceivable lawsuit, especially those alleging intentional fraudulent activities. Courts have consistently held that immunity doctrines should not be expanded beyond their historical or logical scope, especially when to do so would infringe on fundamental rights or principles of justice. Removing absolute immunity in instances of alleged fraud serves a vital public interest in deterring misconduct. If SROs know they can hide behind the veil of immunity even when engaging in fraudulent activities, it could incentivize such behavior, contrary to the public interest. Judicial systems across various jurisdictions often distinguish between acts done in a regulatory capacity and acts that deviate from such roles. Even judges, who enjoy judicial immunity, are not shielded from acts done outside their judicial functions or acts done in the complete absence of jurisdiction. The financial marketplace's integrity is paramount for investor trust and the efficient operation of the economy. Shielding SROs from liability in the face of

clear evidence of fraudulent activity would not only betray public trust but could also imperil the very foundations of the financial system. While the principle behind granting absolute immunity to SROs is sound, it must be limited in scope, especially when clear and intentional wrongdoing is alleged. To allow otherwise would be to prioritize the protection of powerful entities over the integrity of the financial system and the rights of individuals, undermining the very purpose of SROs' existence.

## P. DEFENDANT'S DARK POOL NEGATES NATIONAL MARKET SYSTEM'S SUPPLY AND DEMAND MODEL

371. The Defendants' utilization of dark pools in the trading of AMC's common stock ostensibly contravenes the principles of the National Market System's Supply and Demand Model. By executing substantial volumes of trades within these opaque venues, rather than transparent public exchanges, the Defendants effectively obscure the natural interplay of supply and demand that typically governs price discovery. This obfuscation violates legal requirements for transparency and fair dealing, impeding the equitable functioning of the securities market.

372. Dark pools, which are private exchanges for trading securities, are not accessible by the investing public, and they provide an environment where large volumes of securities can be traded without immediate public disclosure. The secretive nature of trading within dark pools, combined with allegations of internalizing orders and unexplained high volumes of AMC stock that are parked and go unreported until after hours, is construed as omissions or misrepresentations.

373. The use of synthetic shares and lack of transparency materially affected investors' decisions. Citadel, Virtu, Susquehanna, and Citigroup have intentionally manipulated the price of

AMC stock through dark pools. This indicates a clear intention to deceive or manipulate, which violates federal laws.

374. The actions within dark pools have influenced investors' trading decisions, leading them to rely on distorted market conditions. These actions directly led to financial losses for investors, both reliance and causation could be established. Investors have suffered real financial losses as a result of the alleged manipulation. Quantifying these losses and directly linking them to the specific actions within the dark pools would be essential to this element.

375. Since the allegations are directly related to the trading of AMC stock, this element is inherently met. Given Citadel, Virtu, Susquehanna, and Citigroup's operations and the nature of electronic trading, the requirement of involvement in interstate commerce is likely met.

376. Under U.S. federal securities law, there are several relevant provisions that could be applied to the situation involving the use of dark pools by Citadel, Virtu, Susquehanna, and Citigroup in the trading of AMC stock. Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 enacted thereunder, provide the foundational framework for anti-fraud provisions. These provisions prohibit manipulative or deceptive conduct in connection with the purchase or sale of securities. The actions within the dark pools could be characterized as manipulative or deceptive, these provisions would be implicated.[194]

377. Further, the Securities and Exchange Commission's Regulation ATS, governing Alternative Trading Systems, sets out specific requirements for dark pools, including

---

[194] Securities Exchange Act of 1934, Section 10(b) and Rule 10b-5: These provisions prohibit deceptive and manipulative acts in the trading of securities. If Citadel and Citigroup are indeed found to be manipulating the price of AMC stock through their use of dark pools, they are in violation of this rule.

transparency and registration mandates. Non-compliance with these rules by Citadel, Virtu,

Susquehanna, and Citigroup could lead to violations of federal securities law.[195]

378. Section 17(a) of the Securities Act of 1933 adds another layer to the anti-fraud

regime, prohibiting deceitful acts in the offer or sale of securities. This provision is pertinent if

the activities within the dark pools involved any fraudulent or deceitful practices.[196]

379. The Defendants ATS systems also illegally monopolized the trading away from the

public exchanges and into privatized exchanges, which is a violation of 15 U.S.C.A. § 2. It's

through this effort to monopolize trading that the defendants were able to game the system,

subsequently leading to their fraudulent activities.

380. The Financial Industry Regulatory Authority (FINRA) also has relevant rules that

are applicable. Rule 5210 governs the publication of transactions and quotations and forbids

manipulative and fraudulent trade reporting.[197] The actions within the dark pools relating to

AMC stock involved intentional manipulation, thus the rule has been violated. FINRA Rule 5310

---

[195] Regulation ATS (Alternative Trading Systems). SEC.gov. Applicable Links:
Link 1: https://www.sec.gov/files/rules/final/34-40760.txt
Link 2: https://www.law.cornell.edu/cfr/text/17/242.301
 Regulation ATS (Alternative Trading Systems): This regulation requires that alternative trading systems comply with the reporting and transparency rules of a national securities exchange. If Citadel and Citigroup were not transparent in their operation of dark pools or failed to comply with reporting requirements, they could be in violation of this regulation.
[196] Securities Act of 1933, Section 17(a): This section makes it unlawful in the offer or sale of securities, by the use of interstate commerce or the mails, to employ any device, scheme, or artifice to defraud, or to obtain money or property by means of an untrue statement of a material fact. If Citadel and Citigroup used deceptive practices in the dark pools to artificially influence the price of AMC stock, it could be construed as fraud under this law.
[197] FINRA RULE 5210. Publication of Transactions and Quotations. FINRA.org. Link:
https://www.finra.org/rules-guidance/rulebooks/finra-rules/5210
FINRA Rule 5210 (Publication of Transactions and Quotations): This rule prohibits members from reporting false or misleading prices or volumes relating to securities. If it can be proven that Citadel and Citigroup reported misleading information about AMC stock transactions, they could be in violation of this rule.

requires firms to ascertain the best market for a security and obligates them to buy or sell in that market, focusing on best execution and fairness.[198] The manipulation or other unfair practices within dark pools would run afoul of this rule. Lastly, FINRA Rule 5270 prohibits firms from trading ahead of customer orders.[199] The firms were using information from the dark pools to their advantage in this way, which would be in violation of this principle.

381. The Defendants are alleged to be using dark pools to manipulate the stock, creating an "out of sequence" error that has serious ramifications for retail orders on the New York Stock Exchange (NYSE). Within these private trading venues, retail orders can be consolidated, parked, and then negated during after-hours trading through potentially unscrupulous means.

382. This manipulation effectively sidelines the retail investors' orders, preventing them from being executed on the public exchange in the manner intended. The practice can distort market prices, volume, and liquidity, undermining the integrity of the market and possibly leading to financial losses for unsuspecting investors. Allegations of this nature have brought increased scrutiny to the use of dark pools by the defendants, and videographic evidence has been cited to highlight the mechanics of these practices. The situation raises serious concerns about transparency, fairness, and compliance with regulations governing securities trading.

---

[198] FINRA Manual Rule 5310. Best Execution and Interpositioning. FINRA.org. Link: https://www.finra.org/rules-guidance/rulebooks/finra-rules/5310
FINRA Rule 5310 (Best Execution and Interpositioning): This rule requires that a member firm use reasonable diligence to ascertain the best market for the subject security and buy or sell in such a market so that the resultant price to the customer is as favorable as possible under prevailing market conditions. If Citadel and Citigroup did not fulfill their duty to seek the best execution for their clients' trades of AMC stock, they are violating this rule.
[199] FINRA Manual Rule 5270. Front Running of Block Transactions. FINRA.org. Link: https://www.finra.org/rules-guidance/rulebooks/finra-rules/5270
FINRA Rule 5270 (Front Running of Block Transactions): This rule prohibits a member from trading ahead of a customer's large order. If Citadel and Citigroup used the knowledge they gained from dark pool trades to front-run their customers, they are in violation of this rule.

383. In the context of the situation surrounding Citadel, Virtu, Susquehanna, and Citigroup's use of dark pools for trading AMC stock, the material misrepresentation or omission could pertain to undisclosed practices within these dark pools. For instance, the internalization of orders and the use of synthetic shares, hidden or misrepresented, is material, as they would significantly affect an investor's decision to trade AMC stock.

384. This element refers to the intent to deceive or manipulate, and it requires evidence that the defendant knowingly engaged in wrongful conduct. In this case, any deliberate attempts to manipulate prices, volumes, or liquidity within the dark pools, or the use of specific mechanisms to deceive investors, could demonstrate scienter.

385. Reliance necessitates that the plaintiff must have acted based on the false statement or omission made by the defendant. If retail investors and other market participants were influenced by the alleged manipulative practices within the dark pools in their decisions to trade AMC stock, it could fulfill this requirement.

386. Causation demands a direct link between the defendant's fraudulent actions and the plaintiff's financial loss. The manipulation within the dark pools could be directly tied to the economic losses suffered by the investors in AMC stock, it would satisfy this element. This element requires the plaintiff to have actually suffered financial loss as a result of the fraudulent activity. In this scenario, the alleged manipulation of AMC's stock through dark pools would need to be quantified, showing how it led to tangible financial harm to investors. The actions of Citadel, Virtu, Susquehanna, and Citigroup within dark pools must relate to the trading activities of AMC securities to meet this criterion. The alleged manipulation and secretive practices, if they can be proven to have a material impact on the market for these securities, would establish this connection.

387. Lastly, the fraudulent activity must have involved interstate commerce. Given the nature of today's electronic trading and the broad reach of firms like Citadel, Virtu, Susquehanna, and Citigroup, this requirement is likely easily met, as the alleged manipulation would almost certainly have crossed state lines.

388. The situation involving Citadel's, Virtu's, Susquehanna's, and Citigroup's dark pools include elements of significant omission or misrepresentation. The internalization of orders—essentially keeping them within their own trading system rather than exposing them to the broader market—could constitute a failure to disclose vital information or a deliberate deception. This could particularly be the case if such actions were hidden or misrepresented and had a substantial impact on trading AMC stock.

389. Evidence of intentional manipulation of price through dark pools, such as using specific mechanisms to control price or volume, could demonstrate wrongful intent or knowledge of wrongdoing on the part of Citadel, Virtu, Susquehanna, and Citigroup. Such actions align with the element of scienter by showing a deliberate intent to deceive or defraud investors.

390. Retail investors and other market participants have relied upon the integrity and fairness of the market in their decisions to trade AMC stock. If it can be proven that these decisions were influenced by manipulative practices within the dark pools, such reliance would be established as part of the case.

391. To meet the element of causation, plaintiffs would need to establish a direct link between the alleged manipulation within the dark pools and their economic losses. For instance,

showing how the way buy and sell orders for AMC stock were handled or manipulated led to financial losses could fulfill this requirement.

392. The alleged manipulation of AMC's stock within the dark pools would have resulted in financial loss for investors. The plaintiffs would need to quantify these losses accurately and demonstrate that they resulted specifically from the alleged wrongful practices, thereby satisfying the economic loss element.

393. The entire case revolves around the trading of AMC securities. The alleged manipulation within the dark pools, including actions like internalization and potential price manipulation, directly relates to these trading activities. As such, it would meet the requirement of having a connection with the purchase or sale of a security.

394. Given the extensive scale and nature of electronic trading in today's markets, and considering the size and reach of entities like Citadel, Virtu, Susquehanna, and Citigroup, the requirement of involvement in interstate commerce is likely easily met. The alleged manipulation within dark pools would certainly involve trading activities across state lines, fulfilling this element.

395. The allegations against Citadel, Virtu, Susquehanna, and Citigroup in relation to their use of dark pools for trading AMC stock constitutes stock manipulation under federal law. The primary legal arguments hinge on evidence of Material Misrepresentation or Omission, Scienter, Reliance, Causation, Economic Loss, Connection with the Purchase or Sale of a Security, and Interstate Commerce. Various federal laws and FINRA rules are implicated, including Section 10(b) of the Securities Exchange Act of 1934, Regulation ATS, and FINRA Rules 5210, 5310, and 5270. The complexity of dark pools and the need for detailed evidence

presents challenges in a legal proceeding, but the situation seems to align with established legal criteria for stock manipulation.

396. However, the legal proceedings in this matter would require a comprehensive and careful examination of these aspects. Detailed evidence, possibly including intricate trading data, internal communications, and expert testimony, would be necessary to substantiate the claims. The complexity of dark pools as trading venues, along with the inherent secrecy surrounding their operations, would present significant challenges in proving some of the essential elements, particularly those related to reliance and causation.

397. Furthermore, as dark pools are subject to specific regulations and operate with a degree of latitude in their practices, the legal arguments must be finely tuned to the actual activities and intentions of the involved entities. The case against Citadel, Virtu, Susquehanna, and Citigroup, if pursued, would likely become a landmark in legal discussions surrounding dark pools, reflecting broader concerns about transparency, fairness, and the integrity of modern financial markets.

398. The Defendants, along with identified and unidentified co-conspirators, are alleged to have engaged in market manipulation and anti-competitive practices. Through a systematic diversion, restriction and manipulation of retail order flow to an in their own Alternative Trading Systems (ATS), or 'dark pools,' the Defendants appear to be monopolizing this segment of market activity for their own benefit which would be a violation of the following laws: 18 U.S.C. §§ 1961-1968 (2020), 15 U.S. Code § 1,2, 15 U.S.C. § 78j(b) (2018), 17 C.F.R. § 240.10b-5 (2021), 15 U.S.C. § 77q(a) (2018), and FINRA Rule 5270, 5210, and 5310.

399. The Mens Rea of the Defendants appears to be decidedly intentional and purposeful (Securities Act of 1933 Section 17(a)). This intentional rerouting of transactional activity serves to suppress potential price augmentations, thereby undermining the foundational principles of the National Market System (NMS) rooted in supply and demand dynamics (Securities Exchange Act of 1934, Section 10(b); Rule 10b-5). The coordinated acts of pooling the order flow in selective trading venues, strategically "parking" said flow, and permitting only an insubstantial fraction thereof to interact with lit markets not only fulfill the Mens Rea but also constitutes market manipulation as defined by relevant securities laws (Securities Exchange Act of 1934, Section 10(b); Rule 10b-5).

400. The primary intent and operational design of such dark pools is geared towards facilitating institutional, rather than retail, investment activity (15 U.S.C. § 2). This seems to indicate a level of premeditation and potential malice in their operations. Firms were also allegedly using information from the dark pools to their advantage, potentially in violation of FINRA Rule 5270. Even if retail investors collectively execute trades amounting to billions of dollars within a single trading day, the price action of the targeted stock will never correspondingly reflect this significant volume of activity (which is a violation of FINRA Rule 5210; FINRA Rule 5310), thereby possibly satisfying the causation element, as this action and intent seem to lead to a direct, illegal outcome (Securities Act of 1933 Section 17(a)).

401. Beyond Actus Reus and Mens Rea, the court may need to explore jurisdictional considerations, as well as specific violations of securities laws such as FINRA Rule 5310, which mandates best execution and interpositioning, requiring that a member firm use reasonable diligence to ascertain the best market for the subject security and buy or sell in such a market.

Given the involvement of co-conspirators, charges of conspiracy to commit market manipulation could also be relevant under 15 U.S.C. § 1.

402. The plaintiffs and investors lost billions of dollars as a result of this complex fraud (Securities Act of 1933 Section 17(a)).The co-conspirators in this operation collaboratively act to inhibit the vast majority of said order flow from reaching transparent, lit market exchanges which is a violation of 15 U.S.C. § 1; 15 U.S.C.A. § 2; 15 U.S.C. § 78j(b); FINRA Rule 5270; FINRA Rule 5210; FINRA Rule 5310.

403. This intentional rerouting of transactional activity serves to suppress potential price augmentations, thereby undermining the foundational principles of the National Market System (NMS) rooted in supply and demand dynamics (which violates 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; FINRA Rule 5270; FINRA Rule 5310). The coordinated acts of pooling the order flow in selective trading venues, strategically "parking" said flow, and permitting only an insubstantial fraction thereof to interact with lit markets constitutes market manipulation as defined by relevant securities laws: 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; 15 U.S.C. § 1; 15 U.S.C.A. § 2; FINRA Rule 5210; FINRA Rule 5310.

404. Notably, the primary intent and operational design of such dark pools is geared towards facilitating institutional, rather than retail, investment activity (17 C.F.R. §§ 242.300-303 (2021)). Even if retail investors collectively execute trades amounting to billions of dollars within a single trading day, the price action of the targeted stock will never correspondingly reflect this significant volume of activity because the price action would be delayed until after hours or wholly negated through subversive means like front running. The information documented by the dark pool is then manipulated via chart information and sent out to the public in such a way as to bait them to continue to buy more stocks, knowing full well that the price

wont move which is a violation of the following laws: 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5 (2021), FINRA Rule 5210 (2021), FINRA Rule 5310 (2021). Imagine a river flowing steadily towards the sea, representing the stock market. Investors buying stock are like raindrops falling into this river. Normally, more raindrops would mean a larger, stronger river, analogous to a stock price rising with increased buying. However, in the scenario where no matter how much investors buy, the stock won't go up, it's as if there's a hidden dam in the river. Despite the rain pouring in, the river's flow towards the sea (the stock's rise in value) is impeded by this dam (dark pool activities or other manipulative practices). The investors' efforts, like the raindrops, are plentiful and should naturally increase the river's flow, yet the unseen barrier prevents the expected natural outcome.

405. The Defendants' specific actions within the dark pools, such as creating "out of sequence" errors, parking high volumes of AMC stock until after hours, and manipulating price, directly caused the observed distortions in supply and demand and consequent losses to investors (a violation of 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5 (2021)).  The secretive and potentially unscrupulous means employed within these private trading venues effectively sidelined retail investors' orders, preventing their proper execution on the public exchange, which is a violation of the following laws: Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b) (2018); 17 C.F.R. § 240.10b-5 (2021); Securities Act of 1933, § 17(a), 15 U.S.C. § 77q(a) (2018); Anti-Trust Violations Clayton Act § 4, 15 U.S.C. § 15, The Sherman Antitrust Act, 15 U.S.C. § 1 & 2; RICO Act, 18 U.S.C. §§ 1961-1968 (2020); 17 C.F.R. §§ 242.300-303 (2021); FINRA Rules 5270, 5210, 5310. This manipulation directly led to financial losses for unsuspecting investors, and a direct causal link between these actions and the economic losses can be established.

## Q. CITADEL CANCELLING RETAIL ORDERS

406. The cancellation of retail investor orders for **3,955,620,000 shares** of AMC

Common Stock by Citadel Securities and co-defendants from January 2020 to April of 2023

raises serious legal and ethical questions.[200] This behavior is highly irregular compared to other

stocks like APPLE, TESLA, and MICROSOFT and warrants an investigation into potential

market manipulation.

407. Under U.S. securities laws, actions that artificially manipulate the price or

availability of securities, including large-scale order cancellations, constitute illegal market

manipulation. FINRA Rule 5210, which prohibits the publication of manipulative or fraudulent

quotations or transactions, is relevant because these cancellations were part of a deceptive market

manipulation strategy.[201]

408. The Securities Exchange Act of 1934, Section 9(a)(2), applies, as it broadly

prohibits manipulative actions that artificially affect the market for a security.[202] Furthermore,

these cancellations were part of a spoofing strategy, they fell afoul of Section 747 of the Dodd-

Frank Wall Street Reform and Consumer Protection Act, which explicitly prohibits bidding or

offering with the intent to cancel before execution.[203]

---

[200] Rule 605 and 606 Statements. Citadel Securities. Applicable Time Period: 2020-2023. Link:
https://www.citadelsecurities.com/rule-605-606-statements/
[201] FINRA Rule 5210 (Publication of Transactions and Quotations): This rule could apply to Citadel
Securities if it can be proven that the cancellations were part of a deceptive market manipulation strategy.
The high volume of cancellations compared to the actual float of AMC does seem suspicious and may
warrant investigation.
[202] Securities Exchange Act of 1934, Section 9(a)(2): This section does broadly prohibit manipulative
actions that artificially affect the market for security. If Citadel's cancellations were done with the intent
to manipulate the market, this would be a serious violation of this provision.
[203] Section 747 of the Dodd-Frank Wall Street Reform and Consumer Protection Act: This rule applies if
there is evidence to suggest that Citadel was bidding or offering with the intent to cancel before execution
(spoofing).

409. The evidence provided definitively prove a violation, the irregularities and the sheer scale of the cancellations warrant thorough investigation by regulatory authorities to determine whether Citadel Securities' actions constitute violations of these or other securities laws. Such scrutiny is vital to ensuring market integrity and protecting investor interests in a transparent and fair marketplace.[204],[205]

410. Order cancellation itself is not illegal. Market makers cancel orders for various legitimate reasons. However, the cancellation were used to manipulate the market, thus it becomes unlawful. As mentioned in the facts provided, the cancellations would be composed of spoof orders or related to synthetic shares creation.[206] Both scenarios entails violations of securities laws.[207]

411. The sheer volume of canceled orders in AMC, especially compared to other stocks, raises suspicions (See Exhibit "V", attached hereto and incorporated herein by reference). Given that the AMC float was only approximately 519 million shares (until share restructuring in late August 2023), the cancellations exceeded the actual number of shares available. The cancellations being a result of high-frequency trading that contributes to market instability further complicate the legal landscape. These cancellations are done with the intent to mislead or

---

[204] Securities Exchange Act of 1934, Section 9(a)(2): Prohibits manipulative actions that artificially affect the market for security.
[205] Commodity Exchange Act, Section 6(c): Makes it unlawful to manipulate or attempt to manipulate the price of any commodity in interstate commerce.
[206] Securities Exchange Act of 1934, Rule 15c3-3: Regarding the possession or control of securities, may be implicated if synthetic shares are created in a manner that violates broker-dealer control requirements. Reference: 17 CFR § 240.15c3-3 - Customer protection—reserves and custody of securities.
Legal Information Institute - Cornell University. Link:
https://www.law.cornell.edu/cfr/text/17/240.15c3-3
[207] Securities Exchange Act of 1934, Section 15(c)(1): Broker-dealers must observe high standards of commercial honor and just and equitable principles of trade. Conspiracy to manipulate could be a violation.

manipulate the market, they fall afoul of legal requirements.[208] It is believed that other

defendants like Virtu and Susquehanna are involved in the cancellation of spoof orders as well as

retail shareholders, this points to a broader scheme of market manipulation, making the legal

considerations more complex.[209]

412. The cancellation of AMC orders by Citadel Securities, given its irregular scale and

potential connections to spoofing or synthetic shares, raises legitimate legal concerns. Regulatory

authorities should closely scrutinize these actions to determine whether they constitute market

manipulation or other violations of securities laws.[210],[211] The situation necessitates transparent

reporting from Citadel and cooperation with regulators to ensure market integrity and investor

protection.

413. Citigroup plays a dual role as both the underwriter, lender and banker for AMC

stock and as an entity allegedly manipulating the same stock within its Alternative Trading

Systems (ATS), or "dark pools" (a violation of the Securities Act of 1933, Section 17(a);

Securities Exchange Act of 1934, Section 10(b); FINRA Rule 5210). This conflict of interest

financially benefited Citigroup despite the violations of securities law: Securities Act of 1933,

---

[208] Commodity Futures Trading Commission Regulation 180.1: Prohibits manipulative and deceptive conduct in connection with any swap, or contract of sale of any commodity in interstate commerce.
[209] 18 U.S.C. § 1349: Attempt and conspiracy. House.gov. Link:
https://uscode.house.gov/view.xhtml?req=(title:18%20section:1349%20edition:prelim)%20OR%20(granu leid:USC-prelim-title18-section1349)&f=treesort&edition=prelim&num=0&jumpTo=true
Potential Coordination with Other Entities (e.g., Virtu): Conspiracy to Commit Fraud, 18 U.S.C. § 1349: If a coordination between entities can be proven to commit fraud, federal conspiracy charges may apply.
[210] Securities Exchange Act of 1934, Section 21C: Provides the SEC with cease-and-desist authority if there's a reason to believe the Securities Exchange Act has been violated.
Reference:  Securities Exchange Act of 1934, Section 21C. SEC.gov. Link:
https://www.sec.gov/about/offices/oia/oia_enforce/selpro.pdf
[211] Dodd-Frank Wall Street Reform and Consumer Protection Act, Section 929P(b): Enhances the SEC's ability to bring enforcement actions for aiding and abetting securities fraud, which could apply if there are additional entities involved in the misconduct.

Section 17(a); <u>Anti-Trust Violations Clayton Act § 4, 15 U.S.C. § 15, The Sherman Antitrust Act,</u> <u>15 U.S.C. § 1 & 2</u>.

414. Citigroup holds significant short positions and swap contracts related to AMC stock, which means they stand to gain from a reduction in the stock's price despite alleged violations to the <u>Securities Exchange Act of 1934</u>, Section 10(b); FINRA Rule 5270. By strategically "parking" retail order flows within their dark pools and releasing only an insubstantial fraction to interact with lit markets, Citigroup knowingly and effectively suppresses upward price movements of AMC stock. This manipulation allows the bank to close out its short positions and swaps at favorable prices, thereby realizing substantial financial gains despite alleged violations of the <u>Securities Exchange Act of 1934</u>, Section 10(b); <u>17 C.F.R.</u> § 240.10b-5; FINRA Rule 5270.

415. The depressed stock price catalyzed by the bank's actions essentially creates an advantageous situation for their derivatives positions. Lower stock prices mean that the bank can buy shares at a reduced rate to cover its short positions, leading to higher profits when the difference between the sale and cover price is calculated. Additionally, the swaps, which may be structured to pay off if AMC stock declines, become more lucrative as the stock price falls.

## S.    TRADING IRREGULARITIES

### Not "Glitches"

416. After the terrorist attacks on September 11, 2001, the Congress and Senate adjudicated that numerous safeguards were to be put in place to ensure business continuity on Wall Street and in the broader financial services industry. Some of these safeguards include backup sites, enhanced disaster recovery/business continuity planning, increased regulatory

requirements, greater communication infrastructure redundancy, regular industry wide testing, enhanced data protection measure, and increased focus on cybersecurity.

417. Many financial institutions created geographically diverse backup sites to ensure operations could continue even if a primary site was compromised. These backup sites can be activated rapidly in case of emergency, ensuring minimal disruption to business operations. The backup sites are equipped with full operational capabilities and can serve as a replica of the primary site. After 9/11, businesses implemented more robust disaster recovery plans and BCPs to prepare for disruptions. These plans included various scenarios, such as natural disasters, cyberattacks, and other types of disruptions. Regulatory bodies like the Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA) established more stringent requirements for business continuity plans, making it a regulatory imperative that financial firms have comprehensive strategies in place to deal with potential disruptions.

418. To minimize the risk of communication failure, financial firms implemented redundant communication systems. This allows continued communication even if one system fails or is disrupted. The financial industry began conducting regular industry-wide disaster recovery testing, organized by organizations like the Securities Industry and Financial Markets Association (SIFMA). These tests help ensure that the industry is prepared for wide-scale disruptions and can recover quickly. Post 9/11, financial firms also focused on enhancing data protection and recovery measures, including cloud-based backup systems and more robust encryption, to ensure data could be recovered rapidly and securely in case of a disaster. As the potential for cyberthreats became clearer post-9/11, financial institutions also put more robust cybersecurity measures in place, recognizing that disruptions could come from cyberattacks as well as physical attacks.

419. Given the systemic improvements and safeguards that were put in place post-9/11, the type of glitches that is exhibited should not occur under normal circumstances. These issues are typically not inherent to the redesigned system, but can emerge only when intentional coding alterations are made.

420. In this specific situation, it appears that someone intentionally modified the code within the normal system operations. These observable anomalies are essentially the aftereffects of such alterations. It's important to understand that not all brokerage systems are identical - each platform's software is written in different coding languages and built on different architectures.

421. When changes are made to the system or network, each broker's unique system responds differently. In this case, it appears that some of these systems rejected the modifications and instead displayed the real price of AMC. This type of occurrence isn't a random event; it strongly suggests intentional interference in the system. See Exhibit W (Exhibit "W", attached hereto and incorporated herein by reference) for several examples of AMC price and market cap "glitches" that were shared publicly by AMC investors. Calculations such as AMC's share price, outstanding shares, and market cap are simple calculations with only a few variables that should have not room for error. For example, AMC's market cap calculation should never have glitches because it is a simple calculation of two variables: AMC's current share price x the correct authorized number of outstanding AMC common stock shares. So the only reason that AMC's market cap would glitch by 100-1000s+ of percentage points is if behind the scenes there is ongoing manipulation in AMC stock (such as seen in Exhibit W).  If there is manipulation of AMC stock price happening behind the scenes, then the New York Stock Exchange (NYSE) is complicit violating Computer Fraud and Abuse Act 18 USC 1030, 18 U.S.C. §§ 1341, 1349, Section 10(b) and Rule 10b-5, and The Clayton Antitrust Act [15 U.S.C. § 15].

**Susquehanna International Group**

422. During the 2021 AMC short squeeze, Defendant, Susquehanna International Group

(SIG), held an unsustainable short position and swaps against AMC Entertainment Holdings, Inc.

("AMC"). This still open position, accumulated over a span of three years, exposed Defendant

and the rest of the market to systemic risk (See Exhibit "AE", attached hereto and incorporated

herein by reference).  Furthermore, SIG engaged in illicit practices such as naked short selling

and spoofing, jeopardizing the integrity of the market and the interests of retail investors (see

Exhibit AE). This is a violation of Regulation SHO under the Securities Exchange Act of 1934

(17 CFR 242.203). Brokers and dealers are prohibited from accepting a short sale order of an

equity security from another person, or effecting a short sale in an equity security for its own

account (17 CFR 242.203).[212]

423. This behavior resulted in millions of "Failure to Deliver" shares. During the relevant

period, SIG maintained a significantly large short position against AMC. This position was

accumulated over a two-year duration, exposing them to significant market risks evening

resulting in a margin call (See Exhibit AE).

424. It is alleged that SIG has conspired with other hedge funds to destroy the stock value

of AMC and APE securities. Contrary to regulatory requirements, SIG engaged in naked short

selling of AMC shares. This illegal practice, which involves selling shares without borrowing

them, exacerbated the volatility in AMC's stock price. It is alleged that Defendant SIG along with

other co-defendants engaged in a conspiracy to alternate control algorithms for AMC Stock. This

is where one hedge fund takes on the financial burden of shorting the stock and alternates with

---

[212] Regulation SHO 17 C.F.R. § 242.203 Borrowing and delivery requirements.
Code of Federal Regulations (National Archives - ECFR.gov) Link:
https://www.ecfr.gov/current/title-17/section-242.203

another short hedge fund. Defendant SIG executed a pattern of "spoofing" trades in AMC as demonstrated in Exhibit AE and on video clip.[213] This action is in violations of 7 U.S.C. § 6c(a)(5)(C) as it states "Is, is of the character of, or is commonly known to the trade as, "spoofing" (bidding or offering with the intent to cancel the bid or offer before execution)." [214] Spoofing, an illicit trading practice, involves placing orders with no intention of executing them to create a false impression of demand or supply, which is a violation  of 15 U.S.C. § 78i(a)(2). This deceptive practice harmed market participants who traded based on inaccurate price and volume signals. SIG's annual report, for the period in question, discloses approximately 78.9 billion of securities sold but not yet purchased (see Exhibit AE). Meanwhile, SIG reported having approximately 78 billion worth of securities owned (slightly less than the securities sold not yet purchased).[215] SIG lost $48 Billion dollars in value during this time (see Exhibit AE). It is further alleged that SIG created an office in Dublin, Ireland as to transfer bad debt and to hide and or hide, bad debt associated with their trades. This office and their bad debt eventually get closed down, eliminating their debt from record.

425. This disclosure further substantiates the claim of their illicit trading practices, including naked short selling. Defendant SIG, during the relevant period, failed in its obligation to produce required Rule 605 disclosure documents to the public. Rule 605 of the Securities and Exchange Commission mandates that market centers provide monthly electronic reports that include uniform statistical measures of execution quality. SIG's failure to disclose these documents deprived market participants of essential information regarding the quality of SIG's

---

[213] https://www.youtube.com/@MathewAffholterVsDefendants
[214] 7 U.S. Code § 6c - Prohibited transactions. Legal Information Institute - Cornell University. Link: https://www.law.cornell.edu/uscode/text/7/6c
[215] SUSQUEHANNA SECURITIES, LLC Statement of Financial Condition. December 31, 2021. Link: https://www.sec.gov/Archives/edgar/data/920417/000092041722000003/sssfc.pdf

order executions and raised substantial concerns about their commitment to transparency and

regulatory compliance. This is especially valid in determining how many cancelled shares the

defendant has engaged in. SIG also has an astonishing 52 regulatory infractions cited by FINRA,

including multiple from the January 2021 meme stock incident (see Exhibit AE). These facts are

set forth in Exhibit AE, which is attached here to and incorporated by reference.

### NASDAQ

426. The shares of AMC Entertainment Holdings, Inc. ("AMC") are primarily listed and

traded on the New York Stock Exchange ("NYSE"). Notwithstanding this primary listing, AMC

shares are also traded on the National Association of Securities Dealers Automated Quotations

("NASDAQ") under certain circumstances as delineated herein. It is alleged that NASDAQ,

through its trading platforms, has engaged in actions constitutive of market manipulation

concerning the shares of AMC. Specifically, NASDAQ has permitted, if not facilitated, the

employment of algorithmic trading mechanisms that have detrimentally affected the natural

market for AMC shares. Such algorithms have been utilized in a manner that appears to

deliberately impede the liquidity and upward price mobility of AMC shares, particularly during

the initiation of daily trading activities. This purported manipulation is evidenced by Exhibit AC

(Exhibit "AC", attached hereto and incorporated herein by reference), which contains

videographic substantiation of algorithmic trading patterns indicative of market manipulation,

including the insertion of numerous inconsequential one-share transactions within the stream of

customary hundred-share transactions. This systematic insertion of diminutive orders acts

analogically to a blockade, ostensibly contrived to restrain the acceleration of AMC's share price

by artificially manipulating the market velocity and depth.

427. The aforesaid activities, allegedly sanctioned or overlooked by NASDAQ,
constitutes a breach of fair market practices and trading regulations. By distorting the true
supply-demand dynamics in the marketplace, these algorithmic strategies could be interpreted as
creating an artificial trading environment for AMC shares. It is imperative that such allegations
are thoroughly investigated and, if substantiated, addressed with appropriate remedial actions to
preserve the integrity of the securities markets and protect the interests of all market participants.

428. The aforementioned activities relating to the shares of AMC Entertainment
Holdings, Inc. ("AMC") are indicative of price manipulation tactics, tantamount to market
manipulation within the meaning of relevant securities laws and regulations. The algorithmic
strategies implemented by the National Association of Securities Dealers Automated Quotations
("NASDAQ") are analogous to a cyber Denial-of-Service ("DDoS") attack. This comparison
highlights the algorithm's intended or unintended effect of disrupting the natural market traffic by
slowing the execution of trades and potentially preventing the completion of transactions, akin to
a DDoS attack slowing or disrupting access to website services. These manipulative practices
permit market makers to influence the value of AMC's stock adversely, utilizing
disproportionately lower volumes of trade, hence facilitating a reduction in the stock's value with
relative ease. The resultant limitation on AMC's stock's price potential restricts its ability to
experience significant price movements, such as a 'short squeeze,' which could have detrimental
financial repercussions on various hedge funds and financial institutions holding short positions
in AMC. Further allegations of market manipulation are supported by the improper handling of
out-of-sequence trades. A salient incident occurred on July 21, 2023, when Vice Chancellor
Morgan T. Zurn of the Delaware Court of Chancery denied the proposed settlement in the
Consolidated C.A. 2023-0215-MTZ, impacting the trading behavior of AMC stock in after-hours

trading. Subsequent communications from AMC's CEO, which allegedly aimed to influence the stock price negatively, and the occurrence of a substantial out-of-sequence trade on July 24, 2023, have raised serious concerns.

429. The out-of-sequence trade in question, consisting of 300,000 shares, was executed during a pivotal moment in pre-market trading, potentially impeding a technical breakout that could have incurred financial distress upon the aforementioned financial entities. The questionable delay and post-hoc classification of this large trade as 'out-of-sequence' indicate a possible deliberate effort to manipulate AMC's stock price trajectory.

430. Moreover, the evidence suggests that such trades are strategically labeled 'out-of-sequence' to obfuscate their impact on the stock's trading pattern, a tactic which seemingly undermines the transparency and orderliness expected in a fair and equitable securities market. It is of grave concern that a digital system purportedly designed for precision and transparency is being implicated in activities that are at best erroneous and at worst, intentionally deceptive. The purported inability to timestamp transactions accurately strains credulity given the advanced state of digital trading technologies.

431. The collection of these alleged manipulations, evidenced through videographic materials and potentially verifiable by market technicians or programming experts, necessitates rigorous investigation and, if substantiated, calls for enforcement actions to be taken to ensure market integrity and protect investors' rights.

432. In the matter at hand, the anomalous trading patterns of AMC Entertainment Holdings, Inc. ("AMC") stock outside of standard trading hours, as recorded by the National Association of Securities Dealers Automated Quotations ("NASDAQ") and various market makers, reflect a failure to adhere to normative trading ranges. This lapse has conspicuously

surfaced due to the erroneous disappearance of orders in the pre-market phase, followed by a deliberate suppression of AMC's stock price during regular trading hours, and a subsequent manifestation of out-of-sequence trades in after-hours trading. These atypical price surges have drawn the scrutiny of an extensive cohort of retail investors, thereby exposing the malfeasance in question.

433. The systematic timing and sequencing control of trade executions by NASDAQ and market makers constitute a palpable transgression by infringing upon the sacrosanct principle of fair market operations and the upholding of market integrity, which constitutes a violation of several laws and regulations including Section 9(a)(2) of the Securities Exchange Act of 1934, Anti-Trust Violations Clayton Act § 4, 15 U.S.C. § 15, The Sherman Antitrust Act, 15 U.S.C. § 1 & 2, FINRA Rule 5270, and Dodd-Frank Wall Street Reform and Consumer Protection Act, Section 747. The analogy of a financial institution negligently conducting business with a client engaged in illicit activities, despite evident signs of illegality, is apt in portraying the actions of NASDAQ. The allowance and facilitation of these trades, redolent of tacit complicity in potentially illicit activities, draw a parallel with a bank turning a blind eye to suspicious transactions for the sake of profit or relationships, thereby breaching its regulatory obligations. Given the digital sophistication of current securities trading technologies, the burden of proof lies with NASDAQ to exonerate itself from these accusations of manipulation involving AMC stock trading. The inability or refusal to furnish such evidence would further implicate NASDAQ in market manipulation through the deployment of algorithmic strategies and the mishandling of out-of-sequence trades, contravening established rules and regulations designed to ensure fair market practices.

434. The gravity of the situation necessitates immediate and thorough investigation into these algorithmic discrepancies and trading anomalies. Should these allegations be substantiated, it is imperative that appropriate remedial actions be implemented to rectify these violations and restore confidence in the fairness and integrity of the marketplace.

## T.    MEDIA SHORT AND DISTORT CAMPAIGNS

**MEDIA CAMPAIGN (FUD)**

435. "FUD" stands for Fear, Uncertainty, and Doubt. A FUD campaign is a strategy to influence perception by disseminating negative, vague, or false information. This tactic is often used in sales, marketing, public relations, politics, and propaganda. In the context of finance and investing, a FUD campaign involves spreading misleading or exaggerated claims about a company or asset to decrease confidence and drive down its value. For instance, during periods of market volatility, a FUD campaign would involve spreading rumors that lead to panic selling.

436. These financial institutions (such as Citadel) typically have some kind of ownership stake in the media companies in this trade (See Exhibit "Y", attached hereto and incorporated herein by reference).  For example, Citadel Advisors is a historical shareholder of FOX CORP stock (ticker:FOXA). Financial institutions owning news outlets ensures the narrative is always on their side.

## FOX BUSINESS

437. Fox Business News, Citadel Securities, Virtu Financial, and other AMC short hedge funds have developed an unusually close business relationship, characterized by exclusive events

like dinners, golf outings, and private jet trips. There is considerable pressure from upper-level management at Fox Business to provide favorable coverage for Citadel Securities and their interests. This allegedly involved promoting certain viewpoints or giving a platform to biased spokespeople in order for Citadel and other short hedge funds to profit from. Citadel Securities due to its size and reach, was alleged to have promised Fox Business News exclusive access to major financial announcements. This would give Fox an advantage in breaking news over its competitors. It is alleged that there are clandestine exchanges between upper-level management officials at Fox Business News and representatives from Citadel Securities on apps like "Signal", "WhatsApp", and "Bloomberg Chat".

438. Citadel Securities would sponsor several high-profile Fox Business events, and in return, Fox Business would provide them with positive media exposure, downplaying any controversies or challenges that the firm would face. It is alleged that there exist evidence of 'gifts' being exchanged (see Exhibit "Z", attached hereto and incorporated herein by reference). Lavish holidays, designer goods, and tickets to premium events - all seemingly provided by Citadel Securities and other hedge funds to influential figures within Fox Business. Citadel and other short hedge funds would provide Fox Business with slanted trading tips that are explicitly designed to adversely affect its viewers who are investors, ensuring the Citadel investment segments (which are usually short positions) always had the upper hand. In other words, liquidity pumps fueled by retail investors who are viewers. In return, any news related to Citadel Securities' business practices, especially those that would be controversial, would be presented in a more favorable light or, at times, even omitted entirely.

439. To make matters murkier, there was a list. A list of 'silent' contributors to this project. High-profile anchors, producers, reporters, and analysts from Fox Business were

allegedly being compensated generously by Citadel, Virtu, and other hedge funds for their

complicity, ensuring the narrative remained controlled (see Exhibit Z).  Citadel Securities and

Virtu Financial, leveraging its vast data resources, would provide Fox Business with real-time

market trends and predictions. In return, Fox Business would craft segments and discussions that

indirectly nudged public sentiment to align with Citadel's positions. When cross-referencing

these transactions with major news events and found an alarming correlation.  It is alleged that

Fox News executives and anchors have conduct a monetary exchange for manipulating the

narrative on Fox Business News with Citadel Securities, Virtu, and other short hedge funds.

440. Throughout the specified period, market makers and short hedge funds, operating

with both explicit and implicit backing from media entities like Fox Business, systematically

engaged in a campaign with the intent (Scienter) to discredit AMC, targeting a decrease in its

stock value. This practice is called "Short and Distort".  A "short and distort" campaign refers to

an unethical and potentially illegal trading strategy where an investor (or group of investors)

attempts to profit by spreading negative rumors or misinformation about a company in order to

drive down its stock price.

441. After disseminating the false or misleading information, the "short and distort"

investor benefits by having previously established a short position in the company's stock. At the

heart of this concerted effort was Fox Business News, which, on January 13, 2022, spread

patently false information regarding AMC stock through their Twitter account, as corroborated

by Exhibit Z. Fox Business posted a fake headline on Twitter where they (falsely) stated that

AMC Theaters was going private.[216] The tweet has been since deleted (See Exhibit Z). This caused a substantial 8.41 % drop in AMC's stock price.

442. This was a deliberate manipulation tactic used to get retail investors to "panic sell" at fake bad news. Charles Gasparino of Fox News, a pivotal figure in this campaign, cast aspersions on AMC stock's legitimacy and intrinsic value (see Exhibit Z). His repeated negative remarks concerning the company's leadership, viability, and other vital business affairs on Twitter and live broadcasts went beyond the realm of journalistic critique, potentially influencing (in connection with) the buying or selling decisions of potential investors. Mr. Gasparino has continuously and systematically tweeted out misleading information regarding AMC, sometimes even directly sourcing from short sellers. He has also gone after individual investors on Twitter by calling them degrading names like "cult members" likening them to "pedophiles", "morons" and other pejoratives (See Exhibit Z).

443. On one such occurrence, Mr. Gasparino tweeted out a photograph of an empty AMC movie theater in Kips Bay, NY from a text message he had received from a friend whose account was named "Diogenes". It was later revealed by keen eyed AMC investors, that "Diogenes" was non-other than Jim Chanos, an AMC short seller (See Exhibit Z). It is also worth noting that the photograph that Mr. Gasparino posted was not even an AMC movie theater, it was in fact a "Showcase theater", the actual AMC Kips Bay looks very different (see Exhibit Z). Most retail investor did not understand why Mr. Gasparino was so adamant about speaking negatively about

---

[216] Fox Business Public Twitter Account Post on January 13, 2022. FALSE ARTICLE HEADLINE: "Closing the Curtain: Popular movie theater chain goes private after selling final stocks". Note: It was a misleading headline for this article: https://www.foxbusiness.com/markets/amc-ceo-done-selling-company-stock

AMC, it was also revealed that Mr. Gasparino's wife Virginia Juliano is the CEO of Cobblecord, a streaming service which competes for viewership against AMC. Once Mr. Gasparino was caught, he immediately started deleting tweets in rapid succession. It is estimated in one afternoon, Mr. Gasparino deleted hundreds of AMC Tweets (See Exhibit Z). Notably, Gasparino maintains a close personal association with Doug Cifu of Virtu Financials, and the Griffin family of Citadel casting further shadows on his motivations. Mr. Gasparino plays the role of protector of Ken Griffin's reputation on Twitter (see Exhibit Z).

444. Mr. Gasparino is not unfamiliar with controversy. While serving as the senior Wall Street correspondent for Fox Business Network, has claimed to be a Pulitzer Prize nominee, a declaration made in his Fox bio, his agent's website, his publishing bio, and in a 2008 CNBC video. However, upon checking the official list of Pulitzer winners and nominated finalists for 2002 (the year he claimed to be nominated), Gasparino's name is notably absent. The winner in beat reporting for that year was Gretchen Morgenson of The New York Times. The other two nominees were Patrick Healy of The Boston Globe and Jack Kelley of USA Today. When questioned, Gasparino responded that he was "nominated by the WSJ (Wall Street Journal)." However, news organizations don't nominate Pulitzer contenders. Fox later amended Gasparino's online bio to state that his work "was submitted for the Pulitzer," without claiming an actual nomination. Pulitzers discourage the misrepresentation of being a "nominee" based merely on the submission of work. Gasparino's false claims were documented by Journalist Bill Denham and Julia LaRoche (see Exhibit Z).

445. At times Gasparino's on-air vitriol has spilled over into infighting with co-anchors. There exists a video in which Fox Business News aired of Mr. Gasparino engaged in a vitriolic

fight with co-anchor Charles Payne who is purported to have bought AMC Shares. [217] One of the most important tweets that Mr. Gasparino had tweeted was the gravitas of the systemic risk that Citadel and other hedge funds would be under as a result of irresponsible short selling (see Exhibit Z).

446. Adding to the complexity, Anne Dias Griffin, the ex wife of billionaire hedge fund manager (and CEO of Citadel) Kenneth Cordele Griffin ("Ken Griffin"), holds a board position at Fox Business (See Exhibit Z). These facts are set forth in Exhibit Z, which is attached here to and incorporated by reference. Allegations have emerged that her influential position may have been leveraged to steer or expedite the spread of these mistruths which as a result destroyed AMC's stock price and therefore hurt] AMC Shareholders. There's rising speculation that Gasparino, possibly influenced by either Griffin, Dias-Griffin and/or Cifu, played a more sinister role in these questionable activities in driving down the stock price.

447. These actions, intricately linked to the trading activities of AMC securities, drastically affected their market position. By leveraging platforms like Twitter and nationwide television broadcasts, they introduced distorted prices (i.e. artificial price) which deviated starkly from the genuine market demand or inherent value of AMC securities. This deviation and the resulting market manipulation is believed to have led directly (causation) to financial setbacks for the Plaintiffs due to this artificially depressed stock valuation. The evidence presented goes beyond mere circumstantial indicators. The coordinated actions, recurring patterns of misinformation, and the interlinked relationships among key players all paint a picture of intentionality and deliberation. When individual incidents are viewed in isolation, they could be

---

[217] https://twitter.com/PJM75TWEETS/status/1662166370971156506

dismissed as coincidences. However, when considered collectively, they weave a narrative of a grand conspiracy meticulously designed to undermine AMC's market position. The strategic placements within media entities, combined with consistent negative messaging and the relationships between those disseminating the misinformation, strongly suggest this isn't a series of isolated incidents. Instead, they appear to be orchestrated moves in a calculated game to manipulate market perceptions and stock values. Such a level of coordination and consistency can hardly be coincidental; it points towards a well-planned and executed agenda.

448. Additionally, the use of bots and AI were utilized to try and influence social media sentiment. Knowing this through social sentiment and Twitter and YouTube analysis, A.I. Bots were used to persuade retail investors to sell their AMC shares and capitulate (See Exhibit "AA", attached hereto and incorporated herein by reference). Exhibit AA provides screenshots of ownership in media companies, mainstream media smear articles on AMC, use of bots, and influence campaigns).[218] The people behind the profiles that spam the same exacts comments are not real (as seen in Exhibit AA). They are "A.I. Generated people" whose faces were used in the ploy. The media is merely an extension of the Hedge Fund and Investment bank.

449. As a result of this extensive manipulation campaign, AMC shareholders have suffered significant losses, and there is a clear need for an investigation into these activities. AMC has been the targeted of this particular practice ("FUD" campaign) specifically by Citadel, FOX Business, and Citigroup. This is proven by articles and price targets by individuals and outlets associated with Citadel and Citigroup.

---

[218] Exhibit Y includes various screenshots shared online that provide screenshot examples including ownership in media companies, mainstream media smear articles on AMC, use of bots, and influence campaigns. These facts are set forth in Exhibit Y, which is attached hereto and incorporated by reference.

## VI.    LOSS CAUSATION AND STANDING

## A. AMC BDR

450. In the matter of Citigroup's dealings with AMC's unsponsored BDRs, the manipulation has caused harm to the broader market and, consequently, to investors. By creating, controlling, and naked shorting a substantial number of BDRs and engaging in actions such as naked short selling, Citigroup has artificially deflated AMC's share price. Such deflation have led to direct financial losses for shareholders who were subjected to an undervalued share price, or for those who faced market instability created by Citigroup's activities. These losses would need to be quantified and directly traced to Citigroup's actions to establish loss causation.

451. Citigroup's involvement in the manipulation of AMC's unsponsored BDRs raises serious concerns. By engaging in naked short selling through such hidden and deceptive means, the artificial deflation of AMC's share price has caused direct financial losses to shareholders. Investors facing an undervalued share price have strong grounds for legal standing, provided that these losses can be quantified and directly traced to Citigroup's actions. The standing, in this case, is firmly rooted in loss causation, demonstrating the chain of causality between the defendant's action and plaintiff's injury.

## B. APE

452. Citigroup's fraudulent creation and manipulation of APE, misleading statements about APE's authorization, and coordination with Antara to influence the APE's value caused economic harm to AMC's shareholders. Citigroup, being an AMC debt holder and banker, manipulated AMC CEO to comply with their plan. The dilution effect, price manipulation, and

insider trading related to APE could have resulted in financial losses for individual investors, index funds, or other market participants.

453. Citigroup's APE manipulation, including fraudulent creation and misleading statements, show the harm caused to AMC's shareholders. The intricate plot, involving dilution effects and insider trading, purportedly resulted in financial losses to investors and other market participants is arguably some of the worst behavior ever market history. The plaintiffs who were affected by these allegations, have a legitimate claim to legal standing, and can substantiate their claims with evidence of economic harm directly linked to the actions in question.

## C. DARK POOLS, PARKING, AND OUT OF SEQUENCE

454. The plaintiffs, who had significant investments in AMC's common stock, suffered economic losses as a direct result of the defendants' (Citadel, Virtu, Goldman Sachs, Susquehanna, and Citigroup) use of dark pools in trading. The alleged manipulation within these dark pools, including the utilization of synthetic shares, internalization of orders, and intentional price distortion, materially affected market conditions. Investors were led to make trading decisions based on these distorted conditions, which then resulted in real and quantifiable financial harm (see exhibit AI).

455. The defendants' specific actions within the dark pools, such as creating "out of sequence" errors, parking high volumes of AMC stock until after hours, and manipulating price, directly caused the observed distortions in supply and demand and consequent losses to investors. The secretive and potentially unscrupulous means employed within these private trading venues effectively sidelined retail investors' orders, preventing their proper execution on

the public exchange. This manipulation directly led to financial losses for unsuspecting investors, and a direct link between these actions and the economic losses can be established.

456. The use of dark pools by defendants Citadel, Virtu, Susquehanna, and Citigroup is a sophisticated matter involving multiple layers of manipulation. The allegations extend to creating "out of sequence" errors on the NASDAQ and parking high volumes of AMC stock. It led the plaintiffs to make trading decisions based on these manipulative practices and have suffered real and quantifiable harm. Their standing in this case is predicated on the ability to directly link these actions to their financial losses.

**D. CANCELLATION OF ORDERS**

457. Citadel Securities' cancellation of retail orders in AMC Common Stock caused harm to investors in the following ways: The cancellations artificially suppressed the price of AMC stock, which prevented investors from realizing the full value of their investment. The cancellations created a false sense of supply and demand in the market, which misled investors and made it difficult for them to make informed investment decisions. The cancellations contributed to market instability, which made it more difficult for investors to trade AMC stock.

458. Citadel Securities' cancellations were conducted with irregularity and in a manner inconsistent with the handling of other stocks. Parts of these cancellations appear to have been part of a spoofing strategy, which caused investors investment value. The sheer volume of cancellations, exceeding the actual number of AMC shares available, signifies potentially unlawful behavior. The scale and manner of cancellations contributed to market instability, causing indirect loss to market participants.

459. Citadel Securities' actions related to the cancellation of retail orders in AMC Common Stock and their engagement in a spoofing scheme raise serious legal questions. The artificial suppression of AMC's stock price and the creation of false market demand through "Baiting Orders" have purportedly harmed investors. The standing here lies in the direct linkage between these actions and financial losses, created a strong basis for the plaintiffs affected, to seek legal remedies.

**E. SPOOFING**

460. Citadel Securities, Goldman Sachs, Susquehanna, and unknown defendants engaged in a spoofing scheme that led to the manipulation of AMC shares. As detailed, this scheme included placing and swiftly canceling large orders (referred to as "Baiting Orders") to create an artificial perception of market demand, thereby manipulating the share price. The Defendants engaged in spoofing by placing and quickly canceling large Baiting Orders for AMC shares, thus affecting the perceived supply and demand and manipulating the share price. The false impression of market sentiment created by the spoofing allegedly led to a drop in AMC's share prices. This artificial price depression induced other market participants to sell their shares, further driving down the price. Misled by the distorted market conditions, the false market sentiment resulted in the sale of over 3 billion+ shares of AMC Stock at artificially deflated prices. The Plaintiffs allege that these forced sales resulted in substantial financial loss, directly attributable to the Defendants' manipulative actions.

461. Citadel Securities' and Susquehanna's engagement in a spoofing scheme is an independent and grave issue. Spoofing involves placing large orders with the intent to cancel them, thereby creating an illusion of demand or supply. In the context of AMC shares, Citadel's and Susquehanna's actions have artificially affected the perceived supply and demand and

manipulated the share price. This scheme, as detailed in the allegations, includes placing and swiftly canceling large orders (referred to as "Baiting Orders") to create an artificial perception of market demand. By manipulating share prices through these baiting orders, the Defendants have coerced market participants into selling shares at artificially depressed prices. The Plaintiffs who were misled by this scheme and suffered financial loss have clear legal standing. The Plaintiffs evidence of a direct connection between these spoofing actions and substantial financial losses to the Plaintiffs establishes both loss causation and standing in a court of law.

462. Spoofing is a serious concern especially for small and mid cap companies. Northwest Biotherapeutics (ticker: NWBO), "a cancer-focused biotechnology company, has sued eight of the US's largest market making traders including Citadel Securities, Susquehanna and Virtu, alleging that they deliberately drove down its share price by placing sell orders they had no intention of executing. The complaint, filed by Northwest Biotherapeutics in a federal court in New York on Thursday, claimed that the traders "deliberately engaged in repeated spoofing that interfered with the natural forces of supply and demand" by placing tens of millions of fake orders between December 2017 and August of this year." [219]  The case citation is Northwest Biotherapeutics, Inc v. Canaccord Genuity LLC, 1:22-cv-10185, (S.D.N.Y.) and as of October 2023, the case is still ongoing. [220]

## F. CRYPTONIZED TOKENS

---

[219] "US Cancer Drug Company Accuses Market Makers of Stock Spoofing, Financial Times". Article originally posted on Financial Times and reposted by Cohen Milstein. 2023 Cohen Milstein Sellers & Toll PLLC.  December 1, 2022. Link: https://www.cohenmilstein.com/update/us-cancer-drug-company-accuses-market-makers-stock-spoofing-financial-times

[220] Citation: Northwest Biotherapeutics, Inc v. Canaccord Genuity LLC, 1:22-cv-10185, (S.D.N.Y.).  Date Filed: Dec. 1, 2022. Link: https://www.courtlistener.com/docket/66579590/northwest-biotherapeutics-inc-v-canaccord-genuity-llc/

463. Citadel's utilization of cryptocurrency-based derivative products by Alameda to allegedly manipulate the market price of AMC stock could lead to distorted prices. Investors who traded AMC shares during the time of the manipulation suffered economic losses due to the artificial inflation or depression of stock prices. FTX's prompt action to delete any related records, including the AMC Whitepaper, has impeded the ability to trace, analyze, and quantify the impact of the alleged manipulation. This action would exacerbate the economic losses for investors by obstructing justice and hindering the investigation process. The exploitation of Mirror Protocol to access and manipulate traditional financial assets further distort the market, leading to a lack of transparency and fairness. This technology's misuse has contributed to the wrongful economic harm to the plaintiffs' by facilitating the manipulation.

464. Citadel's use of cryptocurrency-based derivative products to manipulate AMC's market price adds a layer of complexity to this matter. Plaintiffs' suffered losses due to artificial price distortion have legal standing to challenge these actions. Additionally, FTX's deletion of related records and potential misuse of Mirror Protocol accentuates the allegations. The standing in this case is contingent on the ability to trace and quantify the impact of these actions on investors' economic losses, which the plaintiff's have through the blockchain.

## G. LULD

465. Citadel, Virtu, Goldman Sachs, and Citigroup's alleged manipulation of AMC and APE stocks through the LULD mechanism, loss causation is central to understanding the gravity of these violations. It appears that the repeated halts on the upward movement of these stocks, as exhibited, have directly impacted retail investors. The purported manipulation led to an artificial suppression of these stocks' prices, causing financial losses for individual investors who had positions in AMC and APE. Loss causation in this case is substantiated by the clear and

convincing chronology of events that links the actions of Citadel, Virtu, Citigroup, Goldman
Sachs, and possibly other LULD Committee members to the financial losses sustained by
investors.

466. The manipulation through the LULD mechanism by Citadel, Virtu, Goldman Sachs,
and Citigroup, affects the Plaintiffs positions in AMC and APE stocks. The artificial suppression
of stock prices is at the core of this issue. The Plaintiffs experienced financial losses due to this
manipulation have a clear path to legal standing, supported by a chronological connection
between Citadel's and the other defendants' actions and their financial harm.

## H. MUDRICK CAPITAL

468. The allegations against Mudrick Capital, if substantiated, provide a clear link
between their fraudulent actions and the financial losses incurred by retail investors and other
market participants. By allegedly receiving insider information from Adam Aron and
manipulating the stock price of Hycroft, Mudrick Capital could be seen as having both materially
misrepresented the company's market value and jeopardized the natural supply-demand dynamic
in the stock market, in violation of Section 10(b) of the Securities Exchange Act of 1934 and
Rule 10b-5 (15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5). This manipulation likely resulted in
distorted stock prices, which subsequently caused financial harm to investors who were unable to
trade on the same insider information.

469. Furthermore, the alleged conspiracy between Mudrick Capital and Adam Aron to
manipulate Hycroft's stock prices using AMC investors' funds would have effectively misled
investors regarding the true financial status and valuation of both companies. This manipulation
can be directly linked to the financial losses suffered by retail investors who were kept in the

dark about these illicit activities, thereby satisfying the loss causation element necessary for a securities fraud claim under RICO statutes (18 U.S.C. §§ 1961-1968).

470. In summary, the alleged actions of Mudrick Capital can be directly tied to economic losses experienced by retail investors who were unable to access the same insider information or who were the unwitting victims of market manipulation. Should these allegations be proven in court, it would establish the necessary loss causation for claims against Mudrick Capital under both Section 10(b) and RICO, leading to potential damages and penalties.

## VII.    THE MARKET WAS EFFICIENT DURING THE RELEVANT PERIOD

471. The market for AMC was efficient during the Relevant Period:

A.  AMC was a regulated issuer that filed periodic public reports with the SEC.

B.  AMC shares traded at high weekly trading volumes.

C.  AMC was eligible to file registration statements with the SEC on Form S-3.

D.  The market promptly reacted to public information disseminated by AMC.

E.  AMC regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other public disclosures, such as communications with the financial press and other similar reporting services.

F.  AMC was regularly covered throughout the Relevant Period by the financial news. As a result of the foregoing, the market for AMC's shares promptly digested current information regarding AMC from all publicly available sources and reflected such information in the price of AMC's shares.

## VIII. CAUSE OF ACTION

### COUNT 1 – ANTI-TRUST AND CONSPIRACY

**VIOLATIONS OF ANTI-TRUST VIOLATIONS CLAYTON ACT § 4, 15 U.S.C. § 15, THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1. AND 2. , 18 U.S.C. §§ 1341, 1349,**

472. The plaintiffs allege that Citigroup, NYSE, Susquehanna, NASDAQ, Virtu, Citadel, Goldman Sachs, and unknown defendants engaged in intentional acts of manipulation, restricting and directing trades to alternative trading systems (ATS), or dark pools, monopolize trade in AMC and APE Stock, which undermines the National Market System's supply and demand dynamics. This includes alleged collusion on Limit Up-Limit Down (LULD) halts, which are critical controls meant to prevent extreme volatility in securities trading. It is claimed that the defendants engaged in anti-competitive practices made false statements or failed to disclose vital information regarding the operation and triggering of LULD halts, misleading investors about the securities' true market conditions and the market's overall stability and functionality.

473. The complaint asserts that all these manipulative acts were done with scienter, and the intent to commit wrongdoing, aiming to deceive or defraud investors through their actions that artificially influenced the stock prices of 'AMC' and 'APE'. The plaintiffs argue that there is a direct connection between the defendants' manipulative behavior and the plaintiffs' decisions to buy or sell the securities in question, indicating that the defendants' actions could have influenced the investment decisions made by the plaintiffs. The plaintiffs assert that their financial losses are a direct result of the defendants' manipulative actions, which caused artificial price movements in the market. These actions compelled the plaintiffs to trade under false pretenses, which they otherwise would not have done under normal market conditions. It is claimed that the plaintiffs

relied on the integrity of the market and the assumption that the securities' prices were being set by the natural forces of supply and demand. This reliance was allegedly breached by the defendants' manipulative practices. The plaintiffs must show a direct causative link between the defendants' actions and their own economic losses, making the case that the depreciation of the securities' value was due to the manipulative tactics of the defendants, not due to other unrelated market factors. The allegations brought forth by the plaintiffs is supported by concrete evidence, such as trading records, witness statements, and other forms of documentation.

## COUNT 2 - RICO

**VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), 18 U.S.C. §§ 1341, 1349, THE CLAYTON ANTITRUST ACT [15 U.S.C. § 15]**

474. All Defendants' conduct amounted to a coordinated pattern of racketeering activity (enterprise and pattern) by manipulating the market, affecting interstate commerce, and causing damage to the plaintiffs.

475. Citigroup, AMC Entertainment, Antara Capital, and the NYSE in their conduct, conspired before and during the creation of 'APE' securities, "project popcorn" to deprive shareholders through fraud, omissions and corrupt practices (Racketeering Activity and Conspiracy) and a violation under 18 U.S.C. §§ 1341, 1349 and The Clayton Antitrust Act, 15 U.S.C. § 15.

476. Antara and Citigroup deprived AMC Shareholders of voting rights and a fair corporate voting process through the Project Popcorn scheme which forced dilution on shareholders, stole voting rights, and took away shares from shareholders as part of the reverse

split that was implemented because of a fraudulent vote which was a violation of 18 U.S.C. § 241

(Conspiracy Against Rights), 42 U.S.C. § 1985(3) (Depriving Persons of Rights or Privileges), 18

U.S.C. §§ 1341, 1349, and The Clayton Antitrust Act [15 U.S.C. § 15].

477. During the Relevant Period, Defendants Fox Business, Virtu and Citadel conspired

and carried out a plan, scheme, and course of conduct that was intended to and, throughout the

Relevant Period, did: (i) deceive the investing public, including Plaintiffs and other investors, as

alleged herein; and (ii) caused Plaintiffs to purchase AMC securities at artificially inflated prices.

In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of

them, took the actions set forth herein. Defendants (i) employed devices, schemes, and artifices to

defraud; (ii) made untrue statements of material fact and/or omitted to state material facts

necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course

of business that operated as a fraud and deceit upon the purchasers/ potential purchasers of the

Company's securities to maintain artificially deflated market prices for AMC securities in

violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as

primary participants in the wrongful and illegal conduct charged herein or as actors who

substantially assisted the conduct. Plaintiffs suffered financial harm as a direct result of the

scheme (including untrue statements) made by Fox Business and Citadel. (Scheme to Defraud and

Racketeering Activity), 18 U.S.C. §§ 1341, 1349, and The Clayton Antitrust Act [15 U.S.C. § 15].

478. Citadel, Citigroup, Virtu, Susquehanna, and Goldman Sachs conspired to

systematically deflate the price of 'AMC' and 'APE' securities through open market manipulation

(Open Market Manipulation and Racketeering Activity). FTX, Alameda, and Citadel are alleged to

have conspired to manipulate the market price of AMC Entertainment Holdings, Inc. ("AMC")

securities through the creation and use of tokenized securities, which is a violation of Securities Exchange Act of 1934, Section 9(a)(2), The Clayton Antitrust Act [15 U.S.C. § 15], and RICO.

479. AMC, Hycroft Mining, and Mudrick Capital conspired to and misled AMC investors to inflate the price of 'HYMC' in a 'pump-and-dump' scheme based on leveraged insider information (Fraudulent Market Manipulation and Direct Causation). This manipulation can be directly linked to the financial losses suffered by the plaintiffs. Plaintiff further alleges that Defendant Mudrick Capital, in conjunction with Adam Aron and others, engaged in a scheme to manipulate the market prices of AMC and Hycroft stocks for their personal gain. The conduct of Defendant Mudrick Capital in colluding to manipulate the market prices of these stocks constitutes a conspiracy to commit securities fraud in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO). Defendant Mudrick Capital's actions were willful, wanton, and carried out with reckless disregard for the market's integrity and the potential harm to Plaintiffs and AMC shareholders. As a direct and proximate result of Defendant Mudrick Capital's wrongful conspiracy to manipulate the market, Plaintiffs and the AMC Shareholders have suffered economic injury and other damages violation of 18 U.S.C. §§ 1341, 1349.

480. Citadel, Virtu, Susquehanna, Citigroup, Goldman Sachs, and co-conspirators defendants were part of an enterprise engaged in a pattern of racketeering activity involving stock manipulation. Defendants' activities included fraud in the connection with the purchase and sale of securities. Defendants and co-conspirators used dark pools to conduct illegal trades, engage in deceptive practices, and communicate in a manner that facilitated the concealment of their manipulative strategies. Defendants' repeated illegal activities over time satisfy the pattern requirement under RICO. The racketeering activity directly led to losses for the AMC stock investors, who are seeking triple damages as provided by the RICO statute (Enterprise, Interstate

Commerce, and Pattern of Racketeering) and 18 U.S.C. §§ 1341, 1349, and The Clayton Antitrust

Act [15 U.S.C. § 15].

## COUNT 3 - BREACH OF FIDUCIARY DUTY

**BREACH OF FIDUCIARY DUTY, VIOLATION OF DODD-FRANK WALL STREET**

**REFORM AND CONSUMER PROTECTION ACT, SECTION 619 ("VOLCKER**

**RULE"), 12 U.S.C. § 1851, 18 U.S.C. §§ 1341, 1349, THE CLAYTON ANTITRUST ACT**

**[15 U.S.C. § 15]**

481. As AMC's trusted banker, lender, underwriter, and investment advisor,  Citigroup

defendants owed fiduciary duties of care and loyalty to the Plaintiffs and willfully or negligently

breached those duties by misrepresenting, defrauding, engaging in stock manipulation, and

omitting material facts. Citigroup breached its fiduciary duties by engaging in actions that were

contrary to the best interests of AMC and its shareholders (a violation of the Investment Advisers

Act of 1940, Section 206 (15 U.S.C. § 80b-6)), for failing to act in the best interests of its client,

AMC., including but not limited to: Extending credit to AMC without securing adequate collateral

as per 12 C.F.R. § 1.73(b),(d). Allegedly participating in the "Project Popcorn Scam" by

approaching CEO Adam Aron with a proposal that led to the selling of AMC common stock and

the creation of APE securities (a convertible preferred share), the reverse split and conversion,

which were not in the best interest of AMC or its shareholders and were allegedly intended to

cover short positions, a violation 18 U.S.C. §§ 1341, 1349, and The Clayton Antitrust Act [15

U.S.C. § 15].

482. Engaging in short selling of AMC stock while simultaneously serving as a lender and

underwriter to AMC Entertainment, thus creating a conflict of interest.

483. As a direct and proximate result of Citigroup's breaches of fiduciary duty, AMC and its shareholders (including the Plaintiffs) suffered significant financial harm.

484. As SRO (Self-regulatory Organizations) Citadel, Virtu, Susquehanna, Goldman Sachs, New York Stock Exchange, and NASDAQ defendants owe the Plaintiffs fiduciary duty of maintaining a fair and orderly marketplace for all participants and the duty to monitor and report under the <u>Securities Exchange Act of 1934</u>, <u>15 U.S.C.</u> §§ 78s(b)-(c), 78f(b).

485. Citigroup Defendant owed Plaintiff a duty to avoid any conflict of interest in performing its advisory and lending services. Defendant engaged in conduct that created a conflict of interest by short-selling Plaintiff's stock for its own benefit, which was diametrically opposed to Plaintiff's interests. By placing its own interests above those of Plaintiff, Defendant breached its duty to avoid conflicts of interest.

486. Citigroup Defendant was under a duty to refrain from self-dealing that would run counter to the interests of Plaintiff. Defendant engaged in self-dealing by short-selling Plaintiff's stock and profiting from the depreciation of Plaintiff's stock value. Defendant's self-dealing activities constitute a breach of its duties to Plaintiff and are wrongful and unauthorized acts that were detrimental to Plaintiff. This is a breach of fiduciary duty under the <u>Dodd-Frank Wall Street Reform</u> and <u>Consumer Protection Act</u>, Section 619 ("Volcker Rule"), <u>12 U.S.C.</u> § 1851.

487. Citigroup's decision-makers failed to act with the level of care that a reasonably prudent person in a similar position would, particularly in the planning, execution, or oversight of 'Project Popcorn' which is a duty of care violation. Citigroup's officers or directors engaged in transactions where they had a personal interest that conflicted with the interests of the company or its shareholders which violates the duty of loyalty. Citigroup's executives engaged in conduct that constituted a breach of the duty of good faith, this would include knowingly acting against the

interests of the company or its shareholders in the development or implementation of Project

Popcorn, which is a violation of Duty of Good Faith. Citigroup failed to fully disclose material

information regarding 'Project Popcorn' to shareholders, thus impeding their ability to make

informed decisions, which is a violation of the duty of candor.

488. NYSE, unidentified market participants, and unknown defendants' actions constituted

breaches of their fiduciary duties of loyalty, good faith, fair dealing, and disclosure, thereby

entitling Plaintiff and AMC Shareholders to damages and equitable relief. The NYSE failed to

exercise reasonable care in overseeing the LULD mechanism, allowing the misuse of the system.

The defendants profited at the expense of retail investors through the improper use of the LULD

halts. Defendants profited and/or secured personal benefits as a result of their breaches of

fiduciary duties. Defendants engaged in, or allowed, trading strategies that improperly influenced

the LULD halts to create artificial price movements, which could deceive the market participants

and create unfair trading conditions. It is alleged that the Defendants profited from these

manipulations. This could mean that they were making trades based on the anticipated movements

caused by these manipulations, or they had some agreement with others who would benefit from

this trading, from which they received a kickback or other compensation. Defendants placed their

personal interests or the interests of other favored parties above those of the investors they were

duty-bound to protect, such as retail investors or shareholders. This is a breach of the duty of

loyalty, which requires fiduciaries to act without any conflict of interest. Defendants made

decisions that were not in the best interests of the shareholders, for example, if they ignored or

suppressed concerns about the LULD mechanism being exploited in a way that could harm

investors, this would breach the duty of care and loyalty. Those in charge of overseeing the

functioning of the LULD mechanism, such as the NYSE or regulatory bodies, failed to monitor or

regulate the mechanism adequately, this could be construed as a breach of fiduciary duty as their failure allowed for manipulative practices to occur.

489. Defendants directly or indirectly enriched themselves or secured an unfair advantage or benefit, either monetarily or in some other form, at the expense of the plaintiffs, who were owed honesty, transparency, and fair treatment under the fiduciary duties that the Defendants were obligated to uphold. It must be alleged that the defendants acted with scienter, meaning they had the intent to deceive, manipulate, or defraud investors by engaging in practices that resulted in the artificial deflation of the stock prices of AMC and APE. The allegations should connect the manipulative behavior directly to the purchase or sale of securities. The Defendant's actions have influenced an investor's decision to buy or sell the stocks in question. The Defendants' manipulative actions caused damages to the investors. The artificial price movement, caused by the LULD halts, led to investors making trades that they otherwise would not have made, resulting in financial losses. Investors relied on the market's integrity and the assumption that securities prices are determined by the natural interplay of supply and demand, not by manipulative practices. There is a direct link between the market manipulation and the economic harm suffered by the investors. The decline in the value of both AMC securities was due to the market manipulation and not some other factors. The Defendants' actions in breaching their fiduciary duty was a violation of The Clayton Antitrust Act [15 U.S.C. § 15] and others.

## COUNT 4 - INSIDER TRADING

## VIOLATION OF 12 C.F.R. § 1.7

490. Citigroup's lending practices and its receipt and use of non-public insider information in violation of 12 C.F.R. § 1.7 and other related regulations represent conduct that falls below the required standard of care and constitutes an actionable breach of regulatory requirements.

491. The plaintiffs seek relief as allowed under federal banking laws for violations committed by Citigroup, which includes but is not limited to, restitution and penalties for non-compliance with the pertinent regulations. As a direct and proximate result of Citigroup's violations of banking regulations, AMC and its shareholders (including the Plaintiffs) suffered significant financial harm.

## COUNT 5 - SPOOFING

## VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10-B PROMULGATED THEREUNDER, 18 U.S.C. §§ 1341, 1349, THE CLAYTON ANTITRUST ACT [15 U.S.C. § 15]

492. Defendants Citadel, Virtu, Susquehanna, Citigroup, Goldman Sachs, and unknown defendants, by engaging in the acts described herein, including, without limitation, the deployment of "Baiting Orders" (or spoofing) that were quickly canceled, have violated §10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission, and violating 18 U.S.C. §§ 1341, 1349 and The Clayton Antitrust Act [15 U.S.C. § 15]. Defendants knowingly or recklessly engaged in acts, practices, and courses of business that operated as a fraud or deceit upon purchasers of AMC stock by employing devices, schemes, or artifices to defraud; by making untrue statements of material fact or by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or by engaging in acts,

practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities.

493. During the Relevant Period, Defendants Fox Business and Citadel carried out a plan, scheme, and course of conduct that was intended to and, throughout the Relevant Period, did: (i) deceive the investing public, including Plaintiff and other investors, as alleged herein; and (ii) cause Plaintiffs to purchase AMC securities at artificially inflated prices (liquidity traps). In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers/ potential purchasers of the Company's securities in an effort to maintain artificially inflated and deflated market prices for AMC securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5, and violation of 18 U.S.C. §§ 1341, 1349. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as actors who substantially assisted the conduct. Plaintiffs suffered financial harm as a direct result of the scheme (including untrue statements) made by Fox Business and Citadel.

494. At all relevant times, Defendant Mudrick Capital, a distressed investment firm, was in a position of trust by virtue of its investment strategy and its close association with AMC through its CEO, Adam Aron, and with Citadel, which has an ownership interest in Mudrick Capital. Defendant Mudrick Capital, by virtue of its relationship with insider Adam Aron, came into possession of material, non-public information regarding AMC and Hycroft. Defendant Mudrick Capital used this information to engage in transactions in the securities of AMC and Hycroft,

which included taking short positions on AMC's stock and derivative and swap positions on

Hycroft's stock, thus violating Section 10(b) of the Securities Exchange Act of 1934 and Rule

10b-5 promulgated thereunder and a violation of 18 U.S.C. §§ 1341, 1349. As a direct and

proximate result of the unlawful conduct of Defendant Mudrick Capital, Plaintiffs and other AMC

Shareholders have suffered damages.

495. The plaintiff asserts a cause of action against Citigroup and Antara in connection with

"Project Popcorn," alleging that the defendants has committed multiple violations of the Securities

Exchange Act of 1934, actions that undermine the integrity of the securities market and deceive

investors. The core accusations assert that Citigroup and Antara, through activities tied to Project

Popcorn, has potentially engaged in market manipulation, misled investors, and conducted insider

trading—serious infractions under the governing law. 18 U.S.C. §§ 1341, 1349, Section 10(b) and

Rule 10b-5, and The Clayton Antitrust Act [15 U.S.C. § 15] are cited against Citigroup for

employing fraudulent and deceptive practices in the acquisition or disposition of securities, a

cornerstone regulation to maintain market integrity and investor confidence. Moreover, Citigroup

and Antara is accused under Section 9(a)(2) of manipulating security prices, a critical measure

against the creation of false or misleading market impressions. Section 14(a) violations are also

alleged, emphasizing the need for honest communication with shareholders during proxy

solicitations, which is claimed to have been compromised by Antara and Citigroup's actions

related to Project Popcorn. Lastly, the plaintiff claims that Citigroup and Antara violated Section

20A, which addresses insider trading liabilities, potentially allowing individuals within the

corporation to profit from non-public information. The collective allegations present a concerning

picture of Antara and Citigroup's business practices regarding Project Popcorn, positing that the

company has willfully disregarded the legal standards set to protect the securities market and its participants.

496. Citadel, Virtu, Susquehanna, Citigroup, and Goldman Sachs engaged in deceptive practices by manipulating the price of AMC stock through dark pools. Defendants engaged in deceptive practices by manipulating the price of AMC stock through dark pools.

497. Defendant made material misrepresentations and omitted crucial information about the stock's trading volume and price. Defendant's actions caused artificial price stability or suppression, which misled investors. The defendant utilized their access to dark pools to strategically place large volumes of AMC stock trades outside of public view. By parking orders and trading after hours, the defendant disrupted the natural supply-demand balance in the public market. Plaintiffs suffered economic loss due to artificial price suppression that differed from the expected price movement with normal trading condition, violating 18 U.S.C. §§ 1341, 1349 , and The Clayton Antitrust Act [15 U.S.C. § 15].

498. Citadel Securities, Virtu, and the Susquehanna Defendants engaged in manipulative behaviors by canceling an abnormally large number of retail investor orders for AMC shares, which is out of step with standard market practices. These cancellations were part of a deceptive strategy to manipulate the market price of AMC stock. From January 2020 to April 2023, Defendants canceled orders totaling 3,955,620,000 shares, an amount that vastly exceeds the actual float of AMC, hinting at potential spoofing to mislead market participants.

499. The scale and pattern of cancellations suggest a strategic effort to create false or misleading appearances of market activity for AMC shares, violating 18 U.S.C. §§ 1341, 1349, Section 9(a)(2) of the Securities Exchange Act of 1934,  and The Clayton Antitrust Act [15 U.S.C.

§ 15]. Such cancellations are indicative of a spoofing strategy, which is explicitly prohibited under Section 747 of the Dodd-Frank Act.

## COUNT 6 - REGSHO

## VIOLATION OF REGULATION SHO (RegSHO) AND THE SECURITIES EXCHANGE ACT OF 1934

500. Plaintiff alleges on information and belief that Defendant SIG, Virtu, Citadel and unknown defendants violated Regulation SHO under the Securities Exchange Act of 1934 (17 CFR 242.203) by failing to locate and deliver shares in connection with short sales of AMC stock, resulting in "Failure to Deliver" positions. The actions taken by the defendant were intentional and part of an ongoing pattern of failing to deliver shares in connection with short sales. As a direct result of the results of failure to delivers produced by SIG, Virtu, and Citadel, massive numbers of synthetic AMC shares were created on the open market which hurt the value of AMC stock held by AMC shareholders and interfered with fair and orderly markets. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other AMC investors suffered damages in connection with their respective purchases and ownership of AMC and APE securities during the Relevant Period.

## COUNT 7 - FRAUD

## VIOLATION OF ANTI-FRAUD PROVISION 15 U.S.C. § 78I(A)(2) OF THE SECURITIES EXCHANGE ACT OF 1934, 18 U.S.C. §§ 1341, 1349, THE CLAYTON ANTITRUST ACT [15 U.S.C. § 15]

501. Plaintiff alleges on information and belief that Defendant SIG, Citadel, Virtu, Citigroup, Goldman Sachs, and unknown defendants intentionally violated 18 U.S.C. §§ 1341,

1349, 15 U.S.C. § 78i(a)(2), and The Clayton Antitrust Act [15 U.S.C. § 15] by engaging in

spoofing, naked short selling, and other manipulative devices and contrivances. These acts, by

creating a false or misleading impression of market supply or demand, manipulated the price of

AMC stock, and constituted a deceit on the market, to the detriment of Plaintiff and other market

participants. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and

other AMC investors suffered damages in connection with their respective purchases and

ownership of AMC and APE securities during the Relevant Period.

## COUNT 8 - MARKET MANIPULATION

### VIOLATION OF SECTION 9(A)(2), SECTIONS 9(A)(2), 10(B), RULE 10B-5, AND SECTION 13(D), 15 U.S.C. § 78j(b), OF THE SECURITIES EXCHANGE ACT OF 1934, 18 U.S.C. §§ 1341, 1349, THE CLAYTON ANTITRUST ACT [15 U.S.C. § 15]

502. Defendant NASDAQ has intentionally engaged in market manipulation in violation

of Section 9(a)(2) of the Securities Exchange Act of 1934 as amended and The Clayton Antitrust

Act [15 U.S.C. § 15], which prohibits manipulation of security prices, including by creating a

false or misleading appearance of active trading and interfering with fair and orderly markets. As a

result of the NASDAQ's actions, it created an artificial price for AMC. The Plaintiffs were

financially harmed by the NASDAQ's actions to incorrectly classify AMC valid orders as "out of

sequence" orders that limited the upside of AMC stock.

503. The AMC Entertainment and Citigroup Defendants, along with unknown defendants,

are accused of engaging in market manipulation and potential insider trading by utilizing non-

public information or deceptive practices in relation to the APEs. This behavior may fall under the

prohibitions of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, 18 U.S.C.

§§ 1341, 1349, which aim to protect the integrity of the securities markets against fraud and

manipulation. Defendants were selling unregistered APEs with the knowledge that such actions would affect the market price or were not publicly disclosed, such actions could be deemed manipulative or deceptive to other investors and market participants.

504. New York Stock Exchange (NYSE), LULD Committee, any unidentified market participants, unknown defendants knowingly or recklessly engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Plaintiff and other shareholders in an effort to maintain artificially low market prices for AMC and APE securities through volatility halts. The Defendants made, or caused to be made, false statements of material fact and/or omitted to state material facts necessary to make the statements not misleading to investors and the investing public, thereby deflating the prices of AMC and APE securities. The defendants accepted payments from market participants to call volatility halts. The defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Relevant Period, did: (i) deceive the investing public, including Plaintiff and other investors, as alleged herein; and (ii) cause Plaintiff and other investors to purchase AMC and APE securities at artificially inflated prices. As a direct and proximate result of the Defendants' wrongful conduct, the Plaintiffs and the other investors suffered damages in connection with their respective purchases of the Company's securities during the Relevant Period. As a direct and proximate result of Defendants' wrongful conduct, the Plaintiffs and the other investors were damaged in their business and property. The market prices of AMC and APE securities during the Relevant Period were artificially inflated as a result of Defendants' fraudulent scheme to manipulate the securities market. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and violating 18 U.S.C. §§ 1341, 1349, and The Clayton Antitrust Act [15 U.S.C. § 15].

505. Under Rule 10b-5, codified at 17 C.F.R. § 240.10b-5, and Section 10(b) of the

Securities Exchange Act of 1934 is codified as 15 U.S.C. § 78j(b), the NYSE Defendants, by

action and inaction, made material misrepresentations and failed to disclose crucial information

about the functioning and impact of the LULD halts. These omissions and misrepresentations

misled investors concerning the true nature and quality of the securities, along with the stability

and integrity of the securities market. The Defendants acted with scienter: they knowingly and

intentionally engaged in deceptive and manipulative practices that directly influenced the artificial

inflation and deflation of the stock prices of AMC Entertainment Holdings, Inc. (AMC) and APE.

This behavior was intricately linked to the purchase or sale of the securities, thereby impacting

investors' decisions. The Defendants' manipulations were likely to and did influence investors'

decisions to buy or sell the stocks in question. The artificial price movements caused by the LULD

halts compelled investors to execute trades they would not have otherwise considered, which

resulted in substantive financial losses. Investors made these trades relying on the market's

structural integrity and the presumption that the prices of securities were being set by the free and

unmanipulated interplay of supply and demand. There exists a direct and proximate causal link

between the Defendants' market manipulation through the misuse of the LULD mechanism and

the economic harm suffered by the Plaintiffs and other investors. The Defendants' conduct thus

constitutes a clear breach of their fiduciary duties to the Plaintiffs and other investors.


## COUNT 9 - MARKET MANIPULATION

## VIOLATION OF THE SECURITIES ACT OF 1933 SECTION 5(C) (15 U.S.C. § 77(A) ,(E), 17(A), 18 U.S.C. §§ 1341, 1349, THE CLAYTON ANTITRUST ACT [15 U.S.C. § 15]

506. Defendant Citigroup, by engaging in the creation and sale of unregistered BDRs, has offered and sold securities that were not registered with the SEC, as required under the Securities Act, and for which no exemption from registration exists. Section 5 of the Securities Act requires all offers and sales of securities to be registered with the SEC unless an exemption applies. Registration is fundamental to the Securities Act's regime of disclosing information necessary to ensure informed investment decisions and to protect the investing public against fraudulent and manipulative practices in the securities markets. Citigroup, directly and through its subsidiaries, created, offered, and sold securities in the form of Brazilian Depositary Receipts ("BDRs") representing shares of American stocks to investors in Brazil without these securities being registered with the SEC, a violation of Section 5(c) The Securities Act of 1933 (15 U.S.C. § 77e), and The Clayton Antitrust Act [15 U.S.C. § 15]. These unregistered securities were neither accompanied by a prospectus compliant with the Securities Act nor subject to any of the Act's recognized exemptions from registration. At all relevant times, Citigroup has engaged in the use of the mails and the means or instruments of interstate commerce to both offer and sell these unregistered securities, thereby invoking the jurisdiction and the regulatory requirements of the Securities Act. The failure to register the BDRs denied the Plaintiffs and AMC Shareholders access to information that is critical to making informed investment decisions, such as the financial health of the issuing company, the risks involved in the investment, and other material facts that would be required in a registration statement filed with the SEC. Citigroup benefited financially from these transactions and had a duty to ensure compliance with all pertinent securities laws, including the registration requirements of the Securities Act. As a direct and proximate result of Citigroup's unlawful offer and sale of unregistered securities, Plaintiffs and AMC Shareholders have suffered damages. These damages include the loss of investment value,

out-of-pocket expenses, and other measurable economic harms that directly flowed from

Citigroup's Securities Act violations.

507. FTX, Alameda, and Citadel are alleged to have conspired to manipulate the market

price of AMC Entertainment Holdings, Inc. ("AMC") securities through the creation and use of

tokenized securities, which is a violation of 18 U.S.C. §§ 1341, 1349, The Clayton Antitrust Act

[15 U.S.C. § 15] and Securities Exchange Act of 1934, Section 9(a)(2). It is alleged that FTX

created tokenized securities representing shares of AMC and that Citadel engaged in short-selling

these tokenized securities in a manner that artificially depressed the market price of AMC shares.

The alleged manipulation negatively impacted the market price of AMC securities, causing

financial harm to the Plaintiffs. Defendants are alleged to have made false statements or omitted

material facts in connection with the purchase or sale of AMC securities violating Section 10(b)

and Rule 10b-5. Defendants are alleged to have made false statements or omitted material facts in

connection with the purchase or sale of AMC securities. Defendants acted knowingly or with

reckless disregard for the truth. The manipulative and deceptive actions of Defendants are alleged

to have been in connection with the purchase or sale of securities, affecting the Plaintiffs'

investment decisions. Plaintiffs suffered economic loss as a result of the Defendants' actions. The

economic loss was caused by the Defendants' fraudulent conduct. Defendants, who allegedly

became beneficial owners of more than 5% of a class of AMC's equity securities (480 Million

shares out of 500 million authorized) registered under the Exchange Act through the creation and

trading of tokenized securities, failed to file with the SEC the required disclosures. The lack of

disclosure deprived the Plaintiffs of material information regarding the ownership and market

manipulation of AMC shares.

508. Defendants AMC and Citigroup engaged in the sale of over 200 million AMC Preferred Equity Units, known as APEs, without the proper registration statement being filed with the SEC. This action, as demonstrated by the exhibits provided, directly contravenes Section 5(c) of the Securities Act of 1933, which mandates the registration of securities before they can be legally sold to the public. The Defendants conducted these sales throughout 2020, 2021, and 2022, but failed to register the APEs with the SEC until August 4, 2022, creating a substantial period where the securities were sold unlawfully and in a manner that could potentially defraud the investors and the market.

509. In connection with the offer, sale, and trading of the APEs, Citigroup Defendants allegedly made materially false statements or omitted to state critical facts necessary to make the statements not misleading. The Citigroup Defendants' actions constitute fraudulent practices, as prohibited by Section 17(a) of the Securities Act of 1933. The failure to disclose the sale of the APEs to the shareholders or the SEC in a timely manner, as shown in the cited exhibits, could be construed as an effort to deceive or defraud the investors by manipulating the true value and the voting power associated with the equity of AMC.

510. Defendants Citadel, Virtu, Susquehanna, Goldman Sachs, and Citigroup engaged in fraudulent interstate transactions involving the offer and sale of AMC securities. Defendants engaged in fraudulent interstate transactions involving the offer and sale of AMC securities. Defendant intentionally rerouted order flows to their own dark pools, deceiving investors about the true market conditions. Defendant's internalization of orders prevented a significant amount of retail order flow from reaching transparent exchanges.

511. The defendant benefited from the intentional delay in order execution, exploiting the time difference for favorable trades. This led to investor losses, as market prices did not reflect the

actual buying pressure from retail investors, a violation of 18 U.S.C. §§ 1341, 1349, and The Clayton Antitrust Act [15 U.S.C. § 15].

## COUNT 10 - FINRA VIOLATION

### VIOLATION OF FINRA RULES 5270, 5210, AND 5310

512. Citadel, Virtu, Susquehanna, Citigroup defendants engaged in activities that directly contravene FINRA rules regarding fair and ethical trade practices. Defendants engaged in activities that directly contravene FINRA rules regarding fair and ethical trade practices.

513. Defendants manipulated trade-related information and failed to provide best execution for their clients. Defendants used information from dark pool transactions for their own benefit, in potential violation of FINRA Rule 5270. By not reflecting the significant trading volume, the defendants failed to observe FINRA Rule 5210, which pertains to the publication of accurate trade reports. Defendants did not exercise reasonable diligence to ascertain the best market for AMC securities, thereby violating FINRA Rule 5310 related to best execution.

514. Citigroup's significant short positions and swaps related to AMC stock created a conflict of interest with its duty to provide fair market practices. Citigroup's manipulation of AMC stock via dark pools for its financial benefit constitutes a violation of FINRA Rule 5270. Citigroup's actions, purportedly designed to benefit its short positions and swaps, effectively manipulated the price of AMC stock. The practice of "parking" retail orders and controlling their release to the market, particularly when such actions are likely to suppress stock prices to the benefit of Citigroup's own positions, runs afoul of FINRA Rule 5270, which prohibits any trading that takes advantage of an upcoming transaction in the same security.

## COUNT 11 - MARKET MANIPULATION

**VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934, SECTION 10(B) AND RULE 10B-5; SECURITIES ACT OF 1933, SECTION 17(A); ANTI-TRUST VIOLATIONS CLAYTON ACT § 4, 15 U.S.C. § 15, THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1. AND 2., 18 U.S.C. §§ 1341, 1349., THE COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030 (A)(4), (A)(5))**

515. Citigroup's dual role as underwriter, lender, banker, and manipulator of AMC stock through its dark pools constitutes a severe conflict of interest. Citigroup engaged in the manipulation of AMC stock by using its dark pools to "park" retail order flows and selectively release them, thereby suppressing the stock price. Citigroup's dual role as underwriter, lender, banker, and manipulator of AMC stock through its dark pools constitutes a severe conflict of interest. Citigroup engaged in the manipulation of AMC stock by using its dark pools to "park" retail order flows and selectively release them, thereby suppressing the stock price. By controlling significant aspects of AMC's financial activities while also engaging in trading that impacts the stock's price, Citigroup breached its duty to market participants. The alleged suppression of upward price movements through strategic order releases from dark pools violates Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, as well as Section 17(a) of the Securities Act of 1933, 18 U.S.C. §§ 1341, 1349, and The Clayton Antitrust Act [15 U.S.C. § 15], due to the deceptive nature of such conduct.

516. The NYSE's dissemination of incorrect data, potentially through fraudulent coding, to retail market participants constituted unauthorized access and transmission of information, in violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030 (a)(4), (a)(5)) and the Securities Exchange Act of 1934 Section 10(b), Rule 10b-5, and Section 19(b).

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Honorable Court grant the following relief:

1. Declare that the actions of the Defendants violated relevant laws and regulations, including but not limited to federal securities laws, antitrust laws, and banking regulations.

2. Award compensatory damages in an amount to be proven at trial, including loss of investment value and any other economic harm suffered by the Plaintiffs due to the Defendants' unlawful conduct, in the amount of $765,630 (Plaintiff A.P. Mathew), and $34,000 (Plaintiff J.Affholter)

3. Award Market Adjusted damages for lost investment performance during the AMC infinity squeeze.

4. Award treble damages as provided by applicable statutes for intentional and wrongful conduct resulting in financial harm to the Plaintiffs.

5. Issue a permanent injunction, enjoining the Defendants from continuing their unlawful practices outlined in this complaint.

6. Order Defendants to make full restitution to Plaintiffs for the economic losses suffered due to the Defendants' unlawful conduct.

7. Order Defendants to disgorge all profits, benefits, and compensation obtained from their illegal conduct from the relevant period.

8. Award pre-judgment and post-judgment interest on all amounts awarded.

9. Award punitive damages to the Plaintiffs.

10. Attorneys' Fees and Costs: Require the Defendants to pay the costs of this action, including reasonable attorneys' fees, as provided by law.

11. Corrective Action: Order corrective action by the Defendants, including implementing measures to ensure compliance with violated legal standards.

12. Punitive Damages: Award punitive damages where applicable and allowed by law, considering the Defendants' willful, wanton, and malicious conduct.

13. Grant further equitable relief as the Court deems just and proper, including but not limited to the appointment of monitors or receivers, impoundment of assets, nullification of contracts related to the unlawful conduct, and inspection of records.

14. Grant any other relief the Court may deem just and equitable, including but not limited to compensatory, consequential, and/or punitive damages, as well as injunctive relief to prevent future misconduct by the Defendants.

## X.    DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all claims so triable.

Dated: November 12, 2023

Respectfully submitted,

*/s/ A. P. Mathew*
A. A. P. Mathew, pro se
Waltham, MA
alexpmathew0311@gmail.com
Voicemail: 781-330-9195

/s/ *Jordan Affholter*
Jordan Affholter, pro se
Ann Arbor, MI
jordanaffholter@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that this document, which was filed with the court via postal mail, and will be sent electronically to all registered participants as identified on the notice of Electronic Filing ("NEF") via email.


/s/ A.P. Mathew
A.P. Mathew