# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

A. MATHEW

       **PLAINTIFF**

      **-AGAINST-**

CITIGROUP GLOBAL MARKETS,
CITADEL SECURITIES LLC, FTX,
ALAMEDA CAPITAL, ANTARA CAPITAL,
NEW YORK STOCK EXCHANGE,
SUSQUEHANNA INTERNATIONAL GROUP,
MUDRICK CAPITAL, VIRTU FINANCIAL,
FOX BUSINESS, NASDAQ, HYCROFT MINING
HOLDING CORPORATION, GOLDMAN SACHS
GROUP, AMC ENTERTAINMENT, DTCC, FINRA. NYSE,
D.F. KING, B. RILEY, WEIL GOTSHAL AND
MANGES, GRANT EISENHOFER, MIRIAM
TAUBER LAW OFFICES, MARK RUBENSTEIN,
DENNIS DONOGHUE, MOELIS AND CO., ABN AMRO,
ESMA, EUROCLEAR, B3 BANCO, CM-EQUITY,
INTERACTIVE BROKERS, APOLLO GLOBAL
MANAGEMENT, MORGAN STANLEY, BARCLAYS,
HSBC, J.P. MORGAN, ALLEGHENY COUNTY PENSION
FUND, BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP, GRANT EISENHOFER, CIM
INVESTMENT MANAGEMENT, BANK OF AMERICA/
MERRILL LYNCH, UNKNOWN DEFENDANTS

      **DEFENDANTS**

Civil Action
No. 1-23-CV-12302-FDS

JURY TRIAL DEMANDED

**PLAINTIFFS' MEMORANDUM OF LAW REGARDING PSLRA PLEADING STANDARDS,**

**RICO, BILLINGS, ACCESS TO INFORMATION IN OPPOSITION DEFENDANTS'**

**MOTIONS TO DISMISS**

## **CASES**

*Krasner v. Cedar Realty Tr., No. 23-1262 (2d Cir. Nov. 14, 2023)*

*Charlton v. Greig, Civ. 22-00344 LEK-RT (D. Haw. Oct. 31, 2023)*

*Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005)*

*In re Compuware Securities Litigation, 301 F. Supp. 2d 672 (E.D. Mich. 2004)*

## **STATUTES**

*Private Securities Litigation Reform Act of 1995*

*RICO*

*The Freedom of Information Act, 5 U.S.C. § 552*

*17 Code of Federal Regulations (CFR) 5.12*

*Market Abuse Regulation (MAR) - Regulation (EU) No 596/2014*

*United Kingdom (UK) Financial Services and Markets Act (FSMA)*

*Australia Corporations Act 2001*

*Canada Securities Act (Ontario)*

*Dodd-Frank Wall Street Reform and Consumer Protection Act. 124 Stat. 1376*

*Federal Rule of Civil Procedure 8(a)(2)*

*Federal Rule of Civil Procedure 9(b)*

*Section 24 of the Securities Act of 1933*

INTRODUCTION 5

1. PSLRA'S HEIGHTENED PLEADINGS PREJUDICES PLAINTIFF 8
   A. SCIENTER 8
   B. DEBATING PLEADING STANDARDS IN CIVIL RIGHTS AND FRAUD
      ALLEGATIONS 11
   C. CAT (CONSOLIDATED-AUDIT -TRAIL) RENDERS PSLRA SUPERFLUOUS 12

2. RICO 14
3. BILLING 17
   A. PLAINTIFFS' CLAIMS ARE NOT PRECLUDED UNDER BILLINGS 17
   B. PURPOSE OF BILLINGS 19
   C. INSUFFICIENT REGULATORY COVERAGE 21
   D. LACK OF CLEAR CONFLICT 22
   E. ABSENCE OF EXPLICIT PRECLUSION 23
   F. POTENTIAL FOR REGULATORY CAPTURE OR ABUSE 23
   G. IMPORTANCE OF MAINTAINING COMPETITIVE MARKETS 24
   H. ANTITRUST SCRUTINY AS A COMPLIMENT 25
   I. LEGAL AND REGULATORY HARMONY 25
   J. PARALLELS BETWEEN SEC OBJECTIVES AND ANTITRUST PURPOSES 25
   K. LIMITATIONS OF REGULATION SHO 26
   L. THE FUTILITY OF FOIA - DISPARITIES IN ACCESS TO INFORMATION 26
   M. INFORMATION ASYMMETRY 29
   N. RETAIL BROKER-DEALERS DELIBERATELY WITHHOLD DETAILED TRADING
      DATA FROM CUSTOMERS 31
   O. DELAYED INFORMATION FLOW 31

4. LACK OF INHERANT FAIRNESS FOR PRO SE LITIGANTS 32
5. THE ANONYMITY OF DODD-FRANK 35
6. REGULATION FAIR DISCLOSURE (REG FD) 36
7. ACCREDITED INVESTOR REGULATIONS 38
8. INITIAL PUBLIC OFFERINGS (IPOS) 40
9. CONSIDERING OTHER FRAMEWORKS 40
10. THE DODD-FRANK ACT 42
11. DURA PHARMACEUTICALS, INC V. BROUDO 44
12. PLAINTIFFS' PLEADINGS MAY INHERENTLY LACK DUE TO `
    INFORMATION GAP AND DENIAL OF RIGHTS AND PRIVILEGES 47
13. JUDICIAL CONSIDERATIONS 49
14. PUBLIC POLICE EXCEPTION 50
15. PROPOSAL FOR REFORMING SECURITIES LITIGATION AND ENHANCING
    TRANSPARENCY IN FINANCIAL MARKETS INTRODUCTION 52
16. COMBINATION OF FACTORS 54
17. PHILOSOPHICAL ARGUMENT 56
18. CONCLUSION 57

## INTRODUCTION

The Plaintiff is the instant matter emphatically declares that the mere existence of a distinct and segregated legal standard for public litigation against financial institutions is not merely an administrative nuance but a profound manifestation of systemic disparity that unequivocally favors the corporate colossi over the solitary individual investor. This bifurcation in the legal framework serves as a glaring beacon and formidable barriers ensconcing the arena in which retail investors must venture to seek justice.

The current framework does not serve Americans, nor does it function as a facilitator, but rather as a formidable barrier to justice. It further privileges a particular echelon within our society, a class endowed with prodigious economic resources and pervasive influence in every corridor of modern life—a class, regrettably, often marred by a reputation for greed, unethical practices, and dishonesty. This "Wall Street Class," as they are aptly named, governs not through the lens of moral responsibility but through a prism of numbers and statistics—graphs and spreadsheets form the bedrock of their decision-making processes. It is upon these cold calculations that their true governance model is built, often at the expense of fairness and equity in our society.

Wall Street is indeed patriotic, as they pride themselves on strong American markets and a dilusion that they feed America. Wall Street, as an institution, embodies a formidable autonomy, steering the economic fates of nations and individuals alike. This autonomy, while necessary for the functioning of capital markets, breeds a sort of existential entitlement. Institutions and individuals within this sphere often operate under the assumption that their actions are not just permissible but essential for the systemic operation of global finance. This perceived indispensability nurtures a culture where entitlement becomes a philosophical doctrine rather than a mere attitude.

The manufacturing, dissemination, and amplification of fear is Wall Street's second biggest export. The fear commodity is used as a bargaining chip, source of influence, competitive advantage, and narrative control. The wielding of fear holds lawmakers, presidents, regulators, and the public at large in a tight grip, guiding decision-making processes and public policies to favor financial giants.

In essence, they are held hostage at gun point. This strategy not only secures favorable legislative outcomes but also maintains a status quo where the financial sector wields disproportionate power over economic and fiscal policies. Through this control, Wall Street ensures that any regulatory changes or economic reforms serve their interests, often at the expense of broader economic equality and stability.

### 1.     PSLRA'S HEIGHTENED PLEADINGS PREJUDICES PLAINTIFF

The 1995 Private Securities Litigation Reform Act (PSLRA) introduced stringent pleading standards aimed at curbing frivolous class actions and reducing corporate litigation costs to enhance market efficiency. However, these standards place a disproportionate burden on retail investors, including plaintiffs, by limiting their capacity to seek and recover damages.

Previously, plaintiffs needed minimal evidence to initiate litigation and could use pretrial discovery to gather more proof. This low barrier encouraged the filing of weak or frivolous suits, leading defendants to often settle rather than endure costly defenses. Enacted to bolster Section 11, the PSLRA's standards—once suited to an era of inefficient record-keeping—now starkly contrast with today's cost-effective systems and exist within a broader regulatory framework designed to ensure consistency.

Under the PSLRA, however, plaintiffs must meet a heightened pleading standard before they can initiate a suit. In other words, PSLRA was specifically intended to make it more difficult to initiate securities litigation (frivolous or otherwise) because plaintiffs would be forced to present evidence of fraud before any pretrial discovery has taken place.[1,2]

---

[1]
https://web.archive.org/web/20121024002708/http://www.bloomberg.com/apps/news?pid=newsarchive&refer=columnist_quinn&sid=axkhffRnncpI
[2]  http://www.bloomberg.com/apps/news?pid=newsarchive&refer=columnist_quinn&sid=axkhffRnncpI

Retail investors often function as the fuel for the financial markets—akin to cattle or cannon fodder. Their capital is crucial, driving market movements and transactions. Yet, this system casually strips value from retail investors during trades, ensuring that banks, private equity firms, and hedge funds not only stay in business but also amass significant wealth.

Under this framework, retail investors are seldom positioned to win; institutional victory is almost a given, reflecting an inherent bias in the system. This perpetuates a cycle of disparity where large entities accumulate wealth at the expense of smaller investors. Such a skewed dynamic exacerbates financial inequality and undermines the principles of a fair and just market system.

Consider the laws that constitute the foundation of state and federal securities regulations. Many of these laws were manufactured by Wall Street lobbyists, promoted by regulatory bodies (whose political campaigns are individually supported by Wall Street) to create the semblance of regulatory oversight. However, they have inadvertently disadvantaged retail investors in their pursuit of justice. Consider the laws:

**Private Securities Litigation Reform Act of 1995 (PSLRA):** This Act was designed to curb frivolous lawsuits and reduce the burden on courts and defendants by introducing more stringent pleading requirements and automatic stays on discovery while a motion to dismiss is pending. For retail investors, these higher standards can make it challenging, if not impossible, to initiate and sustain a lawsuit without substantial and immediate evidence of fraud.

**Securities Litigation Uniform Standards Act of 1998 (SLUSA)**: SLUSA was enacted to prevent plaintiffs from bypassing the stringent requirements of the PSLRA by filing class actions under state laws. SLUSA requires many class actions involving nationally traded

securities to be brought under federal law, thus precluding many state securities law claims where plaintiffs might have had a more lenient pleading standard.

**Class Action Fairness Act of 2005:** While aimed at improving the handling of class action lawsuits by shifting larger class actions into federal court, where the standards are more uniform (and often more stringent), this shift can also limit the strategies available to plaintiffs' attorneys. It can result in making the class certification process more demanding for retail investors.

**Arbitration clauses** (often enforced under the rules of organizations such as FINRA): Many brokerage agreements include mandatory arbitration clauses that require disputes to be settled out of court. While arbitration can be faster and less costly than court litigation, it may also limit discovery and can be seen as less favorable to retail investors who may feel overwhelmed or disadvantaged in a less formal setting without a judge.

These aspects of securities laws and reforms, while integral to maintaining a fair and orderly market, has increased the difficulty for retail investors to seek and obtain justice, especially when facing well-resourced corporate defendants with influence.

**The Delaware Court of Chancery**, while highly respected for its expertise in corporate law, has certain aspects that can be challenging for retail investors involved in securities litigation:

- **Complexity of Corporate Law**: The Delaware Court of Chancery specializes in corporate governance and fiduciary law, areas that can be highly complex and technical. Retail investors, often lacking the legal expertise of institutional investors, may find the sophisticated legal arguments and the intricacies of Delaware corporate law daunting and difficult to navigate.

- **Cost of Litigation**: Litigating in the Delaware Court of Chancery can be expensive. The costs associated with hiring attorneys who specialize in Delaware corporate law and the potential length of litigation can be prohibitive for individual retail investors. This financial burden can deter them from pursuing valid claims.

- **Pro-Management Bias**: There is a perception that the Delaware Court of Chancery tends to be more favorable to corporate management than to shareholders, particularly retail investors. This could be due to the court's historical emphasis on maintaining managerial discretion and promoting business stability, which are often seen as beneficial for corporate growth and economic interests. Judge Morgan Zurn was given an extraordinary amount of evidence that pointed toward a major fraud be prepretaed and still managed to favor with the opposition counsel. Nor was there so much as referral to the Attorney General's office, DOJ, or FBI. A

- **High Standards for Pleading**: The Delaware Court of Chancery requires precise and detailed pleadings. Retail investors must meet high standards of proof for their claims in their initial pleadings. This requirement can be a significant hurdle for those without the resources to obtain detailed evidence at the beginning of their lawsuit.

- **Barriers to Class Actions:** While the Delaware Court of Chancery is a venue for many shareholder disputes, it has specific and stringent requirements for certifying class actions. These requirements are a barrier for retail investors seeking to pool resources and litigate as a group, which is often a more viable option for them compared to individual lawsuits.

- **Focus on Legal Precedents**: The Delaware Court of Chancery is known for its reliance on established legal precedents. This adherence mostly works against retail investors, particularly if past decisions favor corporate practices that conflict with the interests of individual shareholders.

## SCIENTER

Scienter is challenging to prove due to its inherent nature. The mental state that embraces the intent to deceive, manipulate, or defraud is subjective. All litigants can do is tailor an argument citing actions as part of a broader series of actions. This requirement necessitates the plaintiff to establish that the defendant acted with a specific state of mind, which is often difficult to demonstrate directly and typically relies on heavily on circumstantial evidence *Nuggehalli Balmukund Nandkumar v. AstraZeneca PLC, 2023 U.S. App. LEXIS 11905, Scienter Defenses in Securities Fraud Actions, Rotunno v. Wood, 2022 U.S. App. LEXIS 29915*.

The PSLRA further complicates this by requiring the plaintiff to plead facts leading to a strong inference of scienter *Nuggehalli Balmukund Nandkumar v. AstraZeneca PLC, 2023 U.S. App. LEXIS 11905, Rotunno v. Wood, 2022 U.S. App. LEXIS 29915, Utesch v. Lannett Co., 316 F. Supp. 3d 895, § 240.10b-5 Employment of manipulative and deceptive devices.* This is difficult because of the lack of disclosure from the company. SEC filing ccould be cited, which can further arguments towards scienter however, in situations like AMC where the corporate office is not required to disclose certain information i.e. vote rigging scheme and private placements of securities sales, it does very little to aid the litigant.

This inference must be cogent and at least as compelling as any opposing inference of nonfraudulent intent *Nuggehalli Balmukund Nandkumar v. AstraZeneca PLC, 2023 U.S. App. LEXIS 11905, Rotunno v. Wood, 2022 U.S. App. LEXIS 29915, Utesch v. Lannett Co., 316 F. Supp. 3d 895, § 240.10b-5 Employment of manipulative and deceptive devices.*.

The court must consider plausible nonculpable explanations for a defendant's conduct, as well as inferences favoring the plaintiff. This inherently comparative inquiry means that a complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged *Utesch v. Lannett Co., 316 F. Supp. 3d 895, Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308*.

Moreover, in most cases the plaintiff have satisfied the scienter requirement by alleging facts showing that the defendants had both motive and opportunity to commit the fraud or constituting strong circumstantial evidence of conscious misbehavior or recklessness *Nuggehalli Balmukund Nandkumar v. AstraZeneca PLC, 2023 U.S. App. LEXIS 11905, Rotunno v. Wood, 2022 U.S. App. LEXIS 29915, § 240.10b-5 Employment of manipulative and deceptive devices., § 78u-4. Private securities litigation.* Which is what has occurred in the instant matter. Plaintiffs found documentation overseas and hard to piece data from the SEC, and discovery documents from the Delaware trial as to allege through stroang circumstantial evidence of conscious misbehavior.

However, motives common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not establish the requisite scienter. Typically, a plaintiff must show that officers made false statements in order to sell their own shares at a profit *Part 10 — Rules of Practice.* Which in the instant matter has been abundantly shown through Twitter and video.

Arguments against the scienter requirement could be based on its high burden of proof, which invariably deters legitimate claims from being pursued. The requirement for a strong inference of scienter, as well as the need to consider plausible opposing inferences, may be seen as overly stringent *Nuggehalli Balmukund Nandkumar v. AstraZeneca PLC, 2023 U.S. App. LEXIS 11905, Rotunno v. Wood, 2022 U.S. App. LEXIS 29915, Utesch v. Lannett Co., 316 F. Supp. 3d 895, § 240.10b-5 Employment of manipulative and deceptive devices..*

Furthermore, the necessity to demonstrate a unique connection between the fraud and the benefit or to specifically identify the reports or statements containing contrary facts may be viewed as excessively demanding *Part 10 — Rules of Practice.* These aspects of the scienter requirement, as illustrated in cases such as *Utesch v. Lannett Co., 316 F. Supp. 3d 895, Nuggehalli Balmukund Nandkumar v. AstraZeneca PLC Nuggehalli Balmukund Nandkumar v. AstraZeneca PLC, 2023 U.S. App. LEXIS 11905, and Tellabs, Inc. v. Makor Issues & Rights, Ltd. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308*, make it a challenging element to prove in securities fraud cases.

## A.  <u>DEBATING PLEADING STANDARDS IN CIVIL RIGHTS AND FRAUD ALLEGATIONS</u>

In civil rights actions, there has been some debate over the application of heightened pleading standards. This is because of the interplay bewetween and the nature of the allegations. Under Rule *9(b)*, allegations of fraud must be stated with particularity, requiring the pleader to specify the time, place, and specific content of the false representations, as well as the identities of the parties to the misrepresentation. This specificity is meant to give defendants adequate notice of the conduct complained of, enabling them to defend themselves effectively.

In contrast, civil rights claims, which often involve allegations of discriminatory intent, do not usually require the same level of particularity unless they are grounded in fraudulent conduct. The debate in this area typically centers on whether claims that imply a fraudulent or deceitful component should also adhere to the stricter standards of *Rule 9(b)*. Courts have varied in their application, with some requiring heightened pleading for any claims involving elements of deceit, while others apply standard pleading requirements unless the essence of the claim is fraud.

This nuanced application should be applied in the instant matter. Since there was an inherently discriminatory intent against retail shareholders, the heightened pleadings requirements of specificity should not be required based on this discriminatory nature. The decision in *Vess v. Ciba-Geigy Corp USA* helps illustrate this principle by distinguishing between fraud-based claims, which require heightened pleading, and other allegations that may not necessarily involve fraud but still contain elements of deceit or misrepresentation. In the instant AMC matter, there are instances of both fraud, and discriminatory action against a class of investors.

Some courts have suggested that the same heightened pleading standard should apply to affirmative defenses *USCS Fed Rules Civ Proc R 12, Defenses and Objections: when and How Presented; Motion for Judgment on the Pleadings; Consolidating Motions; Waiving Defenses; Pretrial Hearing [Effective until December 1, 2024], Palmer v. Oakland Farms, Inc., 2010 U.S. Dist. LEXIS 63265.*

However, other courts have found that there are no heightened pleading standards for civil rights cases, and all such actions are subject to Rule 8(a)'s notice pleading regime *Educadores Puertorriquenos En Accion v. Hernandez, 367 F.3d 61, USCS Fed Rules Civ Proc R 8, General Rules of Pleading, Kong v. Shirazi-Fard, 814 Fed. Appx. 292, Swierkiewicz v. Sorema N.A., 534 U.S. 506.*

Given the expansive and widely encompassing Wall Street Lobby, it should come to no surprise that the Supreme Court ruled in their favor that a heightened pleading standard may be imposed only by legislative directive like Congress, not by judicial interpretation *Kong v. Shirazi-Fard, 814 Fed. Appx. 292, Swierkiewicz v. Sorema N.A., 534 U.S. 506, Bell Atl. Corp. v. Twombly, 550 U.S. 544.*

## B.   CAT (CONSOLIDATED-AUDIT -TRAIL) RENDERS PSLRA SUPERFLUOUS

The Consolidated Audit Trail (CAT) system enhances securities market transparency and regulatory oversight by capturing detailed information on every trade and order in the U.S. securities markets. This capacity for detailed, real-time monitoring contrasts with the conditions that led to the enactment of the PSLRA of 1995.

### *Enhanced Market Transparency and Data Accuracy*

The CAT system records every transaction and order event, including modifications, cancellations, and executions across all U.S. securities markets. This provides regulators with a granular view of market activities, which was not available when the PSLRA was implemented. The PSLRA's heightened pleading standards were partly justified by the difficulty of obtaining detailed and reliable trading data, which CAT now readily provides.

### *Facilitated Detection of Fraud and Manipulation*

With the CAT system, regulators can track anomalies in trading behavior more efficiently and effectively, reducing the reliance on private litigation as a primary tool against securities fraud. The PSLRA was designed to prevent frivolous litigation, assuming limited regulatory capacity to monitor and investigate all market activities. Now, with the CAT, the SEC and

FINRA can proactively detect and investigate suspicious activities, potentially reducing the need for private actions predicated on less accessible data.

### Quicker Response Times

The real-time data collection by the CAT allows for a much quicker regulatory response to potential market abuses or manipulative activities. This capability diminishes the need for the legal protections against abusive litigation provided by the PSLRA, as regulatory actions can be based on solid, real-time evidence, thus potentially preempting the speculative and less informed litigation the PSLRA aims to curb.

### Reduced Burden on Plaintiffs

One of the PSLRA's key features is its requirement for plaintiffs to specify fraudulent statements and demonstrate scienter at the pleading stage, which can be challenging without detailed trading data. With the CAT's comprehensive data, plaintiffs can potentially meet these stringent requirements more easily if they still choose to litigate, thereby lessening the PSLRA's impact.

### Shift from Litigation to Regulation

As regulators become better equipped to monitor and enforce securities laws directly, the rationale for a stringent litigation framework like the PSLRA, which primarily serves to filter out meritless lawsuits rather than facilitate genuine claims, might be reevaluated. The shift toward more effective regulatory enforcement could lead to discussions about modifying aspects of the PSLRA to better balance between deterring frivolous suits and enabling legitimate claims.

The deployment of the CAT system brings about significant enhancements in market surveillance that the PSLRA, enacted in a different technological era, did not anticipate. This

development could prompt a rethinking of the need for, or the implementation details of, some of the PSLRA's protective measures against frivolous securities litigation, given the modern capabilities for regulatory oversight.

***Enhanced Detection and Deterrence of Fraud***

CAT's comprehensive tracking reduces the likelihood of undetected securities fraud, potentially decreasing the need for private securities litigation as a primary tool for fraud detection.

***Redundancy in Litigation Safeguards***

The PSLRA was designed to prevent abusive litigation in securities fraud cases. With CAT providing detailed data directly to regulators, the rationale for stringent limitations on private actions under PSLRA might be seen as less necessary because regulatory actions can be more effectively targeted and informed, potentially reducing the incidence of meritless claims that the PSLRA aims to curb.

***Shift from Private to Regulatory Enforcement***

Enhanced regulatory capabilities due to CAT might shift the burden of detecting and prosecuting securities fraud from private litigants to regulators, thereby diminishing the role and necessity of private securities litigation under the PSLRA framework.

## 2. <u>RICO</u>

The intersection between the *Racketeer Influenced and Corrupt Organizations Act* (RICO) and securities fraud presents a nuanced legal landscape, shaped significantly by the *Private Securities Litigation Reform Act (PSLRA).* The PSLRA specifically amends RICO to exclude securities fraud as a basis for RICO claims to prevent duplicative recoveries and the

enhanced penalties that RICO permits, such as treble damages, which could disproportionately affect defendants.

Despite this general exclusion, the legal framework allows for certain exceptions where the involvement in securities fraud extends into the realm of aiding and abetting, which is recognized under *18 U.S.C. § 2*. This statute establishes that those who aid and abet a federal crime are treated as principals. Consequently, if a party's involvement in securities fraud rises to the level of aiding and abetting, they may still face RICO charges. This interpretation is upheld by judicial precedents such as *Gottdiener v. Sater*, which acknowledges the possibility of RICO liability for those who contribute significantly to the execution of a securities fraud scheme, even if they are not the main actors.

The defendants provided substantial assistance or encouraged the primary actors in committing securities fraud, making them liable as principals under RICO.

**Citadel Securities & Virtu Financial**: Could be argued to have aided and abetted by creating the mechanisms or platforms (like dark pools or algorithmic trading tools) that facilitated manipulative trading strategies, essentially making market conditions conducive to securities fraud.

**Goldman Sachs & Morgan Stanley**: If these entities structured or marketed financial products that were used to disguise the true nature of securities transactions (masking manipulative trades as legitimate ones), they might be implicated as aiding and abetting under RICO.

**Interactive Brokers & CM-Equity**: These brokerage firms could potentially be seen as aiding and abetting by providing platforms or financial instruments that enabled or concealed manipulative trades, especially if they failed to perform due diligence or knowingly allowed manipulative practices.

**NYSE and NASDAQ**: If it can be demonstrated that these exchanges ignored or failed to regulate clear manipulative trading patterns due to conflicts of interest or financial incentives, they might be argued to have aided and abetted the broader scheme of market manipulation.

**SROs:**   If it can be demonstrated that an SRO knowingly ignored or failed to act on clear evidence of market manipulation or securities fraud due to conflicts of interest, financial incentives, or relationships with the perpetrators, they could potentially be seen as aiding and abetting the fraudulent activities.

Showing that an SRO consistently failed to enforce its own rules in situations where enforcement would have prevented market manipulation or fraud could be construed as implicit assistance in the fraudulent scheme. SRO benefitted financially from allowing certain market manipulations to continue, either through increased trading volumes or fees, this could support a claim of complicity under RICO, as well as avoiding public and judicial, congressional scrutiny for yet another adverse market event.

By failing to address and rectify known abuses, SROs implicitly encouraged continued violations of securities laws on their own exchange, effectively aiding the broader scheme of fraud. SROs are influenced by powerful industry entities to the extent that they fail to perform their regulatory duties, this could be framed as aiding and abetting under RICO.

**DTCC:** If the DTCC failed to address failures to deliver (FTDs) that it knew were being used to manipulate market prices, their inaction could be argued as aiding and abetting the manipulation schemes.

**FINRA:** If FINRA overlooked or dismissed repeated signs of illegal activities like wash trading or spoofing by its members due to undue influence from those same entities, a case might be made for their inclusion in a RICO claim as facilitators of the ongoing fraud.

SROs could have aided and abetted in such a way that it would make it difficult for the court from distinguishing between regulatory incompetence and deliberate malfeasance.

Plaintiffs argue that the actions of these entities went beyond mere negligence or oversight and crossed into active participation or encouragement of fraudulent activities. The application of treble damages under RICO is not just a punitive measure but a necessary deterrent against organized efforts to undermine market integrity.

Furthermore, the imposition of treble damages under RICO, intended as a deterrent against organized crime, highlights the act's stringent punitive measures. In cases like *Thomas H. Lee Equity Fund V, L.P. v. Mayer*, the courts have affirmed the application of such damages in RICO cases linked to securities fraud when the defendant has a criminal conviction. This suggests that a criminal conviction for securities fraud can trigger the severe penalties of RICO, aligning with its broader goal of punishing and deterring organized and egregious illegal activities.

These exceptions within judicial interpretations demonstrate the court's adaptability and its capacity to address complex interactions between statutory provisions, thus ensuring that RICO continues to serve its fundamental purpose of combating organized crime within and beyond the financial sector.

## BILLING

### A.        PLAINTIFFS' CLAIMS ARE NOT PRECLUDED UNDER BILLINGS

In *Credit Suisse Securities (USA) LLC v. Billing, 551 U.S. 264 (2007),* the Supreme Court ruled that antitrust laws do not apply to certain SEC-regulated activities in the securities market where there is a clear regulatory conflict. This decision addresses concerns about regulatory overlap and potential conflicts between antitrust enforcement and securities regulation. The ruling effectively shields the SEC when it opts not to enforce its rules.

Furthermore, there is a distinction between U.S. Government regulators like the SEC and Self-Regulatory Organizations (SROs), each having different accountability structures. In cases where securities laws are less severe, the court should prioritize more serious crimes under antitrust or other federal laws.

For instance, if an SRO inadvertently aids terrorists through market manipulation, questions arise about prosecuting the SRO for aiding and abetting terrorism and the need to investigate any connections between the terrorists and the SRO's employees.Considering the hypothetical scenario where a Self-Regulatory Organization (SRO) facilitates terrorists in accruing financial resources via market manipulation, the question arises: If the money earned through illicit market activities is used in terrorist activities, should the SRO be prosecuted for aiding and abetting terrorism? Additionally, is there a necessity to scrutinize the relationships between the terrorists and the SRO's employees?

Under U.S. law, specifically *Title 18, U.S.C., Section 2*, aiding and abetting involves providing significant assistance or encouragement to someone committing a crime, with knowledge of the criminal activity. If a Self-Regulatory Organization (SRO) significantly aids terrorists in gaining financial resources through illicit activities like market manipulation, it could face aiding and abetting charges, given evidence of its knowledge and intent to assist in the criminal activities. Additionally, *the PATRIOT Act* and other anti-terrorism financing laws expand legal accountability, requiring financial institutions and their employees to prevent money laundering and terrorism financing *(Title III of the PATRIOT Act).* This legal framework necessitates thorough investigations into the relationships between terrorists and SRO employees to determine any complicity or negligence. Such investigations and potential legal culpability highlight the need for stringent regulatory oversight and due diligence within financial institutions and regulatory bodies.

**B.**                    <u>**PURPOSE OF BILLINGS**</u>

Billing was centered on the idea that certain securities market activities, heavily regulated by the SEC, were immune from antitrust scrutiny to avoid conflicting regulatory regimes. Plaintiffs' argue that the regulatory oversight by the SEC or SROs (like NYSE) over the specific practices at issue in the instant matter is not as comprehensive or direct as the court presumed in *Billing*, leaving room for antitrust claims without conflicting with SEC regulations. SEC regulations does not comprehensively cover the conduct at issue or where there's a regulatory gap.

*Billing* concerned activities within the "heartland" of securities trading and underwriting, where SEC oversight is most intense. Plaintiffs' claims involve conduct that falls outside these core securities activities. Plaintiffs argue that *Billing's* rationale for preclusion does not extend to these areas, making antitrust scrutiny appropriate. Plaintiffs' Argue that applying antitrust laws to the conduct at issue would not conflict with SEC regulations but rather would reinforce the overarching goals of market fairness and competition that securities regulations seek to promote.

The SEC's mission, as derived from the *Securities Exchange Act of 1934*, includes a broad mandate to protect investors; maintain fair, orderly, and efficient markets; and facilitate capital formation. This mission is encapsulated in Section 4 of the Act, codified at *15 U.S.C. § 78d.* While the Act itself does not explicitly state this mission in a single section, the objectives can be inferred from the powers and responsibilities assigned to the SEC throughout the Act. For precise language, one would typically refer to the SEC's official publications or its website, where the mission is clearly stated as reflecting these goals.

The purposes of antitrust laws, particularly the *Sherman Act (15 U.S.C. §§ 1-7),* focus on protecting competition in the marketplace. *Section 1 of the Sherman Act (15 U.S.C. § 1)* prohibits contracts, combinations, or conspiracies in restraint of trade, while *Section 2 (15*

*U.S.C. § 2)* addresses monopolization, attempts to monopolize, or conspiracies to monopolize any part of the trade or commerce among the several States, or with foreign nations.

Antitrust enforcement can complement securities regulation by addressing specific practices or behaviors that potentially harm market competition but are not directly covered by existing SEC regulations. A focus on Self-Regulatory Organizations (SROs) reveals areas where practices related to fees and accommodations for large institutional clients could detrimentally impact the broader investing public. These practices might not be fully addressed by current SEC regulations, creating a niche for antitrust intervention. Consider the rationale:

**Disproportionate Fee Structures**:

- **Issue**: SROs make much more money with institutional investors than retail investors through transactions and billings via volume. SROs might implement fee structures that disproportionately benefit large institutional investors through lower transaction costs or preferential pricing models, which are not explicitly regulated by the SEC. Such practices could disadvantage retail investors and smaller financial entities, leading to less competitive and unequal market conditions.

- **Antitrust Oversight**: Antitrust laws could be applied to scrutinize and potentially regulate fee structures that unjustly favor certain market participants, ensuring fair competition and equal access to market resources.

**Preferential Access to Trading Services and Information**:

- **Issue**: SROs could offer preferential access to trading services, platforms, or market information to large institutional clients. This might include early access to data feeds, faster execution speeds, or privileged use of dark pools and other trading venues. While the SEC regulates aspects of market fairness and transparency, specific accommodations that skew the competitive landscape might not be directly addressed.

- **Antitrust Oversight**: Antitrust enforcement can play a role in ensuring that such preferential treatments do not unduly harm market competition, focusing on the preservation of a level playing field where all participants have equitable access to critical trading services and information.

**Exclusive Agreements and Tying Arrangements**:

- **Issue**: SROs might facilitate or turn a blind eye to exclusive agreements between large institutional clients and service providers (e.g., prime brokers,

market makers) or tying arrangements where access to certain services is contingent on the acceptance of additional, potentially unnecessary services. While the SEC oversees market practices to prevent overt conflicts of interest, subtle and complex arrangements that disadvantage competition might escape direct regulation.

- **Antitrust Oversight**: Through antitrust analysis, such exclusive agreements and tying arrangements can be scrutinized for their impact on market competition, particularly if they hinder the entry of new competitors or the ability of smaller entities to compete effectively.

**Preferential Treatment in Rulemaking and Enforcement**:

- **Issue**: There could be perceptions or instances where SRO rulemaking and enforcement actions inadvertently favor large institutional investors, whether through the design of rules that cater to the operational models of these investors or through lenient enforcement practices. While the SEC has oversight over SRO rulemaking and enforcement, the nuanced application of these rules might not fully address competitive concerns.

- **Antitrust Oversight**: Antitrust principles can be applied to evaluate whether SRO practices in rulemaking and enforcement unduly favor certain market participants over others, thereby impacting competitive dynamics in the securities industry.


Regulation SHO, established by the Securities and Exchange Commission (SEC) under *17 CFR §§ 242.200-242.204,* is designed to address issues related to short selling in the securities markets. Its primary objectives include increasing market transparency and preventing abusive practices such as naked short selling. Key provisions include the "locate" requirement, which mandates that a broker must have a reasonable belief that the security can be borrowed before executing a short sale, and the "close-out" requirement, aimed at addressing failures to deliver securities.

**C.**                        **INSUFFICIENT REGULATORY COVERAGE**

In the AMC case, the SEC's regulatory oversight is markedly less comprehensive than the depth of regulation considered in *Credit Suisse Securities (USA) LLC v. Billing*. Unlike *Billing*, where the regulated activities were clearly defined and meticulously overseen by the

SEC, the conduct in question here does not fall under such exacting regulatory provisions. **i.e. securities being listed overseas, unregulated cyptotokens, overseas derivative creation.**

The SEC's regulations applicable to the activities at issue lack specific guidance and do not encompass detailed control mechanisms, which are essential for claiming antitrust immunity. Consequently, the absence of detailed and direct regulatory coverage by the SEC negates the foundation for antitrust immunity that Billing prescribes.

This case presents a scenario where antitrust laws can operate in parallel with the existing regulatory framework without causing disruption to SEC objectives, thus underscoring the necessity to apply antitrust scrutiny to ensure competitive integrity and consumer protection. Therefore, the rationale for antitrust immunity, grounded in avoiding conflicts between antitrust enforcement and regulatory policies, is inapplicable here due to the insufficient scope of SEC oversight.

**D.**                    **LACK OF CLEAR CONFLICT**

In the present case, there is no demonstrable conflict between the application of antitrust laws and the regulatory objectives of the SEC, which weakens the justification for antitrust immunity as set forth in *Credit Suisse Securities (USA) LLC v. Billing*. The activities under scrutiny do not exhibit an inherent incompatibility with antitrust enforcement that would necessitate exclusion from antitrust laws to meet the SEC's regulatory goals.

The SEC's objectives—ensuring fair, orderly, and efficient markets and protecting investors—can be harmoniously advanced alongside the enforcement of antitrust laws. The coexistence of these laws does not impede the SEC's ability to regulate the securities market effectively; rather, it complements the regulatory framework by deterring anti-competitive behavior that could harm the market's integrity and investor interests.

Therefore, the absence of a clear and direct conflict between SEC regulations and antitrust laws in this scenario supports the application of antitrust scrutiny to uphold competitive market conditions and safeguard consumer welfare.

**E.**                    **ABSENCE OF EXPLICIT PRECLUSION**

In this case, the pertinent securities laws do not explicitly preclude the application of antitrust laws to the activities under examination. The statutory framework governing these activities lacks clear directives or historical precedents that specifically exempt them from antitrust enforcement. Unlike in *Credit Suisse Securities (USA) LLC v. Billing*, where the Supreme Court identified areas of significant regulatory overlap as justification for antitrust immunity, here, no similar overlap or statutory mandate suggests that antitrust laws should not apply. The absence of explicit statutory preclusion underlines the principle that, in the absence of clear legislative intent to the contrary, antitrust laws should remain applicable to ensure competitive practices and protect market integrity. Thus, the lack of explicit exemption in the securities laws governing these activities strongly supports the continued application of antitrust scrutiny to prevent anti-competitive practices and promote a healthy competitive environment.

**F.**                **POTENTIAL FOR REGULATORY CAPTURE OR ABUSE**

Granting antitrust immunity based on the Billing precedent in this context poses a significant risk of regulatory capture or abuse. In scenarios where market-dominant entities are involved, exempting certain activities from antitrust laws based solely on regulatory oversight could inadvertently shield non-competitive or harmful conduct from necessary scrutiny. The entities in question wield substantial market influence, heightening the risk that exempting them from antitrust enforcement could lead to practices that entrench their market positions unfairly, to the detriment of competition and consumer interests.

Furthermore, the potential for regulatory capture becomes pronounced when regulatory bodies may rely heavily on the industry expertise and cooperation of the same entities they are tasked with regulating. This interdependence can lead to a regulatory environment that favors incumbents and stifles market entry, thereby undermining the competitive process that antitrust laws are designed to protect. Without the application of antitrust laws, there is a heightened risk that these entities could engage in practices that harm consumers and competitors alike, without adequate regulatory checks. Therefore, to prevent the entrenchment of market power and to ensure robust competition, it is imperative to maintain antitrust oversight even in the presence of SEC regulation.

## G.        IMPORTANCE OF MAINTAINING COMPETITIVE MARKETS

Antitrust laws play a crucial role in preserving competitive market structures and safeguarding consumer interests, which are fundamental to the economic health and fairness of the marketplace. These laws ensure that market competition remains vibrant by preventing monopolistic and anti-competitive practices that can lead to higher prices, reduced choices, and stifled innovation. In the context of this case, applying the Billing precedent to grant antitrust immunity could inadvertently protect activities that, while regulated, might still undermine competitive principles.

The potential use of regulatory oversight as a shield for anti-competitive behavior is particularly concerning in industries where a few entities hold significant market power. Granting antitrust immunity under such circumstances can enable these dominant players to engage in practices that could harm the competitive process, disadvantaging consumers and other market participants. It is essential, therefore, to scrutinize and limit antitrust immunity to cases where a clear and unavoidable conflict exists between regulatory mandates and antitrust enforcement.

Maintaining the enforceability of antitrust laws in sectors where regulatory frameworks are in place is crucial to prevent the erosion of competitive integrity. It ensures that regulation complements rather than supplants the need to protect the competitive process, thereby upholding both the spirit and the effectiveness of antitrust and consumer protection laws. Thus, to foster a healthy economic environment and protect consumer welfare, antitrust laws must be upheld unless there is explicit and justifiable cause for exemption.

**H.**           **ANTITRUST SCRUTINY AS A COMPLIMENT**

Antitrust laws can address broader competitive issues in the securities market that Regulation SHO does not specifically target. This includes scrutinizing collaborative behaviors among market participants that could restrict competition or lead to market manipulation beyond what is covered by Regulation SHO. Antitrust enforcement can work alongside Regulation SHO to ensure a competitive marketplace, preventing firms from using short selling or related practices in a manner that harms market competition or consumer welfare. Antitrust scrutiny is well-suited to examining potential collusive behaviors or market concentration issues that could arise from the strategic use of short selling, aspects that Regulation SHO's provisions do not directly confront.

**I.**           **LEGAL AND REGULATORY HARMONY**

Implementing antitrust scrutiny in areas not fully covered by Regulation SHO does not create overlapping regulation but instead provides a complementary framework. This dual approach ensures that while Regulation SHO addresses the mechanics and transparency of short selling, antitrust laws safeguard against broader competitive abuses, ensuring a holistic approach to market regulation.

**J.**   **PARALLELS BETWEEN SEC OBJECTIVES AND ANTITRUST**
     **PURPOSES**

Just as the SEC aims to protect investors by ensuring fair and transparent markets, antitrust laws protect consumers by ensuring competitive markets, which can lead to lower prices, improved quality, and greater innovation. The SEC's goal of maintaining efficient markets aligns with the antitrust objective of preventing practices that distort market competition, thereby promoting efficiency and fairness. Facilitating capital formation, a key SEC objective, relies on vibrant, competitive markets. Antitrust laws support this by preventing monopolistic practices that could hinder access to capital or the entry of new competitors.

By drawing these parallels, Plaintiffs' argue that antitrust enforcement in certain contexts within the securities industry does not conflict with, but rather supports, the SEC's regulatory objectives, fulfilling the broader mission of promoting healthy, competitive markets and protecting market participants.

## K.        LIMITATIONS OF REGULATION SHO

Regulation SHO aims to curb abusive short selling practices, particularly naked short selling, where an individual sells short without first borrowing the underlying security or ensuring that it can be borrowed. While Regulation SHO effectively addresses specific practices related to short selling and failures to deliver, its focus is **narrow**, primarily aimed at procedural and operational aspects of short selling. Regulation SHO does not directly address broader issues of market competition, such as potential anticompetitive behaviors or practices that may arise from the strategic use of short selling or the concentration of market power among a few participants. This affects everyone including the Plaintiffs.

## L.        THE FUTILITY OF FOIA - DISPARITIES IN ACCESS TO INFORMATION

The Freedom of Information Act (FOIA[3]) enables the full or partial release of government-controlled information, enhancing public transparency. However, FOIA exemptions allow agencies to withhold certain data, which can disadvantage retail investors. Specifically, under 17 CFR 5.12, Forms 1-FR-FCM are exempt from FOIA, although they must disclose specific information like adjusted net capital and retail forex obligations. These exemptions can lead to informational asymmetries that favor institutional investors over retail ones.

"Individual investors rely on the services of broker-dealers and investment advisers when making and implementing investment decisions."[4] "However, studies show that retail investors are confused about the differences among them. These differences include the scope and nature of the services they provide, the fees and costs associated with those services, conflicts of interest, and the applicable legal standards and duties owed to investors."[5] Form CRS Relationship Summary; Amendments to Form ADV[6]; Required Disclosures in Retail Communications and Restrictions on the use of Certain Names or Titles[7]. This confusion can be exacerbated by the complexity of the structure of investment companies, as noted in the *1991 SEC No-Act (LEXIS 1273 The Phoenix Funds).*[8]   The combination of FOIA exemptions, the complexities of financial regulations, and the strict requirements of the PSLRA can create significant challenges for retail investors, potentially limiting their access to information and their ability to seek legal recourse in cases of fraud.

---

[3] The Freedom of Information Act, 5 U.S.C. § 552. Link: https://www.justice.gov/oip/freedom-information-act-5-usc-552

[4] Form CRS Relationship Summary; Amendments to Form ADV; Required Disclosures in Retail Communications and Restrictions on the use of Certain Names or Titles. Securities and Exchange Commission (SEC). Release No. 34-83063; IA-4888; File No. S7-08-18. Link: https://www.sec.gov/files/rules/proposed/2018/34-83063.pdf

[5] Id.

[6] *2018 SEC LEXIS 936*–

[7] –*2018 SEC LEXIS 936*

[8] *1991 SEC No-Act. LEXIS 1273.*

In evaluating precedents within securities litigation, two pertinent cases emerge. The first, *Krasner v. Cedar Realty Trust, Inc.,* delineates the scenario where an external party was accused of abetting an insider's alleged breach of fiduciary duties related to securities owned by shareholders.[9]  The judiciary ascertained that the litigations against the external entity were intrinsically linked to the rights, duties, and obligations emanating from, or associated with, a security, contingent upon demonstrating violations of duties and obligations engendered by said security *Krasner v. Cedar Realty Trust, Inc., 86 F.4th 522.* The subsequent case, *Charlton v. Greig*, addresses the Securities Act of 1933, elucidating the circumstances under which costs, inclusive of legal fees, are permissible in securities litigation *Charlton v. Greig, 2023 U.S. Dist. LEXIS 212337.*[10]

The protection of trade secrets and confidential information, along with *Exemption 8 of FOIA*, create a significant information asymmetry.[11]  Retail investors, like the Plaintiffs, lack access to vital information about market practices and regulatory actions affecting their investments. Additionally, the complexities and volume of financial data, coupled with resource constraints of regulatory bodies, lead to delays and inadequacies in fulfilling FOIA requests. Justice delayed is indeed justice denied. This results in retail investors often receiving outdated or incomplete, redacted information, impeding their ability to make informed decisions. Consequently, these factors collectively contribute to a lack of

---

[9]  Krasner v. Cedar Realty Tr., No. 23-1262 (2d Cir. Nov. 14, 2023). Link: https://law.justia.com/cases/federal/appellate-courts/ca2/23-1262/23-1262-2023-11-14.html

[10]  Charlton v. Greig, 2023 U.S. Dist. LEXIS 212337. Link: https://casetext.com/case/charlton-v-greig-1

[11]  Exemption 8 under the Freedom of Information Act (FOIA) pertains to information submitted for regulation or supervision of financial institutions Freedom of Information Act (FOIA) Intake Request Checklist. This exemption is one of the nine exemptions under FOIA that can justify the denial of a FOIA request. However, even if records fall under this exemption, they still must be disclosed unless the agency reasonably foresees harm resulting from their disclosure or if the disclosure is prohibited by law. This provision was codified by the FOIA Improvement Act of 2016 to ensure that agencies were not simply denying requests because records fell under an exemption without any further analysis.

transparency and equity in the financial markets, putting retail investors at a distinct disadvantage compared to institutional entities. This is not accidental, this is designed to be this way.

The honorable court must always consider the deliberate architectural intricacies within the financial edifice that systematically disenfranchise the retail investor. FOIA is rendered impotent in practice within the financial markets' domain. This is not by mere happenstance, but by cunning design. The *PSLRA* requires plaintiffs to meet much higher pleading standards by specifying each allegedly misleading statement and demonstrating with particularity how the statement is misleading and the scienter (intent to deceive) of the defendant with little to no legal channels or access points. This requirement can make it more challenging for retail shareholders to initiate securities fraud litigation, potentially limiting their recourse in cases of genuine fraud like the instant matter.

## M.          INFORMATION ASYMMETRY

Despite the implementation of insider trading laws aimed at ensuring fairness in the markets, there remains a pronounced perceived information asymmetry between institutional and retail investors. This asymmetry is due to the disparities in resources, tools, and networks available to these groups, which significantly influences their ability to analyze, interpret, and act upon market information.

Institutional investors, such as mutual funds, pension funds, and hedge funds, allocate substantial financial resources toward extensive market research and employ teams of analysts to dissect financial statements, market trends, and industry developments. In contrast, retail investors typically manage their investments independently, with far less capital to invest in similar research endeavors. Additionally, institutions have access to advanced trading platforms, real-time data feeds, and sophisticated analytics software, tools that are often prohibitively expensive or complex for the average retail investor.

Bloomberg Terminal and FactSet, premium financial data and analytics platforms, primarily cater to institutional clients such as investment banks and hedge funds, given their subscription fees—approximately $2,600 per month for Bloomberg and around $1,000 for FactSet. These costs, significantly above what individual investors typically expend for financial information services, effectively restrict access to organizations with the financial capability to absorb such expenses as operational costs. The platforms are designed for professional use, offering advanced functionalities suited to the sophisticated needs of these institutional entities, thereby implicitly excluding retail investors due to both the cost barrier and the specialized nature of the tools provided.

This exclusivity contributes to a pronounced information asymmetry in financial markets, where institutions equipped with superior data and analytical tools obtain a competitive advantage over individual investors. While alternative, more affordable financial information services exist for retail investors, the gap in access to timely and comprehensive market data between institutional and individual investors persists, reinforcing disparities in investment decision-making capabilities.

Furthermore, the broad and established networks of industry contacts that institutional investors maintain offer them insights and information beyond what is publicly available, enhancing their decision-making process. This advantage is compounded by their capacity to execute sophisticated trading strategies, such as algorithmic trading, derivatives trading, and arbitrage, leveraging their substantial capital and advanced technological tools. Lastly, the economies of scale from trading in large volumes afford institutional investors better pricing and lower transaction costs, amplifying their competitive edge over retail investors. This environment creates a significant disparity in the quality and timeliness of information between institutional and retail investors, impacting the latter's investment decisions and outcomes despite regulatory efforts to level the playing field.

## N.   RETAIL BROKER-DEALERS DELIBERATELY WITHHOLD DETAILED TRADING DATA FROM CUSTOMERS

Retail broker-dealers intentionally withhold detailed trading data from customers to mask their operational and financial practices, particularly under arrangements like payment for order flow (PFOF). In PFOF, broker-dealers receive compensation from market makers for directing orders to them, a practice that could influence order routing and potentially compromise trade execution quality. These entities often enter into agreements with confidentiality clauses that prohibit the disclosure of specific details about financial incentives and order routing to third parties, including retail customers. Such non-disclosure deprives retail investors of crucial information, affecting their understanding of whether their trades are executed optimally. This lack of transparency can make it challenging for retail investors to prove claims of biased order routing or suboptimal executions, hindering their ability to seek legal recourse or fair treatment. By obscuring critical data, broker-dealers and market makers effectively shield themselves from scrutiny and potential liability, undermining market integrity and eroding trust in the brokerage system.

## O.                      DELAYED INFORMATION FLOW

The phenomenon of delayed information flow in financial markets refers to the lag between when market-relevant information is made public and when retail investors can utilize this information for investment decisions. This delay primarily stems from the structured disclosure practices mandated for companies and regulatory bodies, which, despite being aimed at fairness, inherently benefit institutional investors with immediate access to information through direct feeds and sophisticated analysis tools. Retail investors, in contrast, depend on financial news, analysis reports, and investment newsletters for information, which undergoes a process of review and dissemination, introducing further delays.

This information asymmetry creates a significant disadvantage for retail investors in several ways. First, it challenges the efficient market hypothesis by suggesting that market prices may adjust to reflect new information before it becomes actionable for retail investors. Consequently, retail investors often find themselves a step behind in reacting to market movements, potentially leading to investment decisions based on outdated information. This scenario not only places retail investors at a strategic disadvantage but also elevates their risk of incurring losses, as they may enter or exit positions at prices that have already absorbed the impact of the new information. The nature of high-frequency trading exacerbates this issue, as these systems can adjust positions in a fraction of a second based on new data, further diminishing the value of the information for retail investors by the time they can act on it.

## LACK OF INHERANT FAIRNESS FOR PRO SE LITIGANTS

### *Costs as barrier to justice*

Estimating the average costs of private securities litigation for individual retail investors in non-class action suits is complex due to varying case complexities, legal strategies, and litigation durations. Significant cost components include attorney fees, which vary widely from hourly rates ($500 to $1,000 per hour) to contingency fees (25% to 40% of the settlement or judgment). Court costs, including filing and court reporter fees, can range from a few hundred to several thousand dollars.

Discovery processes can be particularly expensive, potentially amounting to hundreds of thousands of dollars. Expert witness fees also contribute significantly, potentially exceeding $100,000 depending on the required expertise and duration. Other expenses like travel and accommodations further add to the costs. Altogether, these costs can range from tens of

thousands to over a million dollars, posing a substantial financial risk for individual investors, especially if the potential recovery does not significantly exceed these costs.

*Fairness*

The concept of fairness in heightened pleadings is a significant aspect of U.S. Securities proceedings with Pro Se litigants. Heightened pleading standards can potentially impact retail investors in several ways, primarily by creating barriers to legal recourse. This means that retail investors, who often lack the resources and expertise to gather such detailed information, may find it challenging to meet these standards. The heightened pleading standards require plaintiffs to "provide the who, what, when, where, and how" of the alleged fraud. This level of detail can be difficult for retail investors to obtain, particularly when dealing with complex financial products or opaque corporate structures. It's designed this way to disadvantage retail investors.

Consider 605 data produced by the defendants in this case, what were formatted in such a difficult manner that the Plaintiff had to individually go through millions and billions of individual transactions (by hand)just to accumulate a data set, when it could easily be accessible through other means and venues.

Furthermore, the PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud' *Appvion, Inc. v. Buth, 475 F. Supp. 3d 910*. This can be a high bar for retail investors to meet, as they may not have access to internal company information or the ability to prove a company's fraudulent intent. Obtaining those documents with uncompliant companies like AMC, regulators, and SROs, compounds the issue.

Moreover, the standards under the PSLRA are more stringent than under *USCS Fed Rules Civ Proc R 9, Pleading Special Matters*. While *Rule 9(b)* allows a party to aver generally a defendant's condition of mind, under the PSLRA the complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind *§ 240.10b-5 Employment of manipulative and deceptive devices.*

Given the fact that CEOs of companies and Portfolio Managers are distant figures in which litigants have no diect actions. Retail investors are left with little recourse, resorting to mostly documenting defendant's actions and trying to piece together abstract concepts behind those actions, in the hopes a Judge understands the sequence of events and how its germain to the argument.

Documented actions can be be incredibly subjective, and often times obscure. Compounding the issue is the Business Judgment Rule, a notably subjective law that shields CEOs from liability for decisions that may seem irrational, as long as they are made in good faith and with the belief that they serve the best interests of the corporation. This further increases the burden on retail investors.

In addition, the standards for securities fraud claims under *§ 10(b)* of the *Securities Exchange Act of 1934* and *Rule 10b-5* require a plaintiff to allege that the defendant made a false statement or omission of material fact with scienter, in connection with the purchase or sale of securities, upon which the plaintiff justifiably relied, and that the false statement proximately caused the plaintiff's damages *§ 240.10b-5 Employment of manipulative and deceptive devices.*

This can be a complex and challenging set of requirements for retail investors to meet. In conclusion, while heightened pleading standards are designed to prevent frivolous lawsuits and protect defendants from unfounded accusations of fraud, they can create significant

obstacles for retail investors seeking to pursue legal action. These standards require a level of detail and proof that may be difficult for retail investors to provide, potentially limiting their access to legal recourse *§ 78j. Manipulative and deceptive devices, § 240.10b-5 Employment of manipulative and deceptive devices., Appvion, Inc. v. Buth, 475 F. Supp. 3d 910, City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc., 70 F.4th 668.*

## THE ANONYMITY OF DODD-FRANK

The situation you're describing regarding potential misrepresentation of closing short positions during the GameStop and AMC short squeezes raises significant regulatory concerns. Given the complexity of financial regulations, several laws and regulations may be implicated in such cases.

*The Securities Act of 1933 and the Securities Exchange Act of 1934* are foundational statutes governing securities markets, while rules such as *Rule 606 of Regulation NMS* and FINRA Manual Rules provide specific guidelines for broker-dealers' order handling and execution. SEC regulations like Regulation ATS and Regulation SHO are particularly relevant in the context of market transparency and short selling practices. *SEC Rule 10b-5* prohibits fraudulent activities in connection with securities transactions, which could encompass misrepresentations regarding short positions.

Furthermore, *Dodd-Frank Wall Street Reform and Consumer Protection Act* introduced various regulatory reforms after the 2008 financial crisis, including measures aimed at enhancing market integrity and transparency, such as the Market Access Rule.

To investigate potential improprieties and restore trust in the market, regulators would utilize these legal frameworks to scrutinize trading activities and ensure accountability among all market participants involved in short selling during the mentioned short squeezes. The enforcement of these laws and regulations is crucial for maintaining fair and transparent

markets, especially given the growing role of retail investors in the modern investment landscape.

## REGULATION FAIR DISCLOSURE (REG FD)

Reg FD requires that all publicly traded companies must disclose material information to all investors at the same time. While intended to level the playing field, in practice, it may not always ensure that retail investors get access to the same quality of information as institutional investors, who might be better equipped to analyze and act on information quickly.

Regulation Fair Disclosure (Reg FD), enacted by the U.S. Securities and Exchange Commission (SEC), mandates that all publicly traded companies must disseminate material information to all investors simultaneously. The primary objective of Reg FD is to eliminate the advantage that institutional investors may have had by receiving material information ahead of the broader investor community, thereby aiming to level the playing field between institutional and retail investors.

However, in practice, Reg FD's effectiveness in equitably distributing the benefits of timely and material information is somewhat limited. While it ensures that information is released to all investors at the same time, the regulation does not address the inherent disparities in how different types of investors can process, interpret, and act upon this information.

Institutional investors typically have at their disposal extensive resources for analysis, including teams of analysts, sophisticated data analysis tools, and advanced trading technologies. These resources allow them to dissect and understand the implications of new information much more quickly and thoroughly than retail investors. For example, upon the

release of an earnings report, institutional investors can quickly analyze the data, assess its impact on the market, and adjust their trading strategies accordingly.

Furthermore, institutional investors often have the infrastructure to monitor a wide array of information sources continuously, enabling them to react to information almost instantaneously. This capability is complemented by their use of algorithmic trading systems, which can execute trades within milliseconds of information release, capitalizing on the immediate market movements that often follow significant announcements.

Retail investors, on the other hand, lack access to the same level of analytical resources and may depend on secondary analyses or news reports to understand the implications of newly released information. This delay in processing and acting on information can place retail investors at a disadvantage, as the market may have already adjusted to the new information by the time they are ready to make a trade.

Additionally, the complexity and nuance of some disclosed information may require expert analysis to fully understand its implications. Institutional investors' ability to consult with or employ experts who can interpret the significance of complex disclosures further widens the gap between them and the retail investors, who may struggle to grasp the subtleties of such information without similar expertise.

In summary, while Regulation Fair Disclosure was designed with the noble intention of ensuring all investors have equal access to material information, the disparities in resources, technology, and expertise between institutional and retail investors mean that, in practice, the regulation may not fully equalize the informational playing field. The faster and more sophisticated analysis and action capabilities of institutional investors can still lead to an asymmetry in how information is leveraged, maintaining an advantage over retail investors in many situations.

## ACCREDITED INVESTOR REGULATIONS

Accredited Investor Regulations serve as a critical framework within the financial markets, primarily designed to protect investors from engaging in high-risk investments without sufficient financial acumen or resources to absorb potential losses. These regulations define accredited investors as individuals who satisfy specific income or net worth thresholds, such as having an annual income exceeding $200,000 (or $300,000 together with a spouse) in the last two years or a net worth exceeding $1 million, excluding the value of the primary residence.

This delineation inherently restricts access to certain investment opportunities, such as private placements, hedge funds, venture capital, and other private market offerings, exclusively to accredited investors. These types of investments are often not subject to the same regulatory requirements as public market investments and can offer higher returns, albeit with higher risks and lower liquidity. The rationale behind this regulatory approach is that accredited investors are presumed to have the financial sophistication and the ability to sustain the loss of their investment without a significant impact on their financial wellbeing.

However, this restriction places a considerable limitation on retail investors, who do not meet the accredited investor criteria. Therefore, a broad segment of the market is precluded from participating in potentially lucrative investments, which can contribute to widening the wealth gap between accredited and non-accredited investors. Furthermore, it limits the ability of retail investors to diversify their investment portfolios into private markets, which might offer different risk-return profiles compared to traditional public market investments.

This form of discrimination has several implications that harm the public. Retail investors, regardless of their knowledge, experience, or capacity to understand investment risks, are excluded from potentially high-return investment opportunities available only to

accredited investors. This can limit their ability to diversify their portfolios and access growth opportunities that could improve their financial standing. By limiting access to high-return investments to those who are already wealthy, the regulations can contribute to the perpetuation and even widening of the wealth gap. Wealthier individuals have the opportunity to grow their wealth at a faster rate, reinforcing economic disparities.

The criteria for accredited investors make a broad assumption that wealth correlates with financial sophistication. However, financial knowledge and the ability to make informed investment decisions are not solely dependent on one's income or net worth. There are retail investors with considerable investment knowledge and the capability to assess investment risks effectively, who are nonetheless barred from certain investments due to not meeting the financial criteria. The regulations create a barrier to financial inclusion by systematically excluding a significant portion of the population from participating in the full spectrum of investment opportunities. This not only affects individuals' potential to generate wealth but also limits the pool of capital available to emerging companies and funds that could benefit from a broader base of investors.

While the intention behind accredited investor regulations is to protect less wealthy and potentially less sophisticated investors from high-risk investments, critics argue that it also perpetuates a form of financial exclusivity. This exclusivity can hinder the democratization of investment opportunities, as it bases an individual's investment capabilities not on their knowledge or expertise but rather on their financial status. As the financial landscape evolves, there is ongoing debate about how to balance investor protection with the need for broader access to investment opportunities, prompting discussions among regulators, lawmakers, and the investment community about potentially revising the criteria for accredited investors or creating new pathways for non-accredited investors to participate in private market investments.

## INITIAL PUBLIC OFFERINGS (IPOS)

Companies and their underwriters typically allocate a significant portion of IPO shares to institutional investors. This preference is due to institutions' ability to purchase large volumes of shares, providing stability and credibility to the IPO. Institutional investors, such as mutual funds, pension funds, and hedge funds, are considered long-term investors, which is appealing to companies going public. Wealthy individuals often have access to IPO shares through their relationships with brokerage firms and investment banks. These firms reserve allocations for their top clients as a perk or to maintain their business. Institutional investors can commit to purchasing a substantial number of shares, providing the capital and stability that companies seek during the IPO process.

Their involvement is seen as a vote of confidence in the company's long-term prospects. Retail investors typically have limited access to IPO shares before they begin trading on the open market. When they do have access, it is often through online brokerage platforms that may receive only a small allocation of shares to distribute among their customers. By the time IPO shares are available for trading on the open market, the price may have already surged above the IPO price due to high demand, particularly for highly anticipated listings. Retail investors are then faced with the decision to buy at these elevated prices or forego the opportunity. Buying shares post-IPO at inflated prices increases the risk for retail investors. If the market corrects or if the initial hype fades, they may face significant losses.

## CONSIDERING OTHER FRAMEWORKS

### 1. *The EU*

The EU's MAR provides a comprehensive framework for combatting market abuse, including insider trading and market manipulation.[12] It applies across all EU member states, offering a uniform standard of protection for investors. A key feature is the requirement for issuers to promptly publish insider information that directly affects them, enhancing transparency and ensuring investors have access to material information in a timely manner. Contrast this with the U.S. approach under the PSLRA, which may limit the immediacy and accessibility of certain forward-looking information and imposes stringent conditions on litigation against misleading statements. Highlight how the MAR's emphasis on transparency and prompt disclosure could benefit U.S. retail investors by providing more immediate access to information.

## 2.  United Kingdom (UK) Financial Services and Markets Act (FSMA) and the Role of the Financial Conduct Authority (FCA)

The FSMA, enforced by the FCA, offers a framework for protecting investors through rigorous oversight of financial markets and the entities that operate within them.[13] The FCA's principles for businesses prioritize the protection of consumers, including retail investors, ensuring that firms provide clear and not misleading information. The proactive regulatory approach taken by the FCA in the UK, focusing on consumer protection and the requirement for clarity and fairness in communications with investors. This contrasts with the reactive nature of litigation under the PSLRA, where retail investors must navigate complex legal standards to challenge misleading statements.

---

[12]  Market Abuse Regulation - Finance - European Commission. Link:
https://finance.ec.europa.eu/regulation-and-supervision/financial-services-legislation/implementing-and-delegated-acts/market-abuse-regulation_en
[13]  Financial Services and Markets Act 2023. UK Public General Acts. Link:
https://www.legislation.gov.uk/ukpga/2023/29/contents

### 3.   Australia Corporations Act 2001 and the Role of the Australian Securities and Investments Commission (ASIC)

Australia's Corporations Act, along with oversight by ASIC, emphasizes the protection of investors through both regulatory measures and enforcement actions.[14] ASIC's mandate includes ensuring the fairness and transparency of financial markets, with specific provisions aimed at protecting retail investors from misleading and deceptive conduct. ASIC reseves the power to intervene and take action against market misconduct that could harm retail investors. Compare this with the limitations faced by U.S. retail investors in initiating actions under the PSLRA, especially in terms of proving scienter (intent to deceive) and the high thresholds for class action lawsuits.

### 4.   Canada Securities Act (Ontario) and the Ontario Securities Commission (OSC)

The Securities Act in Ontario, enforced by the OSC, provides for comprehensive investor protections, including stringent disclosure obligations for issuers and the ability to pursue civil remedies for violations affecting market integrity.[15] The OSC actively works to ensure that investors are treated fairly and that they have access to material information when making investment decisions. The OSC's mandate to protect investors and maintain fair and efficient markets, focusing on the mechanisms available for retail investors to seek redress. Contrast this with the challenges posed by the PSLRA's pleading standards and the hurdles to achieving class action status in the U.S.

### THE DODD-FRANK ACT

---

[14] Corporations Act 2001 (Australia). Link: https://www.legislation.gov.au/C2004A00818/2019-07-01/text
[15] Securities Act, R.S.O. 1990, c. S.5 (Ontario, Canada). Link: https://www.ontario.ca/laws/statute/90s05

The *Dodd-Frank Wall Street Reform and Consumer Protection Act*, enacted in response to the 2008 financial crisis, primarily aimed to increase financial stability and consumer protection.[16]  There are aspects of the *Dodd-Frank Act* and its subsequent implementation that indirectly affect the visibility and transparency of certain trading activities, including those from home offices like Citadel and a number of the other defendants.

*Dodd-Frank* brought significant changes to the over-the-counter (OTC) derivatives market, including swaps. These instruments were often traded with little transparency. While Dodd-Frank mandated that most swaps be cleared through central clearinghouses and reported to trade repositories, certain exceptions and exemptions, particularly for smaller players or non-financial entities, might limit the transparency in some aspects of these trades.

Part of *Dodd-Frank, the Volcker Rule* limits certain types of speculative investments by banks. [17]  However, the rule contains exemptions and is complex in its implementation. Some trades, especially those related to market making or hedging risks, could be obscured in the details of these exemptions. In other words, shorts and swap positions are not disclosed by any institution that has a "family office". This is tantamount to a license to be massively over levered with no oversight. So retail investors have no idea who is in fact in this trade and who is manipulating the market.

Dodd-Frank increased the oversight of banks' proprietary trading. However, the specifics of how banks classify and report these trades can affect the visibility of such activities. The complexity and interpretation of compliance rules can lead to variations in how trading

---

[16]  H.R.4173 - Dodd-Frank Wall Street Reform and Consumer Protection Act. 111th Congress (2009-2010). Congress.gov. Link: https://www.congress.gov/bill/111th-congress/house-bill/4173/text

[17]  Section 619 - Volcker Rule. U.S. Securities and Exchange Commission. Link: https://www.sec.gov/spotlight/dodd-frank-section.shtml#619
Section 619 of the Dodd-Frank Act: Prohibition on proprietary trading and certain relationships with hedge funds and private equity funds (joint rulemaking)

activities are disclosed. *Dodd-Frank* required more advisers to private funds (which could include some home offices) to register with the SEC. While this increased transparency, it also means that only larger advisers (with more than $150 million in assets under management) are subject to this requirement, potentially leaving smaller home office trades less visible.

## DURA PHARMACEUTICALS, INC V. BROUDO

The Rule of Specificity and Particularity, as discussed in the context of the "*Dura Pharmaceuticals, Inc. v. Broudo*" Supreme Court case, revolves around how people who have lost money on stocks due to fraud can seek compensation.[18] The Supreme Court decided that if someone buys stocks and the value goes down because of fraud, they can only ask for money back if they prove the fraud directly caused their financial loss. This means just saying the stock price fell because of fraud isn't enough; they need to show how the fraud specifically led to the loss.

This decision makes it harder for investors to sue companies and win in cases of stock fraud. It's especially favorable for the companies being sued and their insurance providers because it sets a high bar for what needs to be included in the lawsuit right from the start. Although the "Dura" case made some things clear, it left open two big questions:

- Do Plaintiffs suing need to provide very detailed information (particularity) about how the fraud caused their loss right when they file the lawsuit?

- Must they point to a specific event or announcement that corrected the misinformation (corrective disclosure), or can they argue their case based on other factors that show the stock was inflated due to fraud?

---

[18] Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005). Link:
https://supreme.justia.com/cases/federal/us/544/336/

The Supreme Court case "*Dura Pharmaceuticals, Inc. v. Broudo*" has led to varied interpretations by courts regarding how detailed a lawsuit needs to be when claiming that fraud caused investors to lose money on stocks. Here's an easier way to understand the situation:

Justice Breyer mentioned a rule (*Federal Rule of Civil Procedure 8(a)(2)*) in the *"Dura"* decision, suggesting that when investors sue for fraud-related stock losses, they might not need to provide an extremely detailed explanation of how the fraud caused their loss (known as "loss causation"). They need to show a reasonable connection between the company's dishonest statements and the drop in stock price, but it might not have to be super detailed.

**Different Court Interpretations**:

- **Some Courts (like those in the Ninth Circuit)** interpreted this to mean that a lawsuit doesn't need to meet a very high level of detail. They believe a basic explanation that links the company's false statements to the stock price falling is enough.

- **Other Courts** think "Dura" didn't clearly define how detailed these claims need to be. A court in North Carolina, for example, said these claims should be very detailed, similar to how fraud needs to be proved in other legal areas (this is referencing Federal Rule of Civil Procedure 9(b)).

- **The Fourth Circuit** supports the idea that more details are needed, comparing it to proving fraud in general.

- **The Sixth Circuit** specifically said that claims can't be vague or generic; they need to clearly show how the fraud led to financial losses.

There's no one-size-fits-all rule on how much detail is needed when suing for stock fraud. Some courts want just enough detail to see a plausible link between the fraud and the loss.

Others demand a high level of detail, similar to other types of fraud cases, to even consider the lawsuit. This difference makes it more challenging for investors because they need to know how specific their case needs to be, depending on where they're suing.

### After Dura

After the Supreme Court case *"Dura Pharmaceuticals, Inc. v. Broudo,"* there's been a legal debate on whether lawsuits claiming stock fraud need to specifically point out a "corrective disclosure." A corrective disclosure is when a company releases new information that corrects previous false or misleading statements, leading to a stock price drop. This is inherently a legal loophole for manipulation.

### Requirement of a Corrective Disclosure

Some courts, like the Southern District of New York, have decided that to argue fraud caused their losses, investors must clearly identify a piece of information that corrected the misleading statements. This is because not every drop in stock prices is due to the company fixing its false statements. These courts want a clear connection between the misleading statements, the corrective information coming out, and the stock price falling. For example, in one case, a news article from CBS MarketWatch was considered enough of a corrective disclosure because it provided new, correct information that impacted the stock price. One example is data from other sources contradicting claims, data published from another source.

### Different Views in Different Places

However, not all courts see it the same way. Some, like in a case with *In re Compuware Securities*, have thrown out lawsuits because they didn't clearly connect the company's false statements to the financial losses of the investors.[19] On the other hand, the Ninth Circuit has

---

[19] In re Compuware Securities Litigation, 301 F. Supp. 2d 672 (E.D. Mich. 2004). Link: https://casetext.com/case/in-re-compuware-securities-litigation

been more lenient, allowing cases to proceed even if there wasn't one specific disclosure that corrected the misleading information. Instead, they accepted broader revelations about a company's financial health as proof of loss causation.

There's a split in how courts across the country handle this requirement. Some demand a very specific piece of information that corrected the misleading statements, while others are okay with a more general uncovering of the truth. This debate is significant because it affects how easy or hard it is for investors to sue companies for fraud. If a court requires a specific corrective disclosure, it might be more challenging to prove the case.

In the instant matter at hand, this legal variability significantly prejudices plaintiffs, especially retail investors who may not have the resources or access to detailed market data to identify specific corrective disclosures or through regulators. The necessity to plead with particularity or identify a corrective disclosure imposes a substantial burden on plaintiffs. They must not only discover but also conclusively link the corrective disclosure to their financial loss, a task complicated by the often opaque nature of corporate disclosures and the rapid movement of financial markets - not to mention the lack of transparency from regulators.

The ongoing debate and differing judicial interpretations highlight a significant tension in securities litigation and should be regarded in the instant matter. Plaintiffs are required to navigate a complex and often inconsistent legal framework to establish loss causation, a prerequisite for their claims to proceed. This inconsistency not only hinders their ability to seek redress but also creates a barrier of entry to holding corporations accountable for misleading or fraudulent practices. All this and no judicial recourse to remedy the deficiency.

**PLAINTIFFS' PLEADINGS MAY INHERENTLY LACK DUE TO INFORMATION GAP AND DENIAL OF RIGHTS AND PRIVILEGES**

Wall Street hedge funds utilize legal and procedural defenses to insulate themselves from litigation and complaints, employing strategies that ensure the non-disclosure of sensitive information potentially subject to legal action. By exploiting legal frameworks and procedural tactics, these entities protect against external examination and challenges. These actions constitute a concerted effort to regulate the dissemination of information, thereby reducing legal risks and curtailing public accountability. Regulatory agencies, including the SEC and FINRA, consistently refuse Freedom of Information Act (FOIA) requests regarding AMC, citing the protection of trade secrets as the primary rationale.

This approach evidences a preference for maintaining confidentiality in commercial operations over ensuring transparency in regulatory activities. The lack of disclosures from at-risk entities results in restricted access to critical information, a tactic aimed at mitigating exposure by concealing sensitive data. This cautious strategy serves to limit risk, acting as both a preventive measure and an obstacle to justice for individuals attempting to understand and engage with securities law and enforcement mechanisms. Consequently, this system hinders fair access to legal redress, obstructing equitable justice.

The *PSLRA* directs the court to appoint as lead plaintiffs the "person or group of persons" with the "greatest financial interest in order to encourage institutional investors, who are more likely to have significant financial holdings at stake as well as greater sophistication and experience in securities matters, to exercise control over the litigation and over counsel".[20] However, the *PSLRA* imposes strict pleading requirements for fraud in securities class action lawsuits, requiring plaintiffs to "specify each statement alleged to have been misleading,

---

[20] 31.3 The Private Securities Litigation Reform Act. Reference 2: 32 Moore's Federal Practice - Civil 31.3 (2023) Link:
https://plusai.lexis.com/document/?pddocfullpath=%2Fshared%2Fdocument%2Fanalytical-materials%2Furn:contentItem:51R1-7NR0-R03P-219S-00000-00&pdmfid=1545874&pdcontentcomponentid=163730&pdproductcontenttypeid=urn:pct:24&pdisdoclinkaccess=true&pdsearchmode=chatbot_citation&crid=38b174f4-f787-4a98-9a1f-a073d4c44aa9

[and] the reason or reasons why the statement is misleading."[21]  This can make it much more challenging for retail shareholders to initiate securities fraud litigation, potentially limiting their recourse in cases of genuine fraud.

## JUDICIAL CONSIDERATIONS

The Plaintiffs present a collection of evidence comprising screenshots, YouTube videos, cellphone recordings, photographs, and various captures of a commercial nature to substantiate their claims. This assortment of digital evidence reflects the modern means by which individuals capture and share information relevant to their allegations. Given the nature of this evidence, which may not traditionally align with more conventional forms of legal documentation, we respectfully request that the court acknowledge the potential limitations faced by the Plaintiffs in adhering to the standard expectations of heightened pleadings.

In light of these considerations, it is our contention that a more flexible approach towards the threshold for heightened pleadings is warranted. This adjustment would not only recognize the evolving landscape of evidence collection and presentation in the digital age but also ensure that justice remains accessible to individuals who may otherwise be disadvantaged by stringent procedural requirements. Therefore, we urge the court to consider the unique context of this case and the manner in which the Plaintiffs have endeavored to present their evidence, and to accordingly allow for a lower threshold for heightened pleadings, thereby facilitating a fair and just examination of the claims at hand.

---

[21] Section 24 of the Securities Act of 1933 (§ 24A.00 SECURITIES REGULATION). Reference 2:   1 Banking Law Digest § 24A.00 (2023). Link:
https://plusai.lexis.com/document/?pddocfullpath=%2Fshared%2Fdocument%2Fanalytical-materials%2Furn:contentItem:5BTY-5VG0-R03J-N2V4-00000-00&pdmfid=1545874&pdcontentcomponentid=410136&pdproductcontenttypeid=urn:pct:24&pdisdoclinkaccess=true&pdsearchmode=chatbot_citation&crid=7f762048-c7ae-4238-a1fe-127cb68b7d68

After the *Dura* decision, some lower courts have started to require that lawsuits must clearly explain how the fraud caused the loss, often including the need to point to a specific event that corrected the false information. This is important for insurance companies and those being sued because it influences whether a lawsuit gets thrown out early on or moves forward, and how the courts view the concept of fraud causing financial loss in later stages of the lawsuit, like when deciding if the case can proceed as a class action or making final decisions before a trial.

## PUBLIC POLICE EXCEPTION

1. **Contravention of Forum State's Public Policy:** The foreign law or judgment must be in direct conflict with the fundamental principles or public policy of the forum state. This means that enforcing the foreign law or judgment would violate the forum state's most deeply held convictions on morality, justice, or the public good.

2. **Fundamental Public Policy**: The public policy invoked must be fundamental to the legal or moral ethos of the forum jurisdiction. Not all policies qualify; the policy must be well-established and recognized as a basis of the social, legal, or economic framework of the state.

3. **Substantial or Direct Connection:** There must be a substantial or direct connection between the application of the foreign law or judgment and the contravention of the forum's public policy. The exception is not invoked for minor or tangential conflicts.

4. **No Violation of International Comity**: While applying the public policy exception, courts remain mindful of international comity, which refers to the legal principle of mutual respect between different jurisdictions. The exception is applied judiciously to avoid unnecessary offense to foreign states, balancing respect for foreign laws with the protection of domestic public policies.

5. **Procedural Fairness Considerations**: In some jurisdictions, the public policy exception may also consider whether the original proceeding in the foreign jurisdiction met basic standards of procedural fairness or due process as understood by the forum state.

6. **Specificity and Restraint in Application:** Courts typically apply the public policy exception with specificity and restraint, recognizing that overuse or broad application could undermine the predictability of legal relations and the enforcement of legitimate foreign judgments.

7. **No Harm to the Forum's Legal Order:** Finally, enforcing the foreign law or judgment should not result in harm or significant disruption to the forum state's legal order or infringe upon the rights of its citizens.

Securities laws and regulations are designed to protect investors, ensure fair and efficient markets, and facilitate capital formation. However, some aspects of these laws and regulations may inadvertently create challenges or barriers for retail investors in terms of transparency. Here are a few key areas where retail investors may face hindrances:

1. **Complexity of Financial Statements**: Securities laws require companies to disclose financial statements and other relevant documents. However, the complexity and technical nature of these documents can make it difficult for retail investors to understand the financial health and risks of a company.

2. **Market Complexity and Financial Products**: The increasing complexity of financial markets and products, including derivatives and structured products, can be challenging for retail investors to understand. This complexity can hinder their ability to make informed investment decisions.

3. **Disclosure of Risks**: While companies are required to disclose risks in their filings, these disclosures are often lengthy and filled with legal jargon, making it difficult for retail investors to fully grasp the potential risks involved in an investment.

Each of these areas highlights the balance regulators must strike between protecting investors and ensuring they have access to investment opportunities. While these regulations are essential for maintaining market integrity and investor protection, they can also present challenges for retail investors seeking transparency and access to the same opportunities as more sophisticated investors.

## PROPOSAL FOR REFORMING SECURITIES LITIGATION AND ENHANCING TRANSPARENCY IN FINANCIAL MARKETS INTRODUCTION

The complexity and restrictive nature of current securities litigation frameworks, particularly under the PSLRA, coupled with the limitations imposed by the Freedom of Information Act (FOIA), have created a landscape that disproportionately disadvantages retail investors. These conditions hinder their ability to seek recourse for securities fraud and to access vital market information, thereby undermining the integrity and transparency of financial markets. To address these issues, we propose a series of reforms aimed at lowering the barriers to securities fraud litigation and enhancing market transparency.

## 1. Amendments to the PSLRA

The PSLRA was enacted with the noble intent of curbing frivolous litigation that could unduly burden companies. However, its stringent pleading standards have also made it exceedingly difficult for plaintiffs, particularly retail investors, to bring forth meritorious cases. We propose the following amendments to the PSLRA:

- **Reducing Pleading Standards**: Amend the PSLRA to relax the heightened pleading requirements for scienter (intent to deceive). Allow courts to infer scienter based on a

holistic consideration of the circumstances and events rather than requiring plaintiffs to plead specific facts demonstrating intent at the motion to dismiss stage.

- **Safe Harbor Revisions**: Narrow the scope of the "safe harbor" provision for forward-looking statements to ensure that companies cannot use it as a blanket protection against accountability for misleading statements that significantly impact investor decisions. Especially in cases where company officers or officials make oral statements, social media posts in public settings and in plain view of investors and potential investors.

- **Lead Plaintiff Provisions**: Modify the criteria for selecting lead plaintiffs in class actions to prevent institutional investors from dominating the litigation process, thereby giving retail investors a more significant role and potentially a greater voice in these actions.

## 2. Enhancing FOIA's Effectiveness in Financial Markets

To improve transparency and ensure that retail investors have access to the information necessary to make informed decisions, we propose the following changes to FOIA:

- **Limiting Exemptions**: Specifically narrow the scope of FOIA exemptions applicable to financial regulatory agencies, such as Exemption 8, which pertains to matters "contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions."[22]

- **Proactive Disclosure Requirements**: Mandate that financial regulatory agencies proactively disclose information that is of public interest, especially regarding

---

[22] FOIA | EXEMPTIONS & EXCLUSIONS. csosa.gov. Link: https://www.csosa.gov/foia-exemptions/.

enforcement actions and investigations into securities fraud, unless such disclosure would genuinely harm an ongoing investigation or violate privacy rights.

## 3. SEC Reforms for Increased Transparency

The Securities and Exchange Commission (SEC) plays a crucial role in maintaining fair, orderly, and efficient markets. To further this mission, we recommend the SEC adopt the following investor-friendly disclosure practices:

- **Enhanced Disclosure for Forward-Looking Statements**: Require companies to provide more detailed disclosures regarding the assumptions underlying their forward-looking statements, including a discussion of the scenarios in which these projections may not materialize.

- **Real-Time Disclosures**: Implement regulations that require real-time disclosure of significant corporate events and insider trades to mitigate information asymmetry between institutional and retail investors.

- **Transparency in Derivatives and Short Selling**: Introduce rules necessitating the disclosure of over-the-counter (OTC) derivatives positions and short-selling activities to provide a clearer picture of market dynamics and potential risks. This is especially necessary in the case of *Dodd-Frank* and the rules pertaining to home offices.

## 4. Creating a Retail Investor Advisory Committee

Establish a Retail Investor Advisory Committee within the SEC to ensure that the interests of retail investors are adequately represented in rule-making processes. This committee would provide recommendations on policies and practices to enhance retail investor protections and ensure their concerns are considered in regulatory decisions.

## COMBINATION OF FACTORS

The systemic manipulations within Wall Street, exacerbated by regulatory gaps, disproportionately harm retail investors by distorting market prices and eroding trust in market fairness. These challenges are compounded by the Private Securities Litigation Reform Act's high pleading standards, which require retail investors to present detailed fraud allegations prematurely, often before accessing crucial evidence through discovery.

This legal structure inherently favors well-resourced defendants, such as major financial institutions, who can better absorb litigation costs and navigate complex legal thresholds. Additionally, the financial industry's control over information results in a significant asymmetry, preventing retail investors from timely access to vital market data.

To rectify these disparities, it is crucial to advocate for legislative and regulatory reforms aimed at lowering barriers for securities fraud litigation and enhancing transparency in financial reporting and trading activities. Such reforms should simplify legal proceedings for retail investors and ensure financial disclosures are beneficial for all market participants.

Furthermore, there is a pressing need to reevaluate the philosophical and moral foundations of current market operations, which prioritize institutional profitability over individual investor protection and market fairness. This shift is essential for developing a financial ecosystem that values ethical considerations and equitable treatment for all participants, especially the most vulnerable.



## PHILOSOPHICAL ARGUMENT

Philosophically, one might also examine Wall Street's entitlement through the lens of moral reciprocity. The sector argues that its efforts—managing pensions, ensuring liquidity, underwriting risks—entail a reciprocal entitlement to certain liberties and rewards. However, this raises questions about the balance of such reciprocity. Is the value provided by Wall Street equitably reciprocated by the rewards and power it garners? Why does America give Wall Street " a pass?", in the age where former Presidents are prosecuted for accounting irregularities. The dissection might suggest an imbalance, where the entitlement felt by Wall Street does not always align with the societal benefits it delivers.

Drawing from Platonic ideals, justice entails that each part of society contributes to the common good in accordance with its nature and receives its due in return. Wall Street's sense of entitlement, then, can be philosophically critiqued through this prism: does it receive more than its due, distorting the harmonious structure of societal justice? The critique would argue that the sector's self-perceived role as the linchpin of economic stability may lead to an overestimation of its deservingness, overshadowing its actual contribution to the polis.

Nietzsche's concept of the 'will to power' can also provide a philosophical framework for understanding Wall Street's entitlement. This concept posits that fundamental to human behavior is not the will to survive, but the will to exert power. Wall Street, in this view, becomes a vivid tableau of this drive, where entitlement is seen as a natural expression of an inherent desire to dominate and expand one's sphere of influence. Thus, the entitlement is not an aberration but a fundamental characteristic of its very essence.

**<u>CONCLUSION</u>**

In conclusion, the Plaintiff's Memorandum of Law illuminates profound systemic disparities within the securities litigation framework under the PSLRA, underscoring how these standards predominantly shield corporate giants at the expense of retail investors. The stringent pleading requirements, coupled with the prohibitive cost of litigation and significant informational asymmetries, not only curtail the individual investor's capacity to seek redress but also perpetuate a cycle of financial inequality. This memorandum advocates for a recalibration of the PSLRA to better serve justice and protect individual investors, emphasizing the necessity for legislative and regulatory reforms to foster a more equitable legal landscape. Such changes are essential to ensure that the securities market remains a fair and just environment for all participants, particularly those who lack the resources of institutional players.

Respectfully submitted,

*/s/ A. P. Mathew*

A. P. Mathew, pro se

Waltham, MA