# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| A. MATHEW<br>    **PLAINTIFF**<br><br>-AGAINST-<br><br>CITIGROUP GLOBAL MARKETS, CITADEL SECURITIES LLC, FTX, ALAMEDA CAPITAL, ANTARA CAPITAL, NEW YORK STOCK EXCHANGE, SUSQUEHANNA INTERNATIONAL GROUP, MUDRICK CAPITAL, VIRTU FINANCIAL, FOX BUSINESS, NASDAQ, HYCROFT MINING HOLDING CORPORATION, GOLDMAN SACHS GROUP, AMC ENTERTAINMENT, DTCC, FINRA. NYSE, D.F. KING, B. RILEY, WEIL GOTSHAL AND MANGES, GRANT EISENHOFER, MIRIAM TAUBER LAW OFFICES, MARK RUBENSTEIN, DENNIS DONOGHUE, MOELIS AND CO., ABN AMRO, ESMA, EUROCLEAR, B3 BANCO, CM-EQUITY, INTERACTIVE BROKERS, APOLLO GLOBAL MANAGEMENT, MORGAN STANLEY, BARCLAYS, HSBC, J.P. MORGAN, ALLEGHENY COUNTY PENSION FUND, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, GRANT EISENHOFER, CIM INVESTMENT MANAGEMENT, BANK OF AMERICA/ MERRILL LYNCH, UNKNOWN DEFENDANTS<br><br>    **DEFENDANTS** | Civil Action<br>No. 1-23-CV-12302-FDS |

JURY TRIAL DEMANDED

**OPPOSITION TO MUDRICK CAPITAL'S MOTION FOR REASONABLE ATTORNEYS' FEES**

1

*Current SEC Investigation into Mudrick, AMC and HYMC*

The actions of Mudrick during the HYMC transaction were so egregious that it warranted an SEC investigation[1]. This is because the regulators saw exactly what the Plaintiff saw: An unusual transaction outside the norm, Murdick generating millions in earnings after being squeezed. According to "Disclosure Insight" article dated June 17th 2024, "records that show AMC Entertainment was involved in an undisclosed 2022-2023 SEC investigation into transactions between itself, Mudrick Capital, and Hycroft Mining (HYMC), that were atypical relative to the company's business and history."

It is obvious that the SEC read the Plaintiff's complaint in it is entirety and saw exactly what the Plaintiff saw, and then acted on it by initiating an investigation. As far as we know the investigation is still active and ongoing. The court must ask itself, why would the SEC expend its limited resources and investigate Mudrick Capital, AMC and Hycroft mining if the Plaintiffs did not plausibly allege? Most recently, to finalize the re-cooperation of Mudrick's losses, AMC conducted a debt for equity swap for nearly $100 million on July 22 2024.[2]

**CMBX**

As evidenced in the Second Amended Complaint, Jason Mudrick and analysts from Mudrick Capital, a hedge fund specializing in distressed investments, personally assessed all 39 malls included in the CMBX 6 Index to identify financially vulnerable malls. Mudrick executives, dressed casually, took notes and photographs in a clandestine manner. Jason Mudrick mentioned that mall security occasionally hassled them during this process. This

---

[1] https://probesreporter.com/news/di-report-sec-investigated-amc%E2%80%99s-transactions-mudrick-and-hycroft
[2] https://investor.amctheatres.com/sec-filings/all-sec-filings/content/0001104659-24-081458/tm2419663d2_424b7.htm

effort was the starting point for Mudrick Capital's strategy to short AMC into bankruptcy, leveraging AMC's inclusion in CMBX.

In June 2021, Trepp, a firm providing data and insights on structured finance, reported that AMC, Regal Cinemas, and Cinemark were the movie operators with the largest CMBS exposure. AMC had the highest exposure, with its theaters listed as top-five tenants behind 83 loans totaling $12.4 billion. Additionally, CMBX 6 included 28 loans with significant theater exposure, with AMC often being the largest tenant.

The strategy to depress AMC's stock is part of a broader "bust out" scheme by Apollo Global Management and Mudrick Capital. AMC's significant tenancy in CMBX 6 properties plays a crucial role in the financial health of these commercial spaces. Any downturn in AMC's operations could impact CMBS structures, allowing firms like Apollo and Mudrick to profit from property value declines. By shorting CMBS indices heavily exposed to AMC, these firms can acquire properties or their debt at reduced prices, positioning themselves for profitable restructuring. This strategy exacerbates AMC's financial stress, leading to a cycle where declining stock prices enable hedge funds to become landlords and raise rents, draining more capital from businesses like AMC. This calculated move leverages AMC's operational challenges during the pandemic to exploit foreseeable market vulnerabilities for significant financial gain, akin to a gambler betting against a weakened team knowing its hidden injuries.

*Mudrick buys Hycroft*

On January 13, 2020, MUDS entered into a purchase agreement with Hycroft Mining Corporation. This agreement was detailed in a Form S-4 "Registration Statement" filed with the SEC on February 14, 2020. It outlined a plan for a business combination in which Mudrick's Acquisition Subsidiary would acquire the equity interests of Hycroft's direct

3

subsidiaries, along with nearly all assets and liabilities, collectively termed the "Hycroft business."

Additionally, on October 4, 2019, a multi-tranche Sprott Credit Agreement was signed by the Seller and its subsidiaries, Sprott Private Resource Lending II (as lender), and Sprott Resource Lending Corp. (as arranger). This agreement allowed the Seller to incur up to $110 million in debt to facilitate the business combination. Concurrently, Mudrick and a Hycroft subsidiary agreed on the Sprott Royalty Agreement, which included a $30 million payment to the subsidiary and established a 1.5% net smelter royalty on the Hycroft mine, the primary asset in this business deal.

During the onset of the pandemic in 2020, AMC faced significant financial challenges, including substantial debt and high executive salaries. Jason Mudrick, founder and CIO of Mudrick Capital Management and an expert in distressed securities, was approached by his friend Adam Aron, CEO of AMC. Mudrick saw an opportunity to align this deal with his firm's investment strategy, which included synergies with CMBX (Commercial Mortgage-Backed Securities) and other short positions.

Mudrick's strategy involved purchasing AMC's debt and betting on the company's potential recovery while simultaneously taking short positions in AMC's stock through short selling and put options. This approach was aimed at profiting from both the potential decline in AMC's stock price due to anticipated shareholder dilution and the potential appreciation of AMC's bonds.

However, this strategy backfired when AMC became a target of retail investors on Reddit, leading to a short squeeze that caused a 10% reduction in Mudrick Capital's net worth. This event also resulted in significant financial losses for major institutions like Citigroup,

Morgan Stanley, Goldman Sachs, and Bank of America. The unexpected trading frenzy by Reddit users created a scarcity of available shares, complicating the process for these institutions and their hedge fund clients, such as Citadel Securities, to close their short positions

*Mudrick was squeezed*

On May 28th, 2021, as AMC's stock approached its 52-week high and neared $40, Jason Mudrick of Mudrick Capital faced significant risk from naked call options at $40 and considerable short positions in AMC. In response to the looming financial threat posed by these positions, Mudrick engaged in negotiations with AMC's CEO, Adam Aron, over the Memorial Day weekend. They agreed on a deal for Mudrick to purchase 8.5 million AMC shares at a premium, totaling $27.12 each.

This strategic move was designed to mitigate the risks associated with the naked calls and stabilize Mudrick's position in AMC. On June 1, 2021, AMC publicly announced this transaction through an SEC filing, stating that the shares were sold to Mudrick at $27.12 per share, resulting in proceeds of over $230.5 million for AMC. Shortly after acquiring these shares, Mudrick Capital learned of AMC's intent to issue an additional 11.5 million shares to raise more capital. Consequently, Mudrick sold all 8.5 million shares acquired over the weekend, realizing them as overvalued and capturing a significant profit. This quick turnaround in selling the shares was noted by Bloomberg as an unusual strategy in U.S. markets, typically indicative of a buyer intending to stabilize market perceptions, not for immediate resale.

However, on June 2nd, 2021, AMC's stock price soared, opening at $37.52 and peaking at $72.62 during the day before closing at $62.55. This dramatic increase led to what is known

as a "meme stock run," setting the highest price point for AMC during this period. Mudrick, still holding other short positions in AMC that were not covered by the sale of the newly acquired shares, found itself under severe financial pressure as these positions were forcefully squeezed due to the unexpected surge in AMC's stock price. Mudrick Capital was short squeezed so hard that it made several news outlets including the New York Post and the Wall Street Journal news. This was professionally embarrassing for Mudrick Capital and the company had to save face.

### *Mudrick Bailout*

In March 2022, amidst significant scrutiny, AMC's CEO Adam Aron made a contentious decision to invest $27.9 million in Hycroft Mining Holding Corporation (HYMC), influenced heavily by his personal ties with Jason Mudrick of Mudrick Capital. This investment appeared as a bailout for Mudrick, who was in financial distress due to previous market activities. The urgency of the situation led AMC's management to hastily visit a remote Nevada mine to evaluate the investment before finalizing the decision. The deal was rushed to take advantage of lower stock prices compliant with Nasdaq requirements, an ironic move considering AMC's recent history of near-bankruptcy saved only by a surge from retail investors.

Hycroft's troubling financials raised doubts about the soundness of the investment, with AMC's board member Sean Goodman needing persuasion to approve the deal, indicating a lack of solid fundamentals supporting the investment. On March 15, 2022, both AMC and Eric Sprott invested $27.9 million in Hycroft, preventing its bankruptcy. Adam Aron publicized this investment as a bold diversification move, highlighting Hycroft's supposed vast resources of

gold and silver. His announcement spurred many AMC shareholders to buy HYMC shares, boosting its price significantly.

Mudrick Capital, benefiting from derivatives on HYMC, gained financially from the increased stock price driven by Aron's promotion among AMC's investor base. This situation has sparked criticism over potential conflicts of interest and questioned the alignment of such decisions with the long-term interests of AMC shareholders. The rapid execution of this deal, underpinned by personal relationships rather than solid economic rationale, underscores concerns about corporate governance and ethical decision-making within AMC.

### *Rule 11(b)*

Plaintiffs' strongly contest the assertion that Rule 11(b) was violated. Despite the court's dismissal of the complaint, the allegations presented were plausible and grounded in facts that a reasonable person could believe had occurred.

### *Good faith, not conspiracy*

The complaint was not filed for any improper purposes. The PSLRA's intention is to curb frivolous lawsuits, but it also recognizes the importance of access to justice, especially for pro se litigants who may not have the resources to secure legal representation. The number of pages and evidence should not be labeled "conspiratorial" or an intent to harass. The Plaintiffs poured so much effort into the document, and to summarily call it "conspiratorial" is insulting. A lengthy and detailed complaint in a very complex litigation case should not be the discounting factor. Granted, when the court did not answer the request for furtherance of time, the Plaintiffs wrongfully assumed that it was the court's way of saying proceed.

What the court witnessed during these proceedings was what desperate everyday people do when Wall Street steals their life's savings. When they seek justice, they produce, improvise and come up with resources in order to fight for justice. Something foul happened with AMC stock which many defendants were a party to. The fact another judge from another state had written a letter, put his signature on it ought to tell you that this is true.

### *The "American Rule" and Fee-Shifting Statutes*

Both New Hampshire and Massachusetts adhere to the "American Rule," which generally requires each party to bear their own attorney's fees and expenses. Exceptions to this rule are limited to situations where:

1. An agreement provides for an award of fees;

2. A fee-shifting statute is applicable; or

3. A statute, rule of court, or case law imposes a sanction (usually in the form of fee shifting) against a litigant who has acted in bad faith, raised wholly frivolous claims, or engaged in conduct solely to drive up litigation costs for the other side (Gorelick v. Star Markets Company, Inc., 102 Mass. App. Ct. 219, 203 N.E.3d 610 (2023)).

The PSLRA includes provisions for awarding attorneys' fees when a complaint is found to violate Rule 11(b). However, in this case, the complaint filed by Mr. Mathew and Mr. Affholter was not frivolous or in bad faith. Anyone one who does extensive research at the level and depth that Mathew and Affholter did, should not even be considered in this category. The allegations were plausible and grounded in facts that a reasonable person could believe had occurred. Therefore, the exceptions to the "American Rule" should not apply here.

### *Economic Disparity*

Had Mr. Mathew and Mr. Affholter had the financial resources to afford a securities lawyer, they would not have proceeded pro se. Their limited finances, which came primarily from donations from other shareholders through YouTube, underscore their genuine belief in the merits of their case and their determination to seek justice despite financial constraints. The high cost of hiring a securities lawyer, which the court can plainly prohibitive for everyday people, further disadvantaged them in their pursuit of justice.

The justice system is meant to be a pillar of fairness and equity, accessible to all citizens regardless of their financial status. However, the reality is that the high costs associated with legal representation can make access to justice elusive for those who need it most. The issue of socioeconomic disparities in access to legal resources ought to be considered. Justice, which should be a fundamental right for every American, is often out of reach for individuals like Mr. Mathew and Mr. Affholter. Given the prohibitive cost of a securities lawyer, it should have been apparent to the defendant's counsel that the plaintiffs likely could not afford to pay such a substantial judgment.

Proceeding with this motion would consume valuable court resources and extend the litigation unnecessarily, which could be avoided by resolving the matter amicably. Additionally, granting such a motion would set a concerning precedent, potentially paving the way for other 41 defendants to seek similar fees, thereby discouraging pro se litigants from pursuing legitimate claims due to fear of financial ruin.

As the court is aware, Mr. Mathew is a disabled veteran in the early stages of kidney failure, and Mr. Affholter earns wages slightly under the poverty line. As of 8/1/2024, neither individual possesses material assets, wills, life insurance, house or title, savings or retirement funds. Therefore, they are financially incapable/infeasible of paying the $150,049 in fees that

Mudrick Capital, seeks. Given that Mudrick Capital is a billion-dollar entity, enforcing this fee would impose an undue and severe financial burden on the plaintiffs, who are already in precarious economic situations.

Pursuing such a substantial fee from financially disadvantaged individuals, including a disabled veteran, could generate negative publicity and damage Mudrick Capital's reputation. This action may be perceived as excessively harsh and disproportionate, especially given the vast financial disparity between the parties. Exercising discretion and compassion in this situation aligns with ethical practices and demonstrates Mudrick Capital's commitment to fairness and humanity.

Courts generally treat pro se litigants more leniently than attorneys, recognizing their lack of legal training. The courts also consider the significant difference in resources between pro se plaintiffs and well-funded defendants. Mr. Mathew and Mr. Affholter, despite being pro se, made earnest efforts to present their case based on their understanding of the law and the facts available to them. It would be unjust to impose substantial financial penalties on them for pursuing their legal rights, particularly when they acted in good faith. We ask the court to deny the motion and adjourn the matter in its entirety.

Dated: July 31, 2024

/s/ A.P. Mathew

CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2024 this document is being filed electronically using the Court's CM/ECF system, which will send notifications of this filing to all registered participants. A copy of the foregoing will also be sent via electronic mail to Plaintiffs.

/s/ A.P. Mathew